UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RIVERKEEPER, INC., NATURAL RESOURCES DEFENSE COUNCIL, WATERKEEPER ALLIANCE, INC., SOUNDKEEPER, INC., DELAWARE RIVERKEEPER NETWORK, AMERICAN LITTORAL SOCIETY, RARITAN BAYKEEPER, INC. d/b/a NY/NJ BAYKEEPER, SAVE THE BAY – PEOPLE FOR NARRAGANSETT BAY, FRIENDS OF CASCO BAY, SANTA MONICA BAYKEEPER, INC., SURFRIDER FOUNDATION, and MASSACHUSETTS PUBLIC INTEREST RESEARCH GROUP, INC. | Case No. 06 Civ. 12987 (PKC) ECF case |
| Plaintiffs, | **AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| vs. | |
| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and STEPHEN L. JOHNSON, in his official capacity as Administrator of the United States Environmental Protection Agency, | |
| Defendants. | |

Riverkeeper, Inc., Natural Resources Defense Council, Waterkeeper Alliance, Inc., Soundkeeper, Inc., Delaware Riverkeeper Network, American Littoral Society, Raritan Baykeeper, Inc. d/b/a NY/NJ Baykeeper, Save the Bay—People for Narragansett Bay, Friends of Casco Bay, Santa Monica Baykeeper, Inc., Surfrider Foundation, and Massachusetts Public Interest Research Group, Inc. (collectively, "Plaintiffs") hereby allege as follows:

## INTRODUCTION

1.       This is an action pursuant to section 505(a)(2) of the Federal Water Pollution Control Act ("CWA" or the "Act"), 33 U.S.C. § 1365(a)(2), to compel the United States Environmental Protection Agency and its administrator, Stephen L. Johnson, (collectively, "EPA" or "Defendants") to perform a nondiscretionary duty under section 316(b) of the Act. 33 U.S.C. § 1326(b).  In

violation of section 316(b), EPA failed to promulgate "Best Technology Available" regulations for cooling water intake structures at certain existing industrial facilities known as "Phase III" facilities.

2.    This action also seeks review under sections 706(2)(A) and 706(2)(C) of the Administrative Procedure Act, 5 U.S.C. §§ 706(2)(A), (C), of EPA's decision not to promulgate BTA regulations for existing Phase III facilities, because such decision was *ultra vires, i.e.,* inconsistent with, and in excess of, its statutory authority, as well as arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.

3.    Cooling water intake structures ("CWIS") are used by industrial facilities to withdraw water from natural water bodies for cooling.  They have enormous environmental impacts as the withdrawal of large volumes of water kills billions of fish and other biota and disrupts the biological integrity and natural balance of the aquatic ecosystem and environment. In particular, CWIS harm and kill aquatic life by entraining small organisms though the plants' heat exchangers and impinging larger fish and wildlife on intake screens.

4.    Congress was well aware of these impacts when it amended the CWA in 1972 and compelled EPA to regulate the location, design, construction and capacity of CWIS so as to minimize their adverse environmental impact.  *See* CWA § 316(b), 33 U.S.C. § 1326(b). Consequently, since 1972, EPA has been subject to a nondiscretionary duty to promulgate national regulations mandating the use of the Best Technology Available (BTA) for CWIS at industrial facilities.  The Act required EPA to promulgate such regulations for new facilities by January 18, 1974 and for existing facilities by July 1, 1977.

5.    EPA has failed to fully comply with Congress's order.  In 1993, Riverkeeper, Inc. and others sued EPA in this Court and, in 1995, obtained a consent decree requiring EPA to propose and take final action on BTA regulations by 2001.  Later, after EPA reported that it was unable to meet

the Court-ordered deadline, the consent decree was modified to allow the agency to implement section 316(b) in three phases.

6.     In 2001, twenty-seven years after the statutory deadline, EPA promulgated "Phase I" BTA regulations for new facilities.  In 2004, also twenty-seven years late, EPA promulgated "Phase II" BTA regulations for existing power plants that withdraw more than 50 million gallons per day.

7.     In 2004, EPA proposed "Phase III" BTA regulations for existing manufacturers in other industries, primarily manufacturers of pulp and paper, chemicals, petroleum and coal products, and primary metals.  Despite having proposed these regulations, EPA failed to promulgate BTA regulations for any existing Phase III facilities.  Specifically, on June 1, 2006, EPA took final action in which it decided not to promulgate BTA regulations for any existing Phase III facilities.

8.     EPA estimates that 629 existing Phase III facilities nationwide entrain and impinge 265 million "age-1 equivalent" fish, a metric which equates to approximately 26.5 billion to 265 billion individual organisms annually.  The Phase III regulations EPA proposed but failed to promulgate would have required reductions in entrainment of 60-90 percent and reductions in impingement of 80-95 percent.

9.     Plaintiffs seek a declaratory judgment that Defendants have a nondiscretionary duty to issue BTA regulations for Phase III facilities and an order requiring them to do so.  Plaintiffs further seek an order holding EPA's final decision not to promulgate BTA regulations for Phase III facilities to be arbitrary and capricious, and contrary to statutory authority, and therefore unlawful.

10.     Granting Plaintiffs the relief they request would effectuate the purposes of the Act and redress the injuries caused by EPA's failure to comply with section 316(b).

**JURISDICTION AND VENUE**

11.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (actions arising under the laws of the United States) and 33 U.S.C. § 1365(a)(2) (citizen suits against EPA).

12.    Venue is proper under 28 U.S.C. § 1391(e)(3) because Riverkeeper, Inc. has its principal place of business in this District.

**COMPLIANCE WITH NOTICE REQUIREMENT**

13.    Plaintiffs have satisfied the notice requirements of section 505(b)(2) of the Act, 33 U.S.C. § 1365(b)(2).  Specifically, on August 10, 2006, Plaintiffs Riverkeeper, Inc., Soundkeeper, Inc., Delaware Riverkeeper Network, American Littoral Society, Save The Bay—People For Narragansett Bay, Friends of Casco Bay, Raritan Baykeeper, Inc. d/b/a NY/NJ Baykeeper, and Santa Monica Baykeeper noticed Defendants, by certified mail, return receipt requested, of their intent to commence this action.  On October 26, 2006, Plaintiffs Natural Resources Defense Council, Waterkeeper Alliance, Inc., Surfrider Foundation, and Massachusetts Public Interest Research Group, Inc. noticed Defendants, by certified mail, return receipt requested, of their intent to commence this action.  A copy of each notice is attached as Exhibit A.  The Plaintiffs also sent a copies of each notice to Attorney General Alberto Gonzales, as required by 40 C.F.R. § 135.2(b).  More than sixty days have passed since Plaintiffs gave notice and the duty to issue regulations under section 316(b) has not been performed.

**THE PARTIES**

**The Plaintiffs**

14.    Riverkeeper, Inc. is a New York not-for-profit corporation dedicated to safeguarding the ecological, recreational, aesthetic, and commercial integrity of the Hudson River and its watershed and tributaries, as well as the watersheds that provide New York City with its drinking

water. Its members use these waters for a variety of purposes, including fishing, swimming, boating, wildlife observation and other recreation, and derive aesthetic enjoyment from their natural beauty. Riverkeeper's principal place of business is 828 South Broadway, Tarrytown, New York 10591.

15.     Natural Resources Defense Council is a not-for-profit environmental organization that uses law, science, and the support of its members to protect the planet's wildlife and wild places and to ensure a safe and healthy environment for all living things. Its members use coastal waters, bays, rivers, and lakes nationwide for a variety of purposes, including fishing, swimming, boating, wildlife observation and other recreation, and derive aesthetic enjoyment from its natural beauty. Natural Resource Defense Council's principal place of business is 40 West 20th Street, New York, NY 10011.

16.     Waterkeeper Alliance is a New York not-for-profit corporation that supports and connects Waterkeeper programs and provides a voice for waterways and their communities worldwide. Its members use waters, bays, rivers, and lakes around the world for a variety of purposes, including fishing, swimming, boating, wildlife observation and other recreation, and derive aesthetic enjoyment from its natural beauty. Waterkeeper Alliance's principal place of business is 50 S. Buckhout, Suite 302, Irvington , New York 10533.

17.     Soundkeeper, Inc. is a Connecticut not-for-profit corporation dedicated to the protection and enhancement of the biological, physical, and chemical integrity of Long Island Sound and its watershed. Its members use Long Island Sound and its watershed for a variety of purposes, including fishing, swimming, boating, wildlife observation and other recreation, and derive aesthetic enjoyment from its natural beauty. Soundkeeper's principal place of business is 7 Edgewater Place, East Norwalk, Connecticut 06855.

18.     Delaware Riverkeeper Network, an affiliate of the American Littoral Society, is an

advocacy organization committed to restoring the natural balance of the Delaware River, its tributaries and watershed where it has been lost and ensuring its preservation where it still exists. Delaware Riverkeeper Network's members use the Delaware River watershed for a variety of purposes, including fishing, swimming, boating, wildlife observation and other recreation, and derive aesthetic enjoyment from its natural beauty. Delaware Riverkeeper Network's principal place of business is 300 Pond Street, Second Floor, Bristol, Pennsylvania 19007.

19.    American Littoral Society, Inc. is a New Jersey not-for-profit corporation dedicated to the protection of the United States coastal environment. Its members use coastal waters, bays and rivers nationwide for many purposes, including fishing, swimming, boating, wildlife observation and other recreation, and derive aesthetic enjoyment from their natural beauty. The American Littoral Society's principal place of business is Sandy Hook, Highlands, New Jersey 07732.

20.    Raritan Baykeeper, Inc. d/b/a NY/NJ Baykeeper is a New Jersey not-for-profit corporation and a conservation and advocacy organization whose mission is to protect, preserve, and restore the Hudson-Raritan Estuary and its tributaries. Raritan Baykeeper's sole member is the American Littoral Society (ALS), which is also a plaintiff in this action. ALS's members use the harbor estuary for a variety of purposes, including fishing, swimming, boating, wildlife observation and other recreation, and derive aesthetic enjoyment from its natural beauty. Raritan Baykeeper's principal place of business is Sandy Hook, Highlands, New Jersey 07732.

21.    Save the Bay—People for Narragansett Bay is a Rhode Island not-for-profit corporation whose mission is to protect, preserve and restore the environmental condition of Narragansett Bay and its watershed. Its members use Narragansett Bay for a variety of purposes, including fishing, sailing, swimming, wildlife observation and derive aesthetic enjoyment from its natural beauty. Its principal place of business is 434 Smith Street, Providence, Rhode Island 02908.

22.     Friends of Casco Bay is a Maine not-for-profit corporation dedicated to protecting Casco Bay protecting and restoring Casco Bay, its associated ecosystems, and the plants and animals that depend on it from misuse and degradation. Friends of Casco Bay's members use Casco Bay for a variety of purposes, including fishing, swimming, boating, wildlife observation and other recreation, and derive aesthetic enjoyment from its natural beauty. Friends of Casco Bay's principal place of business is 2 Fort Road, South Portland, Maine 04106.

23.     Santa Monica Baykeeper is a California not-for-profit Corporation whose mission is to protect and restore the Santa Monica Bay, San Pedro Bay and adjacent waters. Santa Monica Baykeeper's members use these waters for a variety of purposes, including fishing, swimming, boating, wildlife observation and other recreation, and derive aesthetic enjoyment from their natural beauty. Santa Monica Baykeeper's principal place of business is P.O. Box 10096, Marina Del Rey, California 90295.

24.     Surfrider Foundation is a not-for-profit environmental organization dedicated to the protection and enjoyment of the world's oceans, waves, and beaches, for all people, through conservation, activism, research, and education, with particular concern for water quality and the protection of coastal ecology. The Surfrider Foundation's members use coastal waters for a variety of purposes, including fishing, swimming, boating, wildlife observation and other recreation, and derive aesthetic enjoyment from their natural beauty. Surfrider Foundation's principal place of business is P.O. Box 6010, San Clemente, CA 92674.

25.     Massachusetts Public Interest Research Group is a Massachusetts not-for-profit Corporation whose mission is to deliver persistent, result-oriented public interest activism that protects our environment, encourages a fair, sustainable economy, and fosters responsive, democratic government. Massachusetts Public Interest Research Group's members use state waters

for a variety of purposes, including fishing, swimming, boating, wildlife observation and other recreation, and derive aesthetic enjoyment from their natural beauty.  Massachusetts Public Interest Research Group's principal place of business is 44 Winter Street, 4th floor, Boston, MA 02108.

26.     Plaintiffs' members' interests in the use and enjoyment of their waterways and in the quality of the natural environment of these waters is adversely affected by EPA's failure to promulgate regulations governing cooling water intake structures as described herein.

27.     As a result of EPA's actions and inaction, the natural balance of the ecosystem has been and will be disturbed, the abundance of fish and wildlife has been and will be reduced, and the natural beauty of the waters has been and will be further diminished.

**The Defendants**

28.     Defendant United States Environmental Protection Agency, a federal agency of the United States, is charged with primary responsibility for implementing the CWA.

29.     Defendant Stephen L. Johnson is EPA's Administrator, and is sued in that official capacity.

## STATUTORY FRAMEWORK

30.     On October 18, 1972, Congress passed the Clean Water Act, Public Law 92-500, which is codified at 33 U.S.C. § 1251 *et seq*.  The Act established a comprehensive program to restore the chemical, physical and biological integrity of our nation's waters.  Foremost among the Act's stated goals were the protection of fish and wildlife and provision for recreation in and on our nation's waters.  Although Congress focused primarily on the discharge of pollutants, it also mandated regulation of the use of water from natural water bodies by heavy industry for cooling purposes.

31.     The Act defines pollution to include "the man-made or man-induced alteration of the .

. . biological . . . integrity of water." 33 U.S.C. § 1362(19).

32.     The Act prohibits all discharges of pollutants, including heat, to waters of the United States, except as permitted in a National Pollutant Discharge Elimination System (NPDES) permit issued pursuant to CWA section 402, 33 U.S.C. § 1342.  To govern the setting of NPDES permit limitations, the Act requires EPA to establish uniform national standards, based on the leading technology available to the industry classes or category as a whole.  NPDES permits, issued by state agencies or EPA's regional offices, transform these generally applicable effluent limitations and other standards into obligations borne by the individual facility.

33.     Accordingly, in the Act, Congress set forth a comprehensive plan for eliminating the discharge of pollutants and controlling intakes of water for cooling, and established a strict timetable for achieving its objectives.  In section 301, 33 U.S.C. § 1311, Congress ordered the EPA to establish effluent limitations for existing point sources by July 1, 1977.  In section 306, 33 U.S.C. § 1316, Congress ordered the EPA to promulgate regulations establishing national standards of performance for new point sources by January 18, 1974.

34.     Congress also required that the national technology-based standards become more stringent over time.  With the passage of time and the tightening of the standards, cost considerations were to be relegated to a more peripheral role in the selection of best technology.

35.     The Act has always prohibited EPA from basing its technology-based standards on formal cost-benefit analysis and, since 1989, it has prohibited EPA from considering cost in comparison with benefits.

36.     Section 316(b), 33 U.S.C. § 1326(b), states that any standard established pursuant to section 301 or section 306 of the Act "shall require that the location, design, construction and capacity of cooling water intake structures reflect the best technology available for minimizing

adverse environmental impact."

37.    Section 316(b) thus provides that the standards EPA establishes pursuant to sections 301 and 306 must require cooling water intake structures to reflect the best technology available for minimizing adverse environmental impact.

38.    Section 316(b) further requires EPA to establish national categorical technology-based regulations for intake structures, akin to those it establishes for discharges, based on the best performing technology that is feasible and economically achievable for the industry category as a whole.

39.    Section 316(b) also created a mandatory duty enforceable in this Court because the time limits in sections 301 and 306 govern EPA's duty to take action under section 316(b).

## FACTUAL BACKGROUND

40.    As EPA, states, and several courts have found, CWIS have enormous environmental impacts.

41.    The withdrawal of large volumes of water through CWIS kills billions of fish and other aquatic organisms by entraining them through plants' heat exchangers and impinging them on intake screens.  CWIS affect the full spectrum of organisms in the aquatic ecosystem at all life stages (*e.g.*, eggs, larvae, juvenile, adult) from tiny photosynthetic organisms (phytoplankton) to fish, shrimp, crabs, birds, and marine mammals, including threatened and endangered species.

42.    EPA estimated that, nationwide, 629 industrial facilities in the in the pulp and paper, chemicals, petroleum and coal products, primary metals industries industries, as well as smaller steam-electric generating facilities, collectively withdraw 40 billion gallons of cooling water per day.

43.    On average, a chemicals or metals manufacturing facility withdraws approximately

250 million gallons per day, while pulp and paper manufacturers and petroleum and coal refiners withdraw approximately 100 million gallons per day per facility.

44.    Collectively, these facilities entrain and impinge approximately 265 million "age-1 equivalent" fish each year.

45.    The "age-1 equivalent" metric translates into approximately 26.5 billion to 265 billion individual organisms killed by CWIS at these facilities.

46.    In the early 1970s, EPA began promulgating final regulations establishing effluent limitation guidelines and standards for existing sources, and standards of performance for new sources, pursuant to CWA sections 301 and 306.  *See, e.g.,* 39 Fed.  Reg. 16560 (May 9, 1974) (promulgating effluent limitation guidelines and standards for the petroleum refining point source category).

47.    EPA has promulgated effluent limitations guidelines and standards under sections 301 and 306 of the Act for more than 50 industries, including most of the industry categories that use cooling water intake structures (*e.g.*, steam electric power generation, iron and steel manufacturing, pulp and paper manufacturing, petroleum refining, and chemical manufacturing).  *See* 69 Fed. Reg. 68448 (Nov. 24, 2004).  These effluent limitation guidelines and standards are codified, as amended, in the Code of Federal Regulations at 40 C.F.R. Parts 405-471.

48.    On December 13, 1973, EPA published notice of proposed regulations governing cooling water intake structures at new and existing facilities pursuant to CWA section 316(b).  38 Fed. Reg. 34410 (Dec. 13, 1973).

49.    On April 16, 1976, EPA promulgated final regulations that were essentially identical to its proposed regulations.  41 Fed. Reg. 17387 (Apr. 16, 1976).

50.    The final, promulgated regulations were codified in the Code of Federal Regulations

at 40 C.F.R. §§ 402.10-402.12.

51.    Fifty-eight power companies challenged the regulations, arguing that EPA, in providing public notice of the proposed regulations, had failed to publish in the Federal Register a Development Document to which the regulations referred or to follow the mandatory procedure set forth in the Administrative Procedure Act for incorporating such a document by reference.

52.    On November 11, 1977, the United States Court of Appeals for the Fourth Circuit agreed and remanded the regulations to EPA.  *See Appalachian Power v. Train*, 566 F.2d 451 (4th Cir. 1977).

53.    On June 7, 1979, EPA withdrew the intake regulations.  44 Fed. Reg. 32956 (June 7, 1979).

54.    EPA neither reissued the regulations nor, until 2001, issued any other regulations pursuant to section 316(b) of the Act.

55.    In the absence of national BTA regulations under section 316(b), cooling water standards have been determined by permitting authorities, typically state agencies, exercising their "best professional judgment."

56.    The lack of national standards has allowed industrial facilities to avoid technology upgrades and to continue to use cooling water intake structures that kill fish and other aquatic organisms in large numbers.

57.    In 1993, frustrated with EPA's inaction and the resulting regulatory vacuum, Plaintiffs sued EPA in this Court to compel issuance of the regulations required by section 316(b). 93 Civ. 0314 (S.D.N.Y.).  In 1995, this Court entered a consent decree ordering EPA to take final action with respect to section 316(b) regulations by August 13, 2001.  *See Cronin v. Browner*, 898 F. Supp. 1052 (S.D.N.Y. 1995).

58.    In 2000, after EPA reported that it was unable to meet the Court-ordered deadline, the consent decree was amended to allow EPA to implement section 316(b) in three phases:   Phase I (regulations applicable to all new facilities - final action due November 9, 2001); Phase II (regulations applicable to large existing power plants - final action due February 16, 2004); Phase III (regulations applicable to, at a minimum, small existing power plants and existing manufacturers in the pulp and paper, chemicals, petroleum and coal products, and primary metals industries - final action due June 1, 2006).

**The Phase I Regulations**

59.    On August 10, 2000, pursuant to CWA section 316(b) and the consent decree, EPA published notice of proposed Phase I BTA regulations governing cooling water intake structures at new facilities.  65 Fed. Reg. 49060 (Aug. 10, 2000).

60.    On May 25, 2001, EPA published a Notice of Data Availability (NODA) to make available for public review new data and information obtained since proposal of the Phase I regulations.

61.    In the NODA, EPA stated that "[a]t proposal, EPA had not considered … cooling water use by offshore and coastal oil and gas extraction facilities. …  EPA is considering not including within the scope of this Phase I rule offshore and coastal oil and gas operations. Instead of addressing oil and gas operations as part of this rulemaking, EPA is considering addressing oil and gas operations as part of either the Phase II or Phase III rulemaking."  66 Fed. Reg. 28853, 28856 (May 25, 2001).

62.    On December 21, 2001, pursuant to CWA section 316(b) and the consent decree, EPA promulgated its final Phase I BTA regulations governing cooling water intake structures at all new facilities in all industries (except those in the offshore and coastal oil and gas extraction

industrial subcategories) with a design intake flow of greater than 2 million gallons of water per day, at least 25 percent of which is used for cooling.  66 Fed. Reg. 65256 (Dec. 21, 2001).

63.    In the preamble to its final Phase I regulations, EPA stated:  "In response to these industry comments, EPA will propose and take final action on regulations for new offshore and coastal oil and gas facilities, as defined at 40 C.F.R. 435.10 and 40 C.F.R. 435.40, in the Phase III section 316(b) rule."  *Id*. at 65311.

64.    The Phase I regulations, which were codified in the Code of Federal Regulations, require covered facilities, *inter alia*, to (a) reduce their "intake flow, at a minimum, to a level commensurate with that which can be attained by a closed-cycle recirculating cooling water system;" and (b) reduce their intake velocity to 0.5 feet per second.  *See* 40 C.F.R. § 125.80 *et seq*.

65.    EPA estimated that these BTA limitations would reduce entrainment and impingement at these facilities by approximately 96 percent.

66.    On February 3, 2004, the United States Court of Appeals for the Second Circuit upheld held the majority of the Phase I regulations while remanding a "restoration measures" provision, which would have allowed facilities to avoid installing BTA if they took other measures intended to compensate for biological losses in the ecosystem.  *See Riverkeeper, Inc. v. EPA*, 358 F.3d 174 (2d Cir. 2004) ("Riverkeeper I").

**The Phase II Regulations**

67.    On April 9, 2002, pursuant to CWA section 316(b) and the consent decree, EPA published notice of proposed Phase II BTA regulations governing cooling water intake structures at existing power plants that have a minimum design capacity of 50 million gallons per day.  67 Fed. Reg. 17122 (Apr. 9, 2002).

68.    On July 9, 2004, pursuant to CWA section 316(b) and the consent decree, EPA

promulgated its final Phase II BTA regulations.  69 Fed. Reg. 41576 (July 9, 2004).  The Phase II regulations, which were codified in the Code of Federal Regulations, require covered facilities to, *inter alia*, use available technologies to reduce entrainment by 60-90 percent and impingement by 80-95 percent.  *See* 40 C.F.R. § 125.90 *et seq.*

69.    They also included a "restoration measures" provision substantially identical to that remanded in Phase I, as well as other alternative compliance options and variances.

70.    Judicial review of the Phase II regulations is currently pending in the United States Court of Appeals for the Second Circuit. *Riverkeeper, Inc. v. EPA*, 2d Cir. No. 04-6692-ag(L) ("Riverkeeper II").  The case has been fully briefed and argued and the parties are awaiting a decision.

**EPA's Failure to Promulgate Phase III Regulations**

71.    On November 24, 2004, EPA published notice of proposed Phase III BTA regulations governing cooling water intake structures at: (1) all *existing* facilities with a design intake capacity above a certain threshold in all industries except those already regulated by the Phase II Rule; and (2) *new* facilities in the offshore and coastal oil and gas extraction industrial subcategory that EPA had excluded from the Phase I regulations so that EPA could gather additional data.  *See* proposed 40 C.F.R. § 125.101, published at 69 Fed. Reg. 68444, 68544-45 (Nov. 24, 2004).

72.    In the proposal, EPA proposed national categorical BTA regulations for Phase III existing facilities (including those in the pulp and paper, chemicals, petroleum and coal products, and primary metals industries) consistent with the national categorical BTA standards EPA had previously promulgated for Phase II facilities.

73.    Specifically, EPA stated that "[f]or covered existing facilities, today's proposed rule would establish performance standards for reducing . . . impingement mortality by 80 to 95 percent

and entrainment by 60 to 90 percent." 69 Fed. Reg. 68444 (Nov. 24, 2004).

74.    While EPA considered several regulatory thresholds, its primary regulatory option would have applied to 146 facilities in these industries, which collectively withdraw 31 billion gallons per day from waters of the United States.

75.    EPA stated that the proposed regulations were proposed to comply with section 316(b) and the consent decree and were "based on the best technology available to minimize the adverse environmental impact associated with the use of cooling water intake structures." *Id*.

76.    EPA found the proposed national requirements were based on technology that is both "technically available" and "economically practicable." *Id*. at 68449.

77.    In the proposal, EPA also proposed regulations for new facilities in the offshore and coastal oil and gas extraction industrial subcategory that EPA had excluded from the Phase I regulations.

78.    The proposed BTA standards for new offshore and coastal oil and gas extraction facilities were largely similar to the standards EPA had previously promulgated in the Phase I regulations for all other new facilities.

79.    EPA conducted a monetized cost-benefit analysis in which it failed to monetize the benefits of the vast majority of the aquatic organisms that would be protected by the regulations it proposed but failed to adopt.

80.    On June 1, 2006, despite EPA's nondiscretionary duty under section 316(b) to promulgate national categorical BTA standards for existing Phase III facilities and despite the existence of technically available and economically practicable (and economically achievable) technology to minimize adverse environmental impact at existing Phase III facilities, EPA took final action by deciding not to promulgate the proposed Phase III standards or any other national BTA

requirements under section 316(b) for existing Phase III facilities.

81.    Instead, EPA decided to promulgate BTA regulations only for the new offshore and coastal oil and gas extraction facilities that were deferred from Phase I.

82.    EPA has not promulgated section 316(b) regulations for any existing facilities other than the power plants covered by the Phase II regulations.

83.    On June 16, 2006, EPA published its Phase III decision in the Federal Register.

84.    Despite EPA's lack of statutory authority to base its BTA regulations on monetized cost-benefit analysis and its inability to monetize the environmental benefits, EPA stated its rationale as follows:  "EPA has decided not to promulgate a national categorical rule today for Phase III existing facilities . . . . EPA bases this decision on its judgment that the monetized costs associated with the primary option under consideration are wholly disproportionate to the monetized environmental benefits to be derived from that option."  71 Fed. Reg. 35016-17 (June 16, 2006).

85.    EPA estimated that the Phase III regulations it proposed but failed to adopt would have prevented the loss of as many of 98,200,000 "age-1 equivalent" fish and 4,770,000 pounds of fishery yields, annually.

86.    EPA also estimated that 44,500,000 of the "age-1 equivalent" fish losses as a result of its failure to regulate would be in the Mid-Atlantic region.

87.    Because age-1 equivalents are a metric that represents only 0.1 to 1 percent of the eggs and larvae actually entrained, a far larger number of organisms would have been protected by such regulations.

88.    As a result of EPA's failure to comply with section 316(b), and its unlawful action, CWIS at existing industrial facilities continue to damage the ecological integrity of our nation's waters, despite the availability of technology to prevent that degradation, in violation of the Act.

## FIRST CLAIM FOR RELIEF

**Failure to Promulgate Best Technology Available (BTA) Regulations;**
**Violation of Clean Water Act section 316(b), 33 U.S.C. 1326(b)**

89.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

90.    In failing to promulgate BTA regulations for CWIS at existing Phase III facilities as required by CWA section 316(b), 33 U.S.C. § 1326(b), EPA has failed to perform an act or duty under the Act which is not discretionary with the Administrator.

91.    Pursuant to section 505(a)(2) of the Act, 33 U.S.C. § 1365(a)(2), 28 U.S.C. §§ 2201 and 2202, and other appropriate authority, Plaintiffs are entitled to declaratory and injunctive relief to compel issuance of BTA regulations for CWIS at existing Phase III facilities.

## SECOND CLAIM FOR RELIEF

**Judicial Review of Agency Action in Excess of Statutory Authority;**
**Administrative Procedure Act 706(2)(C); 5 U.S.C. § 706(2)(C)**

92.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

93.    EPA's June 1, 2006 decision, published on June 16, 2006, not to promulgate BTA regulations for CWIS at existing Phase III facilities, and the basis for such decision, are inconsistent with, and in excess of, statutory authority and limitations under the Clean Water Act, and otherwise not in accordance with law, and are therefore unlawful.

94.    Pursuant to Sections 706(2)(C) & (A) of the Administrative Procedure Act, 5 U.S.C. §§ 706(2)(C) & (A), Plaintiffs are entitled a judgment finding unlawful and setting aside EPA's action, findings, and conclusions regarding its decision not to promulgate BTA regulations for CWIS at existing Phase III facilities.

## THIRD CLAIM FOR RELIEF

**Judicial Review of Arbitrary and Capricious Agency Action;**
**Administrative Procedure Act 706(2)(A); 5 U.S.C. § 706(2)(A)**

95.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

96.    EPA's June 1, 2006 decision, published on June 16, 2006, not to promulgate BTA regulations for CWIS at existing Phase III facilities, and the basis for such decision, are arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law, and are therefore unlawful.

97.    Pursuant to Section 706(2)(A) of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), Plaintiffs are entitled a judgment finding unlawful and setting aside EPA's action, findings, and conclusions regarding its decision not to promulgate BTA regulations for CWIS at existing Phase III facilities.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter a judgment and order as follows:

1.    Declaring that:  (a) Defendants have a nondiscretionary duty to promulgate valid and enforceable BTA regulations for existing Phase III facilities; (b) Defendants have failed to perform that duty; and (c) Defendants' decision not to promulgate BTA regulations for existing Phase III facilities was unlawful;

2.    Setting aside EPA's decision not to promulgate BTA regulations for existing Phase III facilities;

3.    Compelling Defendants to promulgate such regulations in accordance with a schedule to be established by the Court;

4.      Awarding Plaintiffs their litigation costs and reasonable attorneys' fees in this action;

5.      Retaining jurisdiction over this action until Defendants have issued such regulations

and any disputes relating to litigation costs and fees have been resolved; and

6.      Granting Plaintiffs such other and further relief as the Court deems just and proper.


Dated:  New York, New York              Respectfully submitted,
         January 17, 2007                MORNINGSIDE HEIGHTS LEGAL SERVICES, INC.

                                         By:  ____/s/__Reed Super_____
Of Counsel:                                   Reed W. Super (RS-3615)
P. Kent Correll, Esq. (PC-2609)               Edward Lloyd, Esq.
300 Park Avenue, 17th Floor                   Environmental Law Clinic
New York, NY 10022                            Columbia University School of Law
212-475-3070                                  435 West 116th Street
212-475-2378 (fax)                            New York, NY 10027
                                              212-854-3365
                                              212-854-3554 (fax)
                                         *Counsel for Plaintiffs Riverkeeper, Inc., Natural Resources
                                         Defense Council, Waterkeeper Alliance, Inc., Soundkeeper,
                                         Inc., Delaware Riverkeeper Network, American Littoral
                                         Society, Raritan Baykeeper, Inc. d/b/a NY/NJ Baykeeper, Save
                                         the Bay—People for Narragansett Bay, Friends of Casco Bay,
                                         Santa Monica Baykeeper, Inc., and Surfrider Foundation.*

                                              Joseph Mann
                                              National Environmental Law Center
                                              369 Broadway, Suite 200
                                              San Francisco, CA 94144
                                              415-622-0086, x306 (tel); 415-622-0016 (fax)
                                         *Counsel for Plaintiff Massachusetts Public Interest Research
                                         Group, Inc.*

                                              Charles Caldart
                                              National Environmental Law Center
                                              3240 Eastlake Avenue E., Suite 100
                                              Seattle, WA 98102
                                              206-568-2853 (tel);  206-568-2858 (fax)
                                         *Counsel for Plaintiff Massachusetts Public Interest Research
                                         Group, Inc.*

**EXHIBIT A**

# THE ENVIRONMENTAL LAW CLINIC
## MORNINGSIDE HEIGHTS LEGAL SERVICES, INC.
### COLUMBIA UNIVERSITY SCHOOL OF LAW
#### 435 WEST 116TH STREET • NEW YORK, NY 10027

TEL: 212-854-4376                                              FAX: 212-854-3554
ELLOYD@LAW.COLUMBIA.EDU

August 10, 2006

**By Certified Mail, Return Receipt Requested**

Stephen L. Johnson, Administrator
United States Environmental Protection Agency
Ariel Rios Building
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

> **Re:**  **Notice of Intent to Sue Concerning:  (1) EPA's Failure to
> Promulgate National Categorical BTA Standards for Cooling
> Water Intake Structures at Existing Phase III Facilities; and
> (2) EPA's Purported Exclusion of Certain New Facilities from
> the Phase I Cooling Water Intake Structure Rule.**

Dear Mr. Johnson:

By this letter, Riverkeeper, Inc., Soundkeeper, Inc., Delaware Riverkeeper
Network, American Littoral Society, Save The Bay—People For Narragansett Bay (a/k/a
Narragansett Baykeeper), Friends of Casco Bay (a/k/a Casco Baykeeper), Raritan
Baykeeper, Inc. (d/b/a NY/NJ Baykeeper), and Santa Monica Baykeeper (collectively,
"Riverkeeper")[1] provide notice, pursuant to section 505(a)(2) of the Clean Water Act (the
"Act"), 33 U.S.C. § 1365(a)(2), of their intent to sue you in your capacity as
Administrator of the United States Environmental Protection Agency ("EPA")
concerning:  (1) EPA's failure to promulgate national categorical best technology
available standards for cooling water intake structures at existing Phase III facilities; and
(2) EPA's failure to implement its own Phase I cooling water intake structure rule, 40
C.F.R. § 125.80 *et seq.*, to include all new facilities except those in the offshore and
coastal subcategories of the oil and gas extraction point source category.

As set forth below, promulgation of these Phase III standards and implementation
of the Phase I Rule were nondiscretionary duties of the EPA Administrator which you
failed to undertake.  Accordingly, if you do not take appropriate action to promulgate and
implement these standards and regulations within 60 days of service of this notice,

---

[1]  The organizations giving notice in this letter or their individual representatives
were plaintiffs in a nondiscretionary duty case filed in 1993 against EPA, *Riverkeeper,
Inc. v. Johnson*, 93 Civ. 0314 (S.D.N.Y.).

Stephen L. Johnson
August 10, 2006
Page 2 of 10

Riverkeeper intends to commence, pursuant to section 505(a)(2) and other appropriate authority, including but not limited to the Declaratory Judgment Act, 28 U.S.C. § 2201, one or more actions to compel you to do so.

## Background

Since the 1970s, EPA has been subject to a mandatory, enforceable duty to promulgate national regulations mandating the use of the best technology available (BTA) for cooling water intake structures (CWIS)[2] at industrial and commercial facilities. Specifically, section 316(b) states that "[a]ny standard established pursuant to [CWA §§ 301 or 306] and applicable to a point source ***shall require*** that the location, design, construction, and capacity of cooling water intake structures reflect the best technology available for minimizing adverse environmental impact."[3]   As the United States Court of Appeals for the Second Circuit has explained, this provision, which Congress enacted in 1972, "direct[s] the EPA to regulate ... 'cooling water intake structures' so as to 'minimize adverse environmental impact.'"[4]  Moreover, "section 316(b), as enacted, created a mandatory duty enforceable in the district court, because the time limits in sections 301 and 306 govern EPA's duty to take action under section 316(b)."[5]  Sections 301 and 306 required EPA to promulgate discharge standards for new facilities by January 18, 1974[6] and for existing facilities by July 1, 1977.[7]

EPA failed for many years to take required action to comply with section 316(b), until Riverkeeper sued and obtained a consent decree mandating such action in the United States District Court for the Southern District of New York.  Specifically, in 1977,

---

[2]  CWIS are structures used by industrial and commercial facilities to withdraw water for cooling.  EPA has defined the term as "the total physical structure and any associated constructed waterways used to withdraw cooling water from waters of the U.S."  40 CFR § 125.83.

[3]  Emphasis added.

[4]  *Riverkeeper, Inc. v. EPA*, 358 F.3d 174, 181 (2d Cir. 2004) ("*Riverkeeper I*").

[5]  *Cronin v. Browner*, 898 F. Supp. 1052, 1059 (S.D.N.Y. 1995).

[6]  CWA §§ 306(b)(1)(A), (B) (requiring new source performance standards no later than one year and ninety days after October 18, 1972).

[7]  CWA § 301(b)(1)(A), (B); *see also Riverkeeper*, 358 F.3d at 185-86 ("When the EPA 'established' new source performance discharge 'standard[s]' 'pursuant to section . . . 306,' it ought *then* to have regulated new intake structures because, by virtue of section 316(b), section 306's standards 'shall require that . . . cooling water intake structures reflect the best technology available.") (emphasis in original).

Stephen L. Johnson
August 10, 2006
Page 3 of 10

EPA's first attempt at section 316(b) regulations was remanded by the Fourth Circuit due to procedural defects.[8] EPA subsequently withdrew the regulation and for more than two decades failed to propose any new cooling water intake regulations. In the absence of national regulations, cooling water standards have been relegated to *ad hoc* and typically ineffective determination by individual permit writers exercising "best professional judgment" on a case-by-case basis.[9] In 1993, frustrated with EPA's inaction and the resulting regulatory vacuum, Riverkeeper sued EPA in federal district court to compel issuance of the regulations required by section 316(b).[10] In 1995, it obtained a consent decree ordering EPA to take final action with respect to section 316(b) regulations by August 13, 2001. Later, after EPA reported that it was unable to meet the Court-ordered deadline, the consent decree was modified[11] to allow the Agency to implement section 316(b) in three phases: Phase I (regulations applicable to all new facilities - final action due November 9, 2001); Phase II (regulations applicable to large existing power plants – final action due February 16, 2004); Phase III (regulations applicable to, at a minimum, small existing power plants and existing manufacturers in the pulp and paper, chemicals, petroleum and coal products, and primary metals industries – final action due June 1, 2006).[12]

Despite having taken some action to comply with the consent decree, EPA has nevertheless failed to comply with its mandatory duties under the Clean Water Act and

---

[8] *Appalachian Power Co. v. Train,* 566 F.2d 451, 458-59 (4th Cir. 1977).

[9] *See* CWA § 402(a)(1)(B), 33 U.S.C. § 1342(a)(1)(B) (prior to national regulations, permits are case-by-case). But "once the EPA promulgates applicable standards, regulation of those facilities subject to those standards on a best professional judgment basis must cease, *Natural Res. Def. Counsel v. EPA, 859 F.2d at 200.*" *Riverkeeper I,* 358 F.3d at 203.

[10] That case, originally titled *Cronin v. Reilly,* is currently *Riverkeeper, Inc. v. Johnson,* 93 Civ. 0314 (S.D.N.Y.). The case name has been amended several times.

[11] *Cronin v Browner,* 90 F.Supp.2d 364, 368 (2000). Although the court found that EPA's "explanations for its previous delays do not justify modification of the Consent Decree," it extended the deadlines on the ground that "the public interest does require that the Decree be modified to enable EPA to produce a sound regulation." *Id.* at 372.

[12] *See* Amended Consent Decree (entered Nov. 22, 2000) and Second Amended Consent Decree (entered Nov. 27, 2002) in case 93 Civ. 0314 (S.D.N.Y.). *See also Riverkeeper, Inc. v. Whitman,* 32 Envtl. L. Rep. 20,382, 2001 WL 1505497, at *1 (S.D.N.Y. Nov. 27, 2001) (discussing the three phases of rulemaking).

Stephen L. Johnson
August 10, 2006
Page 4 of 10

other obligations with respect to CWIS, as explained more fully below in Parts I and II of this letter. The actions EPA has taken are as follows.

First, EPA promulgated a Phase I Rule,[13] which applies to all new facilities except those in the offshore and coastal oil and gas extraction industrial subcategory.[14] Although EPA typically establishes Clean Water Act regulations on an industry-by-industry basis, EPA chose "to implement section 316(b) by issuing one overarching regulation that would apply to **_all categories_** of point source subject to sections 301 and 306 that utilize cooling water intake structures."[15]

Second, EPA promulgated a Phase II Rule,[16] which applies to all existing power plants with a design intake flow of at least 50 million gallons per day (mgd).[17]

Third, EPA proposed a Phase III Rule that covered: (1) all existing facilities that use a CWIS with a design intake capacity above a certain threshold in all industries except those already regulated by the Phase II Rule;[18] and (2) new facilities in the offshore and coastal oil and gas extraction industrial subcategory that EPA had excluded from the Phase I Rule. [19] However, on June 16, 2006, although EPA published in the Federal Register a document it entitled "National Pollutant Discharge Elimination System – Final Regulations to Establish Requirements for Cooling Water Intake Structures at Phase III Facilities," those regulations did not establish any national categorical BTA

---

[13]   Published at 66 Fed. Reg. 65,256 – 65,345 (December 18, 2001); codified at 40 CFR § 125.80 *et seq*.

[14]   40 CFR § 125.81; *see also Riverkeeper I*, 358 F.3d at 181 & n.4 "[t]he Rule applies to *all new facilities* … [e]xcept for certain offshore oil and gas facilities." (emphasis added). The Second Circuit "remand[ed] one aspect of the [Phase I] regulation that contradicts Congress's clearly expressed intent." *Riverkeeper I,* 358 F.3d at 181.

[15]   *Cronin*, 898 F. Supp. at 1060 (emphasis added); *see also Riverkeeper I*, 358 F.3d at 186 n.14 (noting that the parties agree that "EPA may promulgate one overarching regulation applicable to all new cooling water intake structures.").

[16]   Published at 69 Fed. Reg. 41,576 – 41,693 (July 9, 2004); codified at 40 CFR § 125.90 *et seq*.

[17]   40 CFR § 125.91. The Phase II Rule is being reviewed by the Second Circuit in a pending case, Docket No. 04-6692-ag(L).

[18]   *See* [proposed] 40 CFR § 125.101, published at 69 Fed. Reg. 68,444, 68544 (Nov. 24, 2004).

[19]   *See* [proposed] 40 CFR § 125.130 *et seq.*, published at 69 Fed. Reg. at 68560 *et seq*.

Stephen L. Johnson
August 10, 2006
Page 5 of 10

requirements whatsoever for any existing facilities, leaving such facilities to be regulated only on a case-by-case, best professional judgment basis.[20] In addition, although the Phase I Rule explicitly applied to all new facilities except offshore and coastal oil and gas extraction facilities[21] and EPA stated in the preamble to the final Phase III Rule that "[t]his rule does not alter the regulatory requirements for facilities subject to the Phase I or Phase II regulations," the Phase III Rule purports that the Phase I Rule does not apply to new "seafood processing vessels or offshore liquefied natural gas import terminals."[22]

## I. EPA'S FAILURE TO PROMULGATE NATIONAL CATEGORICAL BTA STANDARDS FOR COOLING WATER INTAKE STRUCTURES AT EXISTING PHASE III FACILITIES.

Section 316(b) of the Act, 33 U.S.C. § 1326(b), requires the EPA Administrator to promulgate regulations establishing national categorical BTA standards for CWIS that withdraw water from the Nation's waterbodies. On October 10, 1995, the United States District Court for the Southern District of New York entered a consent decree that required EPA to propose regulations implementing Clean Water Act section 316(b) no later than July 2, 1999 and to take final action with respect to such regulations no later than August 13, 2001.

In an amended consent decree entered on November 22, 2000, the section 316(b) rulemaking was trifurcated into three phases. The amended consent decree defined "Phase III Regulations" to mean "regulations implementing section 316(b) of the [Clean Water] Act … [and] applicable to, at a minimum, existing facilities in the following categories that employ a cooling water intake structure, and whose intake flow levels exceed a minimum threshold to be determined by EPA during the Phase III rulemaking process: (i) utility and non-utility power producers not covered by the Phase II Regulations; (ii) pulp and paper manufacturing facilities; (iii) chemical and allied products manufacturing facilities; (iv) petroleum and coal products manufacturing facilities; and (v) primary metals facilities."[23]

The Amended Consent Decree required EPA to propose Phase III regulations by June 15, 2003, and to take final action with respect to such regulations by December 15,

---

[20] 71 Fed. Reg. 35006 (June 16, 2006).

[21] *See* footnote 14 above.

[22] 40 CFR § 125.131(d).

[23] Amended Consent Decree at § 1.f.iii; Second Amended Consent Decree at § 1.f.iii.

Stephen L. Johnson
August 10, 2006
Page 6 of 10

2004. These deadlines were extended in the Second Amended Consent Decree to
November 1, 2004 and June 1, 2006, respectively.

On November 1, 2004, the EPA Administrator proposed regulations establishing
requirements under section 316(b) for Phase III facilities.[24]  In the proposed Phase III
Rule, EPA proposed three possible intake flow thresholds:  50 mgd, 100 mgd, or 200
mgd.[25]  All existing facilities with CWIS whose design intake flow exceed the threshold
would be subject to the regulations, specifically including "any [existing] manufacturing
or industrial facility."[26]  Among the industrial categories that EPA explicitly proposed to
regulate were "Chemicals & Allied Products, Primary Metals Industries, Petroleum &
Coal Products, and Paper & Allied Products."[27]

In its proposed Phase III rule, EPA proposed national categorical BTA standards
for these existing facilities consistent with the national categorical BTA standards it had
previously promulgated for Phase II facilities.[28]  In particular, EPA's November 1, 2004
proposal stated that "[f]or covered existing facilities, today's proposed rule would
establish performance standards for reducing impingement mortality by 80 to 95 percent,
or impingement mortality by 80 to 95 percent and entrainment by 60 to 90 percent."[29]
EPA further stated such regulations were proposed to comply with section 316(b) and the
consent decree and were "based on the best technology available to minimize the adverse
environmental impact associated with the use of cooling water intake structures."[30]
Further, EPA found the proposed national requirements were based on technology that is

---

[24]  The proposed regulations were published on November 24, 2004.  69 Fed. Reg.
68,444 (Nov. 24, 2004).

[25]  *Id.* at 68,445.

[26]  *Id.*

[27]  *Id.* at 68,547.  These were the same industries, along with power producers, that
the consent decree included, at a minimum, within the definition of Phase III regulations.
*See* footnote 23 above.  In addition, in the proposed Phase III Rule, EPA listed other
industries also covered by the proposed regulations and further stated: "This exhibit is not
intended to be exhaustive, but rather provides a guide for readers regarding entities that
may be regulated by this action if they satisfy the final flow threshold and waterbody type
criteria. ... To determine whether your facility is regulated by this action, you should
carefully examine the applicability criteria in § 125.101 and § 125.131 of this proposal."
69 Fed. Reg. at 68,446.

[28]  *Id.* at 68,444.

[29]  *Id.*

[30]  *Id.*

Stephen L. Johnson
August 10, 2006
Page 7 of 10

both "technically available" and "economically practicable."[31]

However, on June 16, 2006, despite the EPA Administrator's nondiscretionary duty under section 316(b) to promulgate national categorical BTA standards for existing Phase III facilities, and despite the existence of technically available and economically practicable (and economically achievable) technology to minimize adverse environmental impact at Phase III facilities as required by section 316(b), EPA failed to adopt the proposed Phase III standards or any other national BTA requirements under section 316(b) for existing Phase III facilities. Your failure to promulgate such standards is a failure "to perform an[ ] act or duty under this chapter which is not discretionary with the Administrator," 33 U.S.C. § 1365(a)(2), and thus constitutes a basis for Riverkeeper to commence an action against you after providing the notice contained in this letter.[32]

## II.    EPA'S EXCLUSION OF CERTAIN NEW FACILITIES OTHER THAN THOSE IN THE OFFSHORE AND COASTAL SUBCATEGORIES OF THE OIL AND GAS EXTRACTION POINT SOURCE CATEGORY FROM THE PHASE I COOLING WATER INTAKE STRUCTURE RULE.

On December 18, 2001, EPA published its final Phase I Rule establishing national categorical BTA requirements that apply to all new facilities (*i.e.*, those constructed after January 17, 2002) that withdraw more than 2 mgd and use at least 25 percent of that water for cooling, except facilities in the offshore and coastal subcategories of the oil and gas extraction point source category as defined under 40 CFR § 435.10 and 40 § CFR 435.40.[33]

However EPA has on several subsequent occasions made statements plainly inconsistent with, and has failed to implement, the unequivocal applicability language in its own final, promulgated Phase I Rule. For example, on June 16, 2006 EPA stated in its final Phase III Rule that the Phase I Rule does not apply to new "seafood processing

---

[31] *Id.* at 68,449. Riverkeeper contends that the economic test for BTA regulations under section 316(b) is economic achievability, not economic practicability; but that distinction is immaterial here.

[32] Riverkeeper believes that EPA's decision not to promulgate national categorical BTA regulations for Phase III facilities is also legally deficient because it is not statutorily-authorized, violates the plain meaning of the Clean Water Act and Congress's clearly expressed intent, is arbitrary, capricious, not supported by substantial evidence in the record, and is otherwise not in accordance with law.

[33] 40 CFR § 125.81; *see also Riverkeeper I*, 358 F.3d at 181 & n.4; *see also* footnote 14 above.

vessels or offshore liquefied natural gas import terminals."[34]  Likewise, EPA has, both before and after promulgation of the Phase III Rule, made other statements purporting to reinterpret the unequivocal applicability language of the Phase I Rule so as to exclude new facilities in industries plainly covered by the Phase I Rule.[35]

Consequently, Riverkeeper is entitled to a declaratory judgment under 28 U.S.C. § 2201 and other appropriate authority that: (1) the Phase I Rule applies to all facilities constructed after January 17, 2002 that withdraw more than 2 million gallons per day from waters of the U.S. and use at least 25 percent of that water for cooling, except facilities in the offshore and coastal subcategories of the oil and gas extraction point source category as defined under 40 CFR § 435.10 and 40 CFR § 435.4; and (2) seafood processing vessels and offshore liquefied natural gas import terminals are not within the offshore and coastal subcategories of the oil and gas extraction point source category as defined under 40 CFR § 435.10 and 40 CFR § 435.4.

While there is no notice letter requirement for actions under the Declaratory Judgment Act, Riverkeeper is giving notice of its intent to sue for this violation of law in this letter because of the interrelated factual basis for the claims and in an attempt to resolve these matters short of litigation.  In addition, EPA's failure to regulate new seafood processing vessels or new offshore liquefied natural gas import terminals under the Phase I Rule and EPA's actions in attempting to exempt those facilities constitute failures to perform an act or duty under section 316(b) of the Clean Water Act which is not discretionary with the Administrator and thus constitutes a basis for Riverkeeper to commence an action under 33 U.S.C. § 1365(a)(2) against you after providing the notice contained in this letter.

During the 60-day notice period, representatives of Riverkeeper are available to discuss this matter with you or members of your staff to see if it can be resolved.  Please do not hesitate to contact Reed Super at (212) 854-3365 or the mailing address listed on this letterhead if you wish to do so.  If such discussions do not occur or are unsuccessful, or if you and EPA otherwise fail to take action sufficient to meet the legal obligations set out above, Riverkeeper intends to file one or more suits after conclusion of the notice period.

---

[34] *See* 40 CFR § 125.131(d), published at 71 Fed. Reg. at 35,041.  EPA admits that it did not amend the Phase I Rule in its Phase III rulemaking: "[t]his rule does not alter the regulatory requirements for facilities subject to the Phase I or Phase II regulations." 71 Fed. Reg. at 35,006.

[35] *See, e.g.,* memo from Mary Smith and Linda Boornazian of EPA, dated April 22, 2004, and *EPA's Liquefied Natural Gas Regulatory Roadmap*, dated July 2006.

Stephen L. Johnson
August 10, 2006
Page 9 of 10

Pursuant to 40 CFR § 135.3(b), the full name, address, and telephone number of the persons giving notice are as follows:

Riverkeeper, Inc.
Attn: Alex Matthiessen,
 Hudson Riverkeeper & President
828 S. Broadway
Tarrytown, NY 10591
914.478.4501

Soundkeeper, Inc.
Attn: Terry Backer,
 L.I. Soundkeeper & Exec. Dir.
P.O. Box 4058
East Norwalk, CT 06855
203.854.5330

Delaware Riverkeeper Network
Attn: Maya van Rossum,
 Delaware Riverkeeper
P.O. Box 326
Washington Crossing, PA 18977
215.369.1188

Save The Bay—People For
Narragansett Bay (a/k/a
Narragansett Baykeeper)
Attn: John Torgan,
 Narragansett Baykeeper
434 Smith Street
Providence, RI 02906
401.272.3540

Raritan Baykeeper, Inc.
(d/b/a NY/NJ Baykeeper)
Attn: Andrew Willner,
 NY/NJ Baykeeper & Exec. Dir.
52 West Front Street
Keyport, NJ 07735
732.888.9870

Friends of Casco Bay
 (a/k/a Casco Baykeeper)
Attn: Joe Payne,
 Casco Baykeeper
2 Fort Road
South Portland, ME 04106
207.799.8574

Santa Monica Baykeeper
Attn: Tracy Egoscue,
 Santa Monica Baykeeper
P.O. Box 10096
Marina del Rey, CA 90295
310.305.9645

American Littoral Society
Attn: Tim Dillingham,
 Executive Director
Sandy Hook
Highlands, NJ 07732
732-291-0055

Sincerely,
MORNINGSIDE HEIGHTS LEGAL SERVICES, INC.

By _____

    Edward Lloyd
    Reed W. Super
    Legal Counsel for Notifiers

    Of counsel:

    P. Kent Correll, Esq.
    300 Park Avenue, 17th Floor
    New York, New York 10022
    212-475-3070
    212-475-2378 (fax)
    Legal Counsel for Notifiers

Stephen L. Johnson
August 10, 2006
Page 10 of 10

cc (by certified mail, return receipt requested):

     The Hon. Alberto Gonzalez
     Attorney General of the United States
     United States Department of Justice
     950 Pennsylvania Avenue, N.W.
     Washington, District of Columbia 20530-0001

# THE ENVIRONMENTAL LAW CLINIC
## MORNINGSIDE HEIGHTS LEGAL SERVICES, INC.
## COLUMBIA UNIVERSITY SCHOOL OF LAW
### 435 WEST 116TH STREET • NEW YORK, NY 10027

TEL: 212-854-4376                                          FAX: 212-854-3554
ELLOYD@LAW.COLUMBIA.EDU

October 26, 2006

**By Certified Mail, Return Receipt Requested**

Stephen L. Johnson, Administrator
United States Environmental Protection Agency
Ariel Rios Building
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

> Re:  **Notice of Intent to Sue Concerning:  (1) EPA's Failure to
> Promulgate National Categorical BTA Standards for Cooling
> Water Intake Structures at Existing Phase III Facilities; and
> (2) EPA's Purported Exclusion of Certain New Facilities from
> the Phase I Cooling Water Intake Structure Rule.**

Dear Mr. Johnson:

By this letter, Natural Resources Defense Council, Waterkeeper Alliance, Inc.,
Surfrider Foundation, and Massachusetts Public Interest Research Group, Inc.
(collectively, "Notifiers") provide notice, pursuant to section 505(a)(2) of the Clean
Water Act (the "Act"), 33 U.S.C. § 1365(a)(2), of their intent to sue you in your capacity
as Administrator of the United States Environmental Protection Agency ("EPA")
concerning:  (1) EPA's failure to promulgate national categorical best technology
available standards for cooling water intake structures at existing Phase III facilities; and
(2) EPA's failure to implement its own Phase I cooling water intake structure rule, 40
C.F.R. § 125.80 *et seq.*, to include all new facilities except those in the offshore and
coastal subcategories of the oil and gas extraction point source category.

As set forth below, promulgation of these Phase III standards and implementation
of the Phase I Rule were nondiscretionary duties of the EPA Administrator which you
failed to undertake.  Accordingly, if you do not take appropriate action to promulgate and
implement these standards and regulations within 60 days of service of this notice,
Riverkeeper intends to commence, pursuant to section 505(a)(2) and other appropriate
authority, including but not limited to the Declaratory Judgment Act, 28 U.S.C. § 2201,
one or more actions to compel you to do so.

Stephen L. Johnson
October 26, 2006
Page 2 of 10

## **Background**

      Since the 1970s, EPA has been subject to a mandatory, enforceable duty to promulgate national regulations mandating the use of the best technology available (BTA) for cooling water intake structures (CWIS)[1] at industrial and commercial facilities. Specifically, section 316(b) states that "[a]ny standard established pursuant to [CWA §§ 301 or 306] and applicable to a point source ***shall require*** that the location, design, construction, and capacity of cooling water intake structures reflect the best technology available for minimizing adverse environmental impact."[2]  As the United States Court of Appeals for the Second Circuit has explained, this provision, which Congress enacted in 1972, "direct[s] the EPA to regulate … 'cooling water intake structures' so as to 'minimize adverse environmental impact.'"[3]  Moreover, "section 316(b), as enacted, created a mandatory duty enforceable in the district court, because the time limits in sections 301 and 306 govern EPA's duty to take action under section 316(b)."[4]  Sections 301 and 306 required EPA to promulgate discharge standards for new facilities by January 18, 1974[5] and for existing facilities by July 1, 1977.[6]

      EPA failed for many years to take required action to comply with section 316(b), until environmental groups led by Riverkeeper, Inc. sued and obtained a consent decree mandating such action in the United States District Court for the Southern District of New York.  Specifically, in 1977, EPA's first attempt at section 316(b) regulations was remanded by the Fourth Circuit due to procedural defects.[7]  EPA subsequently withdrew

---

    [1]  CWIS are structures used by industrial and commercial facilities to withdraw water for cooling.  EPA has defined the term as "the total physical structure and any associated constructed waterways used to withdraw cooling water from waters of the U.S." 40 CFR § 125.83.

    [2]  Emphasis added.

    [3]  *Riverkeeper, Inc. v. EPA*, 358 F.3d 174, 181 (2d Cir. 2004) ("*Riverkeeper I*").

    [4]  *Cronin v. Browner*, 898 F. Supp. 1052, 1059 (S.D.N.Y. 1995).

    [5]  CWA §§ 306(b)(1)(A), (B) (requiring new source performance standards no later than one year and ninety days after October 18, 1972).

    [6]  CWA § 301(b)(1)(A), (B); *see also Riverkeeper*, 358 F.3d at 185-86 ("When the EPA 'established' new source performance discharge 'standard[s]' 'pursuant to section . . . 306,' it ought *then* to have regulated new intake structures because, by virtue of section 316(b), section 306's standards 'shall require that . . . cooling water intake structures reflect the best technology available.") (emphasis in original).

    [7]  *Appalachian Power Co. v. Train,* 566 F.2d 451, 458-59 (4th Cir. 1977).

Stephen L. Johnson
October 26, 2006
Page 3 of 10

the regulation and for more than two decades failed to propose any new cooling water intake regulations. In the absence of national regulations, cooling water standards have been relegated to *ad hoc* and typically ineffective determination by individual permit writers exercising "best professional judgment" on a case-by-case basis.[8] In 1993, frustrated with EPA's inaction and the resulting regulatory vacuum, Riverkeeper and others sued EPA in federal district court to compel issuance of the regulations required by section 316(b).[9] In 1995, they obtained a consent decree ordering EPA to take final action with respect to section 316(b) regulations by August 13, 2001. Later, after EPA reported that it was unable to meet the Court-ordered deadline, the consent decree was modified[10] to allow the Agency to implement section 316(b) in three phases: Phase I (regulations applicable to all new facilities - final action due November 9, 2001); Phase II (regulations applicable to large existing power plants – final action due February 16, 2004); Phase III (regulations applicable to, at a minimum, small existing power plants and existing manufacturers in the pulp and paper, chemicals, petroleum and coal products, and primary metals industries – final action due June 1, 2006).[11]

Despite having taken some action to comply with the consent decree, EPA has nevertheless failed to comply with its mandatory duties under the Clean Water Act and other obligations with respect to CWIS, as explained more fully below in Parts I and II of this letter. The actions EPA has taken are as follows.

---

[8] *See* CWA § 402(a)(1)(B), 33 U.S.C. § 1342(a)(1)(B) (prior to national regulations, permits are case-by-case). But "once the EPA promulgates applicable standards, regulation of those facilities subject to those standards on a best professional judgment basis must cease, *Natural Res. Def. Counsel v. EPA, 859 F.2d at 200.*" *Riverkeeper I*, 358 F.3d at 203.

[9] That case, originally titled *Cronin v. Reilly*, is currently *Riverkeeper, Inc. v. Johnson,* 93 Civ. 0314 (S.D.N.Y.). The case name has been amended several times.

[10] *Cronin v Browner*, 90 F.Supp.2d 364, 368 (2000). Although the court found that EPA's "explanations for its previous delays do not justify modification of the Consent Decree," it extended the deadlines on the ground that "the public interest does require that the Decree be modified to enable EPA to produce a sound regulation." *Id.* at 372.

[11] *See* Amended Consent Decree (entered Nov. 22, 2000) and Second Amended Consent Decree (entered Nov. 27, 2002) in case 93 Civ. 0314 (S.D.N.Y.). *See also Riverkeeper, Inc. v. Whitman,* 32 Envtl. L. Rep. 20,382, 2001 WL 1505497, at *1 (S.D.N.Y. Nov. 27, 2001) (discussing the three phases of rulemaking).

Stephen L. Johnson
October 26, 2006
Page 4 of 10

First, EPA promulgated a Phase I Rule,[12] which applies to all new facilities except those in the offshore and coastal oil and gas extraction industrial subcategory.[13] Although EPA typically establishes Clean Water Act regulations on an industry-by-industry basis, EPA chose "to implement section 316(b) by issuing one overarching regulation that would apply to *all categories* of point source subject to sections 301 and 306 that utilize cooling water intake structures."[14]

Second, EPA promulgated a Phase II Rule,[15] which applies to all existing power plants with a design intake flow of at least 50 million gallons per day (mgd).[16]

Third, EPA proposed a Phase III Rule that covered: (1) all existing facilities that use a CWIS with a design intake capacity above a certain threshold in all industries except those already regulated by the Phase II Rule;[17] and (2) new facilities in the offshore and coastal oil and gas extraction industrial subcategory that EPA had excluded from the Phase I Rule.[18] However, on June 16, 2006, although EPA published in the Federal Register a document it entitled "National Pollutant Discharge Elimination System – Final Regulations to Establish Requirements for Cooling Water Intake Structures at Phase III Facilities," those regulations did not establish any national categorical BTA requirements whatsoever for any existing facilities, leaving such facilities to be regulated only on a case-by-case, best professional judgment basis.[19] In addition, although the

---

[12] Published at 66 Fed. Reg. 65,256 – 65,345 (December 18, 2001); codified at 40 CFR § 125.80 *et seq.*

[13] 40 CFR § 125.81; *see also Riverkeeper I*, 358 F.3d at 181 & n.4 "[t]he Rule applies to *all new facilities* ... [e]xcept for certain offshore oil and gas facilities." (emphasis added). The Second Circuit "remand[ed] one aspect of the [Phase I] regulation that contradicts Congress's clearly expressed intent." *Riverkeeper I*, 358 F.3d at 181.

[14] *Cronin*, 898 F. Supp. at 1060 (emphasis added); *see also Riverkeeper I*, 358 F.3d at 186 n.14 (noting that the parties agree that "EPA may promulgate one overarching regulation applicable to all new cooling water intake structures.").

[15] Published at 69 Fed. Reg. 41,576 – 41,693 (July 9, 2004); codified at 40 CFR § 125.90 *et seq.*

[16] 40 CFR § 125.91. The Phase II Rule is being reviewed by the Second Circuit in a pending case, Docket No. 04-6692-ag(L).

[17] *See* [proposed] 40 CFR § 125.101, published at 69 Fed. Reg. 68,444, 68544 (Nov. 24, 2004).

[18] *See* [proposed] 40 CFR § 125.130 *et seq.*, published at 69 Fed. Reg. at 68560 *et seq.*

Stephen L. Johnson
October 26, 2006
Page 5 of 10

Phase I Rule explicitly applied to all new facilities except offshore and coastal oil and gas extraction facilities[20] and EPA stated in the preamble to the final Phase III Rule that "[t]his rule does not alter the regulatory requirements for facilities subject to the Phase I or Phase II regulations," the Phase III Rule purports that the Phase I Rule does not apply to new "seafood processing vessels or offshore liquefied natural gas import terminals."[21]

## I.    EPA'S FAILURE TO PROMULGATE NATIONAL CATEGORICAL BTA STANDARDS FOR COOLING WATER INTAKE STRUCTURES AT EXISTING PHASE III FACILITIES.

Section 316(b) of the Act, 33 U.S.C. § 1326(b), requires the EPA Administrator to promulgate regulations establishing national categorical BTA standards for CWIS that withdraw water from the Nation's waterbodies.  On October 10, 1995, the United States District Court for the Southern District of New York entered a consent decree that required EPA to propose regulations implementing Clean Water Act section 316(b) no later than July 2, 1999 and to take final action with respect to such regulations no later than August 13, 2001.

In an amended consent decree entered on November 22, 2000, the section 316(b) rulemaking was trifurcated into three phases.  The amended consent decree defined "Phase III Regulations" to mean "regulations implementing section 316(b) of the [Clean Water] Act ... [and] applicable to, at a minimum, existing facilities in the following categories that employ a cooling water intake structure, and whose intake flow levels exceed a minimum threshold to be determined by EPA during the Phase III rulemaking process:  (i) utility and non-utility power producers not covered by the Phase II Regulations; (ii) pulp and paper manufacturing facilities; (iii) chemical and allied products manufacturing facilities; (iv) petroleum and coal products manufacturing facilities; and (v) primary metals facilities."[22]

The Amended Consent Decree required EPA to propose Phase III regulations by June 15, 2003, and to take final action with respect to such regulations by December 15, 2004.  These deadlines were extended in the Second Amended Consent Decree to November 1, 2004 and June 1, 2006, respectively.

---

[19]  71 Fed. Reg. 35006 (June 16, 2006).

[20]  *See* footnote 14 above.

[21]  40 CFR § 125.131(d).

[22]  Amended Consent Decree at § 1.f.iii; Second Amended Consent Decree at § 1.f.iii.

Stephen L. Johnson
October 26, 2006
Page 6 of 10

On November 1, 2004, the EPA Administrator proposed regulations establishing requirements under section 316(b) for Phase III facilities.[23]  In the proposed Phase III Rule, EPA proposed three possible intake flow thresholds:  50 mgd, 100 mgd, or 200 mgd.[24]  All existing facilities with CWIS whose design intake flow exceed the threshold would be subject to the regulations, specifically including "any [existing] manufacturing or industrial facility."[25]  Among the industrial categories that EPA explicitly proposed to regulate were "Chemicals & Allied Products, Primary Metals Industries, Petroleum & Coal Products, and Paper & Allied Products."[26]

In its proposed Phase III rule, EPA proposed national categorical BTA standards for these existing facilities consistent with the national categorical BTA standards it had previously promulgated for Phase II facilities.[27]  In particular, EPA's November 1, 2004 proposal stated that "[f]or covered existing facilities, today's proposed rule would establish performance standards for reducing impingement mortality by 80 to 95 percent, or impingement mortality by 80 to 95 percent and entrainment by 60 to 90 percent."[28]  EPA further stated such regulations were proposed to comply with section 316(b) and the consent decree and were "based on the best technology available to minimize the adverse environmental impact associated with the use of cooling water intake structures."[29]  Further, EPA found the proposed national requirements were based on technology that is both "technically available" and "economically practicable."[30]

---

[23]  The proposed regulations were published on November 24, 2004.  69 Fed. Reg. 68,444 (Nov. 24, 2004).

[24]  *Id.* at 68,445.

[25]  *Id.*

[26]  *Id.* at 68,547.  These were the same industries, along with power producers, that the consent decree included, at a minimum, within the definition of Phase III regulations. *See* footnote 23 above.  In addition, in the proposed Phase III Rule, EPA listed other industries also covered by the proposed regulations and further stated: "This exhibit is not intended to be exhaustive, but rather provides a guide for readers regarding entities that may be regulated by this action if they satisfy the final flow threshold and waterbody type criteria. ... To determine whether your facility is regulated by this action, you should carefully examine the applicability criteria in § 125.101 and § 125.131 of this proposal." 69 Fed. Reg. at 68,446.

[27]  *Id.* at 68,444.

[28]  *Id.*

[29]  *Id.*

[30]  *Id.* at 68,449.  Riverkeeper contends that the economic test for BTA

Stephen L. Johnson
October 26, 2006
Page 7 of 10

However, on June 16, 2006, despite the EPA Administrator's nondiscretionary duty under section 316(b) to promulgate national categorical BTA standards for existing Phase III facilities, and despite the existence of technically available and economically practicable (and economically achievable) technology to minimize adverse environmental impact at Phase III facilities as required by section 316(b), EPA failed to adopt the proposed Phase III standards or any other national BTA requirements under section 316(b) for existing Phase III facilities. Your failure to promulgate such standards is a failure "to perform an[ ] act or duty under this chapter which is not discretionary with the Administrator," 33 U.S.C. § 1365(a)(2), and thus constitutes a basis for Notifiers to commence an action against you after providing the notice contained in this letter.[31]

## II.    EPA'S EXCLUSION OF CERTAIN NEW FACILITIES OTHER THAN THOSE IN THE OFFSHORE AND COASTAL SUBCATEGORIES OF THE OIL AND GAS EXTRACTION POINT SOURCE CATEGORY FROM THE PHASE I COOLING WATER INTAKE STRUCTURE RULE.

On December 18, 2001, EPA published its final Phase I Rule establishing national categorical BTA requirements that apply to all new facilities (*i.e.*, those constructed after January 17, 2002) that withdraw more than 2 mgd and use at least 25 percent of that water for cooling, except facilities in the offshore and coastal subcategories of the oil and gas extraction point source category as defined under 40 CFR § 435.10 and 40 § CFR 435.40.[32]

However EPA has on several subsequent occasions made statements plainly inconsistent with, and has failed to implement, the unequivocal applicability language in its own final, promulgated Phase I Rule. For example, on June 16, 2006 EPA stated in its final Phase III Rule that the Phase I Rule does not apply to new "seafood processing vessels or offshore liquefied natural gas import terminals."[33] Likewise, EPA has, both

---

regulations under section 316(b) is economic achievability, not economic practicability; but that distinction is immaterial here.

[31] Riverkeeper believes that EPA's decision not to promulgate national categorical BTA regulations for Phase III facilities is also legally deficient because it is not statutorily-authorized, violates the plain meaning of the Clean Water Act and Congress's clearly expressed intent, is arbitrary, capricious, not supported by substantial evidence in the record, and is otherwise not in accordance with law.

[32] 40 CFR § 125.81; *see also Riverkeeper I*, 358 F.3d at 181 & n.4; *see also* footnote 14 above.

[33] *See* 40 CFR § 125.131(d), published at 71 Fed. Reg. at 35,041. EPA admits that it did not amend the Phase I Rule in its Phase III rulemaking: "[t]his rule does not

Stephen L. Johnson
October 26, 2006
Page 8 of 10

before and after promulgation of the Phase III Rule, made other statements purporting to reinterpret the unequivocal applicability language of the Phase I Rule so as to exclude new facilities in industries plainly covered by the Phase I Rule.[34]

Consequently, Notifiers are entitled to a declaratory judgment under 28 U.S.C. § 2201 and other appropriate authority that: (1) the Phase I Rule applies to all facilities constructed after January 17, 2002 that withdraw more than 2 million gallons per day from waters of the U.S. and use at least 25 percent of that water for cooling, except facilities in the offshore and coastal subcategories of the oil and gas extraction point source category as defined under 40 CFR § 435.10 and 40 CFR § 435.4; and (2) seafood processing vessels and offshore liquefied natural gas import terminals are not within the offshore and coastal subcategories of the oil and gas extraction point source category as defined under 40 CFR § 435.10 and 40 CFR § 435.4.

While there is no notice letter requirement for actions under the Declaratory Judgment Act, Notifiers are giving notice of their intent to sue for this violation of law in this letter because of the interrelated factual basis for the claims and in an attempt to resolve these matters short of litigation. In addition, EPA's failure to regulate new seafood processing vessels or new offshore liquefied natural gas import terminals under the Phase I Rule and EPA's actions in attempting to exempt those facilities constitute failures to perform an act or duty under section 316(b) of the Clean Water Act which is not discretionary with the Administrator and thus constitutes a basis for Notifiers to commence an action under 33 U.S.C. § 1365(a)(2) against you after providing the notice contained in this letter.

During the 60-day notice period, representatives of Notifiers are available to discuss this matter with you or members of your staff to see if it can be resolved. Please do not hesitate to contact Reed Super at (212) 854-3365 or the mailing address listed on this letterhead if you wish to do so. If such discussions do not occur or are unsuccessful, or if you and EPA otherwise fail to take action sufficient to meet the legal obligations set out above, Notifiers intend to file one or more suits after conclusion of the notice period.

---

alter the regulatory requirements for facilities subject to the Phase I or Phase II regulations." 71 Fed. Reg. at 35,006.

[34] *See, e.g.,* memo from Mary Smith and Linda Boornazian of EPA, dated April 22, 2004, and *EPA's Liquefied Natural Gas Regulatory Roadmap*, dated July 2006.

Stephen L. Johnson
October 26, 2006
Page 9 of 10


Pursuant to 40 CFR § 135.3(b), the full name, address, and telephone number of the persons giving notice are as follows:

Natural Resources Defense Council
40 West 20th Street
New York, NY 11011
212.727.2700

Waterkeeper Alliance
50 S. Buckhout, Suite 302
Irvington, NY 10533
914.674.0622

Surfrider Foundation
P.O. Box 6010
San Clemente, CA 92674
949.492.8170

Massachusetts Public Interest
  Research Group, Inc.
44 Winter Street, 4th floor
Boston, MA 02108
617.292.4800

Sincerely,

MORNINGSIDE HEIGHTS LEGAL SERVICES, INC.

By _____

Of counsel:

P. Kent Correll, Esq.
300 Park Avenue, 17th Floor
New York, New York 10022
212-475-3070
212-475-2378 (fax)
*Legal Counsel for Natural Resources Defense Council and Waterkeeper Alliance, Inc.*

Deborah A. Sivas
Holly D. Gordon
Stanford Law School
  Environmental Law Clinic
Crown Quadrangle
559 Nathan Abbott Way
Stanford, CA 94305-8610
650-723-0325
650-723-4426 (fax)
*Legal Counsel for Surfrider Foundation*

Edward Lloyd
Reed W. Super
Environmental Law Clinic
Columbia University School of Law
435 West 116th Street
New York, NY 10027
212-854-3365    212-854-3554 (fax)
*Legal Counsel for Natural Resources Defense Council and Waterkeeper Alliance, Inc.*

Charles C. Caldart
National Environmental Law Center
3240 Eastlake Avenue East, Suite 100
Seattle, WA 98102
206-568-2853
206-568-2858 (fax)
*Legal Counsel for Massachusetts Public Interest Research Group, Inc.*

Joseph J. Mann
National Environmental Law Center
369 Broadway Street, Suite 200
San Francisco, CA 94133
415-622-0086 x306
415-622-0016 (fax)
*Legal Counsel for Massachusetts Public Interest Research Group, Inc.*

Stephen L. Johnson
October 26, 2006
Page 10 of 10


cc (by certified mail, return receipt requested):

      The Hon. Alberto Gonzalez
      Attorney General of the United States
      United States Department of Justice
      950 Pennsylvania Avenue, N.W.
      Washington, District of Columbia 20530-0001

**CERTIFICATE OF SERVICE**

I hereby certify that on this 18th day of January 2007, I caused to be served by Federal Express a true and correct copy of the foregoing **AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF o**n:


Wendy H. Waszmer
Assistant United States Attorney
86 Chambers Street, 3rd Floor
New York, New York 10007
*Counsel for Defendants*


\_\_\_\_\_/s/  Reed Super_____
Reed Super