MICHAEL J. GARCIA
United States Attorney for the
Southern District of New York
By: WENDY H. WASZMER
Assistant United States Attorney
86 Chambers Street
New York, New York 10007
Tel.: (212) 637-2729
Fax: (212) 637-2717

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ x
                                :

RIVERKEEPER, INC., et al.,         :
                                :

                Plaintiffs,    :    ECF CASE
                                :

                v.            :
                                :    06 Civ. 12987 (PKC)

UNITED STATES ENVIRONMENTAL  :
PROTECTION AGENCY, et al.,      :
                                :

                Defendants.  :
                                :
------------------------------------------------------------ x

## SECOND DECLARATION OF WENDY H. WASZMER

WENDY H. WASZMER, pursuant to 28 U.S.C. § 1746, declares the following:

1.     I am an Assistant United States Attorney in the office of Michael J. Garcia, United States Attorney for the Southern District of New York, attorney for defendants United States Environmental Protection Agency, and Stephen L. Johnson, Acting Administrator of the United States Environmental Protection Agency (collectively, "EPA" or "defendants"), in the above-captioned action. I have been assigned to defend this matter and am familiar with the proceedings herein. I make this declaration in support of Defendants' Motion for a Stay of Proceedings.

2.     Attached hereto as Exhibit A is a true and correct copy of the Petitioners' Pre-

Argument Statement, filed in <u>Riverkeeper v. EPA</u>, 06-3059-ag (2d Cir.).

3.      Attached hereto as Exhibit B is a true and correct copy of the Second Circuit's

docket sheet in <u>Riverkeeper v. EPA</u>, 06-3059-ag (2d Cir.).

4.      Attached hereto as Exhibit C is a true and correct copy of the Notice of Transfer

filed on August 10, 2006, by the Judicial Panel on Multi-District Litigation in <u>Riverkeeper v.</u>

<u>EPA</u>, 06-3059-ag (2d Cir.).

5.      Attached hereto as Exhibit D is a true and correct copy of the Fifth Circuit's

docket sheet in <u>ConocoPhillips, et al. v. EPA</u>, 06-60662-ag (L) (5th Cir.).

6.      Attached hereto as Exhibit E is a true and correct copy of the Brief of

Environmental Petitioners, dated March 30, 2007, filed in <u>ConocoPhillips, et al. v. EPA</u>, 06-

60662-ag (L) (5th Cir.).

7.      Attached hereto as Exhibit F is a true and correct copy of Respondents' Brief,

dated July 13, 2007, filed in <u>ConocoPhillips, et al. v. EPA</u>, 06-60662-ag (L) (5th Cir.).

8.      Attached hereto as Exhibit G is a true and correct copy of the letter from counsel

for Plaintiffs, Reed Super, Esq., to the Court, dated October 2, 2007.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
       October 9, 2007

WENDY H. WASZMER
Assistant United States Attorney
Tel.: (212) 637-2729
Fax: (212) 637-2717

# UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT
## AGENCY APPEAL PRE-ARGUMENT STATEMENT (FORM C-A)

☐ APPLICATION FOR ENFORCEMENT ☐ PETITION FOR REVIEW

1. SEE NOTICE ON REVERSE. 2. PLEASE TYPE OR PRINT. 3. STAPLE ALL ADDITIONAL PAGES

| | | |
|---|---|---|
| CAPTION: Riverkeeper, Inc., Natural Resources Defense Council, Waterkeeper, Inc. Petitioners v. U.S. Environmental Protection Agency; Stephen L. Johnson, in his official capacity as Administrator to the U.S. Environmental Protection Agency Respondents | AGENCY NAME: U.S. Environmental Protection Agency | AGENCY NO.: OW-2004-0002 |
| | DATE THE ORDER UPON WHICH REVIEW OR ENFORCEMENT IS SOUGHT WAS ENTERED BELOW: Rule Promulgated June 30, 2006 | ALIEN NO.: (Immigration Only) |
| | DATE THE PETITION OR APPLICATION WAS FILED: June 30, 2006 | Is this a cross-petition for review / cross-application for enforcement? ☐ YES ☒ NO |

| Contact Information for Petitioner(s) Attorney: | Counsel's Name: Address: Telephone No.: Fax No.: E-mail: **SEE ATTACHED LIST** |
|---|---|
| Contact Information for Respondent(s) Attorney | Counsel's Name: Address: Telephone No.: Fax No.: E-mail: **SEE ATTACHED CERTIFICATE OF SERVICE** |

| JURISDICTION OF THE COURT OF APPEALS (provide U.S.C. title and section): 33 U.S.C. 1369(b)(1) | APPROX. NUMBER OF PAGES IN THE RECORD: UNKNOWN | APPROX. NUMBER OF EXHIBITS IN THE RECORD: UNKNOWN | Has this matter been before this Circuit previously? ☒ Yes ☐ No If Yes, provide the following: Riverkeeper v. EPA I Riverkeeper v. EPA II (see attached sheet) Case Name: 2d Cir. Docket No.: 02-4005-ag — 358 F.3d 174 (2d Cir 2004) 04-6692-ag — Decision Pending Reporter Citation: (i.e., F.3d or Fed. App.) |
|---|---|---|---|

*ADDENDUM "A"*: COUNSEL MUST ATTACH TO THIS FORM: (1) A BRIEF, BUT NOT PERFUNCTORY, DESCRIPTION OF THE NATURE OF THE ACTION; (2) THE RESULT BELOW; AND (3) A COPY OF ALL RELEVANT OPINIONS/ORDERS FORMING THE BASIS FOR THIS PETITION FOR REVIEW OR APPLICATION FOR ENFORCEMENT.

*ADDENDUM "B"*: COUNSEL MUST ATTACH TO THIS FORM: (1) THE RELIEF REQUESTED; (2) A LIST OF THE PROPOSED ISSUES; AND (3) THE APPLICABLE APPELLATE STANDARD OF REVIEW FOR EACH PROPOSED ISSUE.

### PART A: STANDING AND VENUE

| STANDING | VENUE |
|---|---|
| PETITIONER / ~~APPELLANT~~ IS: ☐ AGENCY ☒ OTHER PARTY ☐ NON-PARTY (SPECIFY STANDING): | COUNSEL MUST PROVIDE IN THE SPACE BELOW THE FACTS OR CIRCUMSTANCES UPON WHICH VENUE IS BASED: Petitioners reside and transact business in this circuit; this case arises from same procedural background as cases 02-4005-ag and 04-6692-ag |

**IMPORTANT. COMPLETE AND SIGN REVERSE SIDE OF THIS FORM.**

FORM C-A (Rev. April 2006) Page 1 of 2

---

**PART B:  NATURE OF ORDER UPON WHICH REVIEW OR ENFORCEMENT IS SOUGHT**
(Check as many as apply)

TYPE OF CASE:

| | | | |
|---|---|---|---|
| __X__ | ADMINISTRATIVE REGULATION/ RULEMAKING | _____ | IMMIGRATION-includes denial of an asylum claim |
| _____ | BENEFITS REVIEW | _____ | IMMIGRATION-does NOT include denial of an asylum claim |
| _____ | UNFAIR LABOR | _____ | TARIFFS |
| _____ | HEALTH & SAFETY | _____ | OTHER: |
| _____ | COMMERCE | | (SPECIFY) |
| _____ | ENERGY | | |

---

1.  Is any matter relative to this petition or application still pending below?  ☒ Yes, specify:  __SEE ATTACHED SHEET__  ☐ No

2.  To your knowledge, is there any case presently pending or about to be brought before this Court or another court or administrative agency which:

    (A)   Arises from substantially the same case or controversy as this petition or application ?        ☒ Yes      ☐ No

    (B)   Involves an issue that is substantially similar or related to an issue in this petition or application ?    ☒ Yes      ☐ No

If yes, state whether ☐ "A," or ☐ "B," or ☒ both are applicable, and provide in the spaces below the following information on the *other* action(s):

| Case Name: Riverkeeper, et al. v. EPA | Docket No. 04-6692-ag(L) | Citation: | Court or Agency: 2d Cir. |
|---|---|---|---|
| Name of Petitioner or Applicant    Riverkeeper, et al. | | | |

---

| Date: 6/30/06 | Signature of Counsel of Record: | |
|---|---|---|

---

## NOTICE TO COUNSEL

Once you have filed your Petition for Review or Application for Enforcement, you have only ten (10) calendar days in which to complete the following important steps:

1.  Complete this Agency Appeal Pre-Argument Statement (Form C-A); serve it upon your adversary, and file an original and one copy with the Clerk of the Second Circuit.

2.  Pay the $450 docketing fee to the Clerk of the Second Circuit, unless you are authorized to prosecute the appeal without payment.

    **PLEASE NOTE:  IF YOU DO NOT COMPLY WITH THESE REQUIREMENTS WITHIN TEN (10) CALENDAR DAYS, YOUR PETITION FOR REVIEW OR APPLICATION FOR ENFORCEMENT WILL BE DISMISSED.** *SEE* THE CIVIL APPEALS MANAGEMENT PLAN OF THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT.

**C-A Form Continued**

## ATTORNEYS FOR PETITIONERS

Reed W. Super, Esq.
Edward Lloyd, Esq.
MORNINGSIDE HEIGHTS LEGAL SERVICES, INC.
Environmental Law Clinic
Columbia University School of Law
435 West 116th Street
New York, New York 10027
212-854-3365
212-854-3554 (fax)
Attorneys for Riverkeeper, Inc., Natural Resources
Defense Council, and Waterkeeper Alliance, Inc.

Of Counsel:
P. Kent Correll, Esq.
300 Park Avenue, 17th Floor
New York, New York  10022
212-475-3070
212-475-2378 (fax)

---

## CASES PENDING OR ABOUT TO BE BROUGHT BEFORE OTHER COURTS WHICH (A) ARISE FROM SUBSTANTIALLY THE SAME CASE OR CONTROVERSY AS THIS APPEAL, AND (B) INVOLVE AN ISSUE SUBSTANTIALLY THE SAME, SIMILAR, OR RELATED TO AN ISSUE IN THIS APPEAL:

This case is closely related to (1) a case recently decided by this Court, and (2) another case currently pending before this Court. The U.S. Environmental Protection Agency is promulgating regulations under Section 316(b) of the federal Clean Water Act in three phases, pursuant to a consent decree in a Riverkeeper, Inc., et al. v. Leavitt, 93 Civ. 0314 (S.D.N.Y.). This Court reviewed EPA's Phase I rule in Riverkeeper, Inc., v. EPA, 358 F.3d 174 (2d Cir. 1994) ("Riverkeeper I"). This Court is currently reviewing EPA's Phase II rule in Riverkeeper, Inc., et al. v EPA, Docket No. 04-6692-ag LEAD ("Riverkeeper II"), which was argued before Judges Straub, Sotomayor, and Hall on June 8, 2006. The instant Phase III case and the Riverkeeper I and Riverkeeper II cases all arise from a common procedural background and overlap substantively.

We anticipate that other cases challenging EPA's Phase III rule will be filed in other circuits.

**ADDENDUM A**

**(1) Description of the nature of the action:**

This is an original proceeding under section 509(b)(1) of the federal Clean Water Act, 33 U.S.C. § 1369(b)(1), to review final action of the U.S. Environmental Protection Agency entitled *National Pollutant Discharge Elimination System – Final Regulations to Establish Requirements for Cooling Water Intake Structures at Phase III Facilities*, which was published at 71 Fed. Reg. 35,006 (June 16, 2006) and promulgated for purposes of judicial review on June 30, 2006.

**(2) Result below:**

On June 30, 2006, respondent EPA promulgated national regulations under section 316(b) of the federal Clean Water Act, 33 U.S.C. § 1251 *et seq.* The regulations establish categorical standards for cooling water intake structures only at new offshore and coastal oil and gas extraction facilities. Although EPA had proposed national categorical standards for existing Phase III facilities, the agency's final regulations failed to include any national categorical standards for such facilities, leaving regulation of such facilities to case-by-case determination.

**(3) Copy of all relevant opinions/orders forming the basis for this petition:**

See attached copy of *National Pollutant Discharge Elimination System – Final Regulations to Establish Requirements for Cooling Water Intake Structures at Phase III Facilities*, 71 Fed. Reg. 35,006 (June 16, 2006).

**ADDENDUM B**

(1) **Relief requested:**

Vacatur and remand of EPA's decision not to promulgate national categorical standards for existing Phase III facilities, and a declaration that the federal Clean Water Act prohibits EPA from basing its regulatory decision on monetized cost-benefit analysis.

(2) **Proposed issues:**

a)    Whether EPA's final decision not to promulgate national categorical regulations for Phase III existing facilities violates the plain language of sections 316(b) and 301 of the federal Clean Water Act and was statutorily unauthorized because the Act prohibits EPA from basing its regulatory decision on monetized cost-benefit analysis, and whether EPA's decision in this case was in excess of statutory authority, arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

b)    Whether EPA's *National Pollutant Discharge Elimination System – Final Regulations to Establish Requirements for Cooling Water Intake Structures at Phase III Facilities* are otherwise in excess of statutory authority, arbitrary, capricious, an abuse of discretion, or not in accordance with law.

(3) **Applicable appellate standard of review for each proposed issue:**

The applicable standard of review for the proposed issues is the two-step analysis set forth in Chevron U.S.A., Inc. v. Natural Resources Defense Council, 467 U.S. 837, 842-43 (1984), which requires a determination of (1) whether Congress has directly spoken to the precise question at issue; and (2) if not, whether the agency's answer is based on a permissible construction of the statute. In addition, the standard of review set forth in section 706(2) of the Administrative Procedure Act, 5 U.S.C. § 706(2) requires, *inter alia*, a determination of whether the decision was in excess of statutory authority, arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

# IN THE UNITED STATES COURT OF APPEALS

## FOR THE SECOND CIRCUIT

| | |
|---|---|
| RIVERKEEPER, INC, NATURAL RESOURCES DEFENSE COUNCIL, WATERKEEPER ALLIANCE, INC. | **PETITION FOR REVIEW** |
| Petitioners, | Docket No._____ |
| v. | [Agency Docket No. OW-2004-0002] |
| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, STEPHEN L. JOHNSON, IN HIS OFFICIAL CAPACITY AS ADMINISTRATOR OF THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY | |
| Respondents. | |

## PETITION FOR REVIEW

1.    Pursuant to Section 509(b)(1) of the federal Clean Water Act, 33

U.S.C. § 1369(b)(1), and Rule 15 of the Federal Rules of Appellate Procedure,

Riverkeeper, Inc., Natural Resources Defense Council, and Waterkeeper Alliance,

Inc. hereby petition this Court for review of final action of respondent United

States Environmental Protection Agency, entitled *National Pollutant Discharge*

*Elimination System – Final Regulations to Establish Requirements for Cooling*

1

*Water Intake Structures at Phase III Facilities,* published at 71 Fed. Reg. 35006 - 35046 (June 16, 2006) ("Phase III Rule"). For purposes of judicial review, the final Phase III Rule was promulgated on June 30, 2006. A copy of the final Phase III Rule is attached to this petition.

Respectfully submitted this 30th day of June, 2006.

MORNINGSIDE HEIGHTS LEGAL SERVICES, INC.

REED W. SUPER, ESQ.
EDWARD LLOYD, ESQ.
Environmental Law Clinic
Columbia University School of Law
435 West 116th Street
New York, New York 10027
212-854-3365
212-854-3554 (fax)
*Attorneys for Riverkeeper, Inc., Natural Resources Defense Council, and Waterkeeper Alliance, Inc.*

Of Counsel:

P. KENT CORRELL, ESQ.
300 Park Avenue, 17th Floor
New York, New York 10022
212-475-3070
212-475-2378 (fax)

2

 

# General Docket
## US Court of Appeals for the Second Circuit

Second Circuit Court of
Appeals

INDIV

CLOSED

Court of Appeals Docket #:        06-3059-ag
Nsuit :

Riverkeep, Inc. v. United States          Filed   6/30/06
Environmental Protection Agency

Appeal      Environmental Protection Agency
from:

Case type information:

    Agency

    Petition for Review

    None

Lower court information:

   District:      OW-2004-0002

   Trial Judge:

   MagJudge:

   Date Filed:

   Date order/judgement:

   Date NOA filed:  6/30/2006

Fee status: Paid

Panel Assignment:

Panel:

Date of decision:          9/13/06

Prior cases:  NONE

Current cases NONE

Official Caption 1/

                             INDIV

CLOSED

```
-------------------------------------
```
Docket No. [s] : 06-3059 -ag

Riverkeeper, Inc.,  Natural Resources Defense Council,
Waterkeeper Alliance, Inc.,

        Petitioners,

v.

United States Environmental Protection Agency,  Stephen
L. Johnson, in his official capacity as administrator of
the United States Environmental Protection Agency,

        Respondent.

```
-------------------------------------
```

Authorized Abbreviated Caption 2/
```
-------------------------------------
```
Docket No. [s] : 06-3059 -ag

Riverkeep Inc  v.  United States Environmental
Protection Agency
```
-------------------------------------
```

```
-----------------------------------------------------------
-----------------
```
1/ Fed. R. App. P. Rule 12 [a] and 32 [a].
2/ For use on correspondence and motions only.

Docket as of    September 15,      9:53 pm                Page   2
                2006
                                                  INDIV

                                                  CLOSED

Stephen L. Johnson            Jessica  O`Donnell Esq.

Respondent                    [ LD ret ]
                              U.S. Dept. of Justice ,
                              Environmental Defense Section
                              P.O. Box 23986
                              Washington  , DC ,  20026

                              202-305-0851

United States Environmental   Jessica  O`Donnell Esq. (See
Protection Agency             above)
Respondent                    [ LD ret ]

Natural Resources Defense     Reed W. Super Esq.
Council
Petitioner                    [ LD ret ]

Morning Side Heights Legal
Services, Inc.
435 West 116th Street
New York , NY , 10027

212-854-3365

Riverkeeper, Inc.              Reed W. Super Esq.(See above)

Petitioner                     [ LD ret ]

Docket as of    September 15,      9:53 pm              Page    3
                2006
[]                                                     INDIV

                                                      CLOSED

Waterkeeper Alliance, Inc.     Reed W. Super Esq.(See above)

Petitioner                     [ LD ret ]

Cooling Water Intake           Russell S. Frye Esq.
Structure Coalition
Movant                         [ LD ret ]
                               FryeLaw PLLC

                               3050 K. Street, N.W.
                               Washington  , DC , 20007

                               202-342-8400

American Petroleum Institute   William M. McErlean Esq.

Movant                         [ LD ret ]
                               Barnes & Thornburg

                               One N. Wacker Drive, Suite 4400
                               Chicago , IL , 60606

                               312-357-1313

Docket as of    September 15,      9:53 pm              Page    4
                2006
[]                                                     INDIV

                                                      CLOSED

    6/30/06   Case Docketed: Petition for review of agency
              order on behalf of  PETITIONER    Natural
              Resources Defense Council,   Riverkeeper,
              Inc.,   Waterkeeper Alliance, Inc.,  filed.
              [BM]

    6/30/06   Copy of receipt re: payment of docketing fee
              filed on behalf of  PETITIONER    Natural
              Resources Defense Council,   Riverkeeper,
              Inc.,   Waterkeeper Alliance, Inc.,  .
              RECEIPT # 183955.  [BM]

    6/30/06   Copy of agency decision and order dated

6/16/2006, filed.  [BM]

6/30/06    PETITIONER    Natural Resources Defense
           Council,  Riverkeeper, Inc.,  Waterkeeper
           Alliance, Inc.,  Form C/A filed, with proof
           of service.  [BM]

6/30/06    PETITIONER    Natural Resources Defense
           Council,  Riverkeeper, Inc.,  Waterkeeper
           Alliance, Inc.,  disclosure letter pursuant
           to FRAP Rule 26.1 RECEIVED.  [BM]

7/10/06    Served copy of petition under cover letter
           on respondent.  [BM]

7/10/06    Note SEE case number(s): 04-6699-ag,
           04-4059-ag,02-4005-ag,03-40213-ag,03-4313-ag.
              [BM]

7/21/06    Scheduling order #1 filed. Petitioners brief
           due  8/29/2006. Respondents brief due
           9/28/2006. Ready week  11/6/2006. (LG)  [BM]

7/21/06    Telephonic Pre-Argument Conference Notice
           and Order from Lisa  GreenbergScheduled For:
            Tuesday, August 1, 2006 at 3:00pm, Filed.
           [BM]

7/26/06    Notice of appeal acknowledgment letter from
           Jessica O`Donnell received.  [BM]

7/27/06    Notice of appeal acknowledgment letter from
           Reed Super received.  [BM]

7/31/06    Movant    American Petroleum Institute motion
           for leave to intervene in support of
           respondents filed with proof of service.

Docket as of    September 15,       9:53 pm              Page   5
                2006

                                                        INDIV

                                                        CLOSED

           [BM]

8/1/06     MOVANT    Cooling Water Intake Structure
           Coalition,  28(J) letter received.  [BM]

8/1/06     Movant    Cooling Water Intake Structure
           Coalition motion for leave to intervene
           filed with proof of service.  [BM]

8/2/06     Notice to the Judicial Panel on
           Multidistrict Litigation of Multicircuit
           Petiton for review  from  RESPONDENT
           United States Environmental Protection
           Agency,    received.  [BM]

8/10/06    Judicial Panel on Multi-District Litigation

Notice of Transfer received.    [BM]

8/14/06    Order Filed Vacating the scheduling order
           pending a determination of venue by the
           Judicial Panel on Multi-District Litigation.
           (LG)    [BM]

8/14/06    Notice to counsel in re: Order dated
           8/14/2006.    [BM]

8/15/06    Errata for Motion to intervene from  MOVANT
              Cooling Water Intake Structure Coalition,
           received.    [BM]

8/25/06    Judicial Panel on Multi-District Litigation
           Corrected Notice of Transfer to the United
           States Court of Appeals for the Fifth
           Circuit, received.    [BM]

8/25/06    Judicial Panel on Multi-District Litigation
           Notice of Transfer to the United States
           Court of Appeals for the Fifth Circuit,
           filed.    [BM]

9/13/06    This appeal is disposed in light of the
           Multidistrict Litigation order dated
           8/7/2006.    [BM]

9/13/06    Certified copy of the Order dated 8/7/2006
           transferring petition for review and the
           appellate file, under cover letter to the
           United States Court of Appeals for the Fifth
           Circuit, issued.    [BM]

9/13/06    Certified copy of Multidistrict Litigation
           order  transferring of the appeal issued to
           district court.    [BM]

9/13/06    Notice to counsel in re: Transferred Order
           dated 8/25/2006.    [BM]

Docket as of    September 15,        9:53 pm              Page   6
                2006

[]                                                    INDIV

                                                     CLOSED

9/15/06    Acco received in records room from team.
           [NS]

Docket as of    September 15,        9:53 pm              Page   7
                2006

| PACER Service Center |
| --- |
| Transaction Receipt |
| 10/09/2007 14:12:28 |

| PACER Login: | us1581 | Client Code: | |

| Description: | dkt report | Case Number: | 06-3059 |
|---|---|---|---|
| Billable Pages: | 6 | Cost: | 0.48 |

A CERTIFIED TRUE COPY

AUG - 7 2006

ATTEST

FOR THE JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

AUG - 7 2006

FILED
CLERK'S OFFICE

*DOCKET NO. RTC-85*

## *BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION*

## *IN RE ENVIRONMENTAL PROTECTION AGENCY, FINAL NATIONAL POLLUTANT DISCHARGE ELIMINATION SYSTEM (NPDES) REGULATIONS TO ESTABLISH REQUIREMENTS FOR COOLING WATER INTAKE STRUCTURES AT PHASE III FACILITIES, 71 FED. REG. 35,006, ISSUED ON JUNE 16, 2006*

*Massachusetts Public Interest Group v. EPA,* First Circuit, No. 06-2000
*Riverkeeper Inc., et al. v. EPA,* Second Circuit, No. 06-3069-ag
*ConocoPhillips Company, et al. v. EPA*, Fifth Circuit, No. 06-6-662
*Surfrider Foundation v. EPA,* Ninth Circuit, No. 06-73482

### *CONSOLIDATION ORDER*

The Environmental Protection Agency issued an order dated June 16, 2006. On August 7, 2006, the Panel filed, pursuant to 28 U.S.C. § 2112(a)(3), a notice of multicircuit petitions for review of that order. The notice included four petitions for review pending in four circuit courts of appeal as follows: First Circuit, Second Circuit, Fifth Circuit and Ninth Circuit.

The Panel has randomly selected the United States Court of Appeals for the Fifth Circuit in which to consolidate these petitions for review.

IT IS THEREFORE ORDERED that, pursuant to 28 U.S.C. § 2112(a)(3), the above-captioned petitions for review are consolidated in the Fifth Circuit and that this circuit is designated as the circuit in which the record is to be filed pursuant to Rules 16 and 17 of the Federal Rules of Appellate Procedure.

FOR THE PANEL:

April Layne
Random Selector

Dana Stewart
Witness



# General Docket
## US Court of Appeals for the Fifth Circuit

Court of Appeals Docket #: 06-60662                    Filed: 7/14/06
Nsuit:    0
ConocoPhillips Co, et al v. EPA
Appeal from: Environmental Protection Agency

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
Lower court information:

    District: 0539-1 : OW-2004-0002
    Date Filed: **/**/**
    Date order/judgment: 6/16/06
    Date NOA filed: **/**/**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
Fee status: Paid

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
Prior cases:
  None
Current cases:
                    Lead        Member      Start       End
    Additional Appeal:
                    06-60662    06-60772    8/22/06
                    06-60662    06-60819    8/30/06
                    06-60662    06-60942    10/17/06
                    06-60662    06-61033    10/27/06

Docket as of October 5, 2007 11:55 am                 Page 1

---

06-60662 ConocoPhillips Co, et al v. EPA

CONOCOPHILLIPS CO                Kurt Howard Kuhn
    Petitioner                  FAX 512-479-1101
                                512-472-5456
                                Suite 1400
                                [COR NTC ret]
                                Jackson Battle
                                FAX 512-479-1101
                                512-479-9757
                                Suite 1400
                                [COR LD NTC ret]
                                Brown McCarroll
                                111 Congress Avenue
                                Austin, TX 78701

ANADARKO PETROLEUM CORP          Kurt Howard Kuhn
    Petitioner                  (See above)
                                [COR NTC ret]
                                Jackson Battle
                                (See above)

[COR LD NTC ret]

v.

| | |
|---|---|
| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY<br>        Respondent | Jessica O'Donnell<br>FAX 202-514-8865<br>202-305-0851<br>[COR LD NTC gvt]<br>Rochelle Leigh Russell<br>FAX 202-514-8865<br>202-514-1950<br>[COR NTC gvt]<br>US Department of Justice<br>Environment & Natural Resources<br>PO Box 23986<br>Washington, DC 20026-3968 |
| | Stephen L Johnson<br>Suite 3000<br>[NTC fio]<br>Roger Martella<br>202-564-8040<br>[NTC fio]<br>US Environmental Protection<br>Agency<br>1200 Pennsylvania Avenue NW<br>Washington, DC 20460 |
| COOLING WATER INTAKE STRUCTURE COALITION<br>        Intervenor | Russell Scott Frye<br>FAX 202-342-8451<br>202-342-8400<br>Suite 400<br>[COR LD NTC ret]<br>Kelley Drye Collier Shannon |

Docket as of October 5, 2007 11:55 am                    Page 2

---

06-60662 ConocoPhillips Co, et al v. EPA

                           3050 K Street NW
                           Washington, DC 20748

--------------------------

| | |
|---|---|
| ENTERGY CORP<br>        Amicus Curiae | Michael Brunson Wallace<br>FAX 601-944-7738<br>601-968-5534<br>Suite 600<br>[COR NTC ret]<br>Wise Carter Child & Caraway<br>401 E Capitol Street<br>Heritage Building<br>Jackson, MS 39201-2688 |
| | Elise Zoli<br>FAX 617-523-1231 |

```
                                617-570-1612
                                [COR LD NTC ret]
                                Kevin Paul Martin
                                FAX 617-523-1231
                                617-570-1186
                                [COR NTC ret]
                                Goodwin Procter
                                53 State Street
                                Exchange Place
                                Boston, MA 02109-2881
```

Docket as of October 5, 2007 11:55 am          Page 3

---

06-60662 ConocoPhillips Co, et al v. EPA

CONOCOPHILLIPS CO; ANADARKO PETROLEUM CORP; SURFRIDER
FOUNDATION ; ENVIRONMENT MASSACHUSETTS ; RIVERKEEPER INC;
NATURAL RESOURCES DEFENSE COUNCIL; WATERKEEPER ALLIANCE INC;
SOUNDKEEPER INC; DELAWARE RIVERKEEPER NETWORK; AMERICAN
LITTORAL SOCIETY; RARITAN BAYKEEPER INC, dba NY/NJ BAYKEEPER;
SAVE THE BAY-PEOPLE FOR NARRAGANSETT BAY; FRIENDS OF CASCO BAY;
SANTA MONICA BAYKEEPER

            Petitioners

    v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY;
STEPHEN L JOHNSON, ADMINISTRATOR, UNITED STATES
ENVIRONMENTAL PROTECTION AGENCY, IN HIS OFFICIAL
CAPACITY AS ADMINISTRATOR OF THE UNITED STATES EPA

            Respondents

Docket as of October 5, 2007 11:55 am          Page 4

---

06-60662 ConocoPhillips Co, et al v. EPA

| | |
|---|---|
| 7/14/06 | Agency case docketed. Petition for review filed by Petitioner ConocoPhillips Co, Petitioner Anadarko Petroleum. [06-60662] ROA due on 8/23/06. (nfd) [06-60662] |
| 7/31/06 | Appearance form filed by Kurt Howard Kuhn for Petitioner Anadarko Petroleum, Petitioner ConocoPhillips Co, Jackson Battle for Petitioner Anadarko Petroleum, Petitioner ConocoPhillips Co. [06-60662] (No. of forms filed: 2) (cmb) [06-60662] |
| 8/4/06 | Unopposed motion filed by Respondent EPA to stay further proceedings in this court [5517681-1] pending issuance of order by MDL panel consolidating multiple appeals in a single circuit and expiration of the statutory period for |

|  | filing petitions for review. Date of COS: 8/3/06<br>Sufficient [Y/N]: y [06-60662] (agl) [06-60662] |
|---|---|
| 8/7/06 | CLERK Order filed granting unopposed motion to hold<br>proceedings in abeyance in this court pending issuance of<br>order by MDL panel consolidating multiple appeals in a<br>single circuit and expiration of the statutory period for<br>filing petitions for review. [5517681-1] Stay Follow-up due<br>on 9/6/06. Copies to all counsel. [06-60662] (cmb)<br>[06-60662] |
| 8/14/06 | Filing consolidation order of the Multidistrict Litigation<br>Panel selecting the Fifth Circuit as the court in which to<br>consolidate the multiple petitions for review. [5524506-1]<br>[06-60662] (agl) [06-60662] |
| 8/22/06 | Agency Transfer case docketed. Filing order of the Ninth<br>Circuit transferring case to this Court. [06-60772] (cmb)<br>[06-60772] |
| 8/22/06 | Additional Appeal docketed. [06-60662, 06-60772] (cmb)<br>[06-60662 06-60772] |
| 8/23/06 | Appearance form filed by Jessica O'Donnell for Respondent<br>EPA in 06-60662, Jessica O'Donnell for Respondent EPA in<br>06-60772. [06-60662, 06-60772] (No. of forms filed: 1) (cmb)<br>[06-60662 06-60772] |
| 8/30/06 | Agency Transfer case docketed. Filing order of the First<br>Circuit transferring case to this Court. [06-60819] (cmb)<br>[06-60819] |
| 8/30/06 | Additional Appeal docketed. [06-60662, 06-60772, 06-60819]<br>(cmb) [06-60662 06-60772 06-60819] |
| 8/31/06 | Filing CORRECTED consolidation order of the Multidistrict<br>Litigation Panel selecting the Fifth Circuit as the court<br>in which to consolidate the multiple petitions for review.<br>[5540890-1] [06-60662] (agl) [06-60662] |

Docket as of October 5, 2007 11:55 am                 Page 5

---

06-60662 ConocoPhillips Co, et al v. EPA

| 9/10/06 | Appearance form filed by Jessica O'Donnell for Respondent<br>EPA in 06-60819. [06-60819] (No. of forms filed: 1) (filed<br>in lead case on 8/23/06) (cmb) [06-60819] |
|---|---|
| 9/18/06 | Certified list filed in lieu of record. [06-60662,<br>06-60772, 06-60819] (adb) [06-60662 06-60772 06-60819] |
| 9/27/06 | Appearance form filed by Fredric P Andes for Respondent<br>Amer Petroleum Inst in 06-60772. [06-60772] (No. of forms<br>filed: 1) (cmb) [06-60772] |
| 10/17/06 | Agency Transfer case docketed. Filing order of the Second |

Circuit transferring case to this Court. [06-60942] (ddv)
[06-60942]

10/17/06        Additional Appeal docketed. [06-60662, 06-60772, 06-60819,
                06-60942] (ddv) [06-60662 06-60772 06-60819 06-60942]

10/27/06        Agency case docketed. Petition for review filed by
                Petitioner Soundkeeper Inc in 06-61033, Petitioner DE
                Riverkeeper Ntwrk in 06-61033, Petitioner Amer Littoral
                Scty in 06-61033, Petitioner Raritan Baykeeper in 06-61033,
                Petitioner Save the Bay-People in 06-61033, Petitioner
                Friends of Casco Bay in 06-61033, Petitioner Santa Monica
                in 06-61033. [06-61033] ROA due on 12/6/06. (rsm)
                [06-61033]

10/27/06        Additional Appeal docketed. [06-60662, 06-60772, 06-60819,
                06-60942, 06-61033] (rsm) [06-60662 06-60772 06-60819
                06-60942 06-61033]

11/17/06        Briefing notice issued. [06-60662, 06-60772, 06-60819,
                06-60942, 06-61033] A/Pet's Brief due on 12/27/06 for
                Anadarko Petroleum in 06-60662, for ConocoPhillips Co in
                06-60662, for Surfrider Fdn in 06-60772, for MA Pub Int
                Rsrch Grp in 06-60819, for Waterkeeper Alli Inc in
                06-60942, for Nat Resrc Def Cncl in 06-60942, for
                Riverkeeper Inc in 06-60942, for Santa Monica in 06-61033,
                for Friends of Casco Bay in 06-61033, for Save the
                Bay-People in 06-61033, for Raritan Baykeeper in 06-61033,
                for Amer Littoral Scty in 06-61033, for DE Riverkeeper
                Ntwrk in 06-61033, for Soundkeeper Inc in 06-61033. (agl)
                [06-60662 06-60772 06-60819 06-60942 06-61033]

12/4/06         Motion filed by Cooling Water Intake Structure Coalition to
                intervene on behalf of respondents [5618208-1].
                Response/Opposition due on 12/18/06 in 06-60662, in
                06-60772, in 06-60819, in 06-60942, in 06-61033.    Date of
                COS: 12/2/06  Sufficient [Y/N]: y [06-60662, 06-60772,
                06-60819, 06-60942, 06-61033] (agl) [06-60662 06-60772
                06-60819 06-60942 06-61033]

Docket as of October 5, 2007 11:55 am               Page 6

---

06-60662 ConocoPhillips Co, et al v. EPA

12/6/06         Phone extension confirmed for Petitioner ConocoPhillips Co
                in 06-60662, Petitioner Anadarko Petroleum in 06-60662,
                Petitioner Surfrider Fdn in 06-60772, Petitioner MA Pub Int
                Rsrch Grp in 06-60819, Petitioner Riverkeeper Inc in
                06-60942, Petitioner Nat Resrc Def Cncl in 06-60942,
                Petitioner Waterkeeper Alli Inc in 06-60942, Petitioner
                Soundkeeper Inc in 06-61033, Petitioner DE Riverkeeper
                Ntwrk in 06-61033, Petitioner Amer Littoral Scty in
                06-61033, Petitioner Raritan Baykeeper in 06-61033,
                Petitioner Save the Bay-People in 06-61033, Petitioner
                Friends of Casco Bay in 06-61033, Petitioner Santa Monica
                in 06-61033 for filing petitioners' brief.  Extension

granted to and including 1/26/07. [06-60662, 06-60772, 06-60819, 06-60942, 06-61033] A/Pet's Brief ddl updated to 1/26/07 for Anadarko Petroleum in 06-60662, for ConocoPhillips Co in 06-60662, for Surfrider Fdn in 06-60772, for MA Pub Int Rsrch Grp in 06-60819, for Waterkeeper Alli Inc in 06-60942, for Nat Resrc Def Cncl in 06-60942, for Riverkeeper Inc in 06-60942, for Santa Monica in 06-61033, for Friends of Casco Bay in 06-61033, for Save the Bay-People in 06-61033, for Raritan Baykeeper in 06-61033, for Amer Littoral Scty in 06-61033, for DE Riverkeeper Ntwrk in 06-61033, for Soundkeeper Inc in 06-61033. (agl) [06-60662 06-60772 06-60819 06-60942 06-61033]

12/12/06          Appearance form filed by Philip Kent Correll for Petitioner Waterkeeper Alli Inc, Petitioner Nat Resrc Def Cncl, Petitioner Riverkeeper Inc in 06-60942, Edward Lloyd for Petitioner Waterkeeper Alli Inc, Petitioner Nat Resrc Def Cncl, Petitioner Riverkeeper Inc in 06-60942, Reed W Super for Petitioner Waterkeeper Alli Inc, Petitioner Nat Resrc Def Cncl, Petitioner Riverkeeper Inc in 06-60942, Philip Kent Correll for Petitioner Santa Monica, Petitioner Friends of Casco Bay, Petitioner Save the Bay-People, Petitioner Raritan Baykeeper, Petitioner Amer Littoral Scty, Petitioner DE Riverkeeper Ntwrk, Petitioner Soundkeeper Inc in 06-61033, Edward Lloyd for Petitioner Santa Monica, Petitioner Friends of Casco Bay, Petitioner Save the Bay-People, Petitioner Raritan Baykeeper, Petitioner Amer Littoral Scty, Petitioner DE Riverkeeper Ntwrk, Petitioner Soundkeeper Inc in 06-61033, Reed W Super for Petitioner Santa Monica, Petitioner Friends of Casco Bay, Petitioner Save the Bay-People, Petitioner Raritan Baykeeper, Petitioner Amer Littoral Scty, Petitioner DE Riverkeeper Ntwrk, Petitioner Soundkeeper Inc in 06-61033. [06-60942, 06-60662, 06-60772, 06-60819, 06-61033] (No. of forms filed: 3) (kkf) [06-60662 06-60772 06-60819 06-60942 06-61033]

Docket as of October 5, 2007 11:55 am                    Page 7

---

06-60662 ConocoPhillips Co, et al v. EPA

12/13/06          COURT Order filed: The motion of Cooling Water Structure Coalition for leave to intervene in support of respondents is GRANTED. [5618208-1] in 06-61033, 06-60772, 06-60819, 06-60942, 06-61033 (RHB) Copies to all counsel. [06-60662, 06-60772, 06-60819, 06-60942, 06-61033] (cmb) [06-60662 06-60772 06-60819 06-60942 06-61033]

12/14/06          Appearance form filed by Rochelle Leigh Russell for Respondent EPA in 06-60662, Rochelle Leigh Russell for Respondent EPA in 06-60772, Rochelle Leigh Russell for Respondent EPA in 06-60819, Rochelle Leigh Russell for Respondent Stephen L Johnson, Respondent EPA in 06-60942, Rochelle Leigh Russell for Respondent Stephen L Johnson, Respondent EPA in 06-61033. [06-60662, 06-60772, 06-60819,

06-60942, 06-61033] ( No. of forms filed: 1) (kkf)
[06-60662 06-60772 06-60819 06-60942 06-61033]

12/22/06        Motion filed by Petitioner Surfrider Fdn in 06-60772,
Petitioner MA Pub Int Rsrch Grp in 06-60819, Petitioner
Riverkeeper Inc in 06-60942, Petitioner Nat Resrc Def Cncl
in 06-60942, Petitioner Waterkeeper Alli Inc in 06-60942,
Petitioner Soundkeeper Inc in 06-61033, Petitioner DE
Riverkeeper Ntwrk in 06-61033, Petitioner Amer Littoral
Scty in 06-61033, Petitioner Raritan Baykeeper in 06-61033,
Petitioner Save the Bay-People in 06-61033, Petitioner
Friends of Casco Bay in 06-61033, Petitioner Santa Monica
in 06-61033 to transfer all five consolidated petitions for
review to U S Court of Appeals for the Second Circuit
[5636083-1]. Response/Opposition due on 1/8/07 in 06-60662,
in 06-60772, in 06-60819, in 06-60942, in 06-61033.    Date
of COS: 12/21/06  Sufficient [Y/N]: y [06-60662, 06-60772,
06-60819, 06-60942, 06-61033] (agl) [06-60662 06-60772
06-60819 06-60942 06-61033]

12/22/06        Appearance form filed by Philip Kent Correll for Petitioner
Surfrider Fdn in 06-60772, Edward Lloyd for Petitioner
Surfrider Fdn in 06-60772, Reed W Super for Petitioner
Surfrider Fdn in 06-60772. [06-60772] ( No. of forms filed:
3) (mbc) [06-60772]

Docket as of October 5, 2007 11:55 am        Page 8

---

06-60662 ConocoPhillips Co, et al v. EPA

12/29/06        Motion filed by Respondent EPA in 06-60662, Petitioner
ConocoPhillips Co in 06-60662, Petitioner Anadarko
Petroleum in 06-60662, Intervenor Cooling Water Intake in
06-60662, Respondent EPA in 06-60772, Respondent Amer
Petroleum Inst in 06-60772, Intervenor Cooling Water Intake
in 06-60772, Respondent EPA in 06-60819, Intervenor Cooling
Water Intake in 06-60819, Respondent EPA in 06-60942,
Respondent Stephen L Johnson in 06-60942, Intervenor
Cooling Water Intake in 06-60942, Respondent EPA in
06-61033, Respondent Stephen L Johnson in 06-61033,
Intervenor Cooling Water Intake in 06-61033 to extend time
to file response to motion to transfer [5636083-1] by
Petitioner Surfrider Fdn, MA Pub Int Rsrch Grp, Riverkeeper
Inc, Nat Resrc Def Cncl, Waterkeeper Alli Inc, Soundkeeper
Inc, DE Riverkeeper Ntwrk, Amer Littoral Scty, Raritan
Baykeeper, Save the Bay-People, Friends of Casco Bay, Santa
Monica in 06-60662, motion to transfer [5636083-1] by
Petitioner Surfrider Fdn, MA Pub Int Rsrch Grp, Riverkeeper
Inc, Nat Resrc Def Cncl, Waterkeeper Alli Inc, Soundkeeper
Inc, DE Riverkeeper Ntwrk, Amer Littoral Scty, Raritan
Baykeeper, Save the Bay-People, Friends of Casco Bay, Santa
Monica in 06-60772, motion to transfer [5636083-1] by
Petitioner Surfrider Fdn, MA Pub Int Rsrch Grp, Riverkeeper
Inc, Nat Resrc Def Cncl, Waterkeeper Alli Inc, Soundkeeper
Inc, DE Riverkeeper Ntwrk, Amer Littoral Scty, Raritan
Baykeeper, Save the Bay-People, Friends of Casco Bay, Santa

Monica in 06-60819, motion to transfer [5636083-1] by
Petitioner Surfrider Fdn, MA Pub Int Rsrch Grp, Riverkeeper
Inc, Nat Resrc Def Cncl, Waterkeeper Alli Inc, Soundkeeper
Inc, DE Riverkeeper Ntwrk, Amer Littoral Scty, Raritan
Baykeeper, Save the Bay-People, Friends of Casco Bay, Santa
Monica in 06-60942, motion to transfer [5636083-1] by
Petitioner Surfrider Fdn, MA Pub Int Rsrch Grp, Riverkeeper
Inc, Nat Resrc Def Cncl, Waterkeeper Alli Inc, Soundkeeper
Inc, DE Riverkeeper Ntwrk, Amer Littoral Scty, Raritan
Baykeeper, Save the Bay-People, Friends of Casco Bay, Santa
Monica in 06-61033 [5639503-1]. Date of COS: 12/28/06
Sufficient [Y/N]: y [06-60662, 06-60772, 06-60819,
06-60942, 06-61033] (agl) [06-60662 06-60772 06-60819
06-60942 06-61033]

1/3/07          CLERK Order filed granting joint motion to extend time to
                file response to petitioners' motion to transfer
                proceedings to the 2nd Circuit [5639503-1] until 2/7/07 in
                06-60662, in 06-60772, in 06-60819, in 06-60942, in
                06-61033. Response Opposition ddl updated to 2/7/07 in
                06-60662, 06-60772, 06-60819, 06-60942, 06-61033. Copies to
                all counsel. [06-60662, 06-60772, 06-60819, 06-60942,
                06-61033] (agl) [06-60662 06-60772 06-60819 06-60942
                06-61033]

Docket as of October 5, 2007 11:55 am          Page 9

---

06-60662 ConocoPhillips Co, et al v. EPA

1/11/07         Letter referencing counsel of record form [5566253-1] by
                Fredric P Andes filed by Respondent Amer Petroleum Inst in
                06-60772 [5649624-1]   [06-60772]   (SEND TO SCREENING
                JUDGE/PANEL) (agl) [06-60772]

1/17/07         Motion filed by Petitioner Surfrider Fdn in 06-60772,
                Petitioner MA Pub Int Rsrch Grp in 06-60819, Petitioner
                Riverkeeper Inc in 06-60942, Petitioner Nat Resrc Def Cncl
                in 06-60942, Petitioner Waterkeeper Alli Inc in 06-60942,
                Petitioner Soundkeeper Inc in 06-61033, Petitioner DE
                Riverkeeper Ntwrk in 06-61033, Petitioner Amer Littoral
                Scty in 06-61033, Petitioner Raritan Baykeeper in 06-61033,
                Petitioner Save the Bay-People in 06-61033, Petitioner
                Friends of Casco Bay in 06-61033, Petitioner Santa Monica
                in 06-61033 to extend time to file all petitioners' briefs
                until 10 days after disposition of motion to transfer
                [5654911-1]. Date of COS: 1/16/07 Sufficient [Y/N]: y
                [06-60662, 06-60772, 06-60819, 06-60942, 06-61033] (agl)
                [06-60662 06-60772 06-60819 06-60942 06-61033]

1/19/07         CLERK Order filed granting motion to extend time to file
                all petitioners' briefs [5654911-1] in 06-60662, 06-60772,
                06-60819, 06-60942, 06-61033 until the earlier of 10
                business days after ruling on the motion to transfer or
                March 30, 2007.  Copies to all counsel. [06-60662,
                06-60772, 06-60819, 06-60942, 06-61033] (agl)
                [06-60662 06-60772 06-60819 06-60942 06-61033]

1/30/07         Letter referencing counsel of record form [5566253-1] by
                Fredric P Andes  filed by Respondent Amer Petroleum Inst in
                06-60772 [5663130-1]  [06-60772]  (SEND TO SCREENING
                JUDGE/PANEL) (agl) [06-60772]

2/7/07          Response/opposition filed by Respondent EPA in 06-60662,
                Respondent EPA in 06-60772, Respondent EPA in 06-60819,
                Respondent EPA in 06-60942, Respondent EPA in 06-61033 to
                motion to transfer appeal [5636083-1] by Petitioner
                Surfrider Fdn, MA Pub Int Rsrch Grp, Riverkeeper Inc, Nat
                Resrc Def Cncl, Waterkeeper Alli Inc, Soundkeeper Inc, DE
                Riverkeeper Ntwrk, Amer Littoral Scty, Raritan Baykeeper,
                Save the Bay-People, Friends of Casco Bay, Santa Monica in
                06-60662, 06-60772, 06-60819, 06-60942, 06-61033. Date of
                COS: 2/6/07  Sufficient [Y/N]: y [5670659-1] [06-60662,
                06-60772, 06-60819, 06-60942, 06-61033] (agl)
                [06-60662 06-60772 06-60819 06-60942 06-61033]

Docket as of October 5, 2007 11:55 am                 Page 10

---

06-60662 ConocoPhillips Co, et al v. EPA

2/7/07          Response/opposition filed by Petitioner ConocoPhillips Co
                in 06-60662, Petitioner Anadarko Petroleum in 06-60662,
                Intervenor Cooling Water Intake in 06-60662, Respondent
                Amer Petroleum Inst in 06-60772, Intervenor Cooling Water
                Intake in 06-60772, Intervenor Cooling Water Intake in
                06-60819, Intervenor Cooling Water Intake in 06-60942,
                Intervenor Cooling Water Intake in 06-61033 to motion to
                transfer appeal [5636083-1] by Petitioner Surfrider Fdn, MA
                Pub Int Rsrch Grp, Riverkeeper Inc, Nat Resrc Def Cncl,
                Waterkeeper Alli Inc, Soundkeeper Inc, DE Riverkeeper
                Ntwrk, Amer Littoral Scty, Raritan Baykeeper, Save the
                Bay-People, Friends of Casco Bay, Santa Monica in 06-60662,
                06-60772, 06-60819, 06-60942, 06-61033. Reply to
                Response/Opposition due on 2/16/07 in 06-60662, in
                06-60772, in 06-60819, in 06-60942, in 06-61033. Date of
                COS: 2/6/07  Sufficient [Y/N]: y [5671127-1] [06-60662,
                06-60772, 06-60819, 06-60942, 06-61033] (agl)
                [06-60662 06-60772 06-60819 06-60942 06-61033]

2/15/07         Appearance form filed by Charles Craig Caldart for
                Petitioner MA Pub Int Rsrch Grp in 06-60819. [06-60662,
                06-60772, 06-60819, 06-60942, 06-61033] (No. of forms
                filed: 1) (adb) [06-60662 06-60772 06-60819 06-60942
                06-61033]

2/16/07         Motion filed by Petitioner Riverkeeper Inc in 06-60942,
                Petitioner Nat Resrc Def Cncl in 06-60942, Petitioner
                Waterkeeper Alli Inc in 06-60942 [5682460-1] to file in
                excess pages the  reply to the response/opposition
                [5670659-1] in 06-60662, response/opposition [5671127-1] in
                06-60662, motion to transfer appeal [5636083-1] in
                06-60662, response/opposition [5670659-1] in 06-60772,
                response/opposition [5671127-1] in 06-60772, motion to

```
                   transfer appeal [5636083-1] in 06-60772,
                   response/opposition [5670659-1] in 06-60819,
                   response/opposition [5671127-1] in 06-60819, motion to
                   transfer appeal [5636083-1] in 06-60819,
                   response/opposition [5670659-1] in 06-60942,
                   response/opposition [5671127-1] in 06-60942, motion to
                   transfer appeal [5636083-1] in 06-60942,
                   response/opposition [5670659-1] in 06-61033,
                   response/opposition [5671127-1] in 06-61033, motion to
                   transfer appeal [5636083-1] in 06-61033.  Date of COS:
                   2/15/07  Sufficient [Y/N]: y [06-60662, 06-60772, 06-60819,
                   06-60942, 06-61033] (mbc) [06-60662 06-60772 06-60819
                   06-60942 06-61033]
```

Docket as of October 5, 2007 11:55 am              Page 11

---

06-60662 ConocoPhillips Co, et al v. EPA

2/16/07            Supplemental declaration of Reed W Super filed as
                   Memorandum by Petitioner Riverkeeper Inc in 06-60942,
                   Petitioner Nat Resrc Def Cncl in 06-60942, Petitioner
                   Waterkeeper Alli Inc in 06-60942 in support of motion to
                   transfer appeal [5636083-1] by Petitioner Surfrider Fdn, MA
                   Pub Int Rsrch Grp, Riverkeeper Inc, Nat Resrc Def Cncl,
                   Waterkeeper Alli Inc, Soundkeeper Inc, DE Riverkeeper
                   Ntwrk, Amer Littoral Scty, Raritan Baykeeper, Save the
                   Bay-People, Friends of Casco Bay, Santa Monica in 06-60662,
                   motion to transfer appeal [5636083-1] by Petitioner
                   Surfrider Fdn, MA Pub Int Rsrch Grp, Riverkeeper Inc, Nat
                   Resrc Def Cncl, Waterkeeper Alli Inc, Soundkeeper Inc, DE
                   Riverkeeper Ntwrk, Amer Littoral Scty, Raritan Baykeeper,
                   Save the Bay-People, Friends of Casco Bay, Santa Monica in
                   06-60772, motion to transfer appeal [5636083-1] by
                   Petitioner Surfrider Fdn, MA Pub Int Rsrch Grp, Riverkeeper
                   Inc, Nat Resrc Def Cncl, Waterkeeper Alli Inc, Soundkeeper
                   Inc, DE Riverkeeper Ntwrk, Amer Littoral Scty, Raritan
                   Baykeeper, Save the Bay-People, Friends of Casco Bay, Santa
                   Monica in 06-60819, motion to transfer appeal [5636083-1]
                   by Petitioner Surfrider Fdn, MA Pub Int Rsrch Grp,
                   Riverkeeper Inc, Nat Resrc Def Cncl, Waterkeeper Alli Inc,
                   Soundkeeper Inc, DE Riverkeeper Ntwrk, Amer Littoral Scty,
                   Raritan Baykeeper, Save the Bay-People, Friends of Casco
                   Bay, Santa Monica in 06-60942, motion to transfer appeal
                   [5636083-1] by Petitioner Surfrider Fdn, MA Pub Int Rsrch
                   Grp, Riverkeeper Inc, Nat Resrc Def Cncl, Waterkeeper Alli
                   Inc, Soundkeeper Inc, DE Riverkeeper Ntwrk, Amer Littoral
                   Scty, Raritan Baykeeper, Save the Bay-People, Friends of
                   Casco Bay, Santa Monica in 06-61033 [5682476-1] [06-60662,
                   06-60772, 06-60819, 06-60942, 06-61033] (mbc)
                   [06-60662 06-60772 06-60819 06-60942 06-61033]

2/22/07            CLERK Order filed granting motion to file reply to
                   response/opposition to motion to transfer consolidated
                   petitions for review to the Second Circuit Pursuant to 28
                   U.S.C. Sect 2112(a) in excess pages [5682460-1] in
                   06-60662, 06-60772, 06-60819, 06-60942, 06-61033 Copies to

                    all counsel. [06-60662, 06-60772, 06-60819, 06-60942,
                    06-61033] (cmb) [06-60662 06-60772 06-60819 06-60942
                    06-61033]

Docket as of October 5, 2007 11:55 am                    Page 12

06-60662 ConocoPhillips Co, et al v. EPA

2/22/07          Reply filed by Petitioner Surfrider Fdn in 06-60772,
                 Petitioner MA Pub Int Rsrch Grp in 06-60819, Petitioner
                 Riverkeeper Inc in 06-60942, Petitioner Nat Resrc Def Cncl
                 in 06-60942, Petitioner Waterkeeper Alli Inc in 06-60942,
                 Petitioner Soundkeeper Inc in 06-61033, Petitioner DE
                 Riverkeeper Ntwrk in 06-61033, Petitioner Amer Littoral
                 Scty in 06-61033, Petitioner Raritan Baykeeper in 06-61033,
                 Petitioner Save the Bay-People in 06-61033, Petitioner
                 Friends of Casco Bay in 06-61033, Petitioner Santa Monica
                 in 06-61033 to  response/opposition [5670659-1] in
                 06-60662, response/opposition [5671127-1] in 06-60662,
                 motion to transfer appeal [5636083-1] Reply to Resp/Opp due
                 ddl satisfied. in 06-60662, response/opposition [5670659-1]
                 in 06-60772, response/opposition [5671127-1] in 06-60772,
                 motion to transfer appeal [5636083-1] in 06-60772,
                 response/opposition [5670659-1] in 06-60819,
                 response/opposition [5671127-1] in 06-60819, motion to
                 transfer appeal [5636083-1] in 06-60819,
                 response/opposition [5670659-1] in 06-60942,
                 response/opposition [5671127-1] in 06-60942, motion to
                 transfer appeal [5636083-1] in 06-60942,
                 response/opposition [5670659-1] in 06-61033,
                 response/opposition [5671127-1] in 06-61033, motion to
                 transfer appeal [5636083-1] in 06-61033 [5683303-1]
                 [06-60662, 06-60772, 06-60819, 06-60942, 06-61033] (cmb)
                 [06-60662 06-60772 06-60819 06-60942 06-61033]

3/22/07          COURT Order filed denying petitioners' to transfer
                 consolidated petitions for review to the United States
                 Court of Appeals for the Second Circuit. [5636083-1] in
                 06-60662, 06-60772, 06-60819, 06-60942, 06-61033. A/Pet's
                 Brief ddl updated to 3/30/07 for Anadarko Petroleum in
                 06-60662, for ConocoPhillips Co in 06-60662, for Surfrider
                 Fdn in 06-60772, for MA Pub Int Rsrch Grp in 06-60819, for
                 Waterkeeper Alli Inc in 06-60942, for Nat Resrc Def Cncl in
                 06-60942, for Riverkeeper Inc in 06-60942, for Santa Monica
                 in 06-61033, for Friends of Casco Bay in 06-61033, for Save
                 the Bay-People in 06-61033, for Raritan Baykeeper in
                 06-61033, for Amer Littoral Scty in 06-61033, for DE
                 Riverkeeper Ntwrk in 06-61033, for Soundkeeper Inc in
                 06-61033.    (WED/RHB/FPB) Copies to all counsel. [06-60662,
                 06-60772, 06-60819, 06-60942, 06-61033] (agl)
                 [06-60662 06-60772 06-60819 06-60942 06-61033]

4/2/07           Appellant's Brief filed by Petitioner ConocoPhillips Co in
                 06-60662, Petitioner Anadarko Petroleum in 06-60662.   Disk
                 Provided [Y/N]: y  Sufficient [Y/N]: y [5715818-1]
                 [06-60662, 06-60772, 06-60819, 06-60942, 06-61033] A/Pet's

Brief ddl satisfied. (cmb) [06-60662 06-60772 06-60819 06-60942 06-61033]

Docket as of October 5, 2007 11:55 am       Page 13

---

06-60662 ConocoPhillips Co, et al v. EPA

| | |
|---|---|
| 4/2/07 | Record excerpts filed by Petitioner ConocoPhillips Co in 06-60662, Petitioner Anadarko Petroleum in 06-60662. Disk Provided [Y/N]: n [06-60662, 06-60772, 06-60819, 06-60942, 06-61033] (cmb) [06-60662 06-60772 06-60819 06-60942 06-61033] |
| 4/2/07 | Addendum to brief filed by Petitioner Surfrider Fdn in 06-60772, Petitioner MA Pub Int Rsrch Grp in 06-60819, Petitioner Riverkeeper Inc in 06-60942, Petitioner Nat Resrc Def Cncl in 06-60942, Petitioner Waterkeeper Alli Inc in 06-60942, Petitioner Soundkeeper Inc in 06-61033, Petitioner DE Riverkeeper Ntwrk in 06-61033, Petitioner Amer Littoral Scty in 06-61033, Petitioner Raritan Baykeeper in 06-61033, Petitioner Save the Bay-People in 06-61033, Petitioner Friends of Casco Bay in 06-61033, Petitioner Santa Monica in 06-61033. No. of pages: . [06-60662, 06-60772, 06-60819, 06-60942, 06-61033] (cmb) [06-60662 06-60772 06-60819 06-60942 06-61033] |
| 4/2/07 | Record excerpts filed by Petitioner Surfrider Fdn in 06-60772, Respondent Amer Petroleum Inst in 06-60772, Intervenor Cooling Water Intake in 06-60772, Petitioner MA Pub Int Rsrch Grp in 06-60819, Petitioner Riverkeeper Inc in 06-60942, Petitioner Nat Resrc Def Cncl in 06-60942, Petitioner Waterkeeper Alli Inc in 06-60942, Petitioner Soundkeeper Inc in 06-61033, Petitioner DE Riverkeeper Ntwrk in 06-61033, Petitioner Amer Littoral Scty in 06-61033, Petitioner Raritan Baykeeper in 06-61033, Petitioner Save the Bay-People in 06-61033, Petitioner Friends of Casco Bay in 06-61033, Petitioner Santa Monica in 06-61033. Disk Provided [Y/N]: n [06-60662, 06-60772, 06-60819, 06-60942, 06-61033] (cmb) [06-60662 06-60772 06-60819 06-60942 06-61033] |
| 4/2/07 | Motion filed by Petitioner Surfrider Fdn in 06-60772, Petitioner MA Pub Int Rsrch Grp in 06-60819, Petitioner Riverkeeper Inc in 06-60942, Petitioner Nat Resrc Def Cncl in 06-60942, Petitioner Waterkeeper Alli Inc in 06-60942, Petitioner Soundkeeper Inc in 06-61033, Petitioner DE Riverkeeper Ntwrk in 06-61033, Petitioner Amer Littoral Scty in 06-61033, Petitioner Raritan Baykeeper in 06-61033, Petitioner Save the Bay-People in 06-61033, Petitioner Friends of Casco Bay in 06-61033, Petitioner Santa Monica in 06-61033 to file brief in excess of the word count limitation but not to exceed 17,941 words. [5716770-1] Date of COS: 3/30/07 Sufficient [Y/N]: y [06-60662, 06-60772, 06-60819, 06-60942, 06-61033] (agl) [06-60662 06-60772 06-60819 06-60942 06-61033] |

Docket as of October 5, 2007 11:55 am          Page 14

---

06-60662 ConocoPhillips Co, et al v. EPA

4/2/07          Letter referencing addendum in support of brief [5716609-1]
                by Petitioner Surfrider Fdn, MA Pub Int Rsrch Grp,
                Riverkeeper Inc, Nat Resrc Def Cncl, Waterkeeper Alli Inc,
                Soundkeeper Inc, DE Riverkeeper Ntwrk, Amer Littoral Scty,
                Raritan Baykeeper, Save the Bay-People, Friends of Casco
                Bay, Santa Monica in 06-60662, addendum in support of brief
                [5716609-1] by Petitioner Surfrider Fdn, MA Pub Int Rsrch
                Grp, Riverkeeper Inc, Nat Resrc Def Cncl, Waterkeeper Alli
                Inc, Soundkeeper Inc, DE Riverkeeper Ntwrk, Amer Littoral
                Scty, Raritan Baykeeper, Save the Bay-People, Friends of
                Casco Bay, Santa Monica in 06-60772, addendum in support of
                brief [5716609-1] by Petitioner Surfrider Fdn, MA Pub Int
                Rsrch Grp, Riverkeeper Inc, Nat Resrc Def Cncl, Waterkeeper
                Alli Inc, Soundkeeper Inc, DE Riverkeeper Ntwrk, Amer
                Littoral Scty, Raritan Baykeeper, Save the Bay-People,
                Friends of Casco Bay, Santa Monica in 06-60819, addendum in
                support of brief [5716609-1] by Petitioner Surfrider Fdn, MA
                Pub Int Rsrch Grp, Riverkeeper Inc, Nat Resrc Def Cncl,
                Waterkeeper Alli Inc, Soundkeeper Inc, DE Riverkeeper Ntwrk,
                Amer Littoral Scty, Raritan Baykeeper, Save the Bay-People,
                Friends of Casco Bay, Santa Monica in 06-60942, addendum
                brief(s) [5716609-1] by Petitioner Surfrider Fdn, MA Pub Int
                Rsrch Grp, Riverkeeper Inc, Nat Resrc Def Cncl, Waterkeeper
                Alli Inc, Soundkeeper Inc, DE Riverkeeper Ntwrk, Amer
                Littoral Scty, Raritan Baykeeper, Save the Bay-People,
                Friends of Casco Bay, Santa Monica in 06-61033 filed by
                Petitioner Surfrider Fdn in 06-60772, Petitioner MA Pub Int
                Rsrch Grp in 06-60819, Petitioner Riverkeeper Inc in
                06-60942, Petitioner Nat Def Cncl in 06-60942, Petitioner
                Waterkeeper Alli Inc in 06-60942, Petitioner Soundkeeper Inc
                in 06-61033, DE Riverkeeper Ntwrk in 06-61033, Petitioner
                Amer Littoral Scty in 06-61033, Petitioner Raritan Baykeeper
                in 06-61033, Petitioner Save the Bay-People in 06-61033,
                Petitioner Friends of Casco Bay in 06-61033, Petitioner
                Santa Monica 06-61033 [5717747-1] [06-60662, 06-60772,
                06-60819, 06-60942, 06-61033] (SEND TO SCREENING JUDGE AND
                PANEL) (cmb) [06-60662 06-60772 06-60819 06-60942 06-61033]

Docket as of October 5, 2007 11:55 am          Page 15

---

06-60662 ConocoPhillips Co, et al v. EPA

4/2/07          Appellant's Brief filed by Petitioner Surfrider Fdn in
                06-60772, Petitioner MA Pub Int Rsrch Grp in 06-60819,
                Petitioner Riverkeeper Inc in 06-60942, Petitioner Nat
                Resrc Def Cncl in 06-60942, Petitioner Waterkeeper Alli Inc
                in 06-60942, Petitioner Soundkeeper Inc in 06-61033,
                Petitioner DE Riverkeeper Ntwrk in 06-61033, Petitioner
                Amer Littoral Scty in 06-61033, Petitioner Raritan

Baykeeper in 06-61033, Petitioner Save the Bay-People in
06-61033, Petitioner Friends of Casco Bay in 06-61033,
Petitioner Santa Monica in 06-61033.   Disk Provided [Y/N]:
y Sufficient [Y/N]: y [5721318-1] [06-60772, 06-60662,
06-60819, 06-60942, 06-61033] A/Pet's Brief ddl satisfied.
E/Res's Brief due on 5/2/07 for Amer Petroleum Inst in
06-60772, for EPA in 06-60772, for EPA in 06-60662, for EPA
in 06-60819, for Stephen L Johnson in 06-60942, for EPA in
06-60942, for Stephen L Johnson in 06-61033, for EPA in
06-61033. (cmb) [06-60662 06-60772 06-60819 06-60942
06-61033]

4/5/07        CLERK Order filed granting Petitioners' motion to file
              brief in excess of the word count limitation [5716770-1] in
              06-60662, 06-60772, 06-60819, 06-60942, 06-61033. Copies to
              all counsel [06-60662, 06-60772, 06-60819, 06-60942,
              06-61033]. (ksa) [06-60662 06-60772 06-60819 06-60942
              06-61033]

4/13/07       Unopposed motion filed by Respondent EPA in 06-60662,
              Respondent EPA in 06-60772, Respondent EPA in 06-60819,
              Respondent EPA in 06-60942, Respondent Stephen L Johnson in
              06-60942, Respondent EPA in 06-61033, Respondent Stephen L
              Johnson in 06-61033 to extend time to file respondents'
              brief for 57 days until 6/28/07 [5725649-1].   Date of COS:
              4/12/07 Sufficient [Y/N]: y [06-60662, 06-60772, 06-60819,
              06-60942, 06-61033] (agl) [06-60662 06-60772 06-60819
              06-60942 06-61033]

4/13/07       CLERK Order filed granting unopposed motion to extend time
              to file Respondents' Brief [5725649-1] Res's Brief ddl
              updated to 6/28/07 for EPA in 06-60662, for EPA for EPA in
              06-60819, for Stephen L Johnson in 06-60942, for EPA in
              06-60942, for Stephen L Johnson in 06-61033, for EPA in
              06-61033. in 06-60662, 06-60772, 06-60819, 06-60942,
              06-61033 Copies to all counsel. [06-60662, 06-60772,
              06-60819, 06-60942, 06-61033] (ksa) [06-60662 06-60772
              06-60819 06-60942 06-61033]

5/9/07        Overdue brief notice issued to Respondent Amer Petroleum
              Inst in 06-60772 [06-60772] E/Res's Brief ddl updated to
              5/21/07 for Amer Petroleum Inst. (pac) [06-60772]

5/21/07       Unopposed motion filed by Petitioner MA Pub Int Rsrch Grp
              in 06-60819 to substitute party Environment Massachusetts
              as petitioner in place of MA Pub Int Rsrch Grp [5756670-1].
              Date of COS: 5/17/07 Sufficient [Y/N]: y [06-60819] (agl)

Docket as of October 5, 2007 11:55 am              Page 16

_____

06-60662 ConocoPhillips Co, et al v. EPA

              [06-60819]

5/30/07       COURT Order filed granting petitioner's unopposed motion to
              substitute party [5756670-1] (Environment Massachusetts

substituted for terminated party MA Pub Int Rsrch Grp in 06-60819.) in 06-60819 (REB) Copies to all counsel. [06-60662, 06-60772, 06-60819, 06-60942, 06-61033] (adb) [06-60662 06-60772 06-60819 06-60942 06-61033]

6/19/07        Unopposed motion filed by Respondent EPA in 06-60662, Respondent EPA in 06-60772, Respondent EPA in 06-60819, Respondent EPA in 06-60942, Respondent Stephen L Johnson in 06-60942, Respondent EPA in 06-61033, Respondent Stephen L Johnson in 06-61033 to extend time to file respondent's brief for 15 days until 7/13/07 [5778573-1], and to establish remaining briefing deadlines in this case [5778573-2].   Date of COS: 6/18/07  Sufficient [Y/N]: y [06-60662, 06-60772, 06-60819, 06-60942, 06-61033] (agl) [06-60662 06-60772 06-60819 06-60942 06-61033]

6/19/07        CLERK Order filed granting unopposed motion to extend time to file Respondents' Brief [5778573-1]. E/Res's Brief ddl updated to 7/13/07 for EPA in 06-60662, for EPA in 06-60772, for EPA in 06-60819, for Stephen L Johnson in 06-60942, for EPA in 06-60942, for Stephen L Johnson in 06-61033, for EPA in 06-61033. in 06-60662, 06-60772, 06-60819, 06-60942, 06-61033, denying unopposed motion to establish remaining briefing deadlines [5778573-2] in 06-60662, 06-60772, 06-60819, 06-60942, 06-61033 Copies to all counsel. [06-60662, 06-60772, 06-60819, 06-60942, 06-61033] (agl) [06-60662 06-60772 06-60819 06-60942 06-61033]

7/16/07        Unopposed motion filed by Respondent EPA in 06-60662, Respondent EPA in 06-60772, Respondent EPA in 06-60819, Respondent EPA in 06-60942, Respondent Stephen L Johnson in 06-60942, Respondent EPA in 06-61033, Respondent Stephen L Johnson in 06-61033 to file brief in excess of the word count limitation but not to exceed 27,954 words. [5800648-1] Date of COS: 7/13/07  Sufficient [Y/N]: y [06-60662, 06-60772, 06-60819, 06-60942, 06-61033] (agl) [06-60662 06-60772 06-60819 06-60942 06-61033]

Docket as of October 5, 2007 11:55 am              Page 17

---

06-60662 ConocoPhillips Co, et al v. EPA

7/16/07        Appellee's Brief filed by Respondent EPA in 06-60662, Respondent EPA in 06-60772, Respondent EPA in 06-60819, Respondent EPA in 06-60942, Respondent Stephen L Johnson in 06-60942, Respondent EPA in 06-61033, Respondent Stephen L Johnson in 06-61033.   Disk Provided [Y/N]: Y  Sufficient [Y/N]: Y [5800700-1] [06-60662, 06-60772, 06-60819, 06-60942, 06-61033] E/Res's Brief ddl satisfied. Intervenor Brief due on 7/23/07 for Cooling Water Intake in 06-60662, for Cooling Water Intake in 06-60772, for Amer Petroleum Inst in 06-60772, for Cooling Water Intake in 06-60819, for Cooling Water Intake in 06-60942, for Cooling Water Intake in 06-61033. (adb) [06-60662 06-60772 06-60819 06-60942 06-61033]

7/16/07               Addendum to brief filed by Respondent EPA in 06-60662,
                          Respondent EPA in 06-60772, Respondent EPA in 06-60819,
                          Respondent EPA in 06-60942, Respondent Stephen L Johnson in
                          06-60942, Respondent EPA in 06-61033, Respondent Stephen L
                          Johnson in 06-61033.  No. of pages: 182.  [06-60662,
                          06-60772, 06-60819, 06-60942, 06-61033] (adb)
                          [06-60662 06-60772 06-60819 06-60942 06-61033]

7/16/07               CLERK Order filed granting respondent's unopposed motion to
                          file brief in excess of the word count limitation
                          [5800648-1] in 06-60772, 06-60819, 06-60942, 06-61033
                          Copies to all counsel. [06-60662, 06-60772, 06-60819,
                          06-60942, 06-61033] (adb) [06-60662 06-60772 06-60819
                          06-60942 06-61033]

7/17/07               Phone extension confirmed for Intervenor Cooling Water
                          Intake in 06-60662, Intervenor Amer Petroleum Inst in
                          06-60772, Intervenor Cooling Water Intake in 06-60819,
                          Intervenor Cooling Water Intake in 06-60942, Intervenor
                          Cooling Water Intake in 06-61033 for filing brief.  Extension granted to
                        and including 7/30/07. [06-60662, 06-60772, 06-60819,
                        06-60942, 06-61033] Intervenor Brief ddl updated to 7/30/07
                        for Cooling Water Intake in 06-60662, for Cooling Water
                        Intake in 06-60772, for Amer Petroleum Inst in 06-60772,
                        for Cooling Water Intake in 06-60819, for Cooling Water
                        Intake in 06-60942, for Cooling Water Intake in 06-61033.
                        (cmb) [06-60662 06-60772 06-60819 06-60942 06-61033]

7/25/07               Motion filed by Entergy Corporation to file amicus brief in
                        support of respondent EPA [5809666-1]. Response/Opposition
                        due on 8/6/07 in 06-60662, in 06-60772, in 06-60819, in
                        06-60942, in 06-61033.    Date of COS: 7/24/07  Sufficient
                        [Y/N]: y [06-60662, 06-60772, 06-60819, 06-60942, 06-61033]
                        (agl) [06-60662 06-60772 06-60819 06-60942 06-61033]

Docket as of October 5, 2007 11:55 am              Page 18

---

06-60662 ConocoPhillips Co, et al v. EPA

7/25/07               CLERK Order filed GRANTING motion of Entergy Corporation to
                        file amicus brief in support of EPA [5809666-1] in
                        06-61033, 06-60772, 06-60819, 06-60942, 06-61033. Copies to
                        all counsel. [06-60662, 06-60772, 06-60819, 06-60942,
                        06-61033] (mfn) [06-60662 06-60772 06-60819 06-60942
                        06-61033]

7/25/07               Amicus curiae brief filed by Entergy Corp. Consent included
                        in brief? [Y/NA] NA Disk Provided [Y/N]: Y Sufficient
                        [Y/N]: Y [5810361-1] [06-60662, 06-60772, 06-60819,
                        06-60942, 06-61033] (mfn) [06-60662 06-60772 06-60819
                        06-60942 06-61033]

8/2/07                Intervenor brief filed by Intervenor Cooling Water Intake in
                        06-60662, Intervenor Amer Petroleum Inst in 06-60772,

Intervenor Cooling Water Intake in 06-60772, Intervenor
Cooling Water Intake in 06-60819, Intervenor Cooling Water
Intake in 06-60942, Intervenor Cooling Water Intake in
06-61033. Disk Provided [Y/N]: Y Sufficient [Y/N]: N NO
APPEARANCE FORM FOR ATTORNEY RUSSELL FRYE [5815411-1]
[06-60662, 06-60772, 06-60819, 06-60942, 06-61033]
Intervenor Brief ddl satisfied. Reply Brief due on 8/16/07
for Anadarko Petroleum in 06-60662, for ConocoPhillips Co in
06-60662, for Surfrider Fdn in 06-60772, for Env
Massachusetts in 06-60819, for Waterkeeper Alli Inc in
06-60942, for Nat Resrc Def Cncl in 06-60942, for
Riverkeeper Inc in 06-60942, for Santa Monica in 06-61033,
for Friends of Casco Bay in 06-61033, for Save the
Bay-People in 06-61033, for Raritan Baykeeper in 06-61033,
for Amer Littoral Scty in 06-61033, for DE Riverkeeper Ntwrk
in 06-61033, for Soundkeeper Inc in 06-61033. Sufficient
Brief due on 8/13/07 for Cooling Water Intake in 06-60662,
for Cooling Water Intake in 06-60772, for Cooling Water
Intake in 06-60819, for Cooling Water Intake in 06-60942,
for Cooling Water Intake in 06-61033. (adb) [06-60662
06-60772 06-60819 06-60942 06-61033]

Docket as of October 5, 2007 11:55 am              Page 19

---

06-60662 ConocoPhillips Co, et al v. EPA

8/2/07          Phone extension confirmed for Petitioner ConocoPhillips Co
                in 06-60662, Petitioner Anadarko Petroleum in 06-60662,
                Petitioner Surfrider Fdn in 06-60772, Petitioner MA Pub Int
                Rsrch Grp in 06-60819, Petitioner Env Massachusetts in
                06-60819, Petitioner Riverkeeper Inc in 06-60942,
                Petitioner Nat Resrc Def Cncl in 06-60942, Petitioner
                Waterkeeper Alli Inc in 06-60942, Petitioner Soundkeeper
                Inc in 06-61033, Petitioner DE Riverkeeper Ntwrk in
                06-61033, Petitioner Amer Littoral Scty in 06-61033,
                Petitioner Raritan Baykeeper in 06-61033, Petitioner Save
                the Bay-People in 06-61033, Petitioner Friends of Casco Bay
                in 06-61033, Petitioner Santa Monica in 06-61033 for filing
                reply brief. Extension granted to and including 8/23/07.
                [06-60662, 06-60772, 06-60819, 06-60942, 06-61033] Reply
                Brief ddl updated to 8/23/07 for Anadarko Petroleum in
                06-60662, for ConocoPhillips Co in 06-60662, for Surfrider
                Fdn in 06-60772, for Env Massachusetts in 06-60819, for
                Waterkeeper Alli Inc in 06-60942, for Nat Resrc Def Cncl in
                06-60942, for Riverkeeper Inc in 06-60942, for Santa Monica
                in 06-61033, for Friends of Casco Bay in 06-61033, for Save
                the Bay-People in 06-61033, for Raritan Baykeeper in
                06-61033, for Amer Littoral Scty in 06-61033, for DE
                Riverkeeper Ntwrk in 06-61033, for Soundkeeper Inc in
                06-61033. (agl) [06-60662 06-60772 06-60819 06-60942
                06-61033]

8/7/07          Appearance form filed by Russell Scott Frye for Intervenor
                Cooling Water Intake in 06-60662, Russell Scott Frye for
                Intervenor Cooling Water Intake in 06-60772, Russell Scott
                Frye for Intervenor Cooling Water Intake in 06-60819,

```
                    Russell Scott Frye for Intervenor Cooling Water Intake in
                    06-60942, Russell Scott Frye for Intervenor Cooling Water
                    Intake in 06-61033. [06-60662, 06-60772, 06-60819,
                    06-60942, 06-61033] ( No. of forms filed: 1) Sufficient
                    Brief ddl satisfied. (adb) [06-60662 06-60772 06-60819
                    06-60942 06-61033]

8/8/07              Motion filed by Respondent EPA in 06-60662, Respondent EPA
                    in 06-60772, Respondent EPA in 06-60819, Respondent EPA in
                    06-60942, Respondent Stephen L Johnson in 06-60942,
                    Respondent Stephen L Johnson in 06-61033, Respondent Stephen L Johnson in
                    06-61033 to vacate the clerk's order of 7/25/07
                    [5819528-1], to strike amicus curiae brief of Entergy Corp
                    [5819528-2]. Response/Opposition due on 8/20/07 in
                    06-60662, in 06-60772, in 06-60819, in 06-60942, in
                    06-61033.   Date of COS: 8/7/07 Sufficient [Y/N]: y
                    [06-60662, 06-60772, 06-60819, 06-60942, 06-61033] (agl)
                    [06-60662 06-60772 06-60819 06-60942 06-61033]

Docket as of October 5, 2007 11:55 am                    Page 20
```

---

```
06-60662 ConocoPhillips Co, et al v. EPA

8/8/07              Motion filed by Petitioner Surfrider Fdn in 06-60772,
                    Petitioner Env Massachusetts in 06-60819, Petitioner
                    Riverkeeper Inc in 06-60942, Petitioner Nat Resrc Def Cncl
                    in 06-60942, Petitioner Waterkeeper Alli Inc in 06-60942,
                    Petitioner Soundkeeper Inc in 06-61033, Petitioner DE
                    Riverkeeper Ntwrk in 06-61033, Petitioner Amer Littoral
                    Scty in 06-61033, Petitioner Raritan Baykeeper in 06-61033,
                    Petitioner Save the Bay-People in 06-61033, Petitioner
                    Friends of Casco Bay in 06-61033, Petitioner Santa Monica
                    in 06-61033 to vacate clerk's order of 7/25/07 [5819543-1],
                    or alternatively, to vacate clerk's order of 7/25/07 and
                    permit Entergy to refile an amicus brief containing only
                    the issue that is actually offered in support of EPA
                    [5819543-2]. Response/Opposition due on 8/20/07 in
                    06-60662, in 06-60772, in 06-60819, in 06-60942, in
                    06-61033.   Date of COS: 8/27/07 Sufficient [Y/N]: y
                    [06-60662, 06-60772, 06-60819, 06-60942, 06-61033] (agl)
                    [06-60662 06-60772 06-60819 06-60942 06-61033]

8/10/07             Response/opposition filed by Amicus Curiae Entergy Corp in
                    06-60662, Amicus Curiae Entergy Corp in 06-60772, Amicus
                    Curiae Entergy Corp in 06-60819, Amicus Curiae Entergy Corp
                    in 06-60942, Amicus Curiae Entergy Corp in 06-61033 to
                    motion to vacate order [5819528-1] by Respondent EPA
                    Stephen L Johnson in 06-60662, 06-60772, 06-60819,
                    06-60942, 06-61033, motion to strike brief [5819528-2] by
                    Respondent EPA, Stephen L Johnson 06-60662, 06-60772,
                    06-60819, 06-60942, 06-61033, motion to vacate order
                    [5819543-1] by Petitioner Surfrider Fdn, Env Massachusetts,
                    Riverkeeper Inc, Nat Resrc Def Cncl, Waterkeeper Alli Inc,
                    Soundkeeper Inc, DE Riverkeeper Ntwrk, Amer Littoral Scty,
                    Raritan Baykeeper, Save the Bay-People, Friends of Casco
                    Bay, Santa Monica in 06-60662, 06-60772, 06-60942,
```

06-61033, alternative motion to vacate clerk's order and
permit Entergy to refile amicus brief containing only the
issue that is actually offered in support of EPA
[5819543-2] by Petitioner Surfrider Fdn, Env Massachusetts,
Riverkeeper Inc, Nat Resrc Def Cncl, Waterkeeper Alli Inc,
Soundkeeper Inc, DE Riverkeeper Ntwrk, Amer Littoral Scty,
Raritan Baykeeper, Save the Bay-People, Friends of Casco
Bay, Santa Monica in 06-60662, 06-60772, 06-60819,
06-60942, 06-61033. Response/Opposition ddl satisfied.
Reply to Resp/Opp due on 8/20/07 in 06-60662, in 06-60772,
in 06-60819, in 06-60942, in 06-61033.  Date of COS: 8/9/07
Sufficient [Y/N]: y [5821798-1] [06-60662, 06-60772,
06-60819, 06-60942, 06-61033] (agl) [06-60662 06-60772
06-60819 06-60942 06-61033]

Docket as of October 5, 2007 11:55 am                Page 21

_____

06-60662 ConocoPhillips Co, et al v. EPA

8/16/07          Reply filed by Respondent EPA in 06-60662, Respondent EPA
                 in 06-60772, Respondent EPA in 06-60819, Respondent EPA in
                 06-60942, Respondent Stephen L Johnson in 06-60942,
                 Respondent EPA in 06-61033, Respondent Stephen L Johnson in
                 06-61033 to  response/opposition [5821798-1] in 06-60662,
                 motion to vacate order [5819528-1] in 06-60662, motion to
                 strike brief [5819528-2] in 06-60662, response/opposition
                 [5821798-1] in 06-60772, motion to vacate order [5819528-1]
                 in 06-60772, motion to strike brief [5819528-2] in
                 06-60772, response/opposition [5821798-1] in 06-60819,
                 motion to vacate order [5819528-1] in 06-60819, motion to
                 strike brief [5819528-2] in 06-60819, response/opposition
                 [5821798-1] in 06-60942, motion to vacate order [5819528-1]
                 in 06-60942, motion to strike brief [5819528-2] in
                 06-60942, response/opposition [5821798-1] in 06-61033,
                 motion to vacate order [5819528-1] in 06-61033, motion to
                 strike brief [5819528-2] in 06-61033.  Sufficient [Y/N]: y
                 [5825623-1] [06-60662, 06-60772, 06-60819, 06-60942,
                 06-61033] (agl) [06-60662 06-60772 06-60819 06-60942
                 06-61033]

8/16/07          Reply filed by Petitioner Surfrider Fdn in 06-60772,
                 Petitioner Env Massachusetts in 06-60819, Petitioner
                 Riverkeeper Inc in 06-60942, Petitioner Nat Resrc Def Cncl
                 in 06-60942, Petitioner Waterkeeper Alli Inc in 06-60942,
                 Petitioner Soundkeeper Inc in 06-61033, Petitioner DE
                 Riverkeeper Ntwrk in 06-61033, Petitioner Amer Littoral
                 Scty in 06-61033, Petitioner Raritan Baykeeper in 06-61033,
                 Petitioner Save the Bay-People in 06-61033, Petitioner
                 Friends of Casco Bay in 06-61033, Petitioner Santa Monica
                 in 06-61033 to  response/opposition [5821798-1] in
                 06-60662, motion to vacate order [5819543-1] in 06-60662,
                 motion for extraordinary relief [5819543-2] in 06-60662,
                 response/opposition [5821798-1] in 06-60772, motion to
                 vacate order [5819543-1] in 06-60772, motion for
                 extraordinary relief [5819543-2] in 06-60772,
                 response/opposition [5821798-1] in 06-60819, motion to

vacate order [5819543-1] in 06-60819, motion for
extraordinary relief [5819543-2] in 06-60819,
response/opposition [5821798-1] in 06-60942, motion to
vacate order [5819543-1] in 06-60942, motion for
extraordinary relief [5819543-2] in 06-60942,
response/opposition [5821798-1] in 06-61033, motion to
vacate order [5819543-1] in 06-61033, motion for
extraordinary relief [5819543-2] in 06-61033. Reply to
Resp/Opp due ddl satisfied. Sufficient [Y/N]: y
[5825632-1] [06-60662, 06-60772, 06-60819, 06-60942,
06-61033] (agl) [06-60662 06-60772 06-60819 06-60942
06-61033]

Docket as of October 5, 2007 11:55 am          Page 22

---

06-60662 ConocoPhillips Co, et al v. EPA

8/16/07          Unopposed motion filed by Petitioner Surfrider Fdn in
                 06-60772, Petitioner Env Massachusetts in 06-60819,
                 Petitioner Riverkeeper Inc in 06-60942, Petitioner Nat
                 Resrc Def Cncl in 06-60942, Petitioner Waterkeeper Alli Inc
                 in 06-60942, Respondent Stephen L Johnson in 06-60942,
                 Petitioner Soundkeeper Inc in 06-61033, Petitioner DE
                 Riverkeeper Ntwrk in 06-61033, Petitioner Amer Littoral
                 Scty in 06-61033, Petitioner Raritan Baykeeper in 06-61033,
                 Petitioner Save the Bay-People in 06-61033, Petitioner
                 Friends of Casco Bay in 06-61033, Petitioner Santa Monica
                 in 06-61033 [5825656-1] to hold briefing schedule in
                 abeyance pending the court's ruling on motions for
                 reconsideration, to allow the parties to jointly propose a
                 revised briefing schedule within 10 days after the parties
                 are notified of the court's ruling on reconsideration
                 [5825656-2]. Date of COS: 8/15/07  Sufficient [Y/N]: y
                 [06-60662, 06-60772, 06-60819, 06-60942, 06-61033] (agl)
                 [06-60662 06-60772 06-60819 06-60942 06-61033]

8/21/07          COURT Order filed denying motions of Respondents and
                 Environmental Petitioners to vacate the clerk's order of
                 July 25, 2007 granting the motion fo Entergy Corporation to
                 file amicus brief [5819528-1] [5819543-1] in 06-60662,
                 06-60772, 06-60819, 06-60942, 06-61033, denying
                 Respondent's motion to strike the amicus brief of Entergy
                 Corporation [5819528-2] in 06-60662, 06-60772, 06-60819,
                 06-60942, 06-61033, denying alternative motion of the
                 Environmental Petitioners to vacate the clerk's order
                 granting the motion of Enterguy Corporation to file amicus
                 brief and allow Entergy to re-file its amicus brief
                 addressing only the issue that is actually offered in
                 support of Respondent EPA [5819543-2] in 06-60662,
                 06-60772, 06-60819, 06-60942, 06-61033.  (RHB) Copies to
                 all counsel. [06-60662, 06-60772, 06-60819, 06-60942,
                 06-61033] (agl) [06-60662 06-60772 06-60819 06-60942
                 06-61033]

8/21/07          COURT Order filed granting unopposed motion of
                 Environmental Petitioners to hold the briefing schedule in

abeyance pending the court's ruling on the motions to
vacate the clerk's order of July 25, 2007 granting Entergy
Corporation leave to file an amicus brief [5825656-1] in
06-60662, 06-60772, 06-60819, 06-60942, 06-61033, granting
unopposed motion of Environmental Petitioners to allow the
parties to propose a revised briefing schedule within ten
(10) days after the court's ruling on the motions for
reconsideration [5825656-2] in 06-60662, 06-60772,
06-60819, 06-60942, 06-61033.  (RHB) Reply brief ddl
cancelled.  Copies to all counsel. [06-60662, 06-60772,
06-60819, 06-60942, 06-61033] (agl) [06-60662 06-60772
06-60819 06-60942 06-61033]

Docket as of October 5, 2007 11:55 am              Page 23

---

06-60662 ConocoPhillips Co, et al v. EPA

8/27/07          Appearance form filed by Elise Zoli for Amicus Curiae
                 Entergy Corp in 06-60662, Kevin Paul Martin for Amicus
                 Curiae Entergy Corp in 06-60662, Elise Zoli for Amicus
                 Curiae Entergy Corp in 06-60772, Kevin Paul Martin for
                 Amicus Curiae Entergy Corp in 06-60772, Elise Zoli for
                 Amicus Curiae Entergy Corp in 06-60819, Kevin Paul Martin
                 for Amicus Curiae Entergy Corp in 06-60819, Elise Zoli for
                 Amicus Curiae Entergy Corp in 06-60942, Kevin Paul Martin
                 for Amicus Curiae Entergy Corp in 06-60942, Elise Zoli for
                 Amicus Curiae Entergy Corp in 06-61033, Kevin Paul Martin
                 for Amicus Curiae Entergy Corp in 06-61033. [06-60662,
                 06-60772, 06-60819, 06-60942, 06-61033] (No. of forms
                 filed: 2) (adb) [06-60662 06-60772 06-60819 06-60942
                 06-61033]

8/31/07          Filing letter of Respondent EPA in 06-60662, Respondent EPA
                 in 06-60772, Respondent EPA in 06-60819, Respondent EPA in
                 06-60942, Respondent Stephen L Johnson in 06-60942,
                 Respondent EPA in 06-61033, Respondent Stephen L Johnson in
                 06-61033 dated 8/30/07 setting forth the parties' agreed
                 remainder of the briefing schedule.  [06-60662, 06-60772,
                 06-60819, 06-60942, 06-61033] (agl) [06-60662 06-60772
                 06-60819 06-60942 06-61033]

10/3/07          Appearance form filed by Michael Brunson Wallace for Amicus
                 Curiae Entergy Corp in 06-60662, Michael Brunson Wallace
                 for Amicus Curiae Entergy Corp in 06-60772, Michael Brunson
                 Wallace for Amicus Curiae Entergy Corp in 06-60819, Michael
                 Brunson Wallace for Amicus Curiae Entergy Corp in 06-60942,
                 Michael Brunson Wallace for Amicus Curiae Entergy Corp in
                 06-61033. [06-60662, 06-60772, 06-60819, 06-60942,
                 06-61033] (No. of forms filed: 1) (adb) [06-60662 06-60772
                 06-60819 06-60942 06-61033]

10/4/07          Motion filed by Amicus Curiae Entergy Corp in 06-60662,
                 Amicus Curiae Entergy Corp in 06-60772, Amicus Curiae
                 Entergy Corp in 06-60819, Amicus Curiae Entergy Corp in
                 06-60942, Amicus Curiae Entergy Corp in 06-61033 for leave
                 to file reply brief within 7 days from service of the

```
                    Environmental Petitioners' reply brief [5864587-1].
                    Response/Opposition due on 10/18/07 in 06-60662, in
                    06-60772, in 06-60819, in 06-60942, in 06-61033.    Date of
                    COS: 10/2/07  Sufficient [Y/N]: y [06-60662, 06-60772,
                    06-60819, 06-60942, 06-61033] (agl) [06-60662 06-60772
                    06-60819 06-60942 06-61033]
```

Docket as of October 5, 2007 11:55 am               Page 24

?

---

| PACER Service Center | | |
|---|---|---|
| Transaction Receipt | | |
| 10/09/2007 13:18:02 | | |
| PACER Login: | us1581 | Client Code: |
| Description: | dkt report | Case Number: | 06-60662 |
| Billable Pages: | 24 | Cost: | 1.92 |

---

**Note: The 'as of' date shown is the date of the last public or private docket entry. The docket does, however, show all entries as of today's date.**

# No. 06-60662

## *United States Court of Appeals*
## *for the Fifth Circuit*

CONOCOPHILLIPS CO.; ANDARKO PETROLEUM CORP.; SURFRIDER
FOUNDATION; MASSACHUSETTS PUBLIC INTEREST RESEARCH
GROUP; RIVERKEEPER, INC., NATURAL RESOURCES DEFENSE
COUNCIL, WATERKEEPER ALLIANCE, INC.; SOUNDKEEPER, INC.;
DELAWARE RIVERKEEPER NETWORK; AMERICAN LITTORAL
SOCIETY; RARITAN BAYKEEPER, INC. dba NY/NJ BAYKEEPER; SAVE
THE BAY–PEOPLE FOR NARRAGANSETT BAY; FRIENDS OF CASCO
BAY; SANTA MONICA BAYKEEPER

*Petitioners*

*-against-*

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY;
STEPHEN L. JOHNSON, ADMINISTRATOR, IN HIS OFFICIAL CAPACITY
AS ADMINISTRATOR OF THE UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY

*Respondent*s

### ON PETITION FOR REVIEW OF FINAL ACTION OF THE
### UNITED STATES ENVIRONMENTAL PROTECTION AGENCY

### BRIEF OF THE ENVIRONMENTAL PETITIONERS
Riverkeeper, Inc., Natural Resources Defense Council, Waterkeeper Alliance, Inc.,
Soundkeeper, Inc., Delaware Riverkeeper Network, American Littoral Society, Raritan
Baykeeper, Inc. d/b/a NY/NJ Baykeeper, Save the Bay–People for Narragansett Bay,
Friends of Casco Bay, Santa Monica Baykeeper, Inc., Surfrider Foundation, and
Massachusetts Public Interest Research Group, Inc.

| | |
|---|---|
| Charles C. Caldart | Reed W. Super |
| NATIONAL ENVIRONMENTAL LAW CENTER | Edward Lloyd |
| 3240 Eastlake Ave East, Suite 100 | MORNINGSIDE HEIGHTS LEGAL SERVICES, INC. |
| Seattle, Washington 98102 | Environmental Law Clinic |
| Tel: 206-568-2853  Fax: 206-568-2858 | Columbia University School of Law |
| *Attorney for Petitioner Massachusetts* | 435 West 116th Street |
| *Public Interest Research Group, Inc.* | New York, New York 10027 |
| | Tel: 212-854-4291  Fax: 212-854-3554 |
| | *Attorneys for Environmental Petitioners* |
| March 30, 2007 | *(except Massachusetts Public Interest* |
| | *Research Group, Inc.)* |

additional counsel listed on inside cover

P. Kent Correll
LAW OFFICE OF P. KENT CORRELL
300 Park Avenue, 17th Floor
New York, New York 10022
Tel: 212-475-3070   Fax: 212-475-2378
*Attorney for Environmental Petitioners*
*(except Massachusetts Public Interest Research Group, Inc.)*


On the brief:

Daniel Brian (law student intern)
Michael Goettig (law student intern)
Sarah Hollinshead (law student intern)
Lucas Munoz (law student intern)
Won Park (law student intern)
David Sander (law student intern)

Environmental Law Clinic
Columbia University School of Law
435 West 116th Street
New York, New York 10027


Joseph J. Mann
NATIONAL ENVIRONMENTAL LAW CENTER
369 Broadway Street, Suite 200
San Francisco, California  94133

## CERTIFICATE OF INTERESTED PERSONS

*ConocoPhillips Company and Anadarko Petroleum Corporation*, Petitioners *v. United States Environmental Protection Agency*, Respondent, No. 06-60662 (and consolidated cases)

The undersigned counsel of record certifies that the following listed private (non-governmental) persons and entities as described in the fourth sentence of 5th Cir. Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

### Environmental Petitioners
Riverkeeper, Inc.
Natural Resources Defense Council
Waterkeeper Alliance, Inc.
Soundkeeper, Inc.
Delaware Riverkeeper Network
American Littoral Society
Raritan Baykeeper, Inc. d/b/a NY/NJ Baykeeper
Save the Bay—People for Narragansett Bay
Friends of Casco Bay
Santa Monica Baykeeper, Inc.
Surfrider Foundation
Massachusetts Public Interest Research Group, Inc.

### Counsel for Environmental Petitioners
Reed W. Super, Morningside Heights Legal Services, Inc.
Edward Lloyd, Morningside Heights Legal Services, Inc.
P. Kent Correll, Law Office of P. Kent Correll
Chuck C. Caldart, National Environmental Law Center

### Industry Petitioners
ConocoPhillips Company
Anadarko Petroleum Corporation

### Counsel for Industry Petitioners
Jackson Battle, Brown McCarroll, LLP
Kurt Howard, Kuhn Brown McCarroll, LLP

i

**Intervenors**
American Petroleum Institute
Cooling Water Intake Structure Coalition
American Chemistry Council
American Forest & Paper Association
American Iron & Steel Institute
Utility Water Act Group
General Electric Company

**Counsel for Intervenors**
David Ballard, Barnes & Thornburg LLP
Fredric P. Andes, Barnes & Thornburg LLP
Russell S. Frye, Fryelaw, PLLC

Pursuant to Fed. R. App. Proc. 26.1(a), the undersigned counsel states that the
Environmental Petitioners (see list above) are all not-for-profit corporations that do
not have parent corporations and have not issued any stock.

Dated:  March 30, 2007

Reed W. Super
MORNINGSIDE HEIGHTS LEGAL SERVICES, INC.
Environmental Law Clinic
Columbia University School of Law
435 West 116th Street
New York, New York 10027
Tel:  212-854-4291
Fax:  212-854-3554

ii

## <u>REQUEST FOR ORAL ARGUMENT</u>

Environmental Petitioners believe that oral argument would be beneficial and respectfully request oral argument.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ............................................................ i

REQUEST FOR ORAL ARGUMENT ................................................................... iii

TABLE OF CONTENTS .......................................................................................... iv

TABLE OF AUTHORITIES .................................................................................. viii

JURISDICTIONAL STATEMEMT ........................................................................... 1

ISSUES PRESENTED ............................................................................................... 3

STATEMENT OF THE CASE ................................................................................... 5

    A.      STATEMENT OF FACTS ....................................................................... 5

    B.      STATUTORY FRAMEWORK ............................................................... 7

            1.      The Clean Water Act ....................................................................... 7

            2.      Section 316(b) .............................................................................. 11

    C.      PROCEEDINGS BELOW ..................................................................... 13

            1.      Case-By-Case Permitting ............................................................. 13

            2.      The Consent Decree ..................................................................... 13

            3.      The Phase I Rule ........................................................................... 14

            4.      The Phase II Rule .......................................................................... 15

            5.      EPA's Proposed National, Categorical,
                    Technology-Based Regulations for Existing
                    Manufacturing Facilities ............................................................. 17

            6.      EPA's Decision Not to Promulgate BTA
                    Regulations for Existing Manufacturing Facilities ................... 18

SUMMARY OF ARGUMENT ..............................................................................20

STANDARD OF REVIEW ..................................................................................23

ARGUMENT ........................................................................................................25

POINT I.................................................................................................................25

THIS COURT LACKS JURISDICTION OVER
ENVIRONMENTAL PETITIONERS' CLAIMS...................................................25

    A.      CWA Section 509(b)(1)(E) Does Not Grant Jurisdiction
              to Review EPA's Decision *Not* to Promulgate
              Limitations...........................................................................................25

    B.      EPA Has Not Promulgated a Limitation Under CWA
              Section 316(b) for Existing Manufacturing Facilities.........................30

POINT II ...............................................................................................................37

THE CLEAN WATER ACT REQUIRES EPA TO ADOPT
NATIONAL, CATEGORICAL, TECHNOLOGY-BASED
STANDARDS FOR COOLING WATER INTAKE STRUCTURES....................37

    A.      The Act Imposes an Affirmative, Time-Limited Duty on
              EPA to Promulgate Requirements Applicable to Cooling
              Water Intake Structures. .....................................................................38

    B.      The Requirements for Cooling Water Intake Must be
              Issued as National Categorical Standards. ..........................................39

    C.      The Standards for Cooling Water Intake Must Require
              the Greatest Degree of Protection Attainable Through the
              Use of Available Technology...............................................................44

POINT III .................................................................................................... 47

EPA VIOLATED SECTION 316(b) BY BASING ITS
DETERMINATION ON COST-BENEFIT CONSIDERATIONS ......................... 47

   A.   The CWA Prohibits EPA from Basing its Section 316(b)
      Determinations on a Comparison of Costs to Benefits. ...................... 48

      1.   Section 316(b)'s Plain Language Prohibits Cost-
          Benefit Considerations. ............................................................ 48

      2.   Congress's Exclusion of Cost-Benefit Analysis
          from Section 316(b) Was Intentional. ....................................... 54

      3.   EPA Identifies No Valid Authority for its Cost-
          Benefit Approach. .................................................................... 57

          a.   EPA May Not Rewrite Section 316(b) Based
              on Its Interpretation of a Statement Made on
              the Floor of the House of Representatives. .................... 58

          b.   Section 316(b)'s Reference to an
              Environmental Endpoint Does Not Support
              EPA's Reliance on Cost-Benefit
              Considerations. ............................................................... 60

          c.   EPA May Not Substitute Its Own Cost-
              Benefit Policy for the Feasibility Framework
              Chosen by Congress. ...................................................... 64

POINT IV ................................................................................................... 70

   A.   EPA Ignored Key Data, and Its Conclusion Contradicts
      the Record. .......................................................................................... 70

   B.   Because EPA Provided No Explanation of Its Purported
      "Qualitative" Analysis of Non-Use Benefits, There is Not
      a Sufficient Basis for Judicial Review of its
      Determination. .................................................................................... 76

POINT V ...................................................................................................................79

EPA'S "EXPECTATION" THAT PERMIT WRITERS  WILL
CONSIDER "USEFUL GUIDANCE" IN THE RECORD IS
IMPERMISSIBLY VAGUE UNDER THE APA ...................................................79

POINT VI...................................................................................................................81

EPA VIOLATED THE APA BY FAILING TO PUBLISH OR
INCORPORATE BY REFERENCE THE INFORMATION
TO BE CONSIDERED BY PERMIT WRITERS....................................................81

CONCLUSION .........................................................................................................82

# TABLE OF AUTHORITIES

## FEDERAL CASES

Air Transp. Ass'n of Can. v. FAA, 254 F.3d 271 (D.C. Cir. 2001)..................................................................................................77

Alabama Power Co. v. Costle, 636 F.2d 323 (D.C. Cir. 1979)......................................................................................................64

American Frozen Food Inst. v. Train, 539 F.2d 107 (D.C. Cir. 1976).................................................................................................9, 40

American Iron & Steel Inst. v. EPA, 543 F.2d 521 (3d Cir. 1976)......................................................................................................31

American Paper Inst. v. EPA, 882 F.2d 287 (7th Cir. 1989)...................................................................................................32, 33

American Paper Inst. v. EPA, 890 F.2d 869 (7th Cir. 1989)......................................................................................................30

American Petroleum Inst. v. EPA, 858 F.2d 261 (5th Cir. 1988)......................................................................................................53

American Textile Mfrs. Inst. v. Donovan, 452 U.S. 409, (1981).................................................................................52, 53, 54, 57

Appalachian Power Co. v. EPA, 671 F.2d 801, 809 (4th Cir. 1982)......................................................................................................60

Appalachian Power Co. v. Train, 566 F.2d 451 (4th Cir. 1977)......................................................................................................13

Armco v. EPA, 869 F.2d 975 (6th Cir. 1989)..........................................................28

Association of Pac. Fisheries v. EPA, 615 F.2d 794 (9th Cir. 1980)......................................................................................................57

Atlas Copco v. EPA, 642 F.2d 458 (D.C. Cir. 1979) ...............................................79

Bates v. United States, 522 U.S. 23 (1997) ..............................................................56

Bethlehem Steel Corp. v. EPA, 538 F.2d 513 (2d Cir.
1976)........................................................................................................................25

BizCapital Bus. & Indus. Dev. Corp. v. Comptroller of
the Currency of the United States, 467 F.3d 871 (5th
Cir. 2006)................................................................................................................76

Bowen v. American Hosp. Ass'n, 476 U.S. 610 (1986) ...........................................76

Brock v. Cathedral Bluffs Shale Oil Co., 796 F.2d 533
(D.C. 1986)..............................................................................................................35

Central Hudson Gas & Elec. Corp. v. EPA, 587 F.2d 549
(2d Cir. 1978) ....................................................................................................25, 32

Chemical Mfrs. Ass'n v. EPA, 870 F.2d 177 (5th Cir.
1989)..................................................................................................................passim

Chevron U.S.A. v. NRDC, 467 U.S. 837 (1984)....................................23, 51, 66, 68

Citizens to Preserve Overton Park v. Volpe, 401 U.S. 416
(1971)......................................................................................................................23

Cronin v. Browner, 898 F.Supp. 1052 (S.D.N.Y. 1995) .........................................12

Cronin v. Browner, 90 F.Supp.2d 364 (S.D.N.Y. 2000) .....................................5, 14

Crown Simpson Pulp Co. v. Costle, 599 F.2d 897 (9th
Cir. 1979) ................................................................................................................28

E.I. du Pont de Nemours & Co. v. Train, 430 U.S. 112
(1977)..................................................................................................11, 39, 40, 52

Environmental Defense Fund v. EPA, 598 F.2d 62 (D.C.
Cir. 1978)................................................................................................................28

EPA v. Brown, 431 U.S. 99 (1977) .........................................................................80

EPA v. California, 426 U.S. 200 (1976)................................................................7, 8

EPA v. National Crushed Stone Assoc., 449 U.S. 64
(1980)..............................................................................................10, 11, 51, 53

Escoe v. Zerbst, 295 U.S. 490 (1935).......................................................38

Florida Power & Light Co. v. Lorion, 470 U.S. 729 (U.S.
1985).........................................................................................................76

Friends of the Earth v. EPA, 333 F.3d 184 (D.C. Cir.
2003)..........................................................................................................26

Friends of the Earth v. Laidlaw Envtl. Servs., 528 U.S.
167 (2000)....................................................................................................1

Garcia v. United States, 469 U.S. 70 (1984)..............................................48

Gozlon-Peretz v. United States, 498 U.S. 395 (1991) ..............................56

Hazardous Waste Treatment Council v. EPA, 886 F.2d
355 (D.C. Cir. 1989)...............................................................................49

Hooker Chems. & Plastics Corp. v. Train, 537 F.2d 620
(2d Cir. 1976) ........................................................................................9, 62

Hughes Aircraft Co. v. Jacobson, 525 U.S. 432 (1999) ...........................48

Hunt v. Washington State Apple Advertising Comm'n,
432 U.S. 333 (1977) ..................................................................................2

Keene Corp. v. United States, 508 U.S. 200 (1993)..................................56

Kennecott v. EPA, 780 F.2d 445 (4th Cir. 1985) ..............................10, 50

Longview Fibre Co. v. Rasmussen, 980 F.2d 1307 (9th
Cir. 1992)..................................................................................................25

Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.
Co., 463 U.S. 29 (1983).................................................................24, 70, 72

National Grain & Feed Ass'n v. Occupational Safety &
Health Admin., 866 F.2d 717 (5th Cir. 1989)......................................53

National Welfare Rights Org. v. Mathews, 533 F.2d 637
(D.C. Cir. 1976)....................................................................................................77

National Wildlife Federation v. EPA, 286 F.3d 554 (D.C.
Cir. 2002)............................................................................................................41

Northwest Envtl. Advocates v. EPA, 2005 U.S. Dist.
LEXIS 5373 (N.D. Cal., March 30, 2005). ........................................................31

NRDC v. EPA, 437 F.Supp.2d 1137 (C.D. Cal. 2006) ..........................................29

NRDC v. EPA, 822 F.2d 104 (D.C. Cir. 1987) .................................................11, 51

NRDC v. EPA, 859 F.2d 156 (D.C. Cir. 1988) .......................................................41

NRDC v. EPA, 863 F.2d 1420 (9th Cir. 1988)...................................................10, 50

NRDC v. EPA, No. CV 04-8307-GHK(RCx) (C.D. Cal.,
Aug. 29, 2005)................................................................................................29, 31

Office of Personnel Mgmt. v. Richmond, 496 U.S. 414
(1990)..................................................................................................................69

Pacific Coast Fed'n of Fishermen's Ass'ns v. National
Marine Fisheries Serv., 265 F.3d 1028 (9th Cir. 2001) .......................................77

Pennsylvania Department of Environmental Resources v.
EPA, 618 F.2d 991 (3d Cir. 1980) .......................................................................28

Public Citizen v. Mineta, 340 F.3d 39 (2d Cir. 2003) ............................................78

Regions Hospital v. Shalala, 522 U.S. 448 (1998) ..................................................48

Riverkeeper v. EPA, 358 F.3d 174 (2d Cir. 2004) ...........................................passim

Riverkeeper v. EPA, 475 F.3d 83 (2d Cir. 2007) .............................................passim

Riverkeeper v. Johnson, 93 Civ. 0314 (S.D.N.Y. 1993) .........................................14

Robinson v. Shell Oil Co., 519 U.S. 337 (1997) .....................................................49

Sierra Club v U.S. Fish and Wildlife Serv., 245 F.3d 434
(5th Cir. 2001) ........................................................................................................23

South Holland Metal Finishing Co. v. Browner, 97 F.3d
932 (7th Cir. 1996) ...............................................................................................31

South Terminal Corp. v. E.P.A., 504 F.2d 646 (1st Cir.
1974)...............................................................................................................79, 80

State of Md. v. E.P.A., 530 F.2d 215 (4th Cir. 1975)...............................................80

Sullivan v. Stroop, 496 U.S. 478 (1990)..................................................................49

Texas Office of Public Util. Counsel v. FCC, 265 F.3d
313 (5th Cir. 2001) ................................................................................................76

Texas Oil & Gas Ass'n v. EPA, 161 F.3d 923 (5th Cir.
1998)........................................................................................................45, 50, 52

Tripoli Rocketry Ass'n v. BATFE, 437 F.3d 75 (D.C. Cir.
2006)......................................................................................................................77

Trustees for Alaska v. EPA, 749 F.2d 549 (9th Cir. 1984) ......................................28

United States v. Ron Pair Enters., 489 U.S. 235 (U.S.
1989)......................................................................................................................60

Virginia Elec. & Power Co. v. Costle, 566 F.2d 446 (4th
Cir. 1977)..........................................................................................................passim

Weyerhaeuser v. Costle, 590 F.2d 1011 (D.C. Cir. 1978).......................9, 40, 62, 63

Whitman v. American Trucking Ass'ns, 531 U.S. 457
(2001)....................................................................................................................63

Women's Med. Ctr. v. Bell, 248 F.3d 411 (5th Cir. 2001) ......................................79

**FEDERAL STATUTES**

5 U.S.C. § 552(a) ........................................................................................................ 82

5 U.S.C. § 552(a)(1) .................................................................................................... 81

5 U.S.C. § 706(2)(A) .............................................................................................. 23, 70

5 U.S.C. § 551 ............................................................................................................. 29

28 U.S.C. § 2112(a)(1) ................................................................................................ 32

28 U.S.C. § 1331 ........................................................................................................... 2

29 U.S.C. § 655(b)(5) .................................................................................................. 53

33. U.S.C. § 701(a) ...................................................................................................... 55

33 U.S.C. § 1251(a) ................................................................................................. 7, 61

33 U.S.C. § 1311 ...................................................................................................... 8, 12

33 U.S.C. § 1311(b) ..................................................................................................... 61

33 U.S.C. § 1311(b)(1)(A) ..................................................................................... 13, 38, 59

33 U.S.C. § 1311(b)(1)(B) ........................................................................................... 13

33 U.S.C. § 1311(b)(2) .................................................................................... 10, 60, 66

33 U.S.C. § 1311(b)(2)(A) ..................................................................................... 39, 49

33 U.S.C. § 1311(b)(2)(C)–(F) .................................................................................... 38

33 U.S.C. § 1312(b)(2) ................................................................................................ 55

33 U.S.C. § 1314(b)(1)(B) ..................................................................................... 56, 59

33 U.S.C. § 1314(b)(4)(B) ........................................................................................... 56

33 U.S.C. § 1316 ................................................................................................... 11, 12

33 U.S.C. § 1316(b)(1)(A) .......................38

33 U.S.C. § 1316(b)(1)(B) .......................38, 39

33 U.S.C. § 1326(a) .......................63

33 U.S.C. § 1326(b) .......................37

33 U.S.C. § 1342 .......................8

33 U.S.C. § 1342(a)(1)(B) .......................10

33 U.S.C. § 1362 .......................37

33 U.S.C. § 1362(19) .......................7

33 U.S.C. § 1365(a)(2) .......................2

33 U.S.C. § 1369(b)(1) .......................1, 25, 31

33 U.S.C. § 1369(b)(1)(E) .......................2, 26

33 U.S.C. § 1369(b)(2) .......................32

33 U.S.C. § 701a .......................55

42 U.S.C. § 300g-1(b)(3)(C)(i)(IV) .......................55

42 U.S.C. § 6924(m)(1) .......................49

42 U.S.C. § 7545(c)(2)(B) .......................55

43 U.S.C. § 1347(b) .......................54

**FEDERAL REGULATIONS**

1 C.F.R. § 51.9 .......................82

40 C.F.R. §§ 122-125 .......................41

40 C.F.R. § 125 .................................................................................................18, 40

40 C.F.R. § 125.101 ................................................................................................17

40 C.F.R. § 125.3(c)................................................................................................33

40 C.F.R. § 125.80 ....................................................................................14, 32, 35

40 C.F.R. § 125.81(d) .............................................................................................14

40 C.F.R. § 125.83 ..................................................................................................49

40 C.F.R. § 125.90 ..........................................................................................15, 32

40 C.F.R. § 125.94(a)(5).........................................................................................16

40 C.F.R. § 125.94(b) .............................................................................................16

40 C.F.R. § 402.12 ..................................................................................................34

40 C.F.R. § 419 .......................................................................................................13

40 C.F.R. § 430 .......................................................................................................13

## FEDERAL REGISTER

41 Fed. Reg. 17,364 ................................................................................................36

44 Fed. Reg. 32,956 ................................................................................................13

52 Fed. Reg. 42,522 ................................................................................................27

66 Fed. Reg. 65,256 ..........................................................................................passim

69 Fed. Reg. 22,472 ................................................................................................29

69 Fed. Reg. 41,576 ...............................................................................6, 14, 15, 62

69 Fed. Reg. 68,444 ................................................................................passim

71 Fed. Reg. 35,006 ................................................................................passim

## LEGISLATIVE HISTORY

117 Cong. Rec. 38,808 ....................................................................................50

118 Cong. Rec. 33,762 ........................................................................45, 50, 58

H.R. 9 104th Congress ..................................................................................67

H.R. 961 104th Congress ..............................................................................67

H.R. Rep. No. 92-911 ......................................................................................41

*A Legislative History of the Water Pollution Control Act
Amendments of 1972*, 93d Cong., 1st Session ("1972
Leg. Hist") ..............................................................................................41, 45, 58

## OTHER AUTHORITIES

Executive Order 12866 .............................................................................34, 65, 66

Executive Order 13132 .....................................................................................34

March 20, 2007 Memorandum of Benjamin Grumbles,
Assistant Administrator, EPA Office of Water......................................17

In Re Brunswick Steam Electric Plant, USEPA, Decision
of the General Counsel, EPC GCO 41 .................................................11

In Re Public Service Co. of New Hampshire, 1 EAD 455,
at 21, 1978 WL 21140 ...........................................................................67

## SECONDARY SOURCES

Mary Jane Angelo, Embracing Uncertainty, Complexity,
and Change, 33 Ecology L.Q. 105 (2006)............................................................67

David M. Dreisen, Is Cost-benefit Analysis Neutral?, 77
U. Colo. L. Rev. 335 (2006).................................................................................68

David M. Driesen, Distributing the Costs of
Environmental, Health, and Safety Protection:  The
Feasibility Principle, Cost-Benefit Analysis, and
Regulatory Reform, 32 B.C. Envtl. Aff. L. Rev. 1
(2005)....................................................................................................................68

William H. Rodgers, Jr., Benefits, Costs, and Risks:
Oversight of Health and Environmental
Decisionmaking, 4 Harv. Envtl. L. Rev. 191 (1980) ...........................................68

Sidney A. Shaprio & Thomas O. McGarity, Not So
Paradoxical:  The Rationale For Technology-Based
Regulation, 1991 Duke L. J. 729.........................................................................68

Webster's Third New Int'l Dictionary ................................................................49, 59

## JURISDICTIONAL STATEMEMT

Environmental Petitioners[1] challenge the June 2006 decision of the United States Environmental Protection Agency ("EPA" or the "agency") *not* to promulgate regulations under Clean Water Act section 316(b) governing cooling water intake structures used by existing manufacturing facilities.  Instead of promulgating national, categorical, technology-based regulations, as required by section 316(b), EPA decided to "continue to rely on permit writers' use of their best professional judgment ... on a case-by-case basis."[2]  Environmental Petitioners contend that EPA's decision not to promulgate regulations violates the Clean Water Act ("CWA" or the "Act") and the Administrative Procedure Act ("APA").[3]

---

[1]  Riverkeeper, Inc., Natural Resources Defense Council, Waterkeeper Alliance, Inc., Soundkeeper, Inc., Delaware Riverkeeper Network, American Littoral Society, Raritan Baykeeper, Inc. d/b/a NY/NJ Baykeeper, Save the Bay–People for Narragansett Bay, Friends of Casco Bay, Santa Monica Baykeeper, Inc., Surfrider Foundation, and Massachusetts Public Interest Research Group, Inc.

[2]  National Pollutant Discharge Elimination System – Final Regulations to Establish Requirements for Cooling Water Intake Structures at Phase III Facilities, 71 Fed. Reg. 35,006, 35,016/3 - 35,018/3 (June 16, 2006).  In Federal Register citations in this brief, the number(s) following the "/" refer to the column(s).

[3]  Environmental Petitioners' petitions for review (nos. 06-60772, 06-60819, 06-60942, and 06-61033) were timely filed on July 7, 2006, June 30, 2006, June 30, 2006, and October 27, 2006, respectively, all on behalf of "interested persons" within the meaning of section 509(b)(1), 33 U.S.C. § 1369(b)(1).  The declarations included in the Addendum at Tab 9 demonstrate that Environmental Petitioners' members have standing to challenge EPA's action.  *See generally Friends of the*

This Court, however, lacks jurisdiction to review Environmental Petitioners'
claims because neither CWA section 509(b)(1)(E)[4] – which EPA contends
provides jurisdiction – nor any other statutory provision grants courts of appeal
original jurisdiction to review EPA's decisions *not* to promulgate limitations under
CWA section 316(b). Rather, such jurisdiction lies in the district courts under
CWA section 505(a)(2)[5] and the general federal question statute, 28 U.S.C. section
1331. The full jurisdictional argument is set forth in Point I, below.

_____

*Earth v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 180-81 (2000). Further,
Environmental Petitioners have representational standing on their members'
behalf. *See generally Hunt v. Washington State Apple Advertising Comm'n*, 432
U.S. 333, 343 (1977).

[4] 33 U.S.C. § 1369(b)(1)(E). To minimize potential confusion, we refer to
statutory provisions in the text by their section in the Clean Water Act and provide
parallel citations to the United States Code in footnotes.

[5] 33 U.S.C. § 1365(a)(2).

2

## ISSUES PRESENTED

1.    Whether this Court lacks jurisdiction to review EPA's June 2006 decision *not* to promulgate "best technology available" ("BTA") regulations for cooling water intake structures used by existing manufacturing facilities.

2.    Whether EPA violated CWA section 316(b) by deciding not to promulgate national, categorical, technology-based standards for cooling water intake structures at existing manufacturing facilities.

3.    Whether EPA violated CWA section 316(b) by basing its BTA determination for existing facilities on cost-benefit considerations.

4.    Whether EPA's "judgment" that the costs of the proposed regulation would be wholly disproportionate to the benefits was arbitrary and capricious because EPA compared *total* costs to *partial* benefits, while ignoring its own data in the record indicating that the total benefits would likely have been an order of magnitude greater than the total costs, and without explaining the basis for its conclusion.

5.    Whether EPA's "expectation" that permit writers making case-by-case BTA determinations for existing manufacturing facilities will consider unspecified "useful guidance" in an administrative record consisting of hundreds of thousands of pages is impermissibly vague under the APA.

6.    Whether EPA violated the APA's publication requirements by failing to publish, or incorporate by reference in the Federal Register, the information it states it "expects" permit writers will consider when making case-by-case BTA determinations for existing manufacturing facilities.

## STATEMENT OF THE CASE

### A.    STATEMENT OF FACTS

Factories use cooling water intake structures to withdraw water from natural waterbodies for cooling. These structures have enormous environmental impacts: the withdrawal of large volumes of water kills billions of fish and destabilizes wildlife populations.[6] Intake structures kill aquatic organisms by "entraining" them through plants' heat exchangers[7] and "impinging" them on intake screens,[8] and the discharge of heated water from cooling systems may also harm wildlife.[9] They affect the full spectrum of organisms in the aquatic ecosystem at all life stages (*e.g.*, eggs, larvae, juvenile, adult) from tiny photosynthetic organisms (phytoplankton) to fish, shrimp, crabs, birds, and marine mammals, including

---

[6] *See Riverkeeper v. EPA*, 358 F.3d 174, 181 (2d Cir. 2004) ("*Riverkeeper I*"); *Cronin v. Browner*, 90 F.Supp.2d 364, 366 (S.D.N.Y. 2000) ("[C]ooling water systems 'may interfere with the maintenance or establishment of optimum yields of sport or commercial fish and shellfish, decrease populations of endangered organisms, and seriously disrupt sensitive ecosystems.'").

[7] Fish and shellfish, eggs, larvae, and other organisms too small to be screened out are drawn through a cooling water intake structure into a plant's cooling system, where they are subjected to mechanical stress, thermal shock, and chemical exposure that few, if any, survive. 71 Fed. Reg. at 35,013/1.

[8] The force of water passing through the intake structure traps larger organisms on intake screens, resulting in harm or death through starvation, exhaustion, asphyxiation, or descaling. *Id.*

[9] *Cronin*, 90 F.Supp.2d at 366.

5

threatened and endangered species.[10]

Nationwide, EPA estimates that 683 manufacturing facilities in the pulp and paper, chemicals, petroleum and coal products, and primary metals industries, as well as smaller power plants, collectively withdraw 40 billion gallons of cooling water per day.[11] On average, a chemicals or metals manufacturing facility withdraws approximately 250 million gallons per day, while pulp and paper manufacturers and petroleum and coal refiners withdraw approximately 100 million gallons per day per facility.[12] Collectively, these facilities entrain and impinge approximately 265 million "age-1 equivalent" fish each year.[13]

Fortunately, this environmental damage can be dramatically reduced by available technology. For example, closed-cycle and dry cooling systems "reduce the amount of cooling water needed and in turn … directly reduce the number of aquatic organisms entrained in the cooling water intake structure"[14] as well as

---

[10]  69 Fed. Reg. at 41,576, 41,586/2 (July 9, 2004).

[11]  Technical Development Document for the Final Section 316(b) Phase III Rule, DCN 9-0004, at 2-2.

[12]  *Id*. at 2-4, Table 2.5.

[13]  71 Fed. Reg. at 35,033, Exh. X-1.

[14]  66 Fed. Reg. 65,256, 65,273/2-3 (Dec. 18, 2001). "Where a once-through cooling system would hypothetically entrain some 3.65 million organisms per year, closed cycle cooling would entrain about 180,000, and dry cooling would

impingement and other stresses on the ecosystem.[15]  EPA has also determined that

"a range of technologies" to reduce impingement and entrainment (such as fine

mesh traveling screens, barrier nets, and fish diversion or return systems) are

"commercially available" to the manufacturing industry.[16]

## B.    STATUTORY FRAMEWORK

### 1.    The Clean Water Act

The objective of the CWA is "to restore and maintain the chemical, physical,

and biological integrity of the Nation's waters."[17]  To effectuate this goal, in 1972,

Congress fundamentally reformed the Act in what has been described as a "sea

change" in this country's water pollution control strategy.[18]  Prior law had, among

other things, "focused on the tolerable effects rather than the preventable causes of

water pollution."[19]

---

entrain only 6,570 organisms." *Riverkeeper I*, 358 F.3d at 195 n.22; *see also id*. at 182 n.5 (explaining cooling system types).

[15]  Impingement is related to both intake capacity and velocity.  66 Fed. Reg. at 65,274/1.

[16]  69 Fed. Reg. at 68,444, 68,467/2-3 (Nov. 24, 2004).

[17]  CWA § 101(a), 33 U.S.C. § 1251(a).   The Act defines "pollution" to include "the man-made or man-induced alteration of the ... biological ... integrity of water."  CWA § 502(19), 33 U.S.C. § 1362(19).

[18]  *Riverkeeper I*, 358 F.3d at 184.

[19]  *EPA v. California*, 426 U.S. 200, 202-03 (1976).

As amended, the Act prohibits all discharges of pollutants to waters of the

United States, except as permitted in a National Pollutant Discharge Elimination

System (NPDES) permit.[20]  NPDES permits are issued by EPA or by "delegated"

state agencies that agree to conform their permitting practices to federal norms.[21]

To govern the setting of NPDES permit limitations, whether by state or federal

agencies, the CWA requires EPA to establish uniform, national, technology-based

standards for classes or categories of facilities, based on the most protective

technology available to the industry as a whole, and regardless of the receiving

water's quality.[22]  NPDES permits transform these generally applicable effluent

limitations and other standards into obligations borne by the individual

discharger.[23]

A significant objective of Congress was to standardize permitting and avoid

the "race to the bottom," which commonly occurred before 1972, when states

competed to attract industries by relaxing control requirements.  "Congress

considered uniformity vital to free the states from the temptation of relaxing local

---

[20]  CWA §§ 301, 402, 33 U.S.C. §§ 1311, 1342.

[21]  EPA has delegated NPDES permitting authority to 45 states.  *See*
http://cfpub.epa.gov/npdes/statestats.cfm?view=specific.

[22]  *Riverkeeper I*, 358 F.3d at 184 (citing cases).

[23]  *EPA v. California*, 426 U.S. at 205.

8

limitations in order to woo or keep industrial facilities."[24]

Congress's focus on uniform technology standards in the 1972 amendments

was an explicit repudiation of unsuccessful predecessor statutes that focused on the

harm caused by pollution rather than technologies available to prevent the

pollution.[25]  Under the 1972 Act:

> a discharger's performance is … measured against strict technology-based effluent limitations [setting forth] specified levels of treatment to which it *must conform* …  This new approach reflected developing views on practicality and rights. Congress concluded that water pollution seriously harmed the environment, and that although the cost of control would be heavy, the nation would benefit from controlling that pollution. Yet *scientific uncertainties made it difficult to assess the benefits to particular bodies of receiving water*.[26]

Congress thus "predicated pollution control on the application of control

technology on the plants themselves rather than on the measurement of water

quality."[27]

---

[24] *Weyerhaeuser v. Costle*, 590 F.2d 1011, 1042 (D.C. Cir. 1978); *see also American Frozen Food Inst. v. Train*, 539 F.2d 107, 129 (D.C. Cir. 1976) ("[W]ithout national standards …, the fifty states would be free to set widely varying pollution limitations…. States would be motivated to compete for industry by establishing minimal standards in their individual permit programs.").

[25] *Riverkeeper I*, 358 F.3d at 196 ("Congress rejected a regulatory approach that relies on water quality standards.").

[26] *Weyerhaeuser*, 590 F.2d at 1042 (emphasis added).

[27] *Hooker Chems. & Plastics Corp. v. Train*, 537 F.2d 620, 624 (2d Cir. 1976).  Water quality standards were retained in the 1972 Act as a supplementary

Congress intended the CWA's technology-based standards to become more stringent over time. For permits issued before EPA had promulgated national standards, NPDES permit writers used their "best professional judgment" (BPJ) on a case-by-case basis.[28] Next, by 1977, discharges from existing facilities were to be brought in line with the "best practicable control technology currently achievable" (BPT).[29] In the next phase, by 1989, most facilities nationwide would be required to step up the level of pollution control to standards based on the "best available technology economically achievable" (BAT).[30]

Finally, for new facilities, Congress created the strictest standard in the Act, "new source performance standards," which require the application of "best

---

mechanism that can be used to set limitations stricter, but not more lenient, than technology-based limitations. *Riverkeeper I*, 358 F.3d at 184 n.10.

[28] 33 U.S.C. § 1342(a)(1)(B). Even in BPJ cases, the conditions are to reflect best practices in the industry rather than local conditions. *See Natural Resources Defense Council ("NRDC") v. EPA*, 863 F.2d 1420, 1425 (9th Cir. 1988).

[29] BPT represents the "average of the best existing performance by plants ... within each industrial category. This average is not based upon a broad range of plants within an industrial category or subcategory, but is based upon performance levels achieved by exemplary plants." *EPA v. National Crushed Stone Assoc.*, 449 U.S. 64, 76 n.15 (1980).

[30] 33 U.S.C. § 1311(b)(2). BAT uses "the optimally operating plant, the pilot plant which acts as a beacon to show what is possible." *Kennecott v. EPA*, 780 F.2d 445, 448 (4th Cir. 1985).

available demonstrated control technology" (BADT).[31]  These standards are similar

to the technology-based limitations established for existing sources, except that no

cost-based variances are allowed during permitting.[32]  As the Supreme Court

recognized, the potential for harsh economic consequences does not dampen this

mandate.[33]  Indeed, with the passage of time and the tightening of the standards,

cost considerations were to be relegated to a more peripheral role in the selection

of best technology.[34]

### 2.    Section 316(b)

"[W]ell aware of the dangers posed to aquatic life by the withdrawal of large

volumes of water through cooling water intake structures,"[35] Congress included

section 316(b) in the 1972 Act as part of its technology-based framework.  Section

---

[31]  CWA § 306; 33 U.S.C. § 1316.

[32]  *E.I. du Pont de Nemours & Co. v. Train*, 430 U.S. 112, 137 (1977).

[33]  *Nat'l Crushed Stone*, 449 U.S. at 80 ("Comments in the Senate debate were explicit: 'There is no doubt that we will suffer some disruptions in our economy because of our efforts; many marginal plants may be forced to close.'").

[34]  *NRDC v. EPA*, 822 F.2d 104, 110 (D.C. Cir. 1987); *see also Riverkeeper I*, 358 F.3d at 185 (EPA "should give decreasing weight to expense as facilities have time to plan ahead to meet tougher restrictions.").

[35]  *In re Brunswick Steam Electric Plant*, USEPA, Decision of the General Counsel, EPA GCO 41 at 3 n.10 (June 1, 1976), citing Senate Com. on Public Works *A Legislative History of the Water Pollution Control Act Amendments of 1972*, 93d Cong., 1st Session ("1972 Leg. Hist"), at 196-197.

11

316(b) provides:

> Any standard established pursuant to [CWA sections 301 and 306[36]]
> and applicable to a point source shall require that the location, design,
> construction, and capacity of cooling water intake structures reflect
> the best technology available for minimizing adverse environmental
> impact.

Although they govern withdrawals rather than discharges, section 316(b)

limitations are "technology-based performance requirements analogous to those

derived for point sources under sections 301 (existing sources) and section 306

(new sources)."[37] As the statute indicates, technology-based standards under

sections 301 and 306 are to incorporate section 316(b)'s requirements,[38] and

section 316(b) regulations are to be promulgated at the same time as section 301

and 306 regulations.[39] Thus, EPA was required to promulgate section 316(b)

regulations for new facilities by January 18, 1974,[40] and for existing facilities by

---

[36] 33 U.S.C. §§ 1311, 1316.

[37] 66 Fed. Reg. at 65,285.

[38] *Riverkeeper I*, 358 F.3d at 185; *Virginia Elec. & Power Co. ("VEPCO")
v. Costle*, 566 F.2d 446, 449-50 (4th Cir. 1977); *Cronin v. Browner*, 898 F.Supp.
1052, 1059 (S.D.N.Y. 1995).

[39] *Cronin*, 898 F.Supp. at 1059.

[40] *See* CWA §§ 306(b)(1)(A), (B) (requiring new source performance
standards no later than one year and ninety days after October 18, 1972).

12

July 1, 1977.[41]

## C.    PROCEEDINGS BELOW

### 1.    <u>Case-By-Case Permitting</u>

EPA has promulgated BAT and BADT standards for the major

manufacturing industries that use cooling water, but those regulations do not

contain requirements relating to their intake structures.[42]  Consequently, section

316(b) limitations have been determined on an *ad hoc*, case-by-case basis by

individual permit writers, typically delegated state agencies, exercising their "best

professional judgment" since the CWA's enactment in 1972.  In 1977, EPA's first

section 316(b) regulation was remanded by the Fourth Circuit due to procedural

defects.[43]  EPA subsequently withdrew the regulation,[44] and for more than two

decades failed to propose any new cooling water intake regulations.

### 2.    <u>The Consent Decree</u>

In 1993, frustrated with EPA's inaction, several of the Environmental

Petitioners sued EPA in federal district court to compel issuance of the regulations

---

[41] *See* CWA §§ 301(b)(1)(A), (B) (effluent limitations for existing sources no later than July 1, 1977).

[42] *See, e.g.*, 40 C.F.R. Parts 419 (Petroleum Refining), 430 (Pulp, Paper, and Paperboard).

[43] *Appalachian Power Co. v. Train*, 566 F.2d 451, 458-59 (4th Cir. 1977).

[44] 44 Fed. Reg. 32,956 (June 7, 1979).

13

required by section 316(b).[45]  In 1995, EPA agreed to a consent decree ordering it

to take final action with respect to section 316(b) regulations by August 13, 2001.

Later, after EPA reported that it was unable to meet the Court-ordered deadline,[46]

the consent decree was modified to allow the agency to implement section 316(b)

in three phases:  Phase I (all new facilities); Phase II (large existing power plants);

Phase III (small existing power plants and all other existing facilities).[47]

### 3.    The Phase I Rule

On December 18, 2001, EPA promulgated its final Phase I rule,[48] codified at

40 C.F.R. § 125.80 *et seq.*, which covered all new facilities except offshore and

coastal oil and gas facilities, regulation of which EPA deferred to Phase III.[49]  The

Phase I Rule established a two-track regulatory approach for new facilities to

minimize impingement mortality and entrainment.  Track I included national

intake capacity and velocity requirements based on closed-cycle cooling

---

[45] *Riverkeeper v. Johnson*, 93 Civ. 0314 (S.D.N.Y.).

[46] *Cronin*, 90 F.Supp.2d at 368.

[47]  69 Fed. Reg. at 41,583/3.

[48]  National Pollutant Discharge Elimination System –Regulations
Addressing Cooling Water Intake Structures for New Facilities, 66 Fed. Reg.
65,256 – 65,345 (Dec. 18, 2001).

[49] *Id*. at 65,311/1; 40 C.F.R. § 125.81(d).

technology.[50]  Track II allowed permit applicants two alternative compliance

options, one of which involved unrelated "restoration measures" designed to

"maintain the fish and shellfish in the waterbody [at] a substantially similar level"

to that which would be achieved through Track I.[51]

In *Riverkeeper I*, the Second Circuit agreed that EPA's focus on reducing

impingement and entrainment was proper and upheld the Phase I Rule's closed-

cycle cooling requirement, as well as velocity limits and proportional flow limits.[52]

The Second Circuit also found that EPA exceeded its authority by allowing

compliance with section 316(b) through restoration measures, and remanded that

aspect of the rule.[53]

### 4.    The Phase II Rule

On July 9, 2004, EPA promulgated its Phase II Rule, codified at 40 C.F.R. §

125.90 *et seq.*, which was applicable to large existing power plants.[54]  The Phase II

Rule established performance standards expressed as ranges, specifically, a 60-90

---

[50]  *Riverkeeper I*, 358 F.3d at 182.

[51]  *Id.* at 183.

[52]  *Id.* at 196-200.

[53]  *Id.* at 189-191.

[54]  National Pollution Discharge Elimination System – Final Regulations to
Establish Requirements for Cooling Water Intake Structures at Phase II Existing
Facilities, 69 Fed. Reg. 41,576 – 41,693 (July 9, 2004).

15

percent reduction in entrainment and a 80-95 percent reduction in impingement.[55]

It also included alternative compliance options, including a site-specific

determination of BTA based on a cost-benefit analysis.[56]

The Second Circuit reviewed the Phase II Rule and, on January 25, 2007

issued the *Riverkeeper II* decision remanding significant portions of the rule.

Among other provisions, the court rejected as impermissible under the statute

"those provisions that (1) set performance standards as ranges without requiring

facilities to achieve the greatest reduction of adverse impacts they can; (2) allow

compliance through restoration measures; and (3) authorize a site-specific cost-

benefit variance."[57]   Notably, the Court held that "[i]f the EPA construed the

statute to permit cost-benefit analysis, its action was not 'based on a permissible

construction of the statute,'" [58] because section 316(b) "does not permit the EPA to

choose BTA [best technology available] on the basis of cost-benefit analysis."[59]   In

light of the *Riverkeeper II* decision, EPA suspended the Phase II Rule on March

---

[55]   40 C.F.R. § 125.94(b).

[56]   40 C.F.R. § 125.94(a)(5).

[57]   *Riverkeeper v. EPA*, 475 F.3d 83, 130-131 (2d Cir. 2007) ("*Riverkeeper II*").

[58]   *Id.* at 104 (citation omitted).

[59]   *Id.* at 101.

16

20, 2007.[60]

### 5.     EPA's Proposed National, Categorical, Technology-Based Regulations for Existing Manufacturing Facilities

On November 24, 2004, EPA published notice of proposed Phase III BTA

regulations governing cooling water intake structures at:  (1) all *existing* facilities

with a design intake capacity above a certain threshold in all industries except

those already regulated by the Phase II Rule; and (2) *new* oil rigs (which EPA had

excluded from the Phase I regulations).[61]

For existing manufacturing facilities (including those in the pulp and paper,

chemicals, petroleum and coal products, and primary metals industries), EPA

proposed national categorical BTA regulations consistent with the national

categorical BTA standards EPA had previously promulgated for Phase II

facilities.[62]  Specifically, EPA stated that "[f]or covered existing facilities, today's

proposed rule would establish performance standards for reducing impingement

mortality by 80 to 95 percent … and entrainment by 60 to 90 percent."[63]  While

---

[60] *See* March 20, 2007 Memorandum of Benjamin Grumbles, Assistant Administrator, EPA Office of Water, Addendum at Tab 7.

[61] 69 Fed. Reg. 68,444 – 68,564 (Nov. 24, 2004); *see also* proposed 40 C.F.R. § 125.101, published at 69 Fed. Reg. at 68,544-45.

[62] 69 Fed. Reg. at 68,466/1-2.

[63] *Id*. at 68,444/2.

17

EPA considered several regulatory thresholds, its primary regulatory option would have applied to 146 facilities in these industries, which collectively withdraw 31 billion gallons per day from waters of the United States.[64]

EPA explicitly found that the proposed national requirements for existing manufacturing facilities were "based on the best technology available to minimize the adverse environmental impact associated with the use of cooling water intake structures" and that such technology is both "technically available" and "economically practicable."[65]

### 6.    EPA's Decision Not to Promulgate BTA Regulations for Existing Manufacturing Facilities

On June 16, 2006, EPA published notice of its final action on Phase III regulations, which consisted of two different decisions: (1) the promulgation of regulations for new oil rigs, which are codified at 40 C.F.R. § 125, Subpart N; and (2) a separate decision *not* to promulgate regulations for existing manufacturing facilities. Thus, the "Phase III Rule" applies only to new oil and gas extraction facilities; there is no "Phase III Rule" for existing manufacturing facilities.

Thus, despite its own findings regarding the existence of technically available and economically practicable technology to minimize adverse

---

[64]  71 Fed. Reg. at 35,017/3.

[65]  69 Fed. Reg. at 68,444, 68,449.

18

environmental impact at existing manufacturing facilities, EPA "decided not to promulgate a national categorical rule ... for Phase III existing facilities" and instead "to continue to rely on permit writers' use of their best professional judgment ... on a case-by-case basis."[66] EPA's decision was based on "its judgment that the monetized costs associated with the primary option under consideration are wholly disproportionate to the monetized environmental benefits to be derived from that option,"[67] although it monetized the benefits of only 2.6 percent of the organisms that would be saved.

EPA estimated that the regulations it proposed but failed to adopt for existing manufacturers would have prevented the loss of as many of 98,200,000 "age-1 equivalent" fish and 4,770,000 pounds of fishery yields, annually.[68]

---

[66] 71 Fed. Reg. at 35,016/3 - 35,018/3.

[67] *Id*. at 35,016-17.

[68] *Id*. at 35,033, Exh. X-1.

## SUMMARY OF ARGUMENT

Courts must examine the basis for their jurisdiction before proceeding to consider the merits. Because Environmental Petitioners are challenging EPA's decision *not to promulgate* cooling water intake structure limitations, this Court lacks jurisdiction over those claims. Congress did not grant federal courts of appeal jurisdiction to review all of EPA actions under the CWA. Rather, in CWA section 509(b)(1) Congress specifically enumerated the limited circumstances in which the circuit courts have original jurisdiction. Significantly, this Court and others have consistently held that the courts of appeal lack original jurisdiction to review the action EPA took here – that is, a decision *not* to promulgate limitations under CWA sections 301 and 306. Accordingly, the merits of this case should be determined by a federal district court and not by this Court. (*See infra* Point I.)

If this Court reaches the merits, EPA's June 2006 decision not to establish national BTA standards for existing manufacturing facilities should be vacated and remanded to the agency for further rulemaking proceedings for five significant reasons.

First, EPA violated the statutory mandate imposed on it by CWA section 316(b) to promulgate regulations establishing BTA requirements for cooling water intake structures at existing manufacturing facilities. Where, as here, EPA finds that technology for minimizing the adverse environmental impact of intake

20

structures is available to the facilities at issue and the costs of that technology are feasible for the industry category as a whole, the agency may not make a policy decision to continue case-by-case permitting for cooling water intake structures at those facilities. Congress has already unambiguously made that determination and mandated EPA to promulgate national, categorical BTA requirements. (*See infra* Point II.)

Second, EPA violated the CWA by basing its June 2006 BTA determination for existing manufacturing facilities on cost-benefit considerations. Section 316(b)'s "best technology available" mandate requires EPA to establish standards based on the most protective technology that can be feasibly adopted by the industry category as a whole, without comparing the estimated costs of such technology to the estimated benefits. Conversely, where Congress intends that costs should be considered in relation to benefits, it explicitly indicates such intention on the face of the statute. Here EPA performed a monetized cost-benefit analysis and then explicitly based its rulemaking decision not to promulgate the proposed regulations, or any other regulations, for existing manufacturers on that cost-benefit analysis. EPA's decision violates CWA section 316(b) and must be set aside. (*See infra* Point III.)

Third, EPA's conclusion that the costs of its proposed regulation would be wholly disproportionate to its benefits was arbitrary and capricious because EPA

21

failed to examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made, and because EPA offered an explanation for its decision that runs counter to the evidence before the agency. By EPA's own admission, its monetized cost-benefit analysis compared complete costs to enormously incomplete benefits, capturing the value of only approximately 2.6 percent of the fish and other organisms that the proposed regulation would have protected. EPA then ignored its own preliminary valuation of benefits showing that even the low end of the range of total benefits was likely to be ten times higher than the costs of the rule, and failed to explain its purported qualitative benefits assessment of the other 97.4 percent of the aquatic organisms. (*See infra* Point IV.)

Fourth, EPA's "expectation" that "useful guidance" scattered throughout an administrative record consisting of hundreds of thousands of pages will be considered in case-by-case BTA determinations for existing manufacturing facilities is impermissibly vague because, at best, it merely describes EPA's regulatory goals or objectives, rather than giving regulated entities, permittees, and courts sufficient guidelines by which to measure performance. (*See infra* Point V.)

Fifth, EPA violated the APA's publication requirements by failing to publish in the Federal Register or incorporate by reference the information that such permit writers are to consider. (*See infra* Point VI.)

22

## **STANDARD OF REVIEW**

This Court's analysis of whether EPA has adhered to the CWA and APA proceeds in three steps. First, "[i]f Congress has 'directly spoken to the precise question at issue' and 'the intent of Congress is clear, that is the end of the matter; for the court, and the agency, must give effect to the unambiguously expressed intent of Congress.'"[69]

Second, "[i]f, ... the statute is silent or ambiguous with respect to the specific question at issue, then the question for the court is whether the agency's answer is based on a permissible construction of the statute."[70]

Third, under the APA, challenged agency action must be set aside if found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.[71] To make this finding the court must consider "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."[72] A court will find the action to be arbitrary and capricious if "[1] the agency has relied on factors which Congress has not intended it to

---

[69] *Chevron U.S.A. v. NRDC*, 467 U.S. 837, 842-43 (1984).

[70] *Id.* at 843.

[71] *Sierra Club v U.S. Fish and Wildlife Serv.*, 245 F.3d 434, 444 (5th Cir. 2001) (citing 5 U.S.C. §706(2)(A)).

[72] *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971).

consider, [2] entirely failed to consider an important aspect of the problem, [3] offered an explanation for its decision that runs counter to the evidence before the agency, or [4] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."[73]

---

[73] *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

## ARGUMENT

### POINT I

### THIS COURT LACKS JURISDICTION OVER ENVIRONMENTAL PETITIONERS' CLAIMS.

Contrary to EPA's contention, neither CWA section 509(b)(1)(E), nor any other statutory provision, provides this Court with jurisdiction over Environmental Petitioners' claims; jurisdiction lies instead in the district court. For the reasons set forth immediately below, this Court should dismiss Environmental Petitioners' petitions for lack of jurisdiction without prejudice to their proceeding with their complaint in district court.

### A.    CWA Section 509(b)(1)(E) Does Not Grant Jurisdiction to Review EPA's Decision *Not* to Promulgate Limitations.

Congress did not grant circuit courts jurisdiction to review all of EPA's final actions under the CWA. Instead,

> [t]he complexity and specificity of section 509(b) in identifying what actions of EPA under the [CWA] would be reviewable in the courts of appeals suggests that not all such actions are so reviewable. If Congress had so intended, it could have simply provided that all EPA action under the statute would be subject to review in the courts of appeals, rather than specifying particular actions and leaving out others.[74]

---

[74] *Bethlehem Steel Corp. v. EPA*, 538 F.2d 513, 517 (2d Cir. 1976). *See also Central Hudson Gas & Elec. Corp. v. EPA*, 587 F.2d 549, 555 (2d Cir. 1978) ("It is … clear … that the six categories of § 1369(b)(1) do not cover all possible forms of agency action."); *Longview Fibre Co. v. Rasmussen*, 980 F.2d 1307, 1313 (9th Cir. 1992) ("The specificity and precision of section [509], and the sense of it,

25

Therefore, jurisdiction in the court of appeals turns not on whether EPA has acted

or failed to act, or on whether EPA has issued a rule, but rather on whether the

challenged action is covered by the specific jurisdictional grant of section

509(b)(1)(E), which provides, in pertinent part, as follows:

> Review of the Administrator's action ... in approving or promulgating
> any effluent limitation or other limitation under section 301 [or] 306
> ... may be had by any interested person in the Circuit Court of
> Appeals of the United States .... [75]

The courts have uniformly held that EPA's *failure* to promulgate a

"limitation" under the CWA does not come within the ambit of section

509(b)(1)(E), even where it is expressed as a deliberate decision, is based on an

administrative record, and is published in the Federal Register in the preamble to a

separate but related regulation.  As this Court has explained, "federal district

courts, rather than the courts of appeals, have jurisdiction to hear claims that the

Administrator has failed to fulfill a mandatory duty [under the CWA] to

---

persuade us that it is designed to exclude" unlisted actions); *Friends of the Earth v.
EPA*, 333 F.3d 184, 193 (D.C. Cir. 2003) ("Given the specificity of the CWA's
judicial review provision, we join our sister circuits in holding that the courts of
appeals have original jurisdiction to review only those EPA actions specifically
enumerated in [section 509(b)(1)].").

[75]  33 U.S.C. § 1369(b)(1)(E).  Neither EPA, nor any other party, has
indicated that they believe any other subsection of section 509(b)(1), or any other
jurisdictional provision confers original jurisdiction on this Court.

promulgate regulations or that the Administrator has abused his discretion by not promulgating regulations."[76]

In *Chemical Manufacturers*, EPA promulgated final regulations establishing national categorical technology-based standards for a variety of chemicals discharged by manufacturing plants in the organic chemicals, plastics, and synthetic fibers industries.[77]  In the preamble to those regulations, EPA stated it was *not* setting national limitations for certain pollutants, and that permit limits for such pollutants would instead continue to be established by permit writers on a case-by-case basis.[78]  The petitioner filed a petition for review of the regulations EPA promulgated as well as EPA's decision not to promulgate additional regulations.  This Court reviewed the regulations EPA promulgated for certain pollutants, but held that it was without jurisdiction to review EPA's decision not to promulgate regulations for other pollutants, explaining:

> In effect, [petitioner] asks us to compel the EPA to promulgate effluent limitations for these pollutants.  *Petitioner brings this complaint, however, before the wrong forum. ...* [Petitioner] does not complain that the effluent limitations promulgated by the Administrator to control toxic and nonconventional pollutants are in some way defective or deficient.  Rather, petitioner seeks to compel the Administrator to promulgate such regulations in the first instance.

---

[76]  *Chemical Mfrs. Ass'n v. EPA*, 870 F.2d 177, 266 (5th Cir. 1989).

[77]  *Id.* at 184.

[78]  *See* 52 Fed. Reg. 42,522, 42,544, 42,567 (Nov. 5, 1987).

*Such suits clearly lie within the exclusive jurisdiction of the district court.* [79]

Other circuits are in complete accord. See, for example, *Environmental Defense Fund ("EDF") v. EPA*. 598 F.2d 62, 87 (D.C. Cir. 1978) (arguments that "EPA should promulgate additional regulations … may only be presented to a district court"); *Pennsylvania Department of Environmental Resources v. EPA*, 618 F.2d 991, 994 (3d Cir. 1980) (rejecting claim that "section 509 review was intended by Congress to encompass omissions from regulations or failure to promulgate regulations"); *Crown Simpson Pulp Co. v. Costle*, 599 F2d 897, 902 (9th Cir. 1979) (section 509(b)(1)(E) does not apply where "the Administrator rejected the alleged effluent limitation"), *rev'd on other grounds*, 445 U.S. 193 (1980); *Trustees for Alaska v. EPA*, 749 F.2d 549, 558-59 (9th Cir. 1984) (Where "[petitioners'] argument is framed in terms of the EPA's failure to comply with a nondiscretionary duty to promulgate industry-wide rules … the Act confers jurisdiction on the federal district courts, not courts of appeal, [and] … [t]his grant of jurisdiction is exclusive."); *Armco, Inc. v. EPA*, 869 F.2d 975, 981 (6th Cir. 1989) ("We do not have jurisdiction for claims such as the one presented in this case to compel agency action under [the CWA].").

---

[79] *Chemical Mfrs.*, 870 F.2d at 266 & n.397 (emphasis added); *see also id.* at 188 ("such a claim must be raised in the first instance in the district court").

28

In rejecting claims that section 509 applies in such situations, courts have focused on the nature of claims for relief: jurisdiction lies in the district court where the plaintiffs or petitioners seek either to compel EPA to promulgate regulations or to review EPA's decision not to promulgate regulations.

A recent district court case, *NRDC v. EPA*,[80] is particularly instructive due to its factual similarity to the case at bar. There, EPA "decided not to issue the proposed [effluent limitations]," and instead "elected to allow ... authorities in various states to continue issuing permits based on their 'best professional judgment,' exercised on a case-by-case basis."[81]  EPA asserted that "section 509(b)(1)(E) encompasses any final action by EPA, regardless of whether the end result is [effluent limitations], or a decision not to issue [them]."[82]  The court held that section 509(b)(1)(E) was "inapplicable" because "the statutory language itself suggests that EPA's decision not to issue [effluent limitations] does not constitute approval or promulgation ... even where EPA's failure to approve or promulgate

---

[80]  437 F.Supp.2d 1137 (C.D. Cal. 2006).

[81]  *Id*. at 1144 (citing 69 Fed. Reg. 22,377, 22,472 (Apr. 26, 2004)).  In so doing, EPA noted that the withdrawal of a proposed rule is not itself a rule, stating: "Today's action does not constitute a rule under section 551 of the Administrative Procedure Act, 5 U.S.C. 551.  Hence, requirements of other regulatory statutes and Executive Orders that generally apply to rulemakings (*e.g.*, the Unfunded Mandates Reform Act) do not apply to this action." 69 Fed. Reg. at 22,483.

[82]  *See NRDC v. EPA*, No. CV 04-8307-GHK(RCx) (C.D. Cal., Aug. 29, 2005) (order denying motion to dismiss) at 2.  Addendum at Tab 8.

was a deliberate decision based on a record."[83]  The court concluded that "despite the fact that EPA generated a full administrative record before deciding not to approve or promulgate [effluent limitations], EPA's failure to promulgate ... forecloses review pursuant to section 509(b)(1)(E)."[84]

In the instant case, Environmental Petitioners do not challenge the regulations EPA promulgated for new oil and gas extraction facilities, but rather seek to have the Court compel the promulgation of regulations for existing manufacturing facilities. Accordingly, for the reasons set forth in the cases cited above, section 509 is inapplicable.

## B.    EPA Has Not Promulgated a Limitation Under CWA Section 316(b) for Existing Manufacturing Facilities.

To have "promulgated" a "limitation" reviewable in appellate court under section 509(b)(1)(E), EPA must have published a rule with "independent legal effect" that meaningfully constrains permit writers or permittees.[85]  Other cases are in accord.  See, for example, *American Paper Inst. v. EPA*, 890 F.2d 869, 877 (7th Cir. 1989) (regulation "provid[ing] a general outline of EPA's policy for maintaining existing water quality" is not a section 509(b)(1)(E) limitation);

---

[83]  *Id.*

[84]  *Id.* at 5.

[85]  *Id. at* 289 (7th Cir. 1989) (EPA's published "approach to regulation" was not covered by section 509(b)(1)(E)).

*American Iron & Steel Inst. v. EPA*, 543 F.2d 521, 527 (3d Cir. 1976) (regulations that "neither prescribe specific number limitations for any pollutant, nor … list the factors which must be considered in determining the control measures which individual point sources must employ" are not section 509(b)(1)(E) limitations); *South Holland Metal Finishing Co. v. Browner*, 97 F.3d 932, 936 (7th Cir. 1996) ("interpretive ruling" is not a section 509(b)(1)(E) limitation); *NRDC v. EPA*, No. CV 04-8307-GHK(RCx) (C.D. Cal. Aug. 29, 2005) (EPA's published decision to rely on existing regulatory programs rather than promulgate national categorical discharge standards is not "promulgation" within meaning of section 509(b)(1)(E));[86] *cf. Northwest Envtl. Advocates v. EPA*, 2005 U.S. Dist. LEXIS 5373, at *13-17 (N.D. Cal. March 30, 2005) (regulation *exempting* class of facilities from NPDES program is not a section 509(b)(1)(E) limitation).

Strikingly *unlike* the Phase I, Phase II, and Phase III rules EPA promulgated for cooling water intake structures at other facilities, EPA's 2006 decision that Phase III existing facilities will continue to be regulated on an *ad hoc* basis is nothing more than a policy statement:  it will not be codified and does not change the longstanding *status quo*.

During Phases I and II of the cooling water intake structure rulemaking,

---

[86] *See* Addendum at Tab 8.

EPA established mandatory national standards based on its assessment of the best technology available for minimizing adverse environmental impact. These standards were codified at 40 C.F.R. §§ 125.80 *et seq.* and 125.90 *et seq.*, respectively, and for the first time subjected cooling water intake structures at facilities across the nation to uniform permit requirements. Because both sets of rules had "independent legal effect," original jurisdiction to review them lay unquestionably in the circuit court, and no party contested jurisdiction.[87] Similarly, in the Phase III rule, EPA promulgated mandatory BTA standards for new facilities in the offshore and coastal oil and gas extraction categories, and, as with the Phase I and Phase II rules, there is no dispute that review of those limitations lies in the circuit court.[88]

---

[87] *See Riverkeeper I*, 358 F.3d at 183; *Riverkeeper II*, 475 F.3d at 95.

[88] Unlike Phase I and Phase II where EPA promulgated rules, there is a dispute over jurisdiction here with regard to EPA's decision not to promulgate a rule for existing manufacturing facilities. In such circumstances, "dual filing" in circuit court and district court is common and prudent. *See, e.g., Central Hudson*, 587 F.2d at 555; *VEPCO*, 566 F.2d at 448. Thus, Environmental Petitioners filed petitions to review EPA's June 2006 decision in the Second Circuit and other circuit courts, and also filed a complaint in the Southern District of New York, where lead petitioner Riverkeeper is based. Because CWA section 509(b)(2), 33 U.S.C. § 1369(b)(2), contains a 120-day statute of limitations and because the federal multi-circuit venue rule has a ten-day deadline, 28 U.S.C. § 2112(a)(1), "careful lawyers must apply for judicial review [in the court of appeals] of anything even remotely resembling" an action reviewable under section 509(b)(1). 33 U.S.C. § 1369(b)(1); *American Paper Inst. v. EPA*, 882 F.2d 287, 288 (7th Cir. 1989).

For existing manufacturing facilities, however, EPA "decided *not to promulgate* a national categorical rule."[89] Instead, EPA declared that "section 316(b) requirements for Phase III existing facilities will *continue to be imposed* on a case-by-case, best professional judgment basis."[90] As discussed above, the case-by-case system to which EPA refers was established by Congress in 1972 in CWA section 402(a)(1)(B) and was intended to serve as an interim mechanism until the required national limitations were established.[91] EPA's determination that this system should be left undisturbed is not the "promulgation" of a "limitation" as contemplated by section 509, for this decision does not, in and of itself, constrain permit holders or permittees in any way.[92] EPA tacitly acknowledged this in the Phase III preamble by stating that "there are no benefits or compliance costs for existing facilities from this action,"[93] and by noting that its requisite "Statutory and Executive Order Reviews"[94] covered only the promulgation of the Phase III

---

[89] 71 Fed. Reg. at 35,016/3 (emphasis added).

[90] *Id.* at 35,016/3 – 35,017/1 (emphasis added).

[91] *See supra* at p. 10.

[92] *American Paper Inst.*, 882 F.2d at 288 ("Promulgation means issuing a document with legal effect.").

[93] 71 Fed. Reg. at 35,034/1.

[94] This includes, among others, EPA's analysis of promulgated regulations pursuant to Executive Order 12866 (Regulatory Planning and Review), the

standards governing new oil and gas facilities, and *not* its decision "not to promulgate national categorical standards for Phase III existing facilities."[95]

An examination of EPA's earlier attempt to promulgate section 316(b) regulations, and the review of that attempt by the Fourth Circuit in the *VEPCO* case,[96] further underscores the conclusion that this Court lacks jurisdiction over the instant petition. In 1976, EPA promulgated a regulation, then codified at 40 C.F.R. § 402.12, explicitly *mandating* permit writers, in determining BTA permit requirements under section 316(b), to consider the technical information contained in an EPA-authored "Development Document."[97] Before setting aside this regulation on procedural grounds, the Fourth Circuit held that it was a "limitation" within the meaning of section 509(b)(1)(E), because it was "mandatory in terms that it requires certain information to be considered in determining the best available technology for intake structures."[98]

---

Paperwork Reduction Act, the Regulatory Flexibility Act, the Unfunded Mandates Reform Act, and Executive Order 13132 (Federalism).

[95]  71 Fed. Reg. at 35,034-39.

[96]  566 F.2d 446 (4th Cir. 1977).

[97]  *See id.* at 448 & n.8 ("40 C.F.R. § 402.12 provides [that] '(t)he information contained in the Development Document *shall be considered* ...'") (emphasis added).

[98]  *Id.* at 450.

EPA's pronouncement on existing manufacturing facilities contains no

comparable mandate. Rather, it states:

> ... EPA believes that the rulemaking record contains important factual
> data that can help permit writers when reissuing NPDES permits for
> the Phase III existing facilities. The numeric performance standards
> that EPA had proposed, for example, reflect EPA's judgment
> regarding the level of reduction in impingement mortality and
> entrainment that available technologies can achieve. Similarly, the
> regulatory support documents describe a variety of control devices,
> analyze their effectiveness and present their costs. The record also
> contains information regarding environmental impacts associated with
> cooling water intake structures. *EPA expects permit writers and
> permittees to fully consider this information and other useful guidance
> contained in the record* as they develop site specific section 316(b)
> requirements.[99]

This is a far cry from the 1976 CWIS regulation considered in *VEPCO*, for several

reasons. First, EPA's "expectation" that permit writers will consider certain

information is not a mandate or a directive, in contrast with the use of the

mandatory term "shall" in the 1976 regulation. Second, this expectation appears

only in the preamble to the Phase III rule, and not in the Code of Federal

Regulations, and thus has no binding legal effect.[100] Third, the information and

---

[99]  71 Fed. Reg. at 35,018/3 (emphasis added).

[100]  *See Brock v. Cathedral Bluffs Shale Oil Co.*, 796 F.2d 533, 539 (D.C.
1986) (Scalia, J.). EPA not only codified its 1976 regulation in the C.F.R. but also
subjected it to the economic and regulatory oversight analyses required at that
time. *See* 41 Fed. Reg. 17,367, 17,389/3 (Apr. 26, 1976). As noted, the agency
did no such analysis for its final action on Phase III existing facilities. *See supra*
pp. 33-34.

other "useful guidance" which EPA expects permit writers to consider is not
specifically collected and identified, as was the 263-page development document
in 1976. Rather, each permit writer would have to sift through an administrative
record consisting of thousands of documents comprising hundreds of thousands of
pages and attempt to identify which information and guidance EPA may have
expected it would consider.[101] Thus, EPA's instant action is not a "limitation"
under section 509(b)(1)(E).

Because CWA section 509 does not apply, this Court does not have
jurisdiction to hear Environmental Petitioners' claims. This Court should dismiss
Environmental Petitioners' petitions without prejudice to their proceeding with
their complaint in the district court.

---

[101] The Phase I docket contains nearly 1,000 documents consisting of
approximately 47,000 pages; the Phase II docket contains over 2,600 additional
documents comprising approximately 125,000 pages of supporting material, 69
Fed. Reg. at 68,459/2, and the Phase III administrative record "includes all
materials from the Phase I, Phase II, and Phase III section 316(b) rule dockets." 71
Fed. Reg. at 35,012/3.

## POINT II

### THE CLEAN WATER ACT REQUIRES EPA TO ADOPT NATIONAL, CATEGORICAL, TECHNOLOGY-BASED STANDARDS FOR COOLING WATER INTAKE STRUCTURES.

Section 316(b) of the Clean Water Act, which was part of the sweeping 1972 amendments to the Clean Water Act (then known as the Federal Water Pollution Control Act), reads as follows:

> Any standard established pursuant to section [301] or section [306] of this title and applicable to a point source[102] shall require that the location, design, construction, and capacity of cooling water intake structures reflect the best technology available for minimizing adverse environmental impact.[103]

Accordingly, the technology-based standards for industrial point source dischargers issued by EPA under sections 301 of the Act (for existing dischargers) and section 306 of the Act (for new dischargers) were to include technology-based requirements for minimizing the impacts on fish and shellfish from the intake of cooling water from those dischargers. This is apparent from the plain language of this provision and an examination of the relevant statutory structure.

---

[102] The Act defines "point source" as "any discernable, confined and discrete conveyance ... from which pollutants are or may be discharged." CWA § 502, 33 U.S.C. § 1362.

[103] 33 U.S.C. § 1326(b).

A.     **The Act Imposes an Affirmative, Time-Limited Duty on EPA to Promulgate Requirements Applicable to Cooling Water Intake Structures.**

With its use of a clear command – "shall" – section 316(b) affords the Administrator of EPA no discretion to decline to establish standards for the intake of cooling water.[104]  Further, this provision makes clear that all point sources for which a standard is set under section 301 or section 306 are to be subjected to the contemplated limitations:  "[a]ny" such standard "shall require" the specified limitations on cooling water intake.  Thus, EPA was to have promulgated the requirements for the cooling water intake structures used by various point sources at the same time as it promulgated discharge requirements for those point sources, as part of the same standard.  Sections 301 and 306 each contain specific deadlines by which these standards were to have been promulgated.[105]

---

[104] "'Shall' … is the language of command." *Escoe v. Zerbst*, 295 U.S. 490, 493 (1935).

[105] For existing sources:  33 U.S.C. §§ 1311(b)(1)(A) (July 1, 1977), and 1311(b)(2)(C) – (F) (March 31, 1989).  For new sources:  33 U.S.C. §§ 1316(b)(1)(A) (requiring publication of a list of at least 27 specified industry categories by January 17, 1973), and 1316(b)(1)(B) (requiring promulgation of standards for each category within one year thereafter).

38

**B.    The Requirements for Cooling Water Intake Must be Issued as National Categorical Standards.**

The industrial point source standards promulgated under sections 301 and 306 are "categorical" in nature.  That is, each standard applies to a particular industrial category and, except in those limited circumstances where an individualized waiver or variance may be available, apply uniformly to all facilities in the United States in that category.[106]  Since the requirements for cooling water intake are to be issued as part of these categorical standards, and are to be applicable to the same facilities as to which categorical discharge limitations apply, it is inescapable that these requirements are also to be categorical.

In its recent decision not to establish cooling water intake standards for existing manufacturing facilities, however, EPA takes the position that it need not establish the requirements mandated by section 316(b) through national standards.  "Nothing in section 316(b)," argues the agency, "requires EPA to *promulgate a regulation* to implement the requirements for cooling water intake structures."[107]

---

[106]  *See* 33 U.S.C. § 1311(b)(2)(A) (directing EPA to promulgate "effluent limitations for *categories and classes* of [existing] point sources"); 33 U.S.C. § 1316(b)(1)(B) (specifying that "after a *category* of sources is included in a list" as required by this section, EPA "shall propose and publish regulations establishing Federal standards of performance for new sources *within such category*") (emphases added).  *See generally E.I. du Pont de Nemours & Co. v. Train*, 430 U.S. 112, 126-29 (1977).

[107]  71 Fed. Reg. at 35,010/3 (emphasis added).

The agency does not explain how it squares this assertion with the clear reference in that provision to the "standard" in which the requirements for cooling water intake structures are to be set forth. Nor does it address (much less distinguish) the fact that the effluent limitations with which those requirements were to be conjoined were to be, and have been, issued by regulation.[108] As the Supreme Court stated when rejecting the argument that effluent limitations for existing sources are to be set on a case-by-case basis, the categorical language of the statute is "difficult to reconcile with the view that individual effluent limitations are to be set when each permit is issued." "Normally," the Court noted, "such class wide determinations would be made by regulation, not in the course of issuing a permit to one member of the class."[109] This conclusion is fully consistent with the legislative history of the 1972 amendments, which confirms that Congress envisioned a system of uniform national standards,[110] and that it authorized the individualized setting of technology-based limits by permit writers only for an

[108] See 40 C.F.R. §§ 122-125. *See also DuPont*, 430 U.S. at 129 ("§ 301 limitations are to be adopted by the Administrator ... and [] they are to take the form of regulations.").

[109] *DuPont*, 430 U.S. at 126-127 (quoting *American Meat Inst. v. EPA*, 526 F.2d 442, 450 (7th Cir. 1975) (internal quotation marks omitted)).

[110] Congress created this system of "nationally uniform standards" as the centerpiece of the 1972 amendments. *American Frozen Food Inst. v. Train*, 539 F.2d 107, 121 (D.C. Cir. 1976); *see also Weyerhaeuser*, 590 F.2d at 1042 (D.C. Cir. 1978) ("Congress considered uniformity vital ....").

"interim period" until such uniform standards could be promulgated.[111]

Ignoring this longstanding authority, EPA purports instead to draw support

from a statement made by the Second Circuit in its review of the Phase I cooling

water intake regulations. In the agency's words:

> [T]he U.S. Court of Appeals for the Second Circuit ... specifically
> noted that section 316(b) does not compel EPA to regulate cooling
> water intake structures using any particular format, e.g. overarching
> regulation, different regulations for different categories of sources, or
> individually on a case-by-case basis.[112]

This is a misstatement of the Second Circuit's reasoning. That court relied on

*National Wildlife Federation v. EPA*,[113] for the principle that the CWA allows

permitting to continue on a "case-by-case basis *where categorical regulation is not*

*technologically feasible*."[114] In the Phase I Rule, EPA established national

categorical cooling water intake standards for the vast majority of new facilities,

based on its finding that "technologies ... are commercially available ... for the

---

[111] H.R. Rep. No. 92-911, at 126 (1972), *reprinted in* 1972 Leg. Hist. at 813.

[112] 71 Fed. Reg. at 35,010-11/1 (citing *Riverkeeper I*, 358 F.3d at 203).

[113] 286 F.3d 554, 566-67 (D.C. Cir. 2002).

[114] *Riverkeeper I*, 358 F.3d at 203 (emphasis added). *Riverkeeper I* also
cited *NRDC v. EPA*, 859 F.2d 156, 201-02 (D.C. Cir. 1988), which upheld a
provision of EPA's "antibacksliding" regulations that prohibits permit writers from
weakening BPJ-derived permit conditions if a later-issued national categorical
standard turns out to be less stringent. That case has no bearing on whether EPA
must promulgate categorical standards where technologically feasible.

41

industries affected as a whole."[115]  But EPA also found that new smaller facilities (what it referred to as "below-threshold facilities") were "uniquely situated" and could not meet those categorical standards due to "technical impracticalities."[116] The Second Circuit rejected the manufacturers' challenge to case-by-case permitting of below-threshold facilities, and concluded that case-by-case regulation was appropriate for that subcategory *because of* those "technical impracticalities."[117]

For existing manufacturing facilities, in contrast, EPA has not selected the case-by-case approach as a means of placing limitations on smaller, "below-threshold" facilities for which a categorical approach would not be feasible, but has eschewed the categorical approach altogether.  Further, EPA has not chosen this approach as a matter of technological necessity, but rather as a matter of agency policy.  It does not argue that categorical regulations are infeasible for existing manufacturing facilities.  To the contrary, EPA made the explicit finding that the categorical standards it proposed in 2004 for existing manufacturers, which "would

---

[115]  66 Fed. Reg. at 65,273/1; *see also id.* at 65,275/2 ("technically available").

[116]  358 F.3d at 202-03.

[117]  *Id.* at 203 ("[W]here the EPA is justified in not regulating uniformly, we see no reason why the EPA should have to avoid all regulation.").

establish performance standards for reducing impingement mortality by 80 to 95 percent ... and entrainment by 60 to 90 percent,"[118] *are* both "technically available" and "economically practicable."[119]  In fact, as the agency acknowledged, "none of the [regulated] facilities would incur a severe impact (closure) or a moderate economic impact (financial impact short of closure) under the national categorical regulatory options considered."[120]

Especially given these findings, the validity of which the agency confirmed in its June 2006 pronouncement,[121] EPA has no discretion under the statute to continue in perpetuity the practice of allowing individual permit writers to determine whether, and to what extent, to place limitations on cooling water intake at the nation's manufacturing facilities.[122]  Rather, the agency itself must establish

---

[118]  69 Fed. Reg. at 68,444/2.

[119]  *Id.* at 68,449/1.

[120]  71 Fed. Reg. at 35,032/3.

[121]  *Id*. at 35,018 ("The numeric performance standards that EPA had proposed ... *reflect the agency's judgment regarding the level of reduction in impingement mortality and entrainment that available technologies can achieve*.") (emphasis added).

[122]  *See NRDC v. EPA*, 437 F.Supp. 2d 1137, 1160-61 (C.D. Cal. 2006) (case-by-case permitting "was to be only an interim measure pending the promulgation of guidelines, limitations, and standards mandated elsewhere in the Act.... We know of no [CWA] legal authority stating that the practice of issuing permits based on 'best professional judgment' was to be ongoing.").

these limitations, by regulation, for classes and categories of industrial point

sources.  As the Second Circuit itself affirmed in its review of the Phase II cooling

water intake rule, section 316(b) constitutes a "statutory directive to set national

standards."[123]

## C.    The Standards for Cooling Water Intake Must Require the Greatest Degree of Protection Attainable Through the Use of Available Technology.

The language of section 316(b) mandates that the regulatory standards

governing cooling water intake be technology-based – that is, based on the level of

performance attainable through the use of particular technology.  Further, that

provision gives specific guidance as to the *nature* of the technology on which the

regulation must be based:  "the location, design, construction, and capacity of

cooling water intake structures [must] reflect the best technology available for

minimizing adverse environmental impact."

Thus, the technology must first be "available," which means that it must be

feasible for use within the regulated industry.[124]  The statute itself does not

expressly indicate whether availability must be measured only in terms of

*technological* feasibility (*i.e.*, does the technology work properly when used by this

industry?), or also in terms of *economic* feasibility (*i.e.*, can the industry afford it?).

[123]  *Riverkeeper II*, 475 F.3d at 126.

[124]  *See infra* Point III.

44

The Second Circuit has read section 316(b) as incorporating both concepts, and this view is consistent with the meaning given to the term "available" in the relevant companion sections, 301 ("best available technology economically achievable") and 306 ("best available demonstrated control technology").[125] It is also consistent with the lone passage of legislative history on the point from the 1972 amendments, a floor statement that section 316(b) requires limitations to be set according to the "best technology available commercially at an economically practicable cost."[126]

But not all "available" technologies may be the basis for a section 316(b) standard. Once EPA has identified the universe of available technologies for cooling water intake structures, it must then determine which among them is the "best" at "minimizing adverse environmental impact." It is this technology, then, which is to form the basis for the regulatory standard to be issued by the agency. Accordingly, EPA violated the statutory mandate of section 316(b) by making a

---

[125] *Chemical Mfrs.*, 870 F.2d at 262 ("[T]he Administrator must inquire into the initial and annual costs of applying the technology and make an affirmative determination that those costs can be reasonably borne by the industry."); *Texas Oil & Gas Ass'n v. EPA*, 161 F.3d 923, 928 (5th Cir. 1998) ("EPA must set discharge limits that reflect the amount of pollutant that would be discharged by a point source employing the best available technology that the EPA determines to be economically feasible across the category or subcategory as a whole.").

[126] 118 Cong. Rec. 33,762 (Oct. 4, 1972) *reprinted in* 1972 Leg. Hist. at 264 (statement of Rep. Clausen).

policy decision to continue case-by-case permitting for cooling water intake

structures at existing manufacturing facilities, despite having found that technology

for minimizing the adverse environmental impact of intake structures is available

to those facilities.  EPA's decision should be vacated and remanded with directions

to the agency to promulgate BTA regulations for those facilities.

## POINT III

## EPA VIOLATED SECTION 316(b) BY BASING ITS DETERMINATION ON COST-BENEFIT CONSIDERATIONS

EPA based its decision not to promulgate BTA regulations on "its judgment that the monetized costs associated with the primary option under consideration are wholly disproportionate to the monetized environmental benefits to be derived from that option."[127]  This was improper.  Section 316(b)'s plain language mandating the "best technology available for minimizing adverse environmental impact" compels EPA to establish standards requiring the greatest degree of protection attainable, unless the costs of technology to meet those standards are not feasible for the industry as a whole, regardless of the relationship between those costs and the benefits expected to accrue.  Accordingly, EPA's June 2006 policy decision to reject the technology-based standards that it found were technologically and economically available to the manufacturing industry must be set aside on that basis, and the matter must be remanded to the agency for a new rulemaking decision based on the proper factors.

---

[127]  *See* 71 Fed. Reg. at 35,017/1.

47

A.    **The CWA Prohibits EPA from Basing its Section 316(b) Determinations on a Comparison of Costs to Benefits.**

   1.    **Section 316(b)'s Plain Language Prohibits Cost-Benefit Considerations.**

Determining Congress' intent "begins with 'the language of the statute …

[a]nd where the statutory language provides a clear answer, it ends there as

well."[128]  Section 316(b) includes no language whatsoever authorizing EPA's

regulatory decisions to be driven by cost-benefit analysis.  Instead, as discussed

above in Point II, this provision mandates that EPA's standards for cooling water

intake structures require the greatest degree of protection attainable through the use

of technology that is physically and economically available to the industry as a

whole.  The statutory language does not permit EPA to reject technologically and

economically available technology on the basis of a cost-benefit analysis.

By requiring in section 316(b) the "*best* technology *available* for *minimizing*

adverse environmental impact," Congress directed EPA to identify, and mandate a

level of performance consistent with, the most protective technology that can be

feasibly implemented.  The term "minimize" means "to reduce to the smallest

--------

[128]  *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438 (1999) (citations omitted); *see also Regions Hospital v. Shalala*, 522 U.S. 448, 457 (1998) ("If … traditional tools of statutory construction [reveal that] Congress' intent is clear, 'that is the end of the matter.'"); *Garcia v. United States*, 469 U.S. 70, 75 (1984) (requiring "the most extraordinary showing of contrary intentions" to disregard the plain meaning of a statutory provision).

possible ... amount,"[129] and both the Second Circuit[130] and EPA[131] have applied

this interpretation to the use of the term in section 316(b). Further, by specifying

the "best" technology "available" for minimizing environmental harm, Congress

was drawing from terms used in section 301 and 306 to describe the effluent

discharge limitations with which the cooling water intake limitations were to be

issued. EPA acknowledged that section 316(b)'s operative standard, "best

technology available" (BTA), is nearly linguistically identical to the "best available

technology" (BAT) standard of CWA section 301(b)(2)(A).[132] Courts presume that

identical words used in different parts of the same act are intended to have the

same meaning.[133]

---

[129] WEBSTER'S THIRD NEW INT'L DICTIONARY 1438 (1993); *see also Hazardous Waste Treatment Council v. EPA*, 886 F.2d 355, 361 (D.C. Cir. 1989) (under the Resource Conservation and Recovery Act, 42 U.S.C. § 6924(m)(1), "[t]o 'minimize' something is, to quote the Oxford English Dictionary, to 'reduce [it] to the smallest possible amount, extent, or degree.'").

[130] *Riverkeeper II*, 475 F.3d at 110 (reduce to the "smallest possible extent") (quoting WEBSTER'S THIRD NEW INT'L DICTIONARY 1438 (1986)).

[131] 40 C.F.R. § 125.83 ("reduce to the smallest amount, extent, or degree reasonably possible").

[132] 33 U.S.C. § 1311(b)(2)(A); *see also* 69 Fed. Reg, at 68,448/2-3 ("[T]he phrase 'best technology available' is very similar to 'best available technology.'") (citing *Riverkeeper I*).

[133] *See Sullivan v. Stroop*, 496 U.S. 478, 484 (1990). *See generally Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997) ("The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific

49

As this Court has recognized, "Congress intended [BAT standards] to be based on the performance of the single best-performing plant in an industrial field."[134] Other circuits have agreed: the "BAT standard reflects the intention of Congress to use the latest scientific research and technology in setting effluent limits,"[135] and EPA must "establish effluent limitations that utilize the latest technology ... to reach 'the *greatest attainable level of effluent reduction* which could be achieved.'"[136] Similarly, the Second Circuit has recognized that "[t]he statutory directive [of section 316(b)] requiring facilities to adopt the *best* technology cannot be construed to permit a facility to take measures that produce second-best results, especially given the technology-forcing imperative behind the

---

context in which that language is used, and the broader context of the statute as a whole.").

[134] *Texas Oil & Gas*, 161 F.3d at 928 (quoting *Chemical Mfrs.*, 870 F.2d at 226).

[135] *Kennecott v. EPA*, 780 F.2d 445, 448 (4th Cir. 1985).

[136] *NRDC v. EPA*, 863 F.2d 1420, 1431 (9th Cir. 1988) (emphasis added); *see also Kennecott*, 780 F.2d at 448 ("In setting BAT, EPA uses not the average plant, but the optimally operating plant, the pilot plant which acts as a beacon to show what is possible."). Legislative history confirms that the technology-based regulations should, "*at a minimum*, be established with reference to the *best* performer in any industrial category," 118 Cong. Rec. 33,696 (1972) (emphasis added), and provide a lesser degree of protection "[o]nly when technology is not available." 117 Cong. Rec. 38,808 (1971).

Act."[137]

Further, the Supreme Court stated that the "available" technology on which

a BAT standard is to be based is to be chosen on the basis of technological and

economic feasibility, with no consideration of competing costs and benefits: the

Administrator is permitted to consider total cost, *but not in comparison with*

*effluent reduction benefits*.[138]  Similarly, the Second Circuit has held that, while the

use of the term "available" in section 316(b) "suggests that the EPA may consider

costs in determining BTA, in that a technology that cannot be reasonably borne by

the industry is not 'available' in any meaningful sense, *cost-benefit analysis is not*

*similarly supported by the language or purpose of the statute*."[139]

> EPA may permissibly consider cost [under section 316(b)] in two
> ways: (1) to determine what technology can be "reasonably borne" by
> the industry and (2) to engage in cost-effectiveness analysis in
> determining BTA. Thus, the EPA must first determine what is the
> most effective technology that may reasonably be borne by the
> industry.    In making this initial determination, … EPA must …
> ascertain whether the industry as a whole can reasonably bear the cost
> of the adoption of the technology, bearing in mind the aspirational and
> technology-forcing character of the CWA.    This technology
> constitutes the benchmark for performance.   Once this determination
> has been made, … EPA may then consider other factors, including
> cost-effectiveness, to choose a less expensive technology that

---

[137] *Riverkeeper II*, 475 F.3d at 107-08 (emphasis in original) (internal
citations omitted) (citing *Chevron*, 467 U.S. at 843; *NRDC*, 822 F.2d at 123).

[138] *National Crushed Stone*, 449 U.S. at 71 n.10.

[139] *Riverkeeper II*, 475 F.3d at 99 (emphasis added).

51

*achieves essentially the same results as the benchmark. ... Cost-
benefit analysis, however, is not permitted under the statute because,
as noted, Congress has already specified the relationship between
cost and benefits in requiring that the technology designated by the
EPA be the best available.*[140]

As the Supreme Court and this Court have recognized, the test for whether

BAT standards are economically achievable is whether they are affordable for an

industrial "category or subcategory as a whole."[141]  Further, as this Court has

observed, the requirement that costs be considered is not an invitation to EPA to do

cost-benefit comparisons:

> *The benefit to be achieved from adopting a particular pollution
> control technology is not an element of that technology's cost.*  The
> cost of complying with a BAT-based regulation can be gauged by
> reference to the cost of the technology itself, even if the benefits of
> using that technology are unclear.    Reinjection technology, for
> example, costs the same regardless of whether it reduces pollutant
> discharge by three million pounds per year or three pounds per
> year.[142]

Indeed, as this Court noted, "EPA may prescribe [BAT standards] whose costs are

significantly disproportionate to their benefits, *just as long as the BAT*

---

[140] *Id.* at 99-100 (emphasis added) (citing *American Textile Mfrs. Inst. v.
Donovan*, 452 U.S. 409, 509-10 (1981)).  *See also Riverkeeper I*, 358 F.3d at 195
("[w]ith respect to costs [under section 316(b)], 'the Administrator must inquire
into the initial and annual costs of applying the technology and make an
affirmative determination that those costs can be *reasonably borne* by the
industry.'") (emphasis added) (quoting *Chemical Mfrs.*, 870 F.2d at 262).

[141] *Texas Oil & Gas*, 161 F.3d at 928; *see also DuPont*, 430 U.S. at 126-30.

[142] *Texas Oil & Gas*, 161 F.3d at 936 (emphasis added).

*determination remains economically feasible for the industry as a whole.*"[143]

The central guiding principle underlying the "best technology available" and

"best available technology" standards is *feasibility*, a criterion Congress has

employed in other environmental, health and safety statutes. As this Court has

noted in discussing the Occupational Safety and Health Act ("OSHA"),

> [t]he feasibility requirement ... is an affirmative mandate as well as a limitation. [The agency] *shall* issue standards dealing with toxic materials or harmful physical agents *to the extent feasible*, that is, *to the extent to which industry is 'capable' of abating the hazard.*[144]

Thus, as the Supreme Court has held:

> Congress itself defined the basic relationship between costs and benefits [in OSHA], by placing the "benefit" of worker health above all other considerations save those making attainment of this "benefit" unachievable. *Any standard based on a balancing of costs and benefits by the Secretary that strikes a different balance than that struck by Congress would be inconsistent with the statutory command.*[145]

---

[143] *Id.* (emphasis added); *see also American Petroleum Inst. v. EPA*, 858 F.2d 261, 265 (5th Cir. 1988). Congress recognized and accepted that there would be serious costs, as Senators debating the bill made this explicit: "There is no doubt that we will suffer some disruptions in our economy because of our efforts; many marginal plants may be forced to close." *National Crushed Stone*, 449 U.S. at 80 (quoting legislative history).

[144] *Nat'l Grain & Feed Ass'n v. Occupational Safety & Health Admin.*, 866 F.2d 717, 728 (5th Cir. 1989) (third emphasis added). The relevant section of OSHA provides that "[t]he Secretary ... shall set the standard which most adequately assures, to the extent feasible ... that no employee will suffer material impairment of health or functional capacity." 29 U.S.C. § 655(b)(5).

[145] *American Textile*, 452 U.S. at 509 (emphasis added).

Similarly here, as the Second Circuit has held, because section 316(b) requires the

"best technology available for minimizing adverse environmental impact" – that is,

the most protective technology that industry can feasibly implement – Congress

has "already specified the relationship between costs and benefits in requiring that

the technology designated by … EPA be the best available."[146]  Only the

legislature, not the courts or EPA, may redefine that relationship.

### 2.    Congress's Exclusion of Cost-Benefit Analysis from Section 316(b) Was Intentional.

As the Supreme Court observed in *American Textile*, "[w]hen Congress has

intended that an agency engage in cost-benefit analysis, it has clearly indicated

such intent on the face of the statute."[147]  In fact, many (but by no means all)

environmental statutes call for the implementing agency to engage in some form of

cost-benefit balancing in setting certain regulatory standards.   For example, the

Outer Continental Shelf Lands Act requires "the best available and safest

technologies which the Secretary determines to be economically feasible … *except*

*where the Secretary determines that the incremental benefits are clearly*

*insufficient to justify the incremental costs of utilizing such technologies*,"[148] the

---

[146]  *Riverkeeper II*, 475 F.3d at 100.

[147]  452 U.S. at 510.

[148]  43 U.S.C. § 1347(b) (emphasis added).

54

Flood Control Act directs the Army Corps of Engineers to take certain action if there are "benefits ... in excess of the estimated costs,"[149] the Clean Air Act requires EPA to conduct "a cost benefit analysis" before regulating fuel additives,[150] and the Safe Drinking Water Act requires EPA to perform an "analysis" of "incremental costs and benefits" in setting drinking water standards.[151]  Because Congress has repeatedly demonstrated that it knows how to require cost-benefit considerations when it chooses to do so, the absence of any such requirement in section 316(b) is clear evidence that it did not intend such considerations to govern here.

This conclusion is buttressed by the fact that Congress *did* include the cost-benefit criterion in certain other provisions of the CWA.  Section 302(b)(2) allows the modification of federal *water quality based* effluent limitations where "there is no reasonable relationship between the economic and social costs and the benefits to be obtained."[152]  Further, Congress specified a cost-benefit criterion for two technology-based effluent limitations.  EPA's formulation of "best conventional pollutant control technology" (BCT) standards, which apply to a small set of

---

[149]  33 U.S.C. § 701a.

[150]  42 U.S.C. § 7545(c)(2)(B).

[151]  42 U.S.C. § 300g-1(b)(3)(C)(i)(IV).

[152]  33 U.S.C. § 1312(b)(2).

55

designated "conventional" pollutants, "shall include consideration of the

reasonableness of the relationship between the costs of attaining a reduction in

effluents and the effluent reduction benefits derived."[153]  Similarly, EPA's

formulation of the interim "best practicable technology" (BPT) standards, which

were to govern industry until the agency set BAT and BCT standards, was to

"include consideration of the total cost of application of technology in relation to

the effluent reduction benefits to be achieved from such application."[154]  As the

Supreme Court has consistently held, "[w]here Congress includes particular

language in one section of a statue but omits it in another ... it is generally

presumed that Congress acts intentionally and purposely in the disparate inclusion

or exclusion."[155]  The fact that Congress did not include similar cost-benefit

language for the three standards based on "available" technology – BAT, BADT,

and BTA – thus represents a clear choice to rely on feasibility, and not cost-

---

[153]  CWA § 304(b)(4)(B), 33 U.S.C. § 1314(b)(4)(B).

[154]  CWA § 304(b)(1)(B), 33 U.S.C. § 1314(b)(1)(B).

[155]  *Keene Corp. v. United States*, 508 U.S. 200, 208 (1993) (internal quotation makrs omitted) (*quoting Russello v. United States*, 464 U.S. 16, 23 (1983)); *see also Bates v. United States*, 522 U.S. 23, 29-30 (1997); *Gozlon-Peretz v. United States*, 498 U.S. 395, 404-05 (1991); *Riverkeeper I*, 358 F.3d at 190 (applying this presumption to CWA section 316(b)); *Riverkeeper II*, 475 F.3d at 190 (same).

benefit, as the decision-making criterion.[156]

Accordingly, EPA may not here "make the policy decision, in the face of Congress's determination that facilities use the best technology available, that an economically feasible level of reduction of impingement mortality and entrainment is not desirable in light of its cost."[157] As the Supreme Court has observed, the imposition of a cost-benefit criterion onto a statute meant to be governed by feasibility "would eviscerate" the congressional scheme.[158]

### 3.    EPA Identifies No Valid Authority for its Cost-Benefit Approach.

In the preamble to the proposed and final Phase III rules, EPA states its belief that legal authority to base section 316(b) determinations on cost-benefit considerations stems from two sources. Only one of these is the language of section 316(b) itself, and neither supports EPA's view. Rather, the agency's reliance on cost-benefit considerations here appears to be based squarely on its own notions of appropriate environmental policy – which, in this instance, conflict with the policy chosen by Congress.

---

[156] *See also Association of Pac. Fisheries v. EPA*, 615 F.2d 794, 818 (9th Cir. 1980) ("The conspicuous absence of the comparative language contained in section 304(b)(1)(B) leads us to the conclusion that Congress did not intend the Agency or this court to engage in marginal cost-benefit comparisons" when setting or evaluating BAT standards).

[157] *Riverkeeper II*, 475 F.3d at 100.

[158] *American Textile*, 452 U.S. at 513.

### a. EPA May Not Rewrite Section 316(b) Based on Its Interpretation of a Statement Made on the Floor of the House of Representatives.

EPA first purports to find authority for its cost-benefit approach in the term

"practicability," a term not found in section 316(b). The agency's articulated

reasoning is as follows:

> EPA continues to believe that any impingement or entrainment would be an adverse environmental impact, but has determined that section 316(b) does not require minimization of adverse environmental impact beyond that which can be achieved at a cost that is economically practicable. EPA believes that the relationship between costs and benefits is one component of economic practicability for purposes of section 316(b) and the legislative history indicates that economic practicability may be considered in determining what is the best technology available for purposes of section 316(b).[159]

The legislative history EPA cites for this proposition is a statement by

Representative Clausen of Florida, made during the floor debates on the 1972

amendments, describing section 316(b) as requiring the "best technology available

commercially at an economically practicable cost."[160]   As discussed *supra* in Part

II, this statement appears perfectly consistent with the plain language of section

316(b):  the technology must be commercially available (*i.e.*, technologically

_____

[159]  69 Fed. Reg. at 68,473/2.

[160]  *Id.* (citing 118 Cong. Rec. 33,762 (1972), *reprinted in* 1972 Leg. Hist. at 264).

feasible) and economically practicable (*i.e.*, economically feasible).[161]

The agency, however, would read considerably more into it. In suggesting that "practicable" imports a cost-benefit connotation, the agency may be borrowing from the "best practicable technology" (BPT) effluent limitation described in sections 301 and 304 of the CWA.[162] As discussed above, EPA *was* directed to weigh effluent reduction costs against effluent reduction benefits in setting the BPT standards. If the agency thus is suggesting that Representative Clausen's use of the term "practicable" has transformed section 316(b)'s BTA requirement into a cost-benefit standard, it is clearly wrong, for several reasons.

First, Representative Clausen did not use the CWA term of art "best practicable technology," but simply the word "practicable." The ordinary meaning of this word is "feasible," not "cost-benefit," and the nature of the statement suggests that he meant this ordinary meaning.[163] Second, even if the Congressman had meant with this statement to rewrite section 316(b), he had no power to do so,

---

[161] WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE UNABRIDGED, p. 1780 (1993) ("Practicable" means "Capable of being put into practice, done or accomplished : feasible.").

[162] 33 U.S.C. §§ 1311(b)(1)(A), 1314(b)(1)(B).

[163] BPT allows a limited cost-benefit analysis, not because the term "practicable" implies cost-benefit considerations, but because Congress included in section 304(b)(1)(B) language specifically authorizing consideration of costs in comparison to benefits. 33 U.S.C. § 1314(b)(1)(B).

and it would be a clear error of law for EPA to rely on his intent rather than the

language of the statute (which, of course, reflects the intent of the full Congress).[164]

Third, even if a single member of Congress *could* rewrite a statute with a floor

statement, EPA's authority to set BPT discharge standards ended in 1989, and thus

any implicit authority to apply BPT concepts to the cooling water intake standards

would have ended at the same time.[165]  Fourth, the BPT factors of section

304(b)(1)(B) – even if somehow applicable here – did not authorize a formal,

monetized analysis of the consequential economic and societal benefits of the type

that EPA performed here.[166]

### b.    Section 316(b)'s Reference to an Environmental Endpoint Does Not Support EPA's Reliance on Cost-Benefit Considerations.

EPA also labors to construct an argument around an asserted distinction

between section 316(b)'s BTA standard and section 301's BAT standard:

> The object of the best technology available is explicitly articulated by
> reference to the receiving water:  To minimize adverse environmental
> impact in the waters from which cooling water is withdrawn.  In

---

[164]  *See e.g.*, *United States v. Ron Pair Enters.*, 489 U.S. 235, 241 (U.S. 1989).

[165]  The interim, phase-in BPT standard for existing facilities under section 304(b)(1)(B) expired in 1989 and was replaced by BAT.  33 U.S.C. § 1311(b)(2). *See also Riverkeeper I*, 358 F.3d at 185.

[166]  *See, e.g.*, *Chemical Mfrs.*, 870 F.2d at 204; *Appalachian Power Co. v. EPA*, 671 F.2d 801, 809 (4th Cir. 1982).

60

contrast, under section 301, the goal of BAT is explicitly articulated by reference to a different purpose, to make reasonable further progress toward the national goal of eliminating the discharge of all pollutants (section 301(b)(2)(A)).[167]

This simply misreads section 301(b), which, like section 316(b) and the rest of the

CWA, has an ultimate objective of "restor[ing] and maintain[ing] the chemical,

physical, and biological integrity of the Nation's waters."[168] Any minor

differences among technology-based standards, such as BAT, BTA, or BADT,

cannot, of course, change their fundamental nature, which is to achieve the CWA's

ultimate objective through the establishment of mandatory technological

minimums to reduce pollution in a manner that is easy to administer (unlike the

previous federal clean water legislation), regardless of the provable level of

consequential harm.[169]

---

[167] 69 Fed. Reg. at 68,473/1.

[168] 33 U.S.C. § 1251(a). Because section 301(b) explicitly references that objective, the goal of BAT is also articulated by reference to the receiving water. *See* 33 U.S.C. 1311(b) ("In order to carry out the objective of this chapter…").

[169] What section 316(b) authorizes EPA to do in establishing BTA standards for cooling water intake is akin to what sections 301, 304, and 306 authorize it to do in establishing BAT and BADT effluent discharge standards. In both cases, EPA must make an initial assessment of the relevant parameters to be covered in a set of regulations for an industry category (*e.g.*, heat, color, chemicals, other pollutants, impingement mortality, entrainment), and establish the metrics for assessing performance and determining compliance (*e.g.*, reduction in total mass discharged, maximum discharge concentration, percentage impingement or entrainment). Accordingly, in establishing BTA standards under section 316(b) in the Phase I, II, and III rulemakings, EPA interpreted the object of the required

61

"Congress realized not only that its [pre-1972] water pollution efforts ...

had failed, but also that reliance on receiving water capacity as a crucial test for

pollution levels had contributed greatly to that failure."[170] Accordingly, in place of

the ineffective water quality standards approach, Congress "predicated pollution

control on the application of control technology on the plants themselves rather

than on the measurement of water quality."[171]  In contrast to technology-based

standards, Congress did retain in the Act a distinct form of standard, known as

water quality-based standards, that can only be used to set limitations *more*

stringent than the technology-based limitations.[172]  To find authority for cost-

benefit analysis, EPA reads the language of section 316(b) in a way that would

convert BTA into a water quality standard.  But as the Fourth Circuit explained in

*VEPCO*, section 316(b) is "closely related to the effluent limitations and new

source standards of performance of §§ 301 and 306" and distinguishable from

---

minimization (*i.e.*, the "adverse environmental impact") as "the loss of aquatic
organisms due to impingement and entrainment," and it set performance standards
directed toward minimizing these effects.  This approach is faithful to the intent of
Congress as expressed in the language of section 316(b).  66 Fed. Reg. 65,256/1;
69 Fed. Reg. 41,612/1; *id.* at 41,611-12; 71 Fed Reg. at 35,013/1-2; *id.* at 35,019/3.

[170]  *Riverkeeper I*, 358 F.3d at 189-90 (citing cases); *Riverkeeper II*, 475
F.3d at 114; *Weyerhaeuser*, 590 F.2d at 1042.

[171]  *Hooker Chemicals*, 537 F.2d at 623.

[172]  *Riverkeeper I*, 358 F.3d at 184 n.10.

"state-imposed water quality standards under § 303."[173]

Furthermore, Congress also provided for a water quality approach in CWA section 316(a), which allows thermal discharge standards to be relaxed so long as "the protection and propagation of a balanced, indigenous population of shellfish, fish, and wildlife in and on the body of water [is assured]."[174] Notably, Congress did not use this language in section 316(b), and the Second Circuit has twice found significant that "Congress provided for a water quality standards approach to thermal discharges [in section 316(a)] but did not include that approach (or make any reference to it) in the very next subsection [section 316(b)]."[175] Contorting section 316(b) to infer an unspoken cost-benefit directive, as the agency now purports to do, runs afoul of the statutory mandate. As the Supreme Court has observed: "Congress … does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions – it does not, one might say, hide elephants in mouseholes."[176]

---

[173] *VEPCO*, 566 F.2d at 451 n.17.

[174] CWA § 316(a); 33 U.S.C. § 1326(a). This "was drafted as a clear exception" to the general rule. *Weyerhauser*, 590 F.2d at 1043.

[175] *Riverkeeper I*, 358 F.3d at 190; *Riverkeeper II*, 475 F.3d at 114 n.27; *see also id.* at 114 ("as we held in *Riverkeeper I,* the CWA does not permit the EPA to consider water quality in making BTA determinations").

[176] *Whitman v. American Trucking Ass'ns*, 531 U.S. 457, 468 (2001) (rejecting claim that "modest words" such as "adequate margin" and "requisite"

   c.    **EPA May Not Substitute Its Own Cost-Benefit Policy for
         the Feasibility Framework Chosen by Congress**.

It is textbook administrative law that a federal agency may not substitute its

own judgment for the judgment of Congress.[177]  Yet this is precisely what EPA has

done here.  As the agency notes in its June 2006 Federal Register notice, its

decision to decline to promulgate section 316(b) regulations for existing

manufacturing facilities "advances *EPA's policy* of avoiding imposing unnecessary

burdens on manufacturers."[178]  EPA articulates the nature and basis of this policy

earlier in that publication: "In reaching today's decision, EPA has given special

consideration to the fact that existing manufacturers were the rule's primary

focus."[179]  EPA then cites to studies by the U.S. Department of Commerce and the

U.S. Office of Management and Budget (OMB) discussing the regulatory costs

experienced by the manufacturing sector, and to a later OMB report calling for the

"streamlining" of regulation.  EPA explains that it has tailored its regulatory

---

meant EPA was to consider compliance costs in setting national ambient air quality
standards under Clean Air Act).

   [177] *See, e.g., Alabama Power Co. v. Costle*, 636 F.2d 323, 360 (D.C. Cir.
1979) ("To the extent the agency relies ... on substitution of its own analysis of
policy considerations for those enunciated by Congress, we must reject its action as
trenching on the congressional function.").

   [178]  71 Fed. Reg. at 35,018/2 (emphasis added).

   [179]  *Id*. at 35,018/1.

approach to bring it into accord with the perceived lessons of those reports:

> [The second OMB] report suggests that any unnecessary regulatory
> burdens, especially on small and medium-sized manufacturers, should
> be removed. *To address these concerns* for U.S. manufacturers,
> *benefits justifying costs is of paramount importance.*[180]

With this statement, EPA gives notice that it has gone well beyond its proper

role as the administrator of the environmental policies of Congress. While most

would agree that "unnecessary" regulation is a bad thing, there is no single,

objective standard for determining whether a particular regulation is, in fact,

unnecessary. This is a policy issue on which reasonable people may differ. For

the purpose of this judicial proceeding, of course, the question is not whether one

agrees with the cost-benefit approach chosen by the agency, or whether one agrees

with the feasibility approach chosen by Congress. Rather, the question is whether

unelected executive branch appointees may override the legislative policies

articulated by the branch of government to whom the Constitution has entrusted

the principal responsibility for policymaking. The clear answer, under our system

of government, is no.[181]

---

[180] *Id.* (emphasis added).

[181] EPA's reliance on Executive Order 12866 (Oct. 4, 1993) (hereinafter,
"E.O. 12866") is inapposite here. An executive order cannot override a contrary
mandate from Congress, and this order does not purport to do so. As EPA
acknowledges, E.O. 12866 "does not supersede any of the decision factors
specified in the Clean Water Act and, in fact, says explicitly that it applies only 'to

EPA's assertion that it "has previously considered the costs of technologies in relation to the benefits of minimizing adverse environmental impact in establishing section 316(b)"[182] does not change this. An agency may not modify the plain meaning of a statute it administers by acting in a manner inconsistent with that meaning; in such circumstances, the agency's view is not determinative under *Chevron* because "the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."[183] Even where Congress has not spoken to the precise question at issue, the reviewing court must determine whether the agency's interpretation is "permissible" and based only on "factors Congress intended it to consider."[184] Further, the specific "cost-benefit" comparison to which EPA refers was not undertaken in the context of a national BTA rulemaking, but rather involved a permit proceeding for a New Hampshire nuclear power plant. And EPA's determination in that case did *not* involve a comparison of the costs to the monetized (or even qualitative) benefits of cooling

---

the extent permitted by law and where applicable.'" 71 Fed. Reg. at 35,017/2 (*citing* E.O. 12866 § 1(b)(6)). Furthermore, the executive order explicitly provides that its requirements do not apply where a "statute requires another regulatory approach." E.O. 12866 § 1(a).

[182] 69 Fed. Reg. at 68,473/1 (citing decisions regarding the Seabrook nuclear power plant in New Hampshire).

[183] *Chevron*, 467 U.S. at 842.

[184] *Id.*

water intake technology, but rather a *cost-effectiveness* comparison of two technologies that had essentially the same benefit.[185]

Finally, it should be noted that, despite EPA's assertion here that the cost-benefit approach is "widely accepted as reflecting general principles of sound government regulation,"[186] Congress has repeatedly rejected bills that would have imposed the cost-benefit criterion as a general regulatory mandate,[187] and has generally chosen the feasibility approach in environmental statutes.[188]  Moreover, there is nothing inherently "unsound" about the feasibility approach; it is a valid, effective, and sensible regulatory approach that can, depending on the

---

[185]  *In Re Public Service Co. of New Hampshire*, 1 EAD 455, at 21, 1978 WL 21140 (Decision of the EPA Administrator) (Aug. 4, 1978).

[186]  71 Fed. Reg. at 35,017/2.

[187]  *See, e.g.*, The Risk Assessment and Cost-Benefit Act of 1995, H.R. 9. 104th Cong. (1995), which would have required cost-benefit analysis for major health, safety, and environmental rules, and H.R. 961 104th Cong. § 324(c)(2)(B), which would have required cost-benefit analysis of any rule costing more than $25 million.

[188]  *See, e.g.*, Mary Jane Angelo, *Embracing Uncertainty, Complexity, and Change*, 33 Ecology L.Q. 105, 129-30 (2006) ("Congress has, for the most part, rejected both pure risk-based and cost/benefit standards. ... [T]he majority of existing statutes contain standards that require risk to be avoided to the extent feasible or to the extent that the best available technology can achieve. Accordingly, these statutes are referred to as technology-based statutes.").

circumstances, provide substantial advantages over the cost-benefit approach.[189] In

fact, the technology-based performance standard EPA proposed here "provides a

high degree of flexibility" for the individual regulated facilities.[190]

EPA's decision not to promulgate the Phase III regulations for existing

facilities must be set aside. This decision was not "based on a permissible

construction of the statute,"[191] and was in contravention of the mandate given to

the agency by Congress. An agency of the federal government is only empowered

to act within the statutory guidelines establishing its power, and any action

---

[189] *See, e.g.*, David M. Driesen, *Distributing the Costs of Environmental, Health, and Safety Protection: The Feasibility Principle, Cost-Benefit Analysis, and Regulatory Reform*, 32 B.C. Envtl. Aff. L. Rev. 1, 3 (2005) (discussing advantages of feasibility approach to regulation); Sidney A. Shaprio & Thomas O. McGarity, *Not So Paradoxical: The Rationale For Technology-Based Regulation*, 1991 Duke L. J. 729, 731-36 (1991) (cost-benefit comparisons involving complex ecological resources are difficult, if not impossible, to conduct, and are time-consuming, expensive, and often flawed); David M. Driesen, *Is Cost-Benefit Analysis Neutral?*, 77 U. Colo. L. Rev. 335 at 341, 369 (2006) (environmental benefits can be impossible to quantify and attempts to value them often require controversial value assumptions); William H. Rodgers, Jr., *Benefits, Costs, and Risks: Oversight of Health and Environmental Decisionmaking*, 4 Harv. Envtl. L. Rev. 191, 198 (1980) (discounting environmental benefits tends to undervalue them, and amounts to "a value judgment about equity between generations").

[190] 69 Fed. Reg. at 68,469/2. *See also id*. at 68,468 ("EPA anticipates that facilities will select the most cost-effective technologies or operational measures to achieve the performance level (within the stated range) based on conditions found at their site …").

[191] *Chevron*, 467 U.S. at 843.

exceeding its statutory authority is void.[192]  Accordingly, this matter must be

remanded to EPA for final action consistent with the CWA.

_____

[192]  *Office of Personnel Mgmt. v. Richmond*, 496 U.S. 414, 424 (1990).

## POINT IV

## EPA'S DETERMINATION THAT THE COSTS OF ITS PROPOSED REGULATION WOULD BE WHOLLY DISPROPORTIONATE TO ITS BENEFITS WAS ARBITRARY AND CAPRICIOUS

Agency action must be set aside as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," under section 10(A) of the APA,[193] if the agency failed to "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made'" or if it "offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."[194] Here, EPA's determination that the costs of the proposed regulation would be "wholly disproportionate" to benefits[195] fails all of those tests.

### A.    EPA Ignored Key Data, and Its Conclusion Contradicts the Record.

EPA admitted that it monetized (*i.e.*, placed a dollar value on) only 2.6 percent of the organisms that the proposed rule would have preserved,[196] by

---

[193]  5 U.S.C. § 706(2)(A).

[194]  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

[195]  71 Fed. Reg. at 35,015/1.

[196]  Regional Benefits Analysis for the Final Section 316(b) Phase III Existing Facilities Rule, DCN 9-0003 ("Regional Benefits Analysis") at A3-8.

70

quantifying only the so-called "use" benefits, *i.e.*, those benefits derived from improved commercial and recreational fishing catch.[197] EPA then based its decision not to promulgate BTA regulations "on its judgment that the monetized costs associated with the primary option under consideration are wholly disproportionate to the *monetized* environmental benefits to be derived from that option,"[198] even though it was comparing total costs to a small fraction of the benefits. EPA purports to have considered the remaining 97.4 percent of affected organisms, (which it refers to as "non-use" or ecosystem benefits) "qualitatively."[199] Without providing a rationale that connects the facts to its conclusion, the agency stated that these benefits were "not likely to be of sufficient magnitude to alter EPA's decision" that the costs were wholly disproportionate to benefits.[200] In so doing, however, EPA ignored its own preliminary analysis in the record, which demonstrated that the value of the total (*i.e.*, use *and* non-use) benefits of the proposed regulation were, in fact, likely to be of enormous magnitude, dwarfing total costs. EPA's conclusion thus "runs counter to the

---

[197]  71 Fed Reg. at 35,033/2, 35,034/2.

[198]  *Id*. at 35,017/1 (emphasis added).

[199]  *Id*. at 35,017/2.

[200]  *Id*. at 35,017/3.

evidence before [it]."[201]

In particular, EPA estimated the *total* monetized costs to be approximately $39 million and *partial* monetized benefits to be roughly $2 million.[202] These partial benefits represent the 2.6 percent of affected organisms that have "use" value (*i.e.*, for fishing).[203] The agency conceded that "[t]he regulatory analysis options are expected to provide benefits that were *not accounted for* in the benefits analysis."[204] These "[n]on-use benefits may arise from reduced impacts to ecological resources that the public considers important, such as threatened and endangered species," which EPA stated "can generally only be monetized through the use of stated preference methods."[205]

But EPA chose to ignore highly significant evidence in the record – in fact,

---

[201]   *State Farm*, 463 U.S. at 43.

[202]   71 Fed. Reg. at 35,017/1. The $39 million cost figure EPA calculated represents the present value of 42 years of costs of the proposed regulation at approximately. Economic and Benefits Analysis for the Final Section 316(b) Phase III Existing Facilities Rule at E3-5, DCN 9-0002 ("Economic and Benefits Analysis").

[203]   71 Fed. Reg. at 35,017/1.

[204]   Economic and Benefits Analysis at E3-3 (emphasis added).

[205]   69 Fed. Reg. at 68,492/1. Stated preference methods are studies in which individuals are surveyed as to which resources they consider important, the economic values they would assign to those resources and/or how much they would be willing to pay (e.g., in increased prices for goods and services) to protect them.

its own data – indicating that stated preference methods would likely place an extremely high dollar value (relative to costs) on the 97.4 percent of affected organisms that provide non-use benefits. Specifically, the agency conducted focus groups in preparation for a national survey to determine the total (*e.g.*, use *and* non-use) value that individuals placed on the organisms that the proposed Phase III regulation would protect.[206] These results show that individuals valued total benefits of the proposed regulation (including both use and non-use) at $12 to $54 per year per individual.[207]

Significantly, even the low end of that range is *ten times higher* than the *per-individual cost* of the proposed regulation. EPA identified over 33 million households that would be affected by the regulation (and thus would be expected to hold use and non-use values for the protected organisms).[208] Because EPA calculated the costs of the proposed regulation at approximately $39 million,[209] the benefits of the proposed regulation would outweigh its costs if each affected

---

[206] "Development of Willingness to Pay Survey Instrument for Section 316(b) Phase III Cooling Water Intake Structures" (ABT Associates, May 23,2006), DCN 9-4826, ("Survey Memo") at 2.

[207] Survey Memo at 5.

[208] Economic and Benefits Analysis at Table E3-8.

[209] *See id.* at E3-5. As noted above, this figure represents the present value of all 42 years of regulation.

household valued the total benefit of the proposed regulation at or above $1.18.[210]

Making three very conservative assumptions regarding the data that EPA compiled

– using the lowest value that an individual assigned to the total benefits; equating

individual values with household values, *and* equating a "per year" value of $12

with the present value of 42 years of projected costs – the (per-individual) benefits

of the proposed regulation appear to be an order of magnitude greater than the

(per-individual) costs:  $12 versus $1.18.  And yet EPA ignored these focus group

data and asserted, without factual support, the opposite conclusion:  that costs were

wholly disproportionate to benefits.

As EPA acknowledges, "[d]eveloping comprehensive quantified benefit

estimates for the section 316(b) regulation *requires* consideration of non-use

values because nearly all (96 percent) of impingement and entrainment losses at

CWIS consist of either forage species, or non-landed recreational and commercial

species that do not have direct uses or, as a result, direct use values."[211]  Despite

---

[210]  The $39 million costs divided by the 33 million households equals $1.18 per household.  EPA refers to this as a "break-even" analysis.  The agency conducted its own break-even analysis for non-use (rather than total) benefits, and found that non-use benefits would have to equal $37.2 million, or $1.13 per affected household, for total benefits (including the monetized use benefits) to outweigh costs.  *See id*. at E3-8.

[211]  Agency Information Collection Activities:  Proposed Collection; Comment Request; Willingness to Pay Survey:  Phase III Cooling Water Intake Structures, 69 Fed. Reg. 68,140 68,141/2 (Nov. 23, 2004) (emphasis added).

74

this fact, the agency effectively "zeroed out" these non-use ecosystem benefits by summarily stating, without analysis, that they were insufficient to make up for the difference.[212] This approach contradicts EPA's prior statement that "[i]t is generally accepted that non-use values may be substantial in some cases, and that failure to recognize such values may lead to improper inferences regarding policy benefits and costs."[213]

While focus group data may not provide a sufficient basis from which to calculate broader societal values, such results are used frequently to interpret and validate larger data sets.[214] At the very least, EPA's results indicate that the majority of people place substantial, positive value on the protection offered by the proposed rule.[215] But EPA failed to even acknowledge the significant and compelling data from these studies anywhere in its Federal Register notice, its supporting Economic and Benefits Analysis, or its Regional Benefits Analysis documents.

Because EPA's conclusion that costs are "wholly disproportionate" to total benefits was unsupported, and because, in reaching that conclusion, EPA ignored

---

[212]  71 Fed. Reg. at 35,017/3.

[213]  69 Fed. Reg. at 68,141/1-2.

[214]  Survey Memo at 4.

[215]  *Id.*

75

the most relevant data in the record, its conclusion must be set aside under *State Farm*.

**B.    Because EPA Provided No Explanation of Its Purported "Qualitative" Analysis of Non-Use Benefits, There is Not a Sufficient Basis for Judicial Review of its Determination.**

Congressional delegation of regulatory authority "carries with it the correlative responsibility of the agency to explain the rationale and factual basis for its decision."[216] "[I]f the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation."[217] Here, EPA ignored information demonstrating that the non-use ecosystem benefits associated with the remaining 97.4 percent of affected aquatic life hold significant dollar value, assigned only a *partial* value to benefits to reach its decision, and failed to explain what weight, if any, it gave to unmonetized non-use benefits or how it conducted its qualitative analysis of those benefits and came to a conclusion.

---

[216]    *Bowen v. American Hosp. Ass'n*, 476 U.S. 610, 627 (1986).

[217]    *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (U.S. 1985). *See also BizCapital Bus. & Indus. Dev. Corp. v. Comptroller of the Currency of the United States*, 467 F.3d 871, 873 (5th Cir. 2006); *Texas Office of Public Util. Counsel v. FCC*, 265 F.3d 313, 328 (5th Cir. 2001) (finding the Federal Communications Commission arbitrary and capricious for failing to explain why it chose $650 million as the proper amount for a fund when six studies recommended values from $250 million to $3.9 billion).

EPA identified specific benefits that might result from the proposed rule as well as from other efforts to protect the same resources. However, it provided no basis or explanation for its conclusion that these benefits would not affect the putatively tentative conclusion it had reached on the basis of the 2.6 percent of organisms whose benefits it was able to monetize.[218] By ignoring these data and assessing non-use benefits in qualitative terms, without the explaining its methodology (or even suggesting that any methodology was employed) EPA deprived a reviewing court of any metric by which to determine whether its conclusion was properly reached.[219] Attempts to "assum[e] away" conclusions that require evidentiary support in the record are arbitrary and capricious.[220] Here EPA improperly assumed away the non-use data that were contrary to the predetermined

---

[218] Regional Benefits Analysis at A6-2, A6-5.

[219] *See Air Transp. Ass'n of Can. v. FAA*, 254 F.3d 271, 279 (D.C. Cir. 2001) ("The FAA failed to provide any record justification for the proposition that costs for servicing overflights are the same as costs for servicing non-overflights. It simply assumed it was so. Even under the more deferential standard of review applicable to an interim rule, this is not enough."); *Tripoli Rocketry Ass'n v. BATFE*, 437 F.3d 75, 81 (D.C. Cir. 2006) (The agency "provided virtually nothing to allow the court to determine whether its judgment reflects reasoned decisionmaking"); *National Welfare Rights Org. v. Mathews*, 533 F.2d 637 (D.C. Cir. 1976) ("[R]eview of the regulation is impossible because the promulgation consistently failed to articulate factual determinations underlying the decisions of the Secretary.").

[220] *Pacific Coast Fed'n of Fishermen's Ass'ns v. National Marine Fisheries Serv.*, 265 F.3d 1028, 1037 (9th Cir. 2001).

policy decision it chose to implement.

In *Public Citizen v. Mineta*, the Second Circuit addressed the challenge agencies face in weighing economic costs against less easily quantified benefits.[221] There, the court found the Department of Transportation's action arbitrary and capricious when, without justifying its decision, it chose the less expensive indirect tire pressure monitoring systems and rejected an option that provided greater safety protection (and thus benefits). "It may, of course, be difficult to weigh economic costs against safety benefits. But the difficulty of the task, does not relieve the agency of its obligation to perform it under … *State Farm*."[222] The court rejected the rule because "[t]he agency … presents us with a rulemaking record that does not explain why the costs saved were worth the benefits sacrificed."[223] Likewise, here EPA has not explained why it believed the costs saved are worth the benefits sacrificed, and its conclusion should be remanded under *State Farm*.

---

[221] 340 F.3d 39 (2d Cir. 2003).

[222] *Id.* at 58.

[223] *Id.*

POINT V

## EPA'S "EXPECTATION" THAT PERMIT WRITERS
## WILL CONSIDER "USEFUL GUIDANCE" IN THE RECORD
## IS IMPERMISSIBLY VAGUE UNDER THE APA

The APA requires agencies to give regulators and reviewing courts specific

guidelines to assure consistent application of their rules and give regulated entities

sufficient guidance to understand their responsibilities and act accordingly.[224]  "A

blanket requirement compelling compliance in the absence of an indication of the

factors considered controlling is impermissibly vague.  Even the grant of broad

rulemaking authority from Congress cannot excuse such imprecision."[225]

Here, EPA has not delineated any such factors.  EPA does not *require* that

permit writers consider any criteria or information in making case-by-case

permitting decisions, but merely "expects" that these *ad hoc* decisions will be

made by referring to unidentified "useful information" in the administrative

record.[226]  This "useful information" is scattered throughout a record consisting of

thousands of documents comprising hundreds of thousands of pages.[227]  Unlike the

---

[224]  *See South Terminal Corp. v. E.P.A.*, 504 F.2d 646, 670 (1st Cir. 1974).
*See generally Women's Med. Ctr. v. Bell*, 248 F.3d 411, 421 (5th Cir. 2001).

[225]  *See Atlas Copco v. EPA*, 642 F.2d 458, 465 (D.C. Cir. 1979).

[226]  *See supra* footnote 99 (citing 71 Fed. Reg. at 35,018/3)

[227]  *See supra* footnote 101 (citing 69 Fed. Reg. at 68,459/2 and 71 Fed. Reg.
at 35,012/3).

earlier section 316(b) regulation reviewed by the Fourth Circuit in *VEPCO*, where

EPA codified the requirement that permit writers *must* consider the information

identified and collected in its 263-page development document,[228] EPA's instant

approach fails to constrain permit writers or permittees in any meaningful way.

Two permit writers given the same permit application could reach diametrically

opposed conclusions, depending upon which parts of the record they may have

found "useful." Thus, there is no way for a facility operator, a concerned citizen,

or a reviewing court to determine if a permit writer has made a principled

decision.[229]

Accordingly, EPA's action should be vacated as impermissibly vague and

the matter should be remanded to the agency to enunciate sufficiently concrete

decision-making factors.

---

[228] 566 F.2d at 448 & n.8; *see also supra* pp. 34-36.

[229] *See, e.g., South Terminal Corp.*, 504 F.2d at 670 (Clean Air Act
regulation struck down as vague under APA where "it may mean anything the
permit-giver decides"); *State of Md. v. E.P.A.*, 530 F.2d 215, 221 (4th Cir. 1975)
(Clean Air Act regulation violates APA given "absence of any established relevant
factors" in approving implementation plans), *vacated on other grounds sub nom.
EPA v. Brown*, 431 U.S. 99 (1977).

## POINT VI

## EPA VIOLATED THE APA BY FAILING TO PUBLISH OR INCORPORATE BY REFERENCE THE INFORMATION TO BE CONSIDERED BY PERMIT WRITERS.

The APA provides that "a person may not in any manner be required to resort to, or be adversely affected by, a matter required to be published in the Federal Register and not so published" or "incorporated by reference … with the approval of the Director of the Federal Register."[230] In *Appalachian Power Co. v. EPA*, the companion to the *VEPCO* case, the Fourth Circuit held that this "publication" requirement was triggered by EPA's promulgation of a rule requiring permit writers to consider specific information found in a development document in making case-by-case permit determinations under section 316(b).[231] That court thus struck down the rule because the development document itself had not been published in the Federal Register and because EPA had not complied with the procedural requisites for incorporation by reference.[232]

Likewise, here, EPA has neither published the information it "expects" permit writers to consider in the Federal Register, nor followed these procedural

---

[230]  5 U.S.C. § 552(a)(1).

[231]  *See* 566 F.2d at 455 (4th Cir. 1977) (holding that the 1976 rule "directly affects pre-existing legal rights or obligations").

[232]  *Id.*

81

requisites.  Among other failings, EPA has not:  (1) used "the words 'incorporated by reference;'" (2) "refer[ed] to 5 U.S.C. § 552(a);" (3) "ma[de] an official showing that the publication is in fact available by stating where and how copies may be examined and readily obtained with maximum convenience to the user;" or (4) obtained approval from the Director of the Federal Register to incorporate by reference and published a statement that the incorporation by reference has been so approved.[233]

Consequently, as in *Appalachian Power*, this matter should be remanded so that EPA can satisfy the APA's publication requirement.

## CONCLUSION

For the foregoing reasons, this Court should dismiss Environmental Petitioners' petitions for lack of jurisdiction, without prejudice to their proceeding with their claims in the district court.  If this Court determines that it has jurisdiction, EPA's decision not to promulgate regulations should be vacated and remanded to the agency, with instructions to promulgate national, categorical BTA regulations pursuant to section 316(b) for Phase III existing facilities.

---

[233]  *See* 1 C.F.R. § 51.9 (entitled "What is the proper language of incorporation?").

Dated:  March 30, 2007

Respectfully submitted,

Charles C. Caldart
NATIONAL ENVIRONMENTAL
LAW CENTER
3240 Eastlake Ave East, Suite 100
Seattle, WA 98102
Tel:  206-568-2853
Fax:  206-568-2858

*Attorneys for Massachusetts Public
Interest Research Group, Inc.*

MORNINGSIDE HEIGHTS
LEGAL SERVICES, INC.

by:    Reed W. Super
        Edward Lloyd
        Environmental Law Clinic
        Columbia University School of Law
        435 West 116th Street
        New York, New York 10027
        Tel:  212-854-4291
        Fax:  212-854-3554

        P. Kent Correll
        LAW OFFICE OF P. KENT CORRELL
        300 Park Avenue, 17th Floor
        New York, New York 10022
        Tel:  212-475-3070
        Fax:  212-475-2378

*Attorneys for Environmental Petitioners
(except Massachusetts Public Interest Research
Group, Inc.)*

83

## CERTIFICATE OF SERVICE

I hereby certify that on this 30th day of March 2007, two copies of the foregoing **BRIEF OF THE ENVIRONMENTAL PETITIONERS** and the separate **ADDENDUM TO BRIEF OF THE ENVIRONMENTAL PETITIONERS** were served on the following counsel for the parties by Federal Express:

Jessica O'Donnell
Rochelle L. Russell
Environment & Natural Resources Div.
Environmental Defense Section
U.S. Department of Justice
601 D Street, N.W., Suite 8000
Washington, DC 20004
Jessica.O'Donnell@usdoj.gov
*Counsel for Respondent EPA*

David T. Ballard
Fredric P. Andes
Barnes & Thornburgh LLP
One North Wacker Drive, Suite 4400
Chicago, IL 60606-2833
David.Ballard@BTLaw.com
fandes@btlaw.com
*Counsel for Intervenor American Petroleum Institute*

Jackson Battle
Brown McCarroll, LLP
111 Congress Avenue, Suite 1400
Austin, TX 78701
JBattle@mailbmc.com
*Counsel for Petitioners
ConocoPhillips, et al*

Russell S. Frye
3050 K. Street, NW, Suite 400
Washington, DC 20007-5108
rfrye@fryelaw.com
*Counsel for Intervenor Cooling Water Intake Structure Coalition*

Reed W. Super

## CERTIFICATE OF COMPLIANCE

Pursuant to 5th Cir. R. 32.3, the undersigned provides the following certificate of compliance with respect to the type-volume limitations of Fed. R. App. P. 32(a)(7) and 5th Cir. R. 32.2:

1.     Exclusive of exempted portions in 5th Cir. R. 32.27(a)(7)(B)(iii) and 5th Cir. R. 32.2, this brief contains 17,941 words.  The undersigned has submitted herewith a motion for leave of Court to file this oversized brief.

2.     The brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

3.     An electronic PDF version has been provided with the brief.

4.     The undersigned understands that a material misrepresentation in completing this certificate, or circumvention of the type-volume limits, may result in striking the brief and imposing sanctions against the person signing the brief.

Reed W. Super

# No. 06-60662

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

CONOCOPHILLIPS CO, *ET AL.*,
Petitioners,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, *ET AL.,*
Respondents.

## ON PETITION FOR REVIEW OF A FINAL RULE PROMULGATED BY
## THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY

## BRIEF FOR RESPONDENTS

RONALD J. TENPAS
Acting Assistant Attorney General

JOHN C. CRUDEN
Of Counsel:                          Deputy Assistant Attorney General

ROBERT STACHOWIAK              JESSICA O'DONNELL
Office of General Counsel       ROCHELLE L. RUSSELL
United States Environmental     Environmental Defense Section
Protection Agency               Environment & Natural Resources Div.
                                United States Department of Justice
                                P.O. Box 23986
                                Washington, DC  20026-3986
                                (202) 305-0851
July 13, 2007_____              *Counsel for Respondents*

## STATEMENT REGARDING ORAL ARGUMENT

Respondents United States Environmental Protection Agency and

Administrator Stephen L. Johnson (collectively "EPA"), pursuant to 5th Cir. R.

28.2.4, request oral argument.  EPA believes oral argument would be useful to the

Court.

# TABLE OF CONTENTS

PAGE

JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ISSUES PRESENTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Riverkeeper's Issues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ConocoPhillips' Issues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I.     INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

II.    STATUTORY BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

III.   REGULATORY BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

       A.    EPA's 1976 Section 316(b) Regulation . . . . . . . . . . . . . . . . . . 9
       B.    The Phase I Rule . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
       C.    The Phase II Rule . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
       D.    The Phase III Rule . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

             1.    Development of the Administrative Record . . . . . . . . . . . 12
                   a.    Phase III Existing Facilities: Cost & Benefit
                         Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
                   b.    New Offshore Rigs: Economic & Environmental
                         Analyses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

             2.    The Final Phase III Rule Requirements . . . . . . . . . . . . . . 21
                   a.    Requirements for Existing Facilities . . . . . . . . . . . . 21
                   b.    Requirements for New Offshore Rigs . . . . . . . . . . . 22

STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

I.    RIVERKEEPER'S ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

II.   CONOCOPHILLIPS' ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

I.    RIVERKEEPER'S PETITION SHOULD BE DENIED . . . . . . . . . . . . . 33

      A.    This Court Has Jurisdiction over Riverkeeper's Challenge to the
            Phase III Rule . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

            1.    The Phase III Rule is an "Action" within the Scope of
                  Section 509(b)(1)(E) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

            2.    Riverkeeper Cannot Evade Section 509 by Arguing a Failure
                  to Act When EPA, In Fact, Acted . . . . . . . . . . . . . . . . . . . . . 41

      B.    Section 316(b) Authorizes EPA to Regulate Intake Structures on a
            Case-by-Case Basis or by Categorical Standards . . . . . . . . . . . . . . 46

            1.    Section 316(b) Gives EPA Broad Discretion to Determine How
                  Best to Regulate Intake Structures . . . . . . . . . . . . . . . . . . . . 46

            2.    The Statutory Structure Supports EPA's Interpretation of
                  Section 316(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

            3.    The Court Should Defer to EPA's Longstanding Interpretation
                  of Section 316(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

      C.    EPA's Interpretation of Section 316(b) to Authorize Consideration
            of Costs and Benefits for Existing Facilities is Permissible Under
            the Statute . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

            1.    Section 316(b) is Silent as to the Factors Relevant to BTA
                  and thus Should be Construed as Delegating Significant
                  Discretion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

2.    EPA's Interpretation of Section 316(b) Is Reasonable in Light of Section 316(b)'s Text and Legislative History, the Statutory Structure, and the CWA's Overall Objectives . . . . . . . . . . . . 62

a.    Section 316(b)'s Text Authorizes EPA to Consider Both Technological and Environmental Factors . . . . . 62

b.    The Statutory Structure Supports EPA's Interpretation of Section 316(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

c.    EPA's Interpretation of Section 316(b) is Consistent with the CWA's Overall Objectives . . . . . . . . . . . . . . 71

D.    EPA's Determination that the Monetized Costs of the Proposed National Standards Would Be "Wholly Disproportionate" to the Monetized Benefits Supports Its Case-by-Case Rule for Existing Phase III Facilities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

1.    EPA Considered All Relevant Information, Including Information About Non-Use Benefits . . . . . . . . . . . . . . . . . . 74

a.    EPA's Analysis of Monetized Costs and Benefits Showed a "Wholly Disproportionate" Disparity . . . . . 74

b.    EPA Accounted for Non-Use Benefits, Even Though It Did Not Assign Them A Monetary Value . . . . . . . . . . 76

2.    EPA Fully Explained its Decision . . . . . . . . . . . . . . . . . . . . . 84

E.    EPA's Decision to Apply Section 316(b) Requirements to Existing Phase III Facilities on a Case-by-Case Basis Is Sufficiently Clear . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

F.    EPA Published the Rule and Was Not Required to Incorporate by Reference the Record Information Permit Writers May Consider . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

II.    CONOCOPHILLIPS' PETITION SHOULD BE DENIED . . . . . . . . . . . . 93

A.    EPA Reasonably Chose Economic Achievability, Not Cost-Benefit, to Determine BTA for New Offshore Rigs Because a Cost-Benefit Analysis Is Not Required, Appropriate, or Feasible for New Facilities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

1. EPA's Decision to Rely on Economic Achievability Is Reasonable and Deserves Deference Because Section 316(b) Is Silent on the Issue and Because It Comports with the CWA's New Facility Regulatory Framework . . . . . . . . . . . . . . . . . . . 96

2. EPA's Conclusion that It Lacked Sufficient Data to Conduct a Meaningful Cost-Benefit Analysis for New Offshore Rigs Is Rational and Deserves Deference . . . . . . . . . . . . . . . . . . . . 100

B. EPA Reasonably Chose to Regulate Uniformly Because the Technology Behind the Rule's Standards Is Technically Available and Economically Feasible for All New Offshore Rigs to Adopt and Because a Real Potential for Adverse Environmental Impact Exists in All Locations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106

1. EPA Adequately Considered the Locations of New Offshore Rigs in All Aspects of this Rulemaking . . . . . . . . . . . . . . . 107

2. EPA Rationally Determined that the Technology Behind the Rule's Standards Is Technically Available and Economically Feasible for All New Offshore Rigs to Adopt, Regardless of Location . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109

3. EPA Reasonably Determined that a Real Potential for Adverse Environmental Impact Exists in Both Deepwaters and Shallow Waters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 115

C. ConocoPhillips' Remand Request Lacks Merit . . . . . . . . . . . . . . 121

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 125

# TABLE OF AUTHORITIES

## CASES

Am. Iron & Steel Inst. v. EPA,
115 F.3d 979 (D.C. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79, 121

Am. Iron & Steel Inst. v. EPA,
526 F.2d 1027 (3d Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

Am. Iron & Steel Inst. v. EPA ,
543 F.2d 521 (3d Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Am. Mining Congress v. EPA,
965 F.2d 759 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Am. Paper Inst. v. EPA,
890 F.2d 869 (7th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Am. Petroleum Inst. v. EPA,
661 F.2d 340 (5th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

Am. Petroleum Inst. v. EPA,
787 F.2d 965 (5th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Am. Textile Mfrs. Inst. V. Donovan,
452 U.S. 490 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59, 60

Appalachian Power Co. v. Train,
566 F.2d 451 (4th Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 91

Armco, Inc. v. EPA,
869 F.2d 975 (6th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

Baltimore Gas & Elec. Co. v. Natural Res. Def. Council,
462 U.S. 87 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Barnhart v. Walton,
  535 U.S. 212 (2002) . . . . . . . . . . . . . . . . . . . . . . . 54, 55, 56, 57, 60, 61, 70, 71

BASF Wyandotte Corp. V. Costle,
  598 F.2d 637 (1st Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 120, 121

BP Exploration & Oil Inc. v. EPA,
  66 F.3d 784 (6th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . 8, 42, 57, 58, 98, 122

Chem. Mfrs. Ass'n v. EPA,
  870 F.2d 177 (5th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . 25, 26, 42, 43, 68, 95,
                                                             97, 101, 109, 110, 115,118

Chem. Mfrs. Ass'n v. NRDC,
  470 U.S. 116 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

Chevron U.S.A., Inc. v. Natural Res. Def. Council,
  467 U.S. 837 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 26, 46, 47, 56,
                                                                     60, 62, 71, 72, 96

Citizens to Preserve Overton Park, Inc. v. Volpe,
  401 U.S. 402 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Commonwealth of Mass. v. Hayes,
  691 F.2d 57 (1st Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

CPC Int'l, Inc. v. Train,
  540 F.2d 1329 (8th Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

Crown Simpson Pulp Co. v. Costle,
  445 U.S. 193 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

E.I. du Pont de Nemours & Co. v. Train,
  430 U.S. 112 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

Envtl. Def. Ctr. v. EPA,
  344 F.3d 832 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42, 52

Envtl. Def. Fund v. EPA,
    598 F.2d 62 (D.C. Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

Envtl. Def. v. Duke Energy Corp.,
    127 S. Ct. 1423 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66, 67

EPA v. Cal. ex rel. State Water Res. Control Bd.,
    426 U.S. 200 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 53

EPA v. Nat'l Crushed Stone Ass'n,
    449 U.S. 64 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

Hudson Riverkeeper Fund v. Orange & Rockland Utilities, Inc.,
    835 F. Supp. 160 (S.D.N.Y. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55, 88

In re Dominion Energy Brayton Point, L.L.C.,
    NPDES Appeal No. 03-12, 2006 WL 3361084 (E.P.A.E.A.B. Feb. 1, 2006) . 86

In re Public Serv. Co. of N.H.,
    1 EAD 332, 1977 WL 22370 (June 10, 1977) . . . . . . . . . . . . . . . . . . . . . . . . 70

In re Public Serv. Co. of N.H.
    1 EAD 455, 1978 WL 21146 (Aug. 4, 1978) . . . . . . . . . . . . . . . . . . . . . . . . . 70

Kolender v. Lawson,
    461 U.S. 352 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

Lexecon Inc. v. Milberg Weiss Bershad Hynes Lerach,
    523 U.S. 26 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

Maier v. EPA,
    114 F.3d 1032 (10th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 39, 42

Michigan v. EPA,
    213 F.3d 663 (D.C. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.,
    545 U.S. 967 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60, 61, 62, 67

Nat'l Grain & Feed Ass'n v. OSHA,
   866 F.2d 717 (5th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

Nat'l Wildlife Fed'n v. Consumers Power Co.,
   862 F.2d 580 (6th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

Nat'l Wildlife Fed'n v. EPA,
   286 F.3d 554 (D.C. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42, 52, 98, 110

Northwest Envtl. Advocates v. EPA,
   No. C03-05760 SI, 2005 WL 756614 (N.D. Cal. Mar. 30, 2005),
   appeal docketed, No. 06-17187 (9th Cir. Nov. 20, 2006) . . . . . . . . . . . . . . . . 39

NRDC v. EPA,
   673 F.2d 400 (D.C. Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

NRDC v. EPA,
   859 F.2d 156 (D.C. Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

NRDC v. EPA,
   915 F.2d 1314 (9th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

NRDC v. EPA,
   966 F.2d 1292 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

NRDC v. EPA,
   No. CV 04-8307-GHK (C.D. Cal. Aug. 29, 2005),
   appeal docketed, No. 07-55183 (9th Cir. Feb. 15, 2007) . . . . . . . . . . . . . . . . 44

Pa. Dep't of Envtl. Res. v. EPA,
   618 F.2d 991 (3d Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

Riverkeeper, Inc. v. EPA,
   358 F.3d 174 (2d Cir. 2004) . . . . . . . . . . . . . . . . . 11, 34, 36, 42, 48, 49, 50, 51,
                                  55, 57, 58, 64, 95, 97,109

Riverkeeper, Inc. v. EPA,
   475 F.3d 83 (2d Cir. 2007) . . . . . . . . . . . . . . . . . . 12, 34, 36, 58, 59, 61, 65, 68

Seacoast Anti-Pollution League v. Costle,
    597 F.2d 306 (1st Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

Sierra Club v. EPA,
    314 F.3d 735 (5th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

South Holland Metal Finishing Co. v. Browner,
    97 F.3d 932 (7th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Sun Enters., Ltd. v. Train,
    532 F.2d 280 (2d Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Tex. Office of Pub. Util. Counsel v. FCC,
    183 F.3d 393 (5th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

Tex. Oil & Gas Ass'n v. EPA,
    161 F.3d 923 (5th Cir. 1998) . . . . . . . . . . . . . . . . . 8, 24, 25, 46, 48, 53, 54, 68,
                                                         69, 73, 75, 79, 83, 87, 98,
                                                         100, 105, 107, 110, 121,124

Train v. NRDC,
    421 U.S. 60 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

Trustees for Alaska v. EPA,
    749 F.2d 549 (9th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

United States Steel Corp. v. Train,
    556 F.2d 822 (7th Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

Va. Elec. & Power Co. v. Costle ,
    566 F.2d 446 (4th Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . 34, 35, 36, 37, 40

Village of Hoffman Estates v. Flipside,
    455 U.S. 489 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

Waterkeeper Alliance, Inc. v. EPA,
399 F.3d 486 (2d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

**STATUTES**

The Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551-559, 701-706  . . . 24

5 U.S.C. § 551(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

5 U.S.C. § 552(a)(1)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

5 U.S.C. § 552(a)(1)(D) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90, 91

5 U.S.C. § 706(2)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

28 U.S.C. § 2112(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

33 U.S.C. § 1251(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 71

33 U.S.C. § 1311 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50, 64

33 U.S.C. § 1311(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

33 U.S.C. § 1311(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

33 U.S.C. § 1311(b)(1)(A)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 51, 66

33 U.S.C. § 1311(b)(2)(A)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 51, 66, 69

33 U.S.C. § 1311(b)(2)(E) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 51

33 U.S.C. § 1314   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50, 64

33 U.S.C. § 1314(b)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

33 U.S.C. § 1314(b)(1)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 66

33 U.S.C. § 1314(b)(2)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 66

33 U.S.C. § 1316 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

33 U.S.C. § 1316(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 51

33 U.S.C. § 1316(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

33 U.S.C. § 1316(b)(1)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 97

33 U.S.C. § 1326(b)  . . . . . . . . . . . . . . . . . . . . .  1, 4, 6, 8, 47, 48, 53, 62, 97, 107

33 U.S.C. § 1342 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

33 U.S.C. § 1342(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

33 U.S.C. § 1342(p) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

33 U.S.C. § 1365(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

33 U.S.C. § 1369(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 24

33 U.S.C. § 1369(b)(1)(E) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 28, 35

33 U.S.C. § 1369(b)(1)(F) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

## **CODE OF FEDERAL REGULATIONS**

1 C.F.R. § 51.9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

40 C.F.R. § 122.44(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

40 C.F.R. § 123.25(a)(28) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

40 C.F.R. § 123.30 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

40 C.F.R. § 124.10(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

40 C.F.R. § 125.3(c)-(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

40 C.F.R. § 125.80(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

40 C.F.R. § 125.81(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

40 C.F.R. § 125.83 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

40 C.F.R. § 125.90(b) . . . . . . . . . . . . . . 12, 13, 21, 28, 37, 38, 41, 48, 55, 88, 90

40 C.F.R. § 125.94 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 37

40 C.F.R. §§ 125.130-125.139 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

40 C.F.R. § 125.130(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 22

40 C.F.R. § 125.131(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 94

40 C.F.R. § 125.133 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

40 C.F.R. § 125.134 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

40 C.F.R. § 125.134(b)-(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

40 C.F.R. § 125.134(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 94

40 C.F.R. § 125.134(b)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

40 C.F.R. § 125.134(b)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

40 C.F.R. § 125.134(b)(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

40 C.F.R. § 125.134(b)(6)-(8) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

40 C.F.R. § 125.134(c)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

40 C.F.R. § 125.134(c)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

40 C.F.R. § 125.134(c)(3)(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

40 C.F.R. § 125.134(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

40 C.F.R. § 125.135 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 94

40 C.F.R. § 401.14 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

40 C.F.R. § 402.12 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

## FEDERAL REGISTER

41 Fed. Reg. 17,387 (Apr. 26, 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 91, 96

44 Fed. Reg. 32,854 (June 7, 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

51 Fed. Reg. 24,974 (July 9, 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

65 Fed. Reg. 49,060 (Aug. 10, 2000) . . . . . . . . . . . . . . . . . 70, 96, 98, 99, 100, 102

66 Fed. Reg. 65,256 (Dec. 18, 2001) . . . . . 3, 9, 10, 11, 17, 96, 98, 100, 102, 108

69 Fed. Reg. 41,576 (July 9, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

69 Fed. Reg. 68,444 (Nov. 24, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

70 Fed. Reg. 71,057 (Nov. 25, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

71 Fed. Reg. 35,006 (June 16, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

72 Fed. Reg. 37,107 (July 9, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

## LEGISLATIVE HISTORY

House Consideration of S. Rep. No. 92-1236 (1972) (Conf. Rep.),
    *Legis. Hist.* at 264 (statement of Rep. Clausen) . . . . . . . . . . . . . . . . . . . . . . 63, 64

## GLOSSARY

| | |
|---|---|
| AISI | American Iron & Steel Institute |
| APA | Administrative Procedure Act |
| API | American Petroleum Institute |
| BADT | Best available demonstrated control technology |
| BAT | Best available technology economically achievable |
| BCT | Best conventional pollutant control technology |
| BPJ | Best professional judgment |
| BPT | Best practicable control technology currently available |
| BTA | Best technology available |
| CP | ConocoPhillips |
| CWA | Clean Water Act |
| EBA | Economic and Benefits Analysis for the Final Section 316(b) Existing Facilities Rule |
| Phase I EEA | Economic Analysis of the Final Regulations Addressing Cooling Water Intake Structures for New Facilities |
| EPA | U.S. Environmental Protection Agency |
| LMOGA | Louisiana Mid-Continent Oil and Gas Association |
| MGD | Million gallons of water per day |
| MMS | Minerals Management Service |
| NPDES | National Pollutant Discharge Elimination System |

| NRDC | Natural Resources Defense Council |
| NWEA | Northwest Environmental Advocates |
| OMB | Office of Management & Budget |
| OSHA | Occupational Safety and Health Act of 1970 |
| RBA | Phase III Regional Benefits Analysis |
| SEAMAP | Southeast Area Monitoring and Assessment Program |
| TDD | Technical Development Document for the Final Section 316(b) Phase III Rule |
| VEPCO | Virginia Electric & Power Company |
| WTP | Willing to pay |

## JURISDICTION

Petitioners challenge certain aspects of EPA's Final Rule Establishing

Requirements for Cooling Water Intake Structures at Phase III Facilities, 71

Fed. Reg. 35,006 (June 16, 2006), promulgated pursuant to Clean Water Act

("CWA") Section 316(b), 33 U.S.C. § 1326(b).[1] Petitioners include

ConocoPhillips Company and Anadarko Petroleum Corporation (collectively

"ConocoPhillips") and twelve environmental groups (collectively

"Riverkeeper").[2] The petitions were timely filed under 33 U.S.C. § 1369(b)(1),

and this Court has jurisdiction under 33 U.S.C. § 1369(b)(1)(E).[3]

---

[1] The numbering of the CWA sections does not match the numbering of the corresponding United States Code provisions. For example, CWA Section 316(b) is codified at 33 U.S.C. § 1326(b). To minimize potential confusion, we identify whether we are referring to the CWA section ("Section ___") or the United States Code section ("33 U.S.C. § ___").

[2] Environmental petitioners include Riverkeeper, Inc., Surfrider Foundation, Environment Massachusetts, Natural Resources Defense Council, Waterkeeper Alliance, Inc., Soundkeeper, Inc., Delaware Riverkeeper Network, American Littoral Society, Raritan Baykeeper, Inc. d/b/a NY/NJ Baykeeper, Save the Bay-People for Narragansett Bay, Friends of Casco Bay, and Santa Monica Baykeeper.

[3] Individual environmental groups initially filed petitions in the First, Second, and Ninth Circuits. The petitions were consolidated in this Court, with ConocoPhillips' petition, pursuant to 28 U.S.C. § 2112(a). On March 22, 2007, the Court denied Riverkeeper's motion to transfer all petitions to the Second Circuit.

## ISSUES PRESENTED

**Riverkeeper's Issues:**

1.    Whether the Phase III Rule is an action subject to this Court's exclusive jurisdiction under CWA Section 509(b)(1)(E), 33 U.S.C. § 1369(b)(1)(E).

2.    Whether EPA reasonably interpreted CWA Section 316(b) to authorize case-by-case regulation of intake structures.

3.    Whether EPA reasonably interpreted Section 316(b) to authorize, but not to require, weighing of costs and benefits in determining the "best technology available for minimizing adverse environmental impact" for existing facilities.

4.    Whether EPA's conclusion that the monetized costs of the "50 MGD"[4] option for existing facilities are "wholly disproportionate" to the monetized benefits is reasonable and supported by evidence in the record, and supports EPA's decision to regulate existing facilities on a case-by-case basis.

5.    Whether the Phase III Rule for existing facilities is sufficiently clear to advise regulated parties of their obligations.

6.    Whether EPA correctly concluded that guidance in the record is not required to be formally incorporated by reference in the Federal Register.

---

[4] "MGD" refers to millions of gallons per day of water withdrawn by a cooling water intake structure.

2

**ConocoPhillips' Issues:**

1.      Whether EPA reasonably concluded that economic achievability is an appropriate basis for determining the best technology available for minimizing adverse environmental impact under CWA Section 316(b) for new facilities, and that a cost-benefit analysis is not required, appropriate, or feasible.

2.      Whether EPA reasonably considered the locations of new offshore rigs in this rulemaking.

3.      Whether EPA reasonably determined to regulate all new offshore rigs under one uniform regulation because the technology is technically available and economically feasible for all new offshore rigs to adopt, regardless of location, and because the potential for adverse environmental impact exists in all locations.

## STATEMENT OF THE CASE

### I.      INTRODUCTION

Industrial facilities typically take in large amounts of water through cooling water intake structures ("intake structures") to absorb waste heat from their power generation and manufacturing processes. Collectively, these structures withdraw an estimated 279 billion gallons of water per day from our nation's waters. 66 Fed. Reg. 65,256, 65,262/3 (Dec. 18, 2001). As intake structures withdraw water, they "impinge" and "entrain" aquatic organisms from the smallest plankton, fish

3

eggs, and larvae to the largest adult fish.[5]  Additionally, intake structures may affect the populations and ecosystems that rely on those organisms. 71 Fed. Reg. at 35,012/3.

CWA Section 316(b) requires that "the location, design, construction, and capacity of cooling water intake structures reflect the best technology available for minimizing adverse environmental impact." 33 U.S.C. § 1326(b). The rulemaking at issue here (the "Rule" or "Phase III Rule") is the third phase of EPA's Section 316(b) rulemaking proceedings. The Rule establishes intake structure requirements for facilities not covered in the first two rulemaking phases: certain existing facilities ("existing facilities"),[6] new offshore and coastal oil and gas extraction facilities ("new offshore rigs"),[7] new offshore liquified natural gas facilities, and new seafood processing vessels. Petitioners challenge the Rule only

---

[5] "Impingement" means organisms are trapped against the intake structures by the force of inflowing water, which can cause suffocation, starvation, and physical injury. 71 Fed. Reg. at 35,013/1. "Entrainment" means typically smaller organisms are pulled into and through the facility's cooling system, which can cause death and injury from the cooling system's machines, heat, and chemical processes. Id.

[6] Phase III existing facilities include paper, chemical, petroleum, aluminum, and steel manufacturers, small power plants, and food production and other non-manufacturing facilities. 71 Fed. Reg. at 35,030.

[7] For simplicity, EPA adopts the "rig" terminology used by ConocoPhillips in its opening brief. ConocoPhillips ("CP") Br. at 2, n.1.

4

with respect to the requirements for existing facilities and new offshore rigs. The Rule's specific requirements are summarized below, following the statutory and regulatory background.

## II.    STATUTORY BACKGROUND

The CWA's purpose is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To this end, the CWA establishes a comprehensive regulatory program that: (1) prohibits the discharge of pollutants from point sources to waters of the United States, except as authorized by the CWA; (2) authorizes EPA to develop effluent limitation guidelines and standards and authorizes states to develop water quality standards; and (3) authorizes EPA or authorized states or tribes to issue to point source dischargers National Pollutant Discharge Elimination System ("NPDES") permits that contain effluent limitations for various pollutants as necessary to meet generally applicable technology-based regulations and water quality standards. EPA v. Cal. ex rel. State Water Resources Control Bd., 426 U.S. 200, 205 (1976). In the absence of nationally applicable technology-based standards, permit authorities develop discharge and other limitations on a "best professional judgment" or "BPJ" basis. See, e.g., 33 U.S.C. § 1342(a); 40 C.F.R. §§ 122.44(a)(2), 125.3(c)-(d), 125.80(c), 125.130(c).

5

While the CWA regulatory program's central elements protect the nation's waters by regulating *discharges*,[8/] the statutory provision at issue here – Section 316(b) – protects the nation's waters by regulating the *intake* of cooling water by facilities subject to NPDES requirements. Section 316(b) states, in full:

> [a]ny standard established pursuant to [CWA Sections 301 or 306] and applicable to a point source shall require that the location, design, construction, and capacity of cooling water intake structures reflect the best technology available for minimizing adverse environmental impact.

33 U.S.C. § 1326(b). Section 316(b) does not define the phrase "best technology available for minimizing adverse environmental impact" ("BTA"). However, its meaning can be understood in light of similar phrases used elsewhere in the CWA and referenced in Section 316(b). 71 Fed. Reg. at 35,009/3.

CWA Sections 301, 304, and 306 authorize EPA to establish effluent limitation guidelines and new source performance standards for categories of dischargers based on a variety of factors. For existing sources, Sections 301 and 304 authorize EPA to set effluent limitation guidelines based on the "best practicable control technology currently available" ("BPT"), the "best conventional pollution control technology" ("BCT"), or the "best available

---

[8/] Section 301, 33 U.S.C. § 1311(a), for example, prohibits the discharge of any pollutant into such waters unless authorized by a specific CWA provision, such as CWA Section 402, id. § 1342. Section 402, id. § 1342(a)(1), in turn, authorizes EPA to issue NPDES permits with effluent limitations that restrict the types and amounts of pollutants that may be discharged.

6

technology economically achievable" ("BAT").[9] 33 U.S.C. §§ 1311(b)(1)(A),

1311(b)(2)(A). For new sources, Section 306 directs EPA to establish

performance standards based on the "best available demonstrated control

technology" ("BADT"). Id. § 1316(a)(1). Although the CWA does not define

these phrases, it specifies the factors EPA must consider in establishing them.

For BPT, Section 304(b)(1)(B) specifies that EPA consider "the total cost of

application of technology in relation to the effluent reduction benefits to be

achieved from such application," and take into account "the age of the equipment

and facilities involved, the process employed, the engineering aspects of the

application of various types of control techniques, process changes, non-water

quality environmental impact (including energy requirements), and such other

factors as [EPA] deems appropriate." Id. § 1314(b)(1)(B). Section 304(b)(2)(B)

specifies that EPA consider similar factors for BAT, but unlike Section

304(b)(1)(B), it does not expressly require that EPA compare costs to effluent

reduction benefits. Id. § 1314(b)(2)(B). Rather, it leaves the weighing of the

enumerated factors to EPA's discretion. See Waterkeeper Alliance, Inc. v. EPA,

---

[9] The CWA establishes a timetable for setting effluent limitation guidelines for
existing sources: by July 1, 1977, EPA was to establish effluent guidelines that
reflect BPT for conventional, non-conventional, and toxic pollutants. 33 U.S.C.
§ 1311(b)(1)(A). By 1989, EPA was to establish effluent guidelines for
conventional pollutants based on BCT, and for toxic and non-conventional
pollutants based on BAT. Id. § 1311(b)(2)(A),(E).

399 F.3d 486, 516 (2d Cir. 2005); Tex. Oil & Gas Ass'n v. EPA, 161 F.3d 923,

928 (5th Cir. 1998); BP Exploration & Oil Inc. v. EPA, 66 F.3d 784, 796 (6th Cir.

1995).

Since Section 316(b) points to Sections 301, and by extension Section 304,

EPA has looked to those provisions for guidance in determining BTA for existing

facilities under section 316(b).  See 71 Fed. Reg. at 35,009-10.  At the same time,

however, EPA noted a significant difference between Section 316(b) and Sections

301 and 304: Section 316(b) requires not simply the "best technology available"

but "the best technology available *for minimizing adverse environmental impact*."

33 U.S.C. 1326(b) (emphasis added); 71 Fed. Reg. at 35,010/2.  EPA thus

interpreted the phrase "minimize adverse environmental impact"[10] to further

define what constitutes "best" and "available" under Section 316(b).  Specifically,

EPA determined that the phrase authorizes it to consider the receiving water

effects of candidate technologies.  Id.  Therefore, EPA concluded that, for existing

facilities, Section 316(b) authorizes it to consider the relationship of costs and

benefits in determining what constitutes the "best technology available for

minimizing adverse environmental impact."  Id. at 35,010/2-3.

_____

[10] EPA interpreted "adverse environmental impact" to refer to "the loss of aquatic
organisms due to impingement mortality and entrainment."  71 Fed. Reg. at
35,019/3.

8

Because Section 316(b) references Section 306, and because Section 306 embodies the CWA's framework for regulating new facilities, EPA turned to Section 306 for guidance in promulgating the Rule's national performance standards for new offshore rigs, as it did for other new facilities in the Phase I Rule. See 71 Fed. Reg. at 35,009/3-10/1; 66 Fed. Reg. at 65,309/1.  In determining new source performance standards under Section 306, EPA must consider the cost of achieving the required effluent reduction and any non-water quality environmental impacts and energy requirements.  33 U.S.C. § 1316(b)(1)(B).  Accordingly, EPA established BTA for new offshore rigs by determining whether the chosen control technologies are technically available and economically feasible for the industry to adopt as a whole, and whether there is a potential for adverse environmental impact. See 71 Fed. Reg. at 35,024-29, 35,016/1.

## III.  REGULATORY BACKGROUND

### A.    EPA's 1976 Section 316(b) Regulation.

In 1976, EPA first promulgated regulations implementing Section 316(b). 41 Fed. Reg. 17,387 (Apr. 26, 1976).  Those regulations were challenged and remanded to EPA by the Fourth Circuit for procedural reasons.  Appalachian Power Co. v. Train, 566 F.2d 451 (4th Cir. 1977).  EPA subsequently withdrew

9

the remanded regulations, but left intact a provision, which had not been remanded, that applies Section 316(b)'s substantive standard to point sources. See 44 Fed. Reg. 32,854, 32,956/1 (June 7, 1979); 40 C.F.R. § 401.14.

The 1976 regulation required each NPDES permitting authority to use its best professional judgment to determine BTA at each facility. 71 Fed. Reg. at 35,011/2. EPA distributed draft guidance in 1977, recommending development of site-specific studies of environmental impacts and a basis to determine BTA at each facility.[1] Id. at 35,011/3.

On October 10, 1995, EPA entered into a Consent Decree establishing deadlines for proposing and taking final action on regulations implementing Section 316(b). Id. at 35,011/1. EPA later entered into a Second Amended Consent Decree that divided the process for taking final action on Section 316(b) regulations into three phases, each addressing different categories of facilities. Id. at 35,011/1-2.

## B.    The Phase I Rule.

EPA published the Phase I Rule in the Federal Register on December 18, 2001. 66 Fed. Reg. at 65,256. The Phase I Rule applies to all new facilities,

---

[1] See EPA, Draft Guidance for Evaluating the Adverse Impact of Intake Structures on the Aquatic Environment: Section 316(b) P.L. 92-500 (1977), DCN 9-0017, JA XX-XX.

10

except new offshore rigs,[12] that meet certain threshold specifications. Id. at

65,256/2-3. The performance standards and compliance options established in the

Phase I Rule for new facilities are similar to those in the Phase III Rule for new

offshore rigs.

Several petitioners challenged the Phase I Rule in the Second Circuit. The

Second Circuit upheld the regulations as "based on a reasonable interpretation of

the applicable statute and sufficiently supported by a factual record," but

remanded to EPA that portion of the rule that permitted restoration measures to

meet the new facility performance standards. Riverkeeper, Inc. v. EPA

("Riverkeeper I"), 358 F.3d 174, 181 (2d Cir. 2004); see also id. at 189 (discussing

rationale for remand).

## C.    The Phase II Rule.

On July 9, 2004, EPA published the Phase II Rule, which applies to existing

large power plants that use more than 50 MGD of cooling water and meet certain

threshold specifications. 69 Fed. Reg. 41,576 (July 9, 2004). The Phase II Rule

established national performance standards and compliance options to reduce

impingement and entrainment, and addressed approximately 90% of the total

---

[12] EPA postponed new offshore rigs to the Phase III rulemaking because EPA did
not have information about intake structures at these facilities when it proposed
the rule, and was unable to address the lack of information in time to meet the
consent decree deadline. See 71 Fed. Reg. at 35,015/2.

volume of water withdrawn from intake structures nationally. 40 C.F.R. § 125.94;
71 Fed. Reg. at 35,017/3.

Several petitioners challenged the Phase II Rule in the Second Circuit.
Riverkeeper, Inc. v. EPA ("Riverkeeper II"), 475 F.3d 83 (2d Cir. 2007). The
Second Circuit remanded significant portions of the Phase II Rule, and, relevant
here, held that Section 316(b) does not authorize EPA to engage in a cost-benefit
analysis when selecting BTA standards. Id. at 130-31. EPA subsequently issued a
Final Rule that suspended the Phase II Rule, but left intact 40 C.F.R. § 125.90(b),
which requires that Section 316(b) requirements for existing facilities not subject
to specific uniform requirements be determined on a case-by-case, BPJ basis. 72
Fed. Reg. 37,107, 37,108/3 (July 9, 2007). This provision was not challenged, and
therefore was not at issue, in Riverkeeper II.

### D.     The Phase III Rule.

#### 1.     Development of the Administrative Record.

On November 24, 2004, EPA published and sought public comment on its
proposed Phase III rule ("Proposed Rule"). 69 Fed. Reg. 68,444 (Nov. 24, 2004).
For existing facilities, EPA proposed three options for uniform national
requirements based on three design intake flow thresholds and the type of water
body from which the cooling water would be withdrawn – referred to as the 50,

12

100, and 200 MGD options. Id. In addition, EPA gave notice that it might decide
to rely on its existing case-by-case regulation, 40 C.F.R. § 125.90(b), in lieu of
national categorical requirements for existing facilities. 69 Fed. Reg. at 68,467.
Finally, EPA proposed national categorical requirements for new offshore rigs. Id.
at 68,444.

On November 25, 2005, EPA published a Notice of Data Availability that,
among other things, summarized the significant data EPA had received or
collected since the Proposed Rule, including information related to the Proposed
Rule's costs and benefits, and solicited further public comment on this
information. See 70 Fed. Reg. 71,057 (Nov. 25, 2005). As EPA developed and
interpreted the data on which the Phase III Rule is based, EPA carefully
considered the views of environmental, industry, engineering, and governmental
groups. See 71 Fed. Reg. at 35,012/2-3. EPA held a symposium to discuss the
research, efficacy, and costs of proposed control technologies. Id. EPA also
considered the voluminous materials from the Phase I and Phase II rulemakings.
Id.

Additionally, EPA conducted an entrainment study specific to existing
Phase III facilities. Id. For new offshore rigs, EPA conducted an industry-wide
survey to collect technical and economic data related to proposed new facilities

13

and their intake structures. Id. EPA further relied on its experience and information acquired in promulgating effluent limitations guidelines for offshore rigs, which include extensive public outreach meetings, public comment periods, industry surveys, and economic analyses and models. Id.

### a.    Phase III Existing Facilities: Cost & Benefit Analysis.

In addition to evaluating the technical availability and efficacy of various technologies for reducing impingement and entrainment at existing facilities, EPA undertook an extensive analysis of the estimated national costs and benefits of the proposed 50, 100, and 200 MGD options. EPA's national cost data reflects the estimated social costs and economic impact of the three proposed options. 71 Fed. Reg. 35,030-32; see Economic and Benefits Analysis for the Final Section 316(b) Existing Facilities Rule (June 1, 2006), DCN 9-0002 ("EBA"), Ch. C3, E1, JA XX-XX, XX-XX.[13] To estimate social costs, EPA evaluated the incremental costs of compliance (i.e., capital costs, operation and maintenance costs, installation downtime, and permitting costs) and the administrative costs incurred by state governments and the federal government. 71 Fed. Reg. at 35,031/3; EBA at E1-1, JA XX. To estimate economic impact, EPA assessed how existing

_____

[13] The EBA contains a footer stating: "Internal Draft – Deliberative, Predecisional – Do not Quote, Cite, or Distribute." This footer was included in the final version of the EBA by inadvertent error and should be disregarded.

14

facilities and the firms that own them would be affected financially by the

proposed national categorical standards. 71 Fed. Reg. at 35,032/1; EBA Ch. C3,

JA XX-XX.

EPA's national benefits assessment analyzed both use and non-use benefits.

71 Fed. Reg. at 35,032-33; EBA, Ch. E2, JA XX-XX; Regional Benefits Analysis

for the Final Section 316(b) Existing Facilities Rule (June 2006), DCN 9-0003

("RBA"), Ch. A3-A9, & I1, JA XX-XX, XX-XX.[14]  EPA first calculated the

impingement mortality and entrainment reductions, i.e., the benefits, that would

result from compliance on a national level. 71 Fed. Reg. at 35,032-33.[15]  EPA

---

[14] Use benefits pertain to the affected fishery resources and reflect the value of
current direct and indirect uses of a service or good such as commercial and
recreational harvest of fish. RBA at A3-3, JA XX. Non-use benefits include
"non-marketed" goods and services that reflect human values associated with
existence, bequest, and altruistic motives. RBA at A3-4, JA XX.

[15] EPA derived these benefits by evaluating impingement and entrainment data
from 76 Phase II facilities and 20 Phase III existing facilities. Id. EPA then used
standard fishery modeling techniques to combine facility-derived impingement
and entrainment numbers with relevant life history data to derive estimates of (1)
age-one equivalents losses (the number of individuals of different ages impinged
and entrained expressed as an equivalent number of one-year old fish), and (2)
foregone fishery yield (pounds of commercial harvest and numbers of recreational
fish and shellfish not harvested due to impingement and entrainment). Id. at
35,032-33. EPA then extrapolated impingement and entrainment rates from these
model facilities to facilities for which EPA had no data. Id. at 35,033. To
estimate national benefits for all potentially regulated existing facilities, EPA then
estimated how much these baseline (pre-rule) losses would be reduced by the
proposed 50, 100, and 200 MGD options. Id.

then quantified and monetized the use values associated with the reductions in impingement mortality and entrainment of recreational and commercial fish. 71 Fed. Reg. at 35,033. EPA also conducted a qualitative assessment of non-use benefits. Id. at 35,033/3.

Finally, EPA compared the monetized, annualized social costs of compliance with the monetized, annualized environmental benefits resulting from compliance. Id. at 35,017. EPA determined that the 50 MGD option would result in $1.8 million to $2.3 million in use benefits. Id. When compared to the estimated $38.3 million to $39 million cost of complying with the 50 MGD option, the total cost-to-benefit ratio ranges from a low of 17-to-1 to a high of 22-to-1. Id. Based on this analysis, EPA concluded that the monetized costs of the 50 MGD option were "wholly disproportionate" to its monetized benefits. Id. EPA also concluded that the non-monetized benefits were unlikely to be of sufficient magnitude to alter EPA's judgment that the costs were wholly disproportionate to the benefits. Id. [16]

---

[16] EPA also performed a "break-even" analysis, which attempts to calculate the amount of non-use benefits that would be needed for the proposed regulation's benefits to equal the estimated costs. EBA at E3-7–E3-8, JA XX-XX. The break-even analysis is based on assumptions that embed considerable uncertainty, and therefore EPA did not rely on it. Id.

### b.    New Offshore Rigs: Economic & Environmental Analyses.

In its rulemaking for new offshore rigs, EPA conducted an economic

analysis to determine whether the costs of complying with the Rule will pose a

barrier to entry for new offshore rigs and whether those costs can be reasonably

borne by the offshore rig industry as a whole. See id. at 35,025-29. EPA also

conducted a qualitative environmental impact analysis to determine the potential

for adverse environmental impact due to impingement and entrainment from

intake structures employed by new offshore rigs.[17] See 71 Fed. Reg. at 35,013-

14/1, 35,016/1.

EPA's economic analysis relied on information gathered since the Phase I

rulemaking, including its 2003 industry-wide survey, to ascertain technical and

economic data related to offshore rigs and their intake structures. 71 Fed. Reg. at

35,012/2-3; Technical Development Document for the Final Section 316(b) Phase

III Rule (June 1, 2006), DCN 9-0004 ("TDD") at 7-10–7-19, JA XX-XX. From

---

[17] In the Phase I Rule, EPA regulated all other new facilities based on the *potential* for adverse environmental impact because EPA lacked the requisite data to document *actual* impacts. 66 Fed. Reg. at 65,312, 65,325-26. Because EPA could not know the exact location of future facilities, the details of their intake structure configurations, the species present near the intake structures, and the species' life stages at the intakes, impacts were all unknown. Id. at 65,325/1-2. Here, faced with the same informational gaps, see infra Part II.A.2, EPA also looked for the *potential* for adverse environmental impact. 71 Fed. Reg. at 35,013-14.

17

this data, EPA identified the various intake structures employed by fixed and mobile offshore rigs in both deepwaters and shallow waters, as well as the available impingement and entrainment control technologies for these intake structures. 71 Fed. Reg. at 35,025/1-2; TDD at 7-2–7-31, JA XX-XX. EPA used those technologies that showed superior reliability, performance, and ease of use as the starting point for its economic analysis, which measured both social cost and economic impacts. 71 Fed. Reg. at 35,025.

EPA estimated that the total annualized social cost[18] will range between $3.2 million and $3.8 million.[19] Id. at 35,025/2. For economic impacts, EPA determined that the Rule will not pose a barrier to entry and that its costs can be reasonably borne by the industry, for its costs will not prevent any new offshore rig from being constructed and put into operation or force any of them to close once operations begin. Id. at 35,027-29; see also EBA at B3-1–B3-17, JA XX-XX.

---

[18] Social costs for new offshore rigs include pre-tax costs of regulatory compliance (one-time technology costs, annual operating and maintenance costs, and permitting costs incurred by complying rigs) and implementation costs incurred by the federal government. 71 Fed. Reg. at 35,025/2.

[19] The Rule's economic analysis predicts that, at these social costs, "[t]here is no lost production of oil and gas calculated and no closures or firm failures are estimated. Thus no social costs associated with employment dislocations are incurred." EBA at B3-17, JA XX-XX.

18

For example, EPA estimated that new deepwater fixed offshore rigs in the Gulf of Mexico will incur $306,323 in incremental compliance costs,[20] compared to construction costs ranging from $114 million to $2.3 billion, resulting in a ratio of incremental compliance costs to construction costs of 0.01% to 0.3%. 71 Fed. Reg. at 35,029/1. EPA also determined that it will cost the fixed offshore rig industry an annual total of $1.4 million in initial after-tax investment costs to comply with the Rule, compared to the industry's total annual revenue of $1.3 trillion. EBA at B3-15, Table B3-6, JA XX. Thus, the total annual cost-to-revenue ratio for the fixed offshore rig industry will be less than 0.001%. Id. Additionally, EPA found that, on average, the annual pre-tax and after-tax costs per firm will be approximately $200,000 and $100,000, respectively, resulting in a cost-to-revenue ratio of 0.032% or less for all firms. 71 Fed. Reg. at 35,029/2-3.

For its environmental impact analysis, EPA focused on the Gulf of Mexico, where the majority of new offshore rig construction over the next 20 years is projected to occur. 71 Fed. Reg. at 35,013. Although EPA found no studies that directly examine or document the actual or potential impingement and entrainment impacts from offshore rigs, it was able to rely on numerous studies which show

---

[20] Compliance costs include initial permitting costs, capital costs of installing control technologies, monitoring costs, and operating and maintenance costs. See, e.g., EBA at B3-12, Table B3-5, JA XX.

19

that offshore marine environments provide habitat for a number of species of fish and other aquatic organisms, many of which are small and planktonic (free floating) with minimal swimming ability and thus vulnerable to entrainment. Id.

In particular, EPA relied on ichthyoplankton density data from the Southeast Area Monitoring and Assessment Program ("SEAMAP"), which collects information on the density of fish eggs and larvae in the Gulf of Mexico.[2/] Id. at 35,013/2. The data, collected from 1982 to 2003, shows that ichthyoplankton occur throughout the Gulf of Mexico. Id. Although the data shows spatial and temporal variations, as well as variability at different depths, EPA determined that the range of ichthyoplankton densities is within the same range observed in coastal and inland water bodies addressed by the Phase I Rule. Id. at 35,013/2-3, 35,019/1.

Additionally, from the SEAMAP data, EPA identified over 600 different fish taxa, including commercial and recreational species, in the Gulf of Mexico. 71 Fed. Reg. at 35,013/3. From sources outside the SEAMAP data, EPA found that offshore rigs provide important fish habitat—so much so that 70% of all fishing trips in the Gulf of Mexico head for offshore platforms, and 30% of the 15

---

[2/] EPA also relied on ichthyoplankton densities and other organism data from the areas surrounding offshore rigs off the coasts of California and Alaska, which shows a number of fish and shellfish species live and spawn in these regions. 71 Fed. Reg. at 35,013/3.

million fish caught by recreational fishermen every year off the Texas and

Louisiana coasts come from the waters surrounding platforms. TDD at 7-30–7-31,

JA XX-XX. Furthermore, offshore rigs have been shown to attract and

concentrate aquatic organisms in the immediate vicinity of their underwater

structures. 71 Fed. Reg. at 35,013/3. Given this data, EPA determined that new

offshore rigs operating in deepwater and shallow water areas present the potential

for impingement and entrainment and, therefore, for adverse environmental impact

absent regulation. 71 Fed. Reg. at 35,014/1.

### 2.    The Final Phase III Rule Requirements.

#### a.    Requirements for Existing Facilities.

The Rule specifies that Section 316(b) requirements for existing facilities

must be established on a case-by-case basis, under the NPDES permitting

program, in accordance with 40 C.F.R. § 125.90(b). 71 Fed. Reg. at 35,009/1.

Individual NPDES permit writers, using their best professional judgment, must

determine on a case-by-case basis what requirements each facility must meet to

ensure that the location, design, construction, and capacity of any cooling water

intake structure reflect the best technology available for minimizing adverse

environmental impact at each facility. Id. at 35,015/1-2.

### b.    Requirements for New Offshore Rigs.

The Rule establishes national performance standards for minimizing the adverse environmental impact of intake structures at any new offshore rig that: (1) is a point source required to have a NPDES permit that uses (or proposes to use) an intake structure; (2) has at least one intake structure that uses at least 25% of the water withdrawn for cooling purposes only; and (3) has an intake structure designed to withdraw at least two MGD.[22] 40 C.F.R. § 125.131(a).

The Rule provides three compliance options, the availability of which turns on whether the rig is fixed or mobile,[23] and if fixed, whether the rig contains a sea chest.[24] 71 Fed. Reg. at 35,014.  The Track I compliance option is available to all new offshore rigs and requires them to design their intake structures to meet a through-screen velocity of 0.5 feet per second or less in order to minimize impingement.  40 C.F.R. § 125.134(b)(2).  If a rig is fixed and located in an

---

[22] New offshore rigs with intake structures that do not meet the threshold requirements regarding the amount or percentage of water withdrawn will be regulated case-by-case.  40 C.F.R. § 125.130(c).

[23] A fixed rig is either permanently fixed or moored to the sea bed and is not intended to be moved, such as a drilling platform or tower.  40 C.F.R. § 125.133; see also TDD at 7-3, Fig. 7-1, JA XX.  Mobile rigs include drill ships, semi-submersibles, and drill barges.  40 C.F.R. § 125.133; see also TDD at 7-7, Fig. 7-8, JA XX.

[24] A sea chest is an underwater compartment within the rig's hull or pontoon through which sea water is withdrawn or discharged.  40 C.F.R. § 125.133.

22

estuary or tidal river, it must meet proportional flow requirements based on the size of the waterbody from which the water is withdrawn. Id. § 125.134(b)(3). Additional measures for minimizing impingement may be required in certain circumstances, if deemed necessary by the permitting authority. Id. § 125.134(b)(4). In addition, a fixed rig without a sea chest must employ technologies or operational measures to minimize entrainment. Id. § 125.134(b)(5). Finally, all rigs must implement certain application, monitoring, and recordkeeping requirements. Id. § 125.134(b)(6)-(8).

 The Track II compliance option is available only to fixed rigs. Id. § 125.134(c). Track II permits a fixed rig to employ technologies other than those on which Track I is based if the operator can demonstrate that the alternative technologies achieve reductions in impingement and, if required, entrainment that are comparable to those that would be achieved under Track I. Id. § 125.134(c)(1). A rig located in an estuary or tidal river must meet the same proportional flow conditions as Track I.[25] Id. § 125.134(c)(2). The application, monitoring, and recordkeeping requirements are the same as specified in Track I. Id. § 125.134(c)(3)-(5).

_____

[25] In addition to the requirements in Tracks I and II, all rigs "must comply with any more stringent requirements . . . that are reasonably necessary to comply with any provision of federal or state law." 40 C.F.R. § 125.134(d).

Finally, a new offshore rig may request less stringent requirements than Tracks I or II, but only if: (1) it demonstrates that the costs of compliance would be wholly out of proportion to the costs EPA considered in this rulemaking or result in significant adverse impacts on local water resources other than impingement or entrainment or on energy markets; (2) the alternative requirements are no less stringent than justified by the wholly out-of-proportion costs or the significant adverse impacts caused by the otherwise applicable requirements; and (3) the alternative requirements will ensure compliance with legal requirements. Id. § 125.135.

## STANDARD OF REVIEW

The Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551-559, 701-706, governs judicial review under CWA Section 509(b)(1), 33 U.S.C. § 1369(b)(1). Under the APA's highly deferential standard of review, agency action is valid unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Although the Court's review of such action must be searching and careful, "'the ultimate standard of review is a narrow one.'" Tex. Oil, 161 F.3d at 933 (citing and quoting Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971)).

24

A rule subject to CWA Section 509(b) review "is entitled to a presumption of regularity." Chem. Mfrs. Ass'n v. EPA, 870 F.2d 177, 198 (5th Cir. 1989). "This presumption places a 'considerable burden' on the challenger to overcome the EPA's chosen course of action." Tex. Oil, 161 F.3d at 934 (citing Am. Petroleum Inst. v. EPA, 787 F.2d 965, 983 (5th Cir. 1986)). Moreover, the Court "may not substitute its own judgment for that of the agency." Id. at 933-34 (citing Overton Park, 401 U.S. at 416). Instead, "the Court must determine whether the agency action 'bears a rational relationship to the statutory purposes' and whether 'there is substantial evidence in the record to support it.'" Id. at 934 (internal citation and quotation omitted). "If the agency's reasons and policy choices conform to minimal standards of rationality, then its actions are reasonable and must be upheld." Id. (citations omitted).

With regard to questions of statutory interpretation, the Court must first consider whether Congress has directly addressed the precise question at issue. If so, "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Chevron U.S.A., Inc. v. Natural Resources Def. Council, 467 U.S. 837, 842-43 (1984). But if the statute is silent or ambiguous on the issue, the Court must accept EPA's interpretation if it is reasonable; EPA's interpretation need not represent the only permissible reading

of the statute nor the reading that the Court might originally have given the statute or considers to be the better interpretation. Id. at 843 & n.11; see also Chem. Mfrs., 870 F.2d at 198 ("We need not find that [EPA's interpretation] is the only permissible interpretation, but merely that the 'EPA's understanding of this very 'complex statute' is a sufficiently rational one . . . .").

Finally, where, as here, the agency's decision rests on an evaluation of complex scientific data within the agency's technical expertise and judgment, the Court "must look at the [agency's] decision not as the chemist, biologist, or statistician that [the Court is] qualified neither by training nor experience to be, but as a reviewing court exercising . . . certain minimal standards of rationality." Chem. Mfrs., 870 F.2d at 199 (internal quotation and citation omitted); see also Baltimore Gas & Elec. Co. v. Natural Resources Def. Council, 462 U.S. 87, 103 (1983) (when reviewing an agency's scientific conclusions within its area of special expertise, "a reviewing court must generally be at its most deferential").

## SUMMARY OF ARGUMENT

In the Phase III Rule implementing CWA Section 316(b), EPA established requirements addressing adverse environmental impacts of intake structures at certain new and existing facilities. EPA reasonably identified the applicable sources of statutory authority and appropriately exercised its discretion to interpret that authority as applied to both new and existing facilities covered by the Phase III Rule. Additionally, EPA developed a thorough administrative record (following extensive public participation and comment), considered the data it had before it in light of the relevant statutory factors, reasonably applied the discretion Congress granted it, and brought to bear its significant scientific and technical expertise to determine the appropriate means for regulating Phase III facilities.

Riverkeeper challenges the part of the Rule governing existing facilities, while at the same time contending this Court lacks jurisdiction over its petition. ConocoPhillips challenges the part of the Rule governing new offshore rigs. We summarize below why Petitioners' arguments fail and why the Phase III Rule should be upheld in its entirety.

## I.    RIVERKEEPER'S ISSUES

Although Riverkeeper seemingly believed the courts of appeals had jurisdiction when it filed its petition for review before the Second Circuit,

27

Riverkeeper now argues that jurisdiction lies in the district court and not in this

Court. Riverkeeper's jurisdictional arguments fail because it is well-settled that an

action implementing Section 316(b) constitutes an "action . . . approving or

promulgating [an] . . . other limitation" subject to exclusive appellate jurisdiction

under CWA Section 509(b)(1)(E), 33 U.S.C. § 1369(b)(1)(E). Riverkeeper's

argument that EPA failed to promulgate a regulation merely reflects its

disagreement with the action EPA did take – i.e., to apply Section 316(b) to

existing facilities on a case-by-case basis. Under the CWA's bifurcated

jurisdictional scheme, review of agency "action" enumerated in Section 509(b)(1),

such as the Phase III Rule, is limited to the appellate courts.

Riverkeeper's merits challenges also fail. As to existing facilities, the Phase

III Rule requires that permit writers establish site-specific Section 316(b)

requirements on a case-by-case basis, in accordance with its existing regulation,

40 C.F.R. § 125.90(b). Riverkeeper's arguments, that Section 316(b) "mandates"

that EPA promulgate national, categorical regulations and "prohibits" EPA from

relying on a cost-benefit analysis, cannot be squared with the broad discretion

Congress gave EPA in Section 316(b). EPA's interpretation of Section 316(b) to

grant it discretion to determine whether to apply Section 316(b) on a case-by-case

basis, by uniform, categorical standards, or through a combination of both, is

28

permissible in light of the statutory text and structure, is consistent with EPA's long-standing interpretation, and is supported by prior judicial precedent. Accordingly, the Court should defer to and uphold EPA's interpretation.

EPA's action applying Section 316(b) to existing facilities on a case-by-case basis is supported by its reasoned judgment that the monetized costs of a categorical rule are "wholly disproportionate" to the monetized benefits. In making this judgment, EPA reasonably interpreted Section 316(b)'s explicit reference to both environmental and technological factors to authorize, but not require, a cost-benefit comparison. Because EPA's interpretation is permissible in light of Section 316(b)'s unique text, the statutory structure, and the CWA's overall purposes, this Court should defer to it.

Riverkeeper's argument that EPA's "wholly disproportionate" determination is arbitrary and capricious is contradicted by EPA's extensive economic and benefits analysis. Contrary to Riverkeeper's contention, EPA fully considered all benefits, even though it could only assign a monetary value to some of them. For those benefits for which EPA was unable to assign a monetary value, EPA properly performed a qualitative assessment. Further, EPA fully explained its decision that the non-use benefits were not likely to be of sufficient magnitude to alter its judgment that the monetized cost-to-benefit ratio (ranging from 17-to-1

29

to 22-to-1) was wholly disproportionate, demonstrating a rational connection between the facts found and the choices made. Therefore, the Court should uphold the Rule.

Finally, there is no merit to Riverkeeper's arguments that the Phase III Rule for existing facilities is impermissibly vague and fails to formally incorporate by reference the guidance EPA expects permit writers to consider. EPA's direction in the Phase III Rule that existing facilities must be addressed on a case-by-case basis is sufficiently clear to apprise regulated entities of the applicable requirements. Further, EPA was not required to follow the APA procedures for incorporation by reference for materials intended solely as guidance.

In short, EPA relied on the appropriate factors and made a reasoned judgment in light of all of the evidence. Judged against the APA's deferential reasonableness standard, the Phase III Rule should be upheld.

## II.    CONOCOPHILLIPS' ISSUES

ConocoPhillips challenges EPA's decision to regulate new offshore rigs under one uniform regulation as arbitrary, capricious, and inconsistent with Section 316(b) because EPA allegedly failed to conduct a cost-benefit analysis, to consider location, or to differentiate between deepwater and shallow water rigs. These claims lack merit because they simply represent ConocoPhillips' preference

30

as to how and when Section 316(b) should apply, when Congress left those determinations to EPA.

EPA reasonably concluded that, although Section 316(b) authorizes EPA to consider a cost-benefit analysis, such analysis is neither required nor appropriate for new facilities. This decision is consistent with the CWA's new facility regulatory framework, which focuses on economic achievability (i.e., whether the costs of compliance pose a barrier to entry and can be reasonably borne by the industry as a whole) and does not require a cost-benefit analysis. EPA also reasonably determined that a cost-benefit analysis is not feasible for new facilities, because, without knowing precisely where new facilities will locate, EPA lacks the requisite data to generate reliable economic benefits estimates to compare to costs. Consequently, EPA permissibly chose to establish Section 316(b) requirements for new offshore rigs based on economic achievability, just as it did for other new facilities in the Phase I rulemaking.

EPA also fully considered location in establishing the Rule's uniform regulation. EPA's technical, economic, and environmental impact analyses centered around the different types of intake structures employed by offshore rigs and the projected locations of new offshore rigs, both in terms of geographic location and water depth. From these analyses, EPA rationally determined that,

31

regardless of location, the technology behind the Rule's uniform standards is technically available and economically feasible for all new offshore rigs to adopt. EPA also found that a real potential for adverse environmental impact exists in all locations. Based on all the evidence before it and guided by the CWA's new facility framework, EPA reasonably concluded that a uniform regulation for all new offshore rigs is warranted.

In sum, EPA rationally determined that new offshore rigs should be regulated by one uniform regulation that accommodates all of the various types of rigs and their intake structures. This decision is fully supported by the record, the statute, and relevant case law, and should therefore be upheld in all respects.

32

## ARGUMENT

## I.    RIVERKEEPER'S PETITION SHOULD BE DENIED

Riverkeeper simultaneously challenges this Court's jurisdiction to review

the Phase III Rule and the merits of that Rule.  In part A, below, we demonstrate

that jurisdiction to hear Riverkeeper's merits challenge to the Rule properly

resides in this Court.  In part B, we show that EPA properly construed Section

316(b) to authorize regulation of intake structures on a case-by-case basis, through

national categorical standards, or a combination of both.  In part C, we show that

EPA's interpretation of Section 316(b) to authorize consideration of costs in

relation to benefits is permissible under the statute.  In part D, we establish the

reasonableness of EPA's conclusion that the monetized costs of a categorical rule

option are "wholly disproportionate" to the monetized benefits, which supports its

decision to regulate existing facilities on a case-by-case basis.  In part E, we

demonstrate why Riverkeeper's vagueness challenge fails.  In part F, we show that

EPA was not required to use the APA incorporation by reference procedures for its

guidance to permit writers for applying Section 316(b) requirements to existing

facilities.  In short, Riverkeeper's petition should be denied.

33

**A.    This Court Has Jurisdiction over Riverkeeper's Challenge to the Phase III Rule.**

Despite having filed a petition for review in the court of appeals and having asked this Court to transfer its petition to the Second Circuit, Riverkeeper now argues that CWA Section 509(b)(1)(E) is inapplicable to its petition and that the district courts have jurisdiction over its claims against EPA.[26] This argument lacks merit. As Riverkeeper concedes, this Court's jurisdiction turns on "whether the challenged action is covered by the specific jurisdictional grant in 509(b)(1)(E)." Riverkeeper Br. at 26. Every court to consider the issue has concluded that each of EPA's prior Section 316(b) rulemakings is an action within the scope of Section 509(b)(1)(E). See Riverkeeper II, 475 F.3d at 95; Riverkeeper I, 358 F.3d at 183-84; Va. Elec. & Power Co. v. Costle ("VEPCO"), 566 F.2d 446, 450 (4th Cir. 1977). Similarly, the Phase III Rule at issue here is an action within the scope of Section 509(b)(1)(E). Therefore, this Court has jurisdiction.

---

[26] Notably, Riverkeeper filed a complaint in the Southern District of New York, alleging that the Phase III Rule constitutes a failure to perform a nondiscretionary duty. Riverkeeper, Inc. v. EPA, No. 06-12987 (S.D.N.Y., filed Nov. 11, 2006). EPA moved to dismiss that complaint for lack of jurisdiction. In short, Riverkeeper's jurisdictional argument is simply another attempt to venue this case in what it perceives to be a more favorable forum. Id. (motion filed Feb. 7, 2007).

34

The Court should reject Riverkeeper's attempt to evade this Court's jurisdiction by styling its claim as one challenging a failure to promulgate a regulation. Riverkeeper challenges the merits of EPA's final action – made on a full administrative record, following notice-and-comment rulemaking – and *not* some alleged failure to act. Under the CWA's bifurcated jurisdictional scheme, the courts of appeals have exclusive jurisdiction to review the merits of EPA actions enumerated in Section 509(b)(1), such as the Phase III Rule.

### 1.    The Phase III Rule is an "Action" within the Scope of Section 509(b)(1)(E).

CWA Section 509(b)(1)(E) provides exclusive appellate jurisdiction over review of certain EPA actions. It provides, in pertinent part:

> Review of the Administrator's action . . . in approving or promulgating any effluent limitation or other limitation under [CWA Sections 301 or 306] . . . may be had by any interested person in the Circuit Court of Appeals of the United States . . .

33 U.S.C. § 1369(b)(1)(E). It is well-settled that if an action falls within the scope of an action enumerated within Section 509, appellate jurisdiction is exclusive. See Maier v. EPA, 114 F.3d 1032, 1038 (10th Cir. 1997).

It is also well-settled that an action implementing Section 316(b) is an "other limitation" within the scope of Section 509(b)(1)(E). In VEPCO, for instance, industry challenged EPA's 1976 Section 316(b) rule. 566 F.2d at 446.

The Fourth Circuit examined the statutory scheme and policies influencing judicial

review, and concluded,

> [i]f a limitation other than an effluent limitation can exist under § 301
> or § 306, which we must assume it can, we think a regulation
> implementing the requirements of § 316(b) must qualify as an 'other
> limitation' within the meaning of § 509(b)(1)(E).[27]

Id. at 450.  The Second Circuit twice reaffirmed the Fourth Circuit's conclusion

when reviewing EPA's Section 316(b) Phase I and Phase II Rules.  Riverkeeper II,

475 F.3d at 95; Riverkeeper I, 358 F.3d at 183-84.  Like EPA's previous Section

316(b) rules, the Phase III Rule is an action implementing Section 316(b), and,

thus, under VEPCO, is within the scope of Section 509(b)(1)(E).

Riverkeeper's contention that EPA's decision to apply case-by-case

requirements for existing facilities does not constitute a "limitation" lacks merit

because the Fourth Circuit found the 1976 regulation to constitute a "limitation,"

even though that regulation also specified case-by-case requirements.  VEPCO,

566 F.2d at 450.  As the statutory term "other limitation" is not defined, the

VEPCO court looked to the statutory definition of "effluent limitation," which

---

[27] Put another way, Section 316(b) requirements qualify as an "other limitation"
under Section 509(b)(1)(E) because they are *related to* effluent limitations under
CWA Section 301.  See id. at 450.  Therefore, the analysis in American Paper
Institute v. EPA, 890 F.2d 869 (7th Cir. 1989), upon which Riverkeeper relies,
actually supports EPA's view.  According to that court, the "other limitation"
language of Section 509(b)(1)(E) is "restricted to limitations *directly related to*
effluent limitations."  Id. at 877 (emphasis added).

includes, inter alia, a "restriction." Id. at 450 (citing CWA § 502(11)).  The court found the "best technology available" standard to be a "limitation" because it is "a restriction on the untrammeled discretion of the industry which was the condition prior to the passage of the statute." Id.  The Phase III Rule establishes restrictions for two classes of facilities: (1) new oil and gas rigs must comply with uniform national standards for reductions in impingement and entrainment; and (2) existing facilities must meet Section 316(b) requirements determined by the permitting authority on a case-by-case basis.  71 Fed. Reg. at 35,009/1; 40 C.F.R. §§ 125.130-125.139, § 125.90(b).  Therefore, the Rule constitutes an "other limitation."

Other courts have recognized that a rule need not contain numerical limits to constitute a "limitation" under Section 509.  In NRDC v. EPA, the D.C. Circuit concluded that EPA's consolidated permit regulations, which established EPA's general policies and procedures for NPDES and other permits, are "an effluent limitation or other limitation."  673 F.2d 400, 404-05 (D.C. Cir. 1982).  The court found that those regulations were a "'limitation on point sources and permit issuers' and 'a restriction on the untrammeled discretion of the industry,'" and thus, were "limitations" for purposes of Section 509(b)(1)(E).  NRDC v. EPA, 673 F.2d at 404-05 (citing VEPCO, 566 F.2d at 450).  Similarly, the Phase III Rule is a

37

restriction on permit writers and existing facilities in that it requires the application of Section 316(b) requirements on a case-by-case basis.

That EPA did not promulgate a new regulation applying Section 316(b) to existing facilities on a case-by-case basis does not deprive the Rule of legal effect. The Phase III Rule constitutes EPA's final action, published in the Federal Register, after notice-and-comment rulemaking, regarding how certain existing facilities are to be regulated under Section 316(b). It represents "the whole or part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy," and thus constitutes a final rule with legal effect. See 5 U.S.C. § 551(4) (defining "rule").[28]

Moreover, the Phase III Rule relies on EPA's existing regulation requiring existing facilities not covered by uniform regulations to comply with Section 316(b) on a case-by-case basis. See 71 Fed. Reg. at 35,009/1 (citing 40 C.F.R. § 125.90(b)). To promulgate an additional regulation establishing case-by-case requirements for existing Phase III facilities would have been superfluous in light of the binding legal requirements imposed by the existing regulation.

---

[28] Riverkeeper's contention that the Phase III Rule applies only to new oil and gas rigs, and that there is no Phase III Rule for existing facilities, Riverkeeper Br. at 18, is at odds with EPA's own description of the Rule as incorporating its decisions on both new offshore rigs and existing Phase III facilities, 71 Fed. Reg. at 35,014.

38

Indeed, courts have held that a decision to rely on an existing regulation is subject to review under Section 509(b)(1)(E). See Maier v. EPA, 114 F.3d 1032, 1037-38 (10th Cir. 1997). In Maier, the petitioner challenged EPA's refusal to revise its "secondary treatment" regulations to include categorical controls on a certain pollutant, instead of case-by-case controls. Id. at 1036. The court held that where a "petitioner's challenge is to the substance of a regulation that the agency has already promulgated, exclusive jurisdiction in the court of appeals may not be evaded merely by styling the claim as one for failure to revise." Id. at 1038. The holding in Maier applies equally here, where Riverkeeper challenges EPA's decision to forego categorical standards for existing facilities in favor of its existing case-by-case, BPJ regulation.

Riverkeeper's reliance on Northwest Environmental Advocates v. EPA ("NWEA"), No. C03-05760 SI, 2005 WL 756614, *5 (N.D. Cal. Mar. 30, 2005), appeal docketed, No. 06-17187 (9th Cir. Nov. 20, 2006), is unavailing. In NWEA, the court concluded that EPA's ballast water regulation *exempting* a class of facilities from any form of NPDES regulation at all did not "present[] any restriction or any limitation." Id. at *5. The court's conclusion is inapplicable to the Phase III Rule, which, unlike the ballast water regulation, is not an exemption

39

from regulation, but rather establishes how Section 316(b) requirements will be applied to certain facilities.[29]

Also unavailing is Riverkeeper's reliance on American Iron & Steel Institute v. EPA ("AISI"), 543 F.2d 521, 525 (3d Cir. 1976). The AISI court did not consider whether something, such as an action implementing Section 316(b) requirements, that is not an "effluent limitation" might otherwise be an "other limitation." See 543 F.2d at 525 n.9, 528-29. As established in VEPCO, a Section 316(b) rule is an "other limitation" subject to Section 509(b)(1)(E). 566 F.2d at 450. Therefore, AISI is inapposite.

Moreover, the AISI court focused on the timing of judicial review, as opposed to the appropriate forum.[30] The challenged regulations in AISI related to NPDES permit conditions that the court found were more properly reviewed under Section 509(b)(1)(F) "at an appropriate time and on an appropriate record," in the context of a specific NPDES permit challenge. 543 F.2d at 529. Riverkeeper is not suggesting that review of the Phase III Rule should be deferred until it is

---

[29] Moreover, the NWEA court's cramped construction of Sections 509(b)(1)(E) and (b)(1)(F) is inconsistent with applicable precedent. See, e.g., NRDC v. EPA, 966 F.2d 1292, 1296-97 (9th Cir. 1992); Am. Mining Congress v. EPA, 965 F.2d 759, 763 (9th Cir. 1992); NRDC v. EPA, 915 F.2d 1314, 1320 (9th Cir. 1990).

[30] Indeed, the court expressly declined to consider district court jurisdiction. 543 F.2d at 529.

applied in an NPDES permit. Because the Rule is a final action within the scope
of Section 509(b)(1)(E), made on the basis of an administrative record, it is
reviewable now, in this Court.

Also distinguishable is <u>South Holland Metal Finishing Co. v. Browner</u>, 97
F.3d 932, 936 (7th Cir. 1996), which involved review of EPA's informal
interpretation of regulations distinguishing a "new source" from an "existing
source." As the court observed, the challenged interpretation merely "advised
interested parties of how the EPA would *likely* rule" were it to act on a formal
request. <u>Id.</u> In contrast, the Phase III Rule is a final agency action *requiring* that
existing facilities comply with Section 316(b) requirements that are determined on
a case-by-case basis under 40 C.F.R. § 125.90(b). 71 Fed. Reg. at 35,009/1.
Accordingly, the Rule is subject to review in this Court pursuant to Section
509(b)(1)(E).

### 2. Riverkeeper Cannot Evade Section 509 by Arguing a Failure to Act When EPA, In Fact, Acted.

Riverkeeper's claim that EPA should have promulgated uniform, categorical
regulations, instead of requiring case-by-case limits, goes to the merits of EPA's
decision, and does not allege a failure to act. It is well-established that challenges
to a final rulemaking action, like the Phase III Rule, that results in a decision not
to promulgate regulations for a particular class of facilities or pollutants, are

41

within the scope of jurisdiction under Section 509(b)(1)(E).  See, e.g., Riverkeeper I, 358 F.3d at 202-03 (decision to regulate below-threshold facilities on a case-by-case basis); Envtl. Def. Ctr. v. EPA, 344 F.3d 832, 843 (9th Cir. 2003) (claim that EPA failed to promulgate requirements for certain storm water point sources); Nat'l Wildlife Fed'n v. EPA, 286 F.3d 554, 566-67 (D.C. Cir. 2002) (decision to regulate discharges of color pollutants on a case-by-case basis); Maier, 114 F.3d at 1037-38 (decision not to revise CWA regulations to adopt treatment standards); BP Exploration, 66 F.3d at 795 (decision not to regulate radioactive pollutants); Chem. Mfrs., 870 F.2d at 265-66 (decision not to promulgate pre-treatment standards for certain pollutants).  These cases demonstrate that a rulemaking action in which EPA affirmatively decides that categorical regulations are not appropriate in some circumstances is distinguishable from a failure to promulgate a regulation in the first instance – a distinction that Riverkeeper ignores.

    This Court's decision in Chemical Manufacturers illustrates this distinction particularly well because it addressed both a decision not to promulgate regulations for certain pollutants and agency inaction on regulations for other pollutants.  First, the Court considered a challenge to EPA's affirmative decision, in a rulemaking proceeding for effluent limitation guidelines, not to establish pre-treatment standards for six pollutants.  Chem. Mfrs., 870 F.3d at 248.  These

42

pollutants were considered during the rulemaking and were part-and-parcel of

EPA's action promulgating the effluent limitation guidelines.  The Court's review

of the reasonableness of EPA's decision demonstrates that it obviously concluded

it had jurisdiction.  See id.

Simultaneously, the Chemical Manufacturers Court declined to consider

petitioners' challenge to EPA's deferral of rulemaking action for certain

pollutants, reasoning that EPA's failure to act was subject to district court

jurisdiction under CWA Section 505, 33 U.S.C. § 1365(a)(2).  Chem. Mfrs., 870

F.2d at 265-66.  As the Court observed, the CWA establishes a bifurcated judicial

review scheme, whereby Section 509(b)(1) grants appellate courts jurisdiction to

review certain EPA *actions,* while Section 505(a)(2) gives the district courts

jurisdiction over claims of agency *inaction*.  Id. at 260 & n.379, 265-66; see also

Maier, 114 F.3d at 1038 (jurisdiction lies in the court of appeals "[w]here

petitioners challenge is to the substance of a regulation that the agency has already

promulgated"); Sun Enters., Ltd. v. Train, 532 F.2d 280, 287-88 (2d Cir. 1976)

(challenge to "the manner in which [EPA's] duties were performed," as opposed to

a failure to perform a nondiscretionary duty, must be brought in the court of

appeals under Section 509); cf. Crown Simpson Pulp Co. v. Castle, 445 U.S. 193,

197 n.9 (1980) (an affirmative decision to veto a permit, as opposed to a failure to object, would be an "action" for purposes of Section 509(b)(1)(F)).

In this case, Riverkeeper challenges the reasonableness of EPA's final action, following notice-and-comment rulemaking and based on a full administrative record, that Section 316(b) requirements for existing facilities must be addressed on a case-by-case basis, rather than by uniform regulations. Thus, Riverkeeper's challenge is to the same type of action as EPA's decision not to promulgate pre-treatment standards for certain pollutants – over which the Chemical Manufacturers Court exercised jurisdiction – but quite unlike the decision to defer promulgation of regulations for certain other pollutants – which this Court found to be beyond its jurisdiction. Because Riverkeeper challenges the substance of EPA's action, and *not* agency inaction, the exclusive jurisdiction of Section 509(b)(1)(E) applies.

Ignoring the bifurcated framework recognized by Chemical Manufacturers, Riverkeeper relies on an unreported, non-binding lower court order in NRDC v. EPA, No. CV 04-8307-GHK (C.D. Cal. Aug. 29, 2005), appeal docketed, No. 07-55183 (9th Cir. Feb. 15, 2007). The NRDC opinion is inconsistent with Chemical Manufacturers because it fails to recognize the distinction between review of EPA actions under Section 509(b)(1), and review of inaction in the face of a

44

nondiscretionary duty under CWA Section 505(a)(2).  Moreover, NRDC is

distinguishable because it involved EPA's withdrawal of proposed effluent

limitations, in contrast to EPA's affirmative action approving case-by-case

requirements for existing facilities.

　　　All of the additional cases Riverkeeper cites involve agency *inaction* – i.e.,

EPA made no decision at all regarding the particular facilities or pollutants – like

the claims this Court found to be beyond its jurisdiction in Chemical

Manufacturers.  These cases are inapposite.  See Envtl. Def. Fund v. EPA, 598

F.2d 62, 90-91 (D.C. Cir. 1978) (declining jurisdiction over claim that EPA should

have considered regulations for new facilities where the challenged rulemaking

was intended to cover existing facilities).  See also Pa. Dep't of Envtl. Resources

v. EPA, 618 F.2d 991, 994-95 (3d Cir. 1980) (holding Section 509 inapplicable to

deferral of abandoned mine regulations); Armco, Inc. v. EPA, 869 F.2d 975,

981-82 (6th Cir. 1989) (holding Section 509 inapplicable where EPA declined to

propose sludge management regulations); Trustees for Alaska v. EPA, 749 F.2d

549, 558 (9th Cir. 1984) (declining Section 509 jurisdiction where EPA failed to

promulgate placer mining regulations).  In contrast, the Phase III Rule constitutes

final action to establish national categorical standards for some facilities and to

require case-by-case determinations for other facilities.  Because Riverkeeper

45

seeks judicial review of action within the scope of Section 509, rather than inaction, jurisdiction lies in this Court.

### B.    Section 316(b) Authorizes EPA to Regulate Intake Structures on a Case-by-Case Basis or by Categorical Standards.

Section 316(b) gives EPA discretion to determine how to regulate intake structures, whether on a case-by-case basis, pursuant to categorical standards, or through a combination of both. See 71 Fed. Reg. at 35,010/3-35,011/1. EPA's interpretation of Section 316(b) is reasonable, supported by the CWA's language and structure, and consistent with EPA's long-standing practice. Under well-settled principles of Chevron deference, EPA's reasonable interpretation should be upheld.

### 1.    Section 316(b) Gives EPA Broad Discretion to Determine How Best to Regulate Intake Structures.

This Court's review of EPA's interpretation of Section 316(b) is governed by the familiar two-step Chevron framework. See Tex. Oil, 161 F.3d at 937 (citing Chevron, 467 U.S. at 837). As explained below, Section 316(b) is ambiguous, indeed silent, on the precise question at issue – whether EPA may regulate intake structures on a case-by-case basis – and thus the deferential Chevron step two analysis governs. See id. at 937-38. Under this deferential standard, the Court "need not find that [an interpretation] is the only permissible

46

construction that EPA might have adopted but only that EPA's understanding of

this very 'complex statute' is a sufficiently rational one to preclude a court from

substituting its judgment for that of EPA." Chem. Mfrs. Ass'n v. NRDC, 470 U.S.

116, 125 (1985) (citation omitted).

Section 316(b) provides, in full:

> Any standard established pursuant to [CWA sections 301 or 306] and
> applicable to a point source shall require that the location, design,
> construction, and capacity of cooling water intake structures reflect the
> best technology available for minimizing adverse environmental impact.

33 U.S.C. § 1326(b). Thus, Section 316(b)'s text establishes a substantive

standard for regulating intake structures – *i.e.*, intake structures must "reflect the

best technology available to minimize adverse environmental impact" – i.e., the

"BTA." Id. However, the statute is silent on how to apply Section 316(b)

requirements. It does *not*, as Riverkeeper argues, *require* EPA to promulgate

national categorical standards. See Riverkeeper Br. at 38. Thus, EPA's

interpretation is entitled to deference as long as it is based on a permissible

construction of the statute. See Chevron, 467 U.S. at 843-44.

EPA's view that the statute provides it discretion to decide whether to

regulate on a case-by-case basis, by categorical standards, or through a

combination of the two is a permissible construction. The statutory directive that

intake structures "reflect the best technology available for minimizing adverse

47

environmental impact," 33 U.S.C. § 1326(b), is "the only substantive statutory

requirement explicitly applicable to intake structure regulations." Riverkeeper I,

358 F.3d at 186. The Phase III Rule makes the BTA standard applicable to case-

by-case permitting decisions by express cross-reference to Section 316(b).

40 C.F.R. § 125.90(b). Thus, under EPA's interpretation, intake structures are

governed by the BTA standard, whether it is applied under a categorical rule or on

a case-by-case basis. Either way, the statutory requirement is met. Therefore,

EPA's interpretation is a permissible construction of the statute entitled to

deference. Tex. Oil, 161 F.3d at 938.

Indeed, when faced with a similar challenge to EPA's Phase I regulations,

the Second Circuit agreed that EPA's interpretation of Section 316(b) is a

permissible one. Riverkeeper I, 358 F.3d at 202-203. Specifically, the Court held:

> [Section 316(b)] does not compel EPA to regulate either by one
> overarching regulation, or based on categories of sources . . ., or on a
> case-by-case basis. . . .

Id. In light of the discretion conferred by the statute, the court concluded that

EPA's decision to regulate certain below-threshold facilities on a case-by-case was

reasonable. Id. at 203. Riverkeeper I further supports EPA's construction of

Section 316(b) to permit case-by-case regulation of existing facilities.

48

Riverkeeper's contention that Section 316(b) permits case-by-case regulation only where categorical regulation is technologically infeasible mischaracterizes Riverkeeper I. See Riverkeeper Br. at 41. In reviewing Section 316(b), the court squarely held that there is "*no textual bar* in sections 306 or 316(b) to regulating below-threshold structures on a case-by-case basis," and that Section 316(b) does not compel EPA to regulate in a particular manner. Riverkeeper I, 358 F.3d at 203 (emphasis added). Nothing in Riverkeeper I supports Riverkeeper's view that the statute prohibits a case-by-case approach if a categorical approach is technically feasible. Rather, the Riverkeeper I court's construction of Section 316(b) supports EPA's interpretation of the text to grant EPA discretion to determine how to regulate intake structures.

Riverkeeper's erroneous reading of Riverkeeper I conflates the legal issue of whether the statute authorizes EPA to regulate on a case-by-case basis with the separate question of whether EPA's decision to regulate on a case-by-case basis was reasonable. The first inquiry, governed by Chevron, requires the Court to defer to EPA's reasonable interpretation of an ambiguous statute. The Court must decide the second inquiry – whether EPA reasonably applied Section 316(b) to existing facilities on a case-by-case basis – based on the record and rationale for

the Phase III Rule, and not based on what the Second Circuit concluded was

reasonable for the Phase I Rule.[31]

### 2.    The Statutory Structure Supports EPA's Interpretation of Section 316(b).

The CWA as a whole supports EPA's interpretation of Section 316(b) to

provide discretion as to how to regulate intake structures. Intake structures are

uniquely situated in the CWA, or, in the words of the Second Circuit, "*suorum*

*generum*."  Riverkeeper I, 358 F.3d at 186. Unlike most CWA provisions, which

aim to limit *discharges* into water, Section 316(b) addresses the environmental

effects of the *intake* of water. Accordingly, Congress did not include intake

structures in those CWA sections dealing with discharges. Rather, Congress chose

to regulate intake structures "pursuant to a separate – and terse – section

concerned more generally with the uniqueness of heat as a pollutant."

Riverkeeper I, 358 F.3d at 186.

Congress's individualized treatment of intake structures is further reflected

in the differences between the requirements for intake structures specified in

Section 316(b) and the requirements for effluent discharges specified in Sections

301, 304, and Section 306, 33 U.S.C. §§ 1311, 1314, 1316. Section 316(b)

---

[31] We demonstrate the reasonableness of EPA's rationale for the Phase III Rule in Part I.D. infra.

requires only that intake structures reflect the "best technology available for minimizing adverse environmental impact." In contrast, Sections 301 and 306 not only specify the substantive standard applicable to effluent discharges – i.e., the "best practicable control technology currently available," 33 U.S.C. § 1311(b)(1)(A), "best conventional pollutant control technology," id. § 1311(b)(2)(E), "best available technology economically achievable," id. § 1311(b)(2)(A), and "best available demonstrated control technology," id. § 1316(a)(1) – but significantly, Sections 301, 304, and 306 also explicitly detail how EPA is to determine such standards. For example, Section 301 authorizes EPA to establish effluent limitations for "categories or classes" of sources, id. § 1311(b)(2)(A), and Section 304 specifies the factors EPA may consider in setting those standards, id. § 1314(b).

Congress's decision not to include the same level of detail in Section 316(b) for regulating intake structures indicates an intent to give EPA broad discretion to make those decisions. See Riverkeeper I, 358 F.3d at 187 n.12 ("To the extent the provision is silent on issues to which other sections speak, we hesitate to draw the negative inference that the brevity of Section 316(b) reflects an intention to limit the EPA's authority rather than a desire to delegate significant rulemaking

51

authority to the Agency. . . "). If Congress intended to constrain EPA's discretion as it did with regard to effluent discharges, it would have done so expressly.

Riverkeeper attempts to argue that Section 316(b)'s cross-reference to Sections 301 and 306 requires uniform, categorical regulation and forecloses case-by-case decision-making under Section 316(b). See Riverkeeper Br. at 39-40. This argument fails for several reasons. First, Riverkeeper's interpretation is at odds with Congress's intentional treatment of intake structures as a class unto themselves, separate from effluent discharges. Accordingly, the decision in E.I. du Pont de Nemours & Co. v. Train, 430 U.S. 112, 126-29 (1977), finding that Section 301 effluent limitations may be established by regulation, does not preclude case-by-case regulation under Section 316(b).

Second, Riverkeeper's argument is contrary to those cases holding that, even under Sections 301 and 306, EPA may properly regulate discharges on a case-by-case basis. For example, in National Wildlife Federation, 286 F.3d at 566, the court upheld EPA's decision to regulate color as a pollutant on a case-by-case basis. See also Maier, 114 F.3d 1032 (upholding EPA's decision to regulate nitrogenous biochemical oxygen demand on a case-by-case basis); cf. Envtl. Def. Ctr., 344 F.3d at 859 (upholding EPA's decision not to promulgate nationwide limits under 33 U.S.C. 1342(p) for stormwater discharges from certain facilities).

52

Indeed, nothing in the statutory text, the legislative history, or the statutory structure prohibits EPA from promulgating different Section 301 effluent limitations within a category or subcategory of point sources. Tex. Oil, 161 F.3d at 938 (upholding EPA's decision to set different effluent limits for point sources within a category or subcategory).

Third, Section 316(b)'s reference to "[a]ny *standard* established pursuant to [Section 301 or Section 306] and applicable to a point source," 33 U.S.C. § 1326(b) (emphasis added), does *not* require that EPA implement intake structure requirements through national categorical standards. Sections 301 and 306, and by extension, Section 304, authorize EPA to establish generally applicable effluent limitations and performance standards for categories or classes of facilities that become applicable to a point source only when included in individual NPDES permits, pursuant to Section 402. See EPA v. Cal., 426 U.S. at 205 ("An NPDES permit serves to transform generally applicable effluent limitations and other standards . . . into the obligations . . . of the individual discharger."); Tex. Oil, 161 F.3d at 928 (effluent limitations are not "self-executing"; they "achieve their bite only after they have been incorporated into NPDES permits"). Thus, Section 316(b) requires that for a facility with an intake structure and subject to an NPDES permit, the permitting authority must apply Section 316(b) requirements at the

same time it applies effluent limitations or performance standards in an NPDES

permit. Section 316(b)'s reference to "standard" is ambiguous. EPA has the

discretion to require that the application of Section 316(b) requirements to a point

source be based either on uniform national standards, or on a case-by-case basis.

In either case, the final standard "applicable to a point source" is reflected in an

individual NPDES permit.

For these reasons, the Court should defer to EPA's reasonable interpretation

of Section 316(b) to authorize regulation of intake structures by categorical

standards, on a case-by-case basis, or through a combination of both. See Tex.

Oil, 161 F.3d at 938.

### 3. The Court Should Defer to EPA's Longstanding Interpretation of Section 316(b).

EPA's longstanding interpretation of Section 316(b) to permit case-by-case

regulation provides further support for EPA's decision to do so in the Phase III

Rule. Courts "normally accord particular deference to an agency interpretation of

longstanding duration." Barnhart v. Walton, 535 U.S. 212, 220 (2002) (citation

omitted). See also, e.g., Train v. NRDC, 421 U.S. 60, 87 (1975) (upholding EPA's

regulation where "there has undoubtedly been reliance upon [EPA's]

interpretation by the States and other parties affected"); Nat'l Wildlife Fed'n v.

54

Consumers Power Co., 862 F.2d 580, 587 (6th Cir. 1988) (upholding EPA's construction of the CWA because it was consistent with the Agency's past policy).

In fact, EPA and state permitting authorities have been implementing Section 316(b) on a case-by-case basis for over 25 years, 71 Fed. Reg. at 35,011/1, and courts have recognized this practice as consistent with the statute. See Hudson Riverkeeper Fund v. Orange & Rockland Utils., Inc., 835 F. Supp. 160, 165 (S.D.N.Y. 1993) ("This leaves to the Permit Writer an opportunity to impose conditions on a case by case basis, consistent with the statute . . . ."). Moreover, both EPA's Phase I and Phase II Rules require case-by-case permitting for facilities that do not meet the applicability criteria for the national categorical standards. 40 C.F.R. §§ 125.81(c), 125.90(b). As noted, the Riverkeeper I court upheld EPA's Phase I case-by-case regulation. 358 F.3d at 203. Because EPA's longstanding interpretation of Section 316(b) to permit case-by-case regulation is reasonable, it deserves a high level of deference. Barnhart, 535 U.S. at 220.

## C.    EPA's Interpretation of Section 316(b) to Authorize Consideration of Costs and Benefits for Existing Facilities is Permissible Under the Statute.

EPA based its Phase III Rule for existing facilities on an analysis of the relative costs and benefits of the proposed national categorical standards. See 71 Fed. Reg. at 35,015, 35,017. EPA reasonably interprets Section 316(b) to

55

authorize it to consider the relationship of costs and benefits when determining the BTA – i.e., the "best technology available for minimizing adverse environmental impacts" – for existing facilities. Id. at 35,010. As we explain below, EPA's interpretation is supported by Section 316(b)'s text and legislative history, the statutory structure, and the CWA's overall objectives.

### 1. Section 316(b) Is Silent as to the Factors Relevant to BTA and thus Should be Construed as Delegating Significant Discretion.

Section 316(b) neither expressly requires nor expressly prohibits consideration of costs in relation to benefits when determining BTA. Indeed, Congress did not define the relevant terms "best technology available for minimizing adverse environmental impact," nor did it specify the factors that EPA should consider in determining BTA. Under Chevron, "such silence . . . normally creates ambiguity. It does not resolve it." Barnhart, 535 U.S. at 218; Chevron, 467 U.S. at 843-44 (where "Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate [the statutory] provision"). In light of Congress's silence, the Court must defer to EPA's reasonable interpretation of Section 316(b) to authorize consideration of costs and benefits. Id.

Riverkeeper's argument that cost-benefit analysis is precluded because Congress did not expressly authorize it, Riverkeeper Br. at 48, misstates Chevron step one. The question under Chevron step one is "whether the statute unambiguously forbids the Agency's interpretation." Barnhart, 535 U.S. at 218. Nothing in the CWA unambiguously forbids cost-benefit analysis under Section 316(b). Contrary to Riverkeeper's argument, the requirement that EPA choose the "best" technology available for "minimizing" adverse impact does not require EPA to rely on the "most protective" technology or the single best-performing plant – i.e., the best at reducing impingement and entrainment. Section 316(b) allows EPA to choose among alternative technologies "based on more than impingement and entrainment." Riverkeeper I, 358 F.3d at 196; cf. BP Exploration, 66 F.3d at 796 (stating that "best" in "best available technology" under CWA Section 301 "does not mean that the chosen technology must be the best pollutant removal") (citation omitted). Further, EPA's regulations define the word "minimize" to mean "reduce to the smallest amount, extent, or degree *reasonably* possible." 40 C.F.R. § 125.83 (emphasis added). This definition leaves room for EPA to consider whether the cost of requiring a certain degree of minimization is reasonable.

Riverkeeper further errs by arguing that the words of Section 316(b) permit EPA to consider only economic and technological feasibility, and foreclose any consideration of benefits. A "statute is to be considered in all its parts when construing any one of them." Lexecon Inc. v. Milberg Weiss Bershad Hynes Lerach, 523 U.S. 26, 36 (1998). Riverkeeper's exclusive emphasis on economic and technological feasibility ignores the words "minimizing adverse environmental impact." Congress's reference to an environmental endpoint indicates EPA may consider a technology's potential to minimize adverse environmental impact, i.e., its "benefits." 71 Fed. Reg. at 35,010/3. Moreover, the "CWA does not state what weight should be accorded to the relevant factors; rather, the Act gives EPA the discretion to make those determinations." Riverkeeper I, 358 F.3d at 195 (quoting BP Exploration, 66 F.3d at 802). Riverkeeper's interpretation would require EPA to treat impingement and entrainment reduction as the most important factor, contrary to Congress's intent to give EPA discretion.

For similar reasons, the Second Circuit's construction of Section 316(b) in Riverkeeper II, 475 F.3d at 98-99, to prohibit cost-benefit analysis is incorrect. The court's conclusion is based on its reading of the statute to "require[] a technology-driven result," and not "an assessment of the desirability of reducing

58

adverse environmental impacts in light of the cost of doing so." Id. at 99. By focusing on the words "best technology available," the Second Circuit failed to consider how those words are modified by the words "minimizing adverse environmental impact." Id. In contrast to the Second Circuit's reasoning, an interpretation that permits EPA to weigh benefits and costs in determining whether a technology is the "best" gives full meaning to Section 316(b)'s text because it allows for a consideration of both technological and environmental factors. Moreover, because nothing in Section 316(b) specifies what weight EPA should give to technological and environmental factors in determining BTA, the Second Circuit erred in concluding that Congress defined the relationship between costs and benefits. Id. (citing Am. Textile Mfrs. Inst. v. Donovan, 452 U.S. 490, 509 (1981)).

Also unavailing is Riverkeeper's argument that Congress, by its silence, intentionally excluded any consideration of the relationship between costs and benefits in Section 316(b) BTA determinations. In support of its argument, Riverkeeper mistakenly relies on the decision in American Textile. See id. In that case, the Supreme Court held only that the statute in question, Section 6(b)(5) of the Occupational Safety and Health Act of 1970, did not *require* the agency (OSHA) to do a cost-benefit analysis. See id. 452 U.S. at 506; accord

59

Commonwealth of Mass. v. Hayes, 691 F.2d 57, 61 n.4 (1st Cir. 1982). The Court

did not reach the question whether OSHA had the discretion to perform such an

analysis. Therefore, American Textile is inapposite to the question of whether

EPA has discretion under Section 316(b) to engage in a cost-benefit analysis.[32]

Moreover, the dicta in American Textile, 452 U.S. at 510, suggesting that

Congress "uses specific language when intending an agency engage in cost-benefit

analysis," predates the decision in Chevron, 467 U.S. at 843-44, which requires

courts to construe Congressional silence as a delegation of – as opposed to a

limitation on – EPA's authority. See Nat'l Cable & Telecomms. Ass'n v. Brand X

Internet Servs., 545 U.S. 967, 980 (2005); Barnhart, 535 U.S. at 218; cf. NRDC v.

EPA, 859 F.2d 156, 186 (D.C. Cir. 1988) (noting that Chevron clarified the

framework for review of agency interpretations and that post-Chevron "courts are

bound to defer to a reasonable agency interpretation"). Indeed, more recent

decisions applying Chevron principles of statutory construction construe

Congressional silence to permit cost-benefit analysis. See, e.g., Sierra Club v.

EPA, 314 F.3d 735, 744 (5th Cir. 2002) ("determinations based on a cost/benefit

---

[32] In any event, as this Court has observed, the CWA's statutory framework for
cost analysis "differs fundamentally" from the statute at issue in American Textile,
because CWA 304(b)(1)(B) authorizes cost-benefit balancing. Am. Petroleum
Inst. v. EPA, 661 F.2d 340, 355 n.36 (5th Cir. 1981); see also Am. Textile, 452
U.S. at 512 n.30 (recognizing cost-benefit authority under CWA Section
304(b)(1)(B)).

analysis are within EPA's discretion unless the statutory scheme precludes such a determination") (citing <u>Michigan v. EPA</u>, 213 F.3d 663, 678-79 (D.C. Cir. 2000)). In the absence of any indication that Congress intended to preclude cost-benefit analysis, the Court should reject Riverkeeper's invitation to read such a prohibition into the statute.

The Second Circuit's analysis of Section 316(b)'s silence is similarly flawed.  <u>See</u> <u>Riverkeeper II</u>, 475 F.3d at 99-100.  By assuming Congress's silence in Section 316(b) amounts to a prohibition on EPA's authority, the Second Circuit turns the principle of <u>Chevron</u> deference on its head.  <u>See</u> <u>Barnhart</u>, 535 U.S. at 218 (recognizing that Congressional silence delegates discretion).  Rather than permitting EPA to fill the gap left by Congress, the Second Circuit construes the gap as a conscious Congressional choice, depriving EPA of its authority to fill that gap.  <u>See</u> <u>Brand X</u>, 545 U.S. at 980 (noting that "ambiguities in statutes within an agency's jurisdiction to administer are delegations of authority to the agency to fill the statutory gap in reasonable fashion").  Because the Second Circuit's decision contravenes well-established principles of agency deference under <u>Chevron</u>, this Court should not give it any weight.

## 2.    EPA's Interpretation of Section 316(b) Is Reasonable in Light of Section 316(b)'s Text and Legislative History, the Statutory Structure, and the CWA's Overall Objectives.

Because Section 316(b) is ambiguous, this Court's review of EPA's interpretation of that provision becomes more deferential.  If EPA's interpretation is reasonable, "Chevron *requires* a federal court to accept the agency's construction of the statute, even if the agency's reading differs from what the court believes is the best statutory interpretation."  Brand X, 545 U.S. at 980 (emphasis added).  "[O]nly where congressional intent is pellucid are we entitled to reject a reasonable administrative construction of a statute."  Nat'l Grain & Feed Ass'n v. OSHA, 866 F.2d 717, 733 (5th Cir. 1989).  As explained below, EPA's interpretation of Section 316(b) to permit it to consider costs and benefits, where appropriate, is reasonable and entitled to deference.  The Court may not substitute its own – or Riverkeeper's – construction for EPA's reasonable interpretation. Chevron, 467 U.S. at 844.

### a.    Section 316(b)'s Text Authorizes EPA to Consider Both Technological and Environmental Factors.

EPA's authority to consider costs and benefits in determining BTA stems from Section 316(b)'s text, which requires that intake structures "reflect the best technology available for minimizing adverse environmental impact."  33 U.S.C. § 1326(b).  This provision is unique to the CWA in that it combines a technology-

based requirement – i.e., the "best technology available" – with an environmental endpoint – "minimizing adverse environmental impact." Thus, EPA reasonably interprets Section 316(b) to authorize consideration of both technological factors, such as a technology's cost, and environmental factors, such as reductions in impingement and entrainment. For existing facilities, EPA interprets this to mean it may weigh costs and benefits of technology options to determine whether they actually do minimize adverse environmental impact or whether that decision should be left to case-by-case decision-making. 71 Fed. Reg. at 35,010/3.

EPA's interpretation of Section 316(b)'s text to authorize cost-benefit analysis for existing facilities is supported by Section 316(b)'s legislative history, which indicates the BTA standard does not require minimization of adverse environmental impact beyond that which is available at an economically practicable cost. House Consideration of S. Rep. No. 92-1236 (1972) (Conf. Rep.) ("Legis. Hist.") at 264 (statement of Rep. Clausen). EPA considers the relationship between costs and benefits as one component of economic practicability. 71 Fed. Reg. at 35,010/3. When the costs of a categorical rule under Section 316(b) substantially outweigh the benefits of such a rule, a categorical rule may not be economically practicable, and therefore, not the "best technology available for minimizing adverse environmental impact." Id.

### b.    The Statutory Structure Supports EPA's
### Interpretation of Section 316(b).

Although Section 316(b) does not identify the factors EPA may consider in

determining BTA, it does cross-reference Section 301 and, by extension, Section

304, 33 U.S.C. §§ 1311, 1314, both of which shed light on the breadth of EPA's

discretion in setting CWA discharge standards.  The phrase "best technology

available" in 316(b) is similar to "best available technology" in Sections

301(b)(2)(A) and 304(b)(2)(B).  In addition, Sections 301(b)(1)(A) and

304(b)(1)(B) contain the phrase "best practicable control technology currently

available," which is similar to language appearing in Section 316(b)'s legislative

history, which indicates that BTA means the "best technology available

commercially at an economically practicable cost."  Legis. Hist., at 264 (statement

of Rep. Clausen).  Thus, EPA properly looks to Section 304 for guidance in

interpreting Section 316(b).  By the same token, there are significant differences

between Section 316(b) and Sections 301, 304, and 306.  Therefore, EPA may

decide that "not every statutory directive contained [in Sections 301 and 306] is

applicable" to Section 316(b).  Riverkeeper I, 358 F.3d at 187.

Riverkeeper erroneously argues that Section 316(b)'s BTA standard means

the same thing as Section 301's "best available technology" or "BAT" standard.

Riverkeeper contends that since Section 304(b)(2)(B) excludes cost-benefit

64

analysis from the list of factors for BAT determinations, cost-benefit analysis is similarly precluded for BTA determinations under Section 316(b). Riverkeeper's flawed reasoning is taken from the Second Circuit's decision in Riverkeeper II, which held that the absence of express cost-benefit language in Section 304(b)(2)(B)'s BAT standard forecloses cost-benefit analysis under Section 316(b). Riverkeeper II, 475 F.3d at 98, 102.

Riverkeeper's attempt to superimpose Section 304(b)(2)(B) BAT factors on Section 316(b) BTA determinations fails because it ignores significant differences between Sections 316(b) and 304 in terms of their language, the statutory objectives, and the overall statutory structure. The Second Circuit's analysis in Riverkeeper II also ignored these important distinctions and, as a result, failed to give appropriate deference to EPA's interpretation of Section 316(b). However, as explained below, these differences between BTA and BAT support EPA's interpretation of Section 316(b)'s unique words to create an independent standard that properly considers costs and benefits for existing facilities.

First, as the Supreme Court observed, the same words can have different meanings when used in different contexts in the same statute, despite the usual presumption:

> [M]ost words have different shades of meaning and consequently may be variously construed, not only when they occur in different statutes,

65

> but when used more than once in the same statute or even in the same
> section.

Envtl. Def. v. Duke Energy Corp., 127 S.Ct. 1423, 1432 (2007) (citation omitted).

Although Section 316(b)'s BTA standard and Section 304's BAT standard share

similar words, those words appear in different contexts. Section 304's BAT

standard refers to the "best available technology *economically* achievable" in

Section 301. 33 U.S.C. §§ 1314(b)(2)(B), 1311(b)(2)(A) (emphasis added).

Section 316(b) provides for requirements that reflect the "best technology

available for minimizing adverse environmental impact." Id. § 1326(b). Thus,

while Section 301's terms focus on technological and economic feasibility,

Section 316(b)'s terms are not so limited. As discussed above, EPA reasonably

interprets Section 316(b)'s unique standard to authorize a consideration of

benefits. See supra at 62-63.

Moreover, Section 316(b)'s terms "best," "technology," and "available" also

appear in Section 301's BPT standard – i.e., "best practicable control technology

currently available." 33 U.S.C. § 1311(b)(1)(A). Section 304(b)(1)(B) specifies

that for BPT standards EPA must consider "the total cost of application of

technology in relation to the effluent reduction benefits to be achieved from such

application," and other factors. Id. § 1314(b)(1)(B). Section 304's authorization

of a limited cost-benefit balancing for BPT standards, coupled with the express

direction in Section 316(b) to consider environmental impact, supports EPA's

interpretation of Section 316(b) to authorize a weighing of costs and benefits for

BTA standards.

Furthermore, because the BTA, BAT, and BPT standards are textually

similar, but not identical, Section 316(b)'s cross-reference does not compel EPA

to choose either BAT or BPT to guide its interpretation of Section 316(b).  Section

316(b)'s cross-reference to Section 301 creates an ambiguity that Congress tasked

EPA, and not the Court, with resolving.[33]  See Envtl. Def., 127 S.Ct. at 1433 (a

"cross-reference alone is certainly no unambiguous congressional code for

eliminating the customary agency discretion to resolve questions" of statutory

interpretation).  Put another way, while EPA may consider the factors in Section

304(b)(1)(B) and (b)(2)(B), alone or in combination, it also may interpret Section

316(b)'s unique language to establish a regulatory standard that is different from

---

[33] EPA v. Nat'l Crushed Stone Ass'n, 449 U.S. 64, 71 n.10 (1980), does not
resolve the ambiguity in Section 316(b), contrary to Riverkeeper's argument.  See
Riverkeeper Br. at 51.  That case addressed whether a variance from BPT
standards must consider economic ability to meet the standard.  The Court's
observation in dicta that Section 304 authorizes EPA to consider cost in relation to
benefits for BPT, but not for BAT, does not constitute a prohibition of cost-benefit
analysis under Section 316(b) because Section 316(b) was not at issue in that case.
Moreover, because Crushed Stone's construction does not address, let alone flow
from, the unambiguous terms of Section 316(b), its dicta cannot trump EPA's
reasonable interpretation of Section 316(b).  Brand X, 545 U.S. at 981.

the standards in Section 304, as long as its construction of the statute is reasonable.[34]

Riverkeeper's assumption that BPT standards became obsolete in 1989, Riverkeeper Br. at 60; see also Riverkeeper II, 475 F.3d at 102, reflects its misunderstanding of the CWA.  While BPT standards represent the first phase of effluent limitation guidelines, those standards were not phased out after 1989 for all pollutants.  In the second phase of effluent limitation guidelines, the level of control depends on the type of pollutant.  Conventional pollutants are governed by a "best conventional technology" ("BCT") standard, while toxic and nonconventional pollutants are controlled by BAT standards.  See 33 U.S.C. § 1311(b).  EPA applies a particular cost test to determine the BCT standard and, if a proposed control for a particular conventional pollutant does not "pass" this test, EPA does not specify additional controls for the pollutant.  51 Fed. Reg. 24,974, 24976 (July 9, 1986).  Thus, the pollutant remains regulated by BPT standards.  Id.; cf. Chem. Mfrs., 870 F.2d at 207 (upholding EPA's interpretation

---

[34] Since EPA does not interpret Section 316(b)'s BTA standard to mean the same thing as Section 304(b)(2)(B)'s BAT standard, this Court's interpretation of the BAT standard in Texas Oil, 161 F.3d at 936, is inapposite here.  Further, Texas Oil held only that Section 304(b)(2)(B) does not *obligate* EPA to conduct a cost-benefit analysis when determining BAT.  It does not address the question whether EPA has the *discretion* to weigh costs and benefits, if it determines such analysis is appropriate.

that BCT does not displace BPT or override EPA's authority to promulgate BPT for conventional pollutants).

Further, Section 316(b) does not contain the same temporal framework as Section 304, and thus there is no basis to draw the negative inference that after 1989 EPA may not consider BPT factors, including cost and benefits, when setting BTA standards under Section 316(b). Indeed, since Congress enacted Section 316(b) in 1972, it is more plausible to assume Congress intended that EPA would, in determining BTA under Section 316(b), consider and weigh the full range of factors specified in Section 304, including those relevant to BPT and BAT, as appropriate, depending on the type of facility regulated.

Second, Section 316(b)'s express reference to "adverse environmental impact" further distinguishes BTA standards for intake structures from Section 301 effluent limitations. Under Section 301, the goal of BAT is explicitly articulated by reference to a different purpose than Section 316(b) – i.e., to make reasonable further progress toward the national goal of eliminating the *discharge* of all pollutants. 33 U.S.C. § 1311(b)(2)(A). In other words, the effluent limitations "reflect the capabilities of available pollution control technologies *to prevent or limit different discharges* rather than the impact those discharges have on the waters." Tex. Oil, 161 F.3d at 927 (emphasis added).

69

Section 316(b), by contrast, directs EPA to "minimiz[e] adverse environmental impact," and thus authorizes EPA to consider the *impact* intake structures have on a particular waterbody and the benefits of reducing those impacts. Thus, while Section 304(b)(1)(B)'s BAT standards look to technological capability, Section 316(b) looks in two directions – toward both the technology and its benefits. Indeed, EPA historically has interpreted Section 316(b) to permit a balancing of costs and benefits to determine the degree of minimization of adverse impact required. See 71 Fed. Reg. at 35,010/3; 65 Fed. Reg. 49,060, 49,094 (Aug. 10, 2000) (citing EPA's 1977 Draft Guidance).[35] EPA's interpretation is entitled to heightened deference when it is consistent with the agency's past practice. Barnhart, 535 U.S. at 220 ("this Court will normally accord particular deference to an agency interpretation of 'longstanding' duration") (citation omitted).

---

[35] See also, e.g., Seacoast Anti-Pollution League v. Costle, 597 F.2d 306, 311 (1st Cir. 1979) (upholding EPA's decision not to require further minimization where "the costs would be 'wholly disproportionate to any environmental benefit'"); United States Steel Corp. v. Train, 556 F.2d 822, 850 (7th Cir. 1977) ("we trust that EPA will conduct a limited cost-benefit analysis once the information on which an evaluation of the various technologies can be made becomes available"); In re Public Serv. Co. of N.H., 1 EAD 455, 1978 WL 21146, at 21 (Aug. 4, 1978) (deciding intake location need not be moved where costs "would be wholly disproportionate to any environmental benefit"); In re Public Serv. Co. of N.H., 1 EAD 332, 1977 WL 22370, at 7 (June 10, 1977) (it is not "reasonable to interpret Section 316(b) as requiring use of technology whose cost is wholly disproportionate to the environmental benefit to be gained").

Finally, Section 316(b)'s independence from Section 301 (and by extension,

Section 304) in the overall statutory framework counsels against equating Section

316(b) with any particular standard under Section 301. As discussed previously,

Section 316(b) regulates the intake of water, as opposed to effluent discharges,

which Sections 301 and 304 regulate. See supra at 50. The statutory structure

reflects that Congress recognized this distinction as significant and elected to

include Section 316(b) in a separate and terse CWA provision, rather than within

the effluent limitation and new source performance provisions. See supra at 50-

51. Because Congress did not specify the factors EPA may consider for

determining BTA under Section 316(b), EPA has the discretion to fill that gap.

EPA's interpretation of Section 316(b) to permit a consideration of costs and

benefits for existing facilities fills that gap in a manner consistent with the

statutory text and structure. Therefore, the Court should uphold it. See Barnhart,

535 U.S. at 218; Chevron, 467 U.S. at 843-44.

### c.    EPA's Interpretation of Section 316(b) is Consistent with the CWA's Overall Objectives.

Contrary to Riverkeeper's contention, EPA's construction of Section 316(b)

also is consistent with the CWA's objective of restoring and maintaining the

nation's waters, 33 U.S.C. 1251(a). See Riverkeeper Br. at 61. Applying Section

316(b) requirements on a case-by-case basis will result in application of the "best

technology available" for a particular site and ensure that Congress's goal of minimizing adverse environmental impact is met. 71 Fed. Reg. at 35,017/3.

Riverkeeper's objection to EPA's interpretation of Section 316(b) as having been influenced by policy considerations lacks merit. As the Supreme Court recognized in Chevron: "The power of an administrative agency to administer a congressionally created . . . program *necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress.*" 467 U.S. at 843 (citation omitted) (emphasis added). Accordingly, agency interpretations of statutes they are entrusted to administer – especially those that involve policy choices – are entitled to deference. Id. at 844. When an agency's interpretation "represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, [the court] should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned." Id. at 845.

For all of the foregoing reasons, EPA's interpretation is reasonable, and the Court should defer to it.

**D.    EPA's Determination that the Monetized Costs of the Proposed National Standards Would Be "Wholly Disproportionate" to the Monetized Benefits Supports its Case-by-Case Rule for Existing Phase III Facilities.**

EPA based its decision to address Section 316(b) requirements for existing facilities case-by-case on evidence in the record indicating that the monetized costs of categorical standards would be "wholly disproportionate" to the monetized benefits. 71 Fed. Reg. at 35,015, 35,017. Under the narrow APA standard of review, the Court must uphold EPA's decision as long as "the agency 'articulated a rational relationship between the facts found and the choice made.'" Tex. Office of Pub. Util. Counsel v. FCC, 183 F.3d 393, 412 (5th Cir. 1999) (citation omitted). "If the agency's reasons and policy choices conform to minimal standards of rationality, then its actions are reasonable and must be upheld." Tex. Oil, 161 F.3d at 934. EPA's record and its rationale demonstrate the reasonableness of a case-by-case approach for regulating existing facilities.

Riverkeeper challenges EPA's judgment, arguing that EPA ignored key data and failed to explain its decision. Riverkeeper's argument lacks merit. The record shows that EPA collected and analyzed the relevant data and information, fully considered all data and information in its decision-making process, and clearly explained the basis for the final rule.

73

### 1.  EPA Considered All Relevant Information, Including Information About Non-Use Benefits.

In this rulemaking, EPA developed a robust record regarding the estimated national costs of the proposed categorical-rule options (i.e., the 50, 100, and 200 MGD options) for existing facilities, as well as the national benefits that would be achieved by compliance with those options.  EPA's national cost data reflect the estimated compliance costs and other social costs of the three proposed categorical-rule options.  71 Fed. Reg. 35,030-32; see EBA, Ch. E1, JA XX-XX. EPA's national benefits assessment analyzed both use benefits and non-use benefits.  71 Fed. Reg. at 35,032-34; EBA, Ch. E2, JA XX-XX; RBA, Ch. A3–A9 & I1, JA XX-XX; see also supra n.14.  EPA estimated economic benefits using a range of valuation methods, depending on the benefit category.  71 Fed. Reg. at 35,033/1. Although EPA assigned no monetary value to non-use benefits, the record demonstrates that EPA considered them, contrary to Riverkeeper's argument.  71 Fed. Reg. at 35,017, 35,033; EBA Ch. E3, JA XX-XX; RBA Ch. A6, JA XX-XX.

### a.  EPA's Analysis of Monetized Costs and Benefits Showed a Wholly Disproportionate Disparity.

EPA estimated that the total pre-tax costs of the 50 MGD option would be $38.3 million to $39 million, while the monetized benefits from commercial and

recreational uses would be just $1.8 million to $2.3 million.  71 Fed. Reg. at 35,017/1, 35,034 Ex. XI; EBA at E1-6, Table E1-5, JA XX.  This yields a cost-to-benefit ratio ranging from a low of 17-to-1 to a high of 22-to-1.  71 Fed. Reg. at 35,017/1, 35,034 Ex. XI; EBA at E3-3, Table E3-2 (mean column), JA XX.

In EPA's judgment, the costs of the 50 MGD option would be "wholly disproportionate" to the projected benefits.  71 Fed. Reg. at 35,017.  Therefore, EPA concluded that this regulatory option is not the "best technology available for minimizing adverse environmental impact."  Id.  As discussed above, Section 316(b) authorizes EPA to consider the relationship between costs and benefits to determine whether its proposed rule reflects the "best technology available for minimizing adverse environmental impact" – i.e., the BTA.  See supra Part I.C.  Where the estimated costs of a proposed rule are "wholly disproportionate" to the estimated benefits, the proposed regulatory option is not the BTA.  See 71 Fed. Reg. at 35,017/1.  Under the deferential APA standard of review, the court should not substitute its judgment on this question for that of EPA.  Tex. Oil, 161 F.3d at 933-34.

**b.    EPA Accounted for Non-Use Benefits, Even Though It Did Not Assign Them A Monetary Value.**

Riverkeeper's argument that EPA failed to consider non-use benefits is not supported.  The record demonstrates that EPA considered non-use benefits an important part of its decision-making process, even though it did not monetize them.  71 Fed. Reg. at 35,017/2; RBA at A3-8–A3-9 & Ch. A6, JA XX-XX, XX-XX; EBA at E3-2, JA XX; Development of Willingness to Pay Survey Instrument, May 23, 2006, DCN 9-4826, ("WTP Memo"), at 1, JA XX.

Riverkeeper's contention that EPA ignored the value of 97.4% of species is wrong.  EPA was unable to assign a *monetary* value to these non-use benefits because it did not have the requisite information.  71 Fed. Reg. at 35,017/2.  To monetize non-use benefits, it is necessary to be able to: (1) quantify the environmental impacts; and (2) assign a monetary value to those impacts. 35,017/2; see EPA Guidelines for Preparing Economic Analyses, DCN 6-3235 ("EPA Guidelines") at 62-63, JA XX-XX; OMB Circular A-4: Regulatory Analysis, DCN 7-3205 ("OMB Circular A-4) at 26-7, JA XX.  Obtaining the necessary information to monetize non-use benefits can be challenging for several reasons.  See, generally, RBA at A3-8, JA XX.  For example, non-use benefits are not associated with easily observable behavior from which value can be inferred. Id.  In contrast, for use-benefits, observable commercial and recreational behavior

76

(e.g., market transactions, the cost of travel for recreational fishing) provide such information.  See, e.g., id. at A3-5–A3-7, JA XX-XX.

EPA attempted to obtain information that might have been used to monetize non-use benefits, but was unable to do so prior to the consent decree deadline for the Phase III Rule.  Specifically, EPA initiated design of a stated-preference survey, which is the accepted method for monetizing non-use benefits.[36] However, undertaking a stated-preference survey is a time-consuming process. For example, EPA spent approximately two years, beginning before the Phase III proposal was issued, and convened 12 focus groups to collect data to design a draft survey instrument.  See generally, WTP Memo at 2, JA XX.

In addition, because such surveys ask respondents to make value judgments on unfamiliar issues, the results are highly sensitive to the wording and presentation of issues.  See id.; see also OMB Circular A-4, at 24, JA XX.  To ensure the reliability of its survey, EPA then subjected the draft survey to a peer-review process.  WTP Memo at 6, JA XX.  Although the peer reviewers were generally supportive of EPA's approach, they raised numerous technical concerns

––––––––––––––––––––

[36]  Stated-preference surveys: (1) ask what an individual is willing to pay for ecological improvements; or (2) ask individuals to choose between competing hypothetical "packages" of ecological improvements and household costs.  RBA at A3-7.  In either case, values are estimated by statistical analysis of survey responses.  Id.

77

and suggested improvements to the draft instrument.  Id.; RBA at A6-1, JA XX.[37]

In addition, they urged EPA to add six to 12 months to the schedule to ensure

"thorough evaluation of the pilot survey, careful statistical analysis of the main

survey, and more thought about a follow-up survey."  WTP Memo at 6, JA XX.

Ultimately, EPA was unable to make the recommended changes, receive

approval for the survey, conduct the survey, and analyze the results within the time

constraints of the rulemaking set forth in the consent decree.  Id.; RBA at A6-1, JA

XX.[38]  Therefore, EPA was unable to monetize non-use benefits for the

rulemaking.  71 Fed. Reg. at 35,033/3.  Instead, EPA evaluated non-use benefits

qualitatively.  Id. at 35,017/2.  A qualitative analysis is the generally accepted

method for addressing non-use benefits that cannot be quantified or monetized.  71

Fed. Reg. at 35,033/3; EPA Guidelines at 64.  EPA's qualitative assessment shows

_____

[37] For example, reviewers suggested numerous changes to the slide presentation accompanying the draft survey – a "major part of the research strategy"– which implicated changes to the overall procedures and logistics for conducting the slide show and survey that would have to be re-tested before implementation.  See Willingness to Pay Survey Reviewer Comments Report, Feb. 1, 2006, DCN 9-4828 ("Reviewer Report") at 5-6, 29, JA XX-XX, XX; see also id. at 68-71, JA XX-XX.

[38] EPA began to incorporate the reviewers' suggestions into the draft survey and to prepare a draft document responding to the reviewers' comments.  See Reviewer Report, JA XX.  Although it was initially believed that the reviewers' comments could be addressed in time, see id. at 40, EPA ultimately concluded that it could not incorporate all of the suggested revisions in time, see WTP Memo at 2, 6, JA XX, XX; RBA A6-1, JA XX.

78

that EPA thoroughly examined the qualitative effects of intake structures on fish

populations and ecosystems.  <u>See</u> RBA Ch. A6, JA XX-XX.

 The choice of using imperfect information or investing resources to perform

the perfect study is a decision courts leave to the expert judgment of the agency.

<u>See</u> <u>Am. Iron & Steel Inst.  v. EPA</u>, 115 F.3d 979, 1004 (D.C. Cir. 1997).  Given

the consent decree time constraints and the technical challenges inherent in

conducting reliable stated-preference surveys generally, EPA reasonably chose to

rely on a qualitative analysis of non-use benefits.  Further, EPA's choice is

consistent with applicable guidance, which approves of such qualitative analyses

for describing non-quantifiable effects.  <u>See</u> EPA Guidelines, at 64, JA XX; OMB

Circular A-4, at 3, JA XX.  Accordingly, this Court should not substitute its

judgment for EPA's.  <u>See</u> <u>Tex. Oil</u>, 161 F.3d at 933-34.

 Also unavailing is Riverkeeper's argument that EPA ignored data in the

record.  Riverkeeper argues that the focus group data showed that stated-

preference methods would place an "extremely high dollar value" on non-use

benefits of the proposed regulation.  Riverkeeper Br. at 73.  This argument fails

for several reasons.  First, Riverkeeper is simply wrong in suggesting that the

focus group data shows individuals valued the total benefits of the proposed

regulation at a range of $12 to $54 per year.  <u>See</u> <u>id.</u>  In fact, 26% of participants

responded that they would have ascribed a zero value for impingement and entrainment reductions described in the survey. See WTP Memo at 5, JA XX. Therefore, the low end of the range of values ascribed to total benefits is $0.

Second, Riverkeeper's assumption that the focus group data reflects what participants would be willing to pay for the total benefits of the proposed national standards is incorrect. Focus group participants were asked how they would value regulatory options that would save between 4.6 million to 3.5 billion fish per year, with all but two focus groups seeing a minimum savings of 400 million fish per year. See Final Focus Group Report 2005, Oct. 18, 2005, DCN 9-4830, App. A-G (surveys), JA XX-XX; 2004 Focus Group Report, June 30, 2004, DCN 9-4829, App. II-V (surveys), JA XX-XX. The proposed regulatory options were projected to save between 71.1 million and 98.2 million fish. EBA at E2-2, JA XX. Thus, the values reported relate to impingement and entrainment reductions – i.e., benefits – that in most instances were much larger than the projected benefits of the proposed national categorical standards. In other words, the focus group data is not representative of the benefits of the proposed national standards.

Third, Riverkeeper wrongly assumes that the focus-group data is reliable for purposes of assigning a monetary value to non-use benefits for this rulemaking. The focus groups were not designed, nor intended, to develop values for non-use

80

benefits. The focus groups were convened as an intermediary step, to help EPA develop an appropriate survey instrument for developing values for non-use benefits. See WTP Memo at 2, JA XX.

For numerous reasons, it is inappropriate to substitute focus group data for willingness-to-pay estimates derived from fully validated, large-sample survey instruments. See id. at 4; Economic Valuation with Stated Preference Surveys: A Manual, DCN 7-5201 ("Econ. Valuation Manual"), at 153, JA XX. Here, the focus groups were selected by contractors from lists of potential participants maintained by the contractors; they are not nationally (or even locally) representative. See WTP Memo at 4, JA XX. Therefore, EPA could not use the focus group data to extrapolate reliable national benefits estimates. The focus group data merely represent the range of what 96 individuals said in response to various draft surveys about the value of saving vastly more fish than the proposed national categorical standards were projected to save.

Additionally, the results of stated-preference surveys are highly sensitive to details of survey design, and EPA had not yet addressed the peer reviewers' technical concerns in the draft surveys used in the focus groups. See OMB Circular A-4, at 24 (surveys should be "rigorously pretested"), JA XX. Indeed, the very purpose of the focus groups is to develop a well-designed survey through an

81

iterative process.  See The Role of Focus Groups in Designing a Contingent

Valuation Survey to Measure the Benefits of Hazardous Waste Management

Regulations, DCN 9-4931, at 1-8–1-9, JA XX-XX; Using Surveys to Value Public

Goods: the Contingent Valuation Method, DCN 9-0045, at 112, 218, JA XX, XX;

Econ. Valuation Manual, at 153, JA XX.

Consequently, without more information, such as the results of a well-

designed, validated, large-sample survey, there would be *no* basis for EPA to

choose to value non-use benefits at the low end of the focus group data, the high-

end, or anywhere in between.  Thus, it would have been arbitrary for EPA to rely

on this data to assign a monetary value to non-use benefits, as Riverkeeper

suggests.

For these same reasons, the Court should disregard Riverkeeper's argument

that the benefits of the proposed regulation outweigh its costs.  See Riverkeeper

Br. at 74.  Riverkeeper's argument relies on a comparison of the focus group data

and Riverkeeper's own "break-even" analysis of per-household costs of the

proposed national categorical standards.  See id.  Because the focus group data

does not reliably represent what a household would be willing to pay for the

benefits of the proposed national categorical standards, Riverkeeper's comparison

is flawed.

82

Finally, Riverkeeper is wrong that EPA assigned non-use benefits a zero value in its analysis. The record shows that EPA recognized that non-use benefits were likely to be more than zero. See, e.g., WTP Memo at 5, JA XX. In fact, EPA noted that in the Phase II Rule, where costs exceeded monetized benefits by a 5-to-1 ratio, EPA could *not* conclude the substantial non-monetized, non-use benefits would be insufficient to justify the costs. 71 Fed. Reg. at 35,018/1. However, for the Phase III Rule, based on information in the record – including, the size of the monetized cost-benefit ratio, qualitative information about the likely ecosystem impacts of cooling water withdrawals from existing facilities, the uncertainty of the qualitative analysis, and other policy considerations – EPA concluded that the value of non-use benefits is unlikely to be of sufficient magnitude to alter EPA's judgment about the relationship of costs to benefits. 71 Fed. Reg. at 35,017/2-3. EPA's assessment of such complex scientific matters is entitled to heightened deference. Tex. Oil, 161 F.3d at 934 (recognizing that courts are "extremely deferential" where the "decision rests on an evaluation of complex scientific data within the agency's technical expertise") (citations omitted).

83

## 2.    EPA Fully Explained Its Decision.

EPA fully explained its decision that the non-use benefits were not likely to overcome the wholly disproportionate disparity in the monetized cost-benefit ratio. While the cost-benefit ratio played a significant role in EPA's decision, Riverkeeper ignores the totality of factors EPA considered in making this judgment. As explained in the Rule's preamble and below, EPA also took into account the uncertainty inherent in qualitative benefits assessment, information from the Phase II rule, qualitative information in the record about the likely impacts of cooling water withdrawals, and other policy concerns enumerated in the preamble. Id. at 31,017-8; see also EBA at E3-2, JA XX. All of these factors support EPA's ultimate conclusion.

While the monetized cost-benefit ratio does not incorporate the value of non-use benefits, it does shed light on the likelihood that they would be of sufficient magnitude to sway EPA's decision. With the use values measured at $2.25 million, and total social costs at $38.3 million, non-use values would have to be at least $36 million for the national benefits to equal the national costs. EBA at E3-8, Table E3-8, JA XX. In other words, the non-use benefits would have to be valued at *16 times* the use values to equal EPA's estimated costs. EPA did not believe this was likely for several reasons.

84

In this connection, EPA noted that the cost-benefit ratios for the Phase III Rule were far more disproportionate than the cost-benefit ratios for the Phase II Rule. In contrast to the 22-to-1 and 17-to-1 cost-to-benefit ratios for existing Phase III facilities, the ratio for Phase II facilities was 5-to-1. 71 Fed. Reg. at 35,018/1. Thus, while EPA in Phase II was able to conclude that the non-use benefits were of sufficient magnitude to support its decision that the Phase II standards were the BTA, in Phase III, where the cost-to-benefit ratio was significantly greater, EPA could not draw the same conclusion. See id. at 35,018.

EPA's decision also was influenced by the fact that impacts from existing Phase III facilities are small in comparison to the universe of Phase II existing facilities, and thus, the benefits of reducing these impacts are likely to be much smaller. Id. at 35,017/3. The Phase III Rule for existing facilities addresses only approximately 10% of the cooling water withdrawn nationally. Id. EPA estimated that the 146 facilities that would have been covered by the broadest possible rule withdraw 31 billion gallons of water a day and kill about 265 million fish and shellfish annually. See id. Compared to Phase II existing facilities, the proposed Phase III national rule for existing facilities would have saved only an additional 7% of fish and shellfish, while expanding the universe of facilities subject to national categorical regulation by 27%. Id. EPA further noted that the other

85

proposed options (i.e., the 100 and 200 MGD options) involved even less intake

flow and fewer facilities than the 50 MGD option, and thus would result in even

smaller reductions in impingement and entrainment. Id. at 35,018/1.

Finally, Riverkeeper's argument that EPA did not explain why the costs

saved are worth the fish sacrificed misunderstands EPA's decision. See

Riverkeeper Br. at 78. EPA's decision to apply Section 316(b) requirements on a

case-by-case basis does not sacrifice any fish because it does not exempt facilities

from compliance with Section 316(b). Rather, the Rule allows permit writers to

consider site-specific information and determine the BTA for *that* facility. 71

Fed. Reg. at 35,017/3.

At some facilities, case-by-case requirements could result in saving more

fish than a national rule might save. This is exactly what occurred with a NPDES

permit for the Brayton Point power station. Id. at 35,018. Although Brayton Point

is within the scope of EPA's Phase II Rule, the facility's permit was developed

prior to the effective date of the Phase II requirements, on a case-by-case, BPJ

basis. In re: Dominion Energy Brayton Point, L.L.C., NPDES Appeal No. 03-12,

12 E.A.D. ___, 2006 WL 3361084, slip op. at 152 (E.P.A.E.A.B. Feb. 1, 2006).

The Brayton Point permit requires that facility to reduce intake flow

commensurate with cooling towers, id. at 153-55, while the later adopted Phase II

86

categorical standards would not have required compliance by using cooling towers, id. at 149. Thus, the case-by-case requirements were more stringent than the categorical standards.

In light of the foregoing, Riverkeeper has failed to meet the "considerable burden" it has to set aside EPA's decision. Tex. Oil, 161 F.3d at 934. The record demonstrates that EPA considered all relevant data and information and fully explained its rationale. Further, the Phase III Rule is reasonable in light of the information EPA considered and the corresponding explanation of its reasons. Accordingly, the Rule should be upheld.

### E. EPA's Decision to Apply Section 316(b) Requirements to Existing Phase III Facilities on a Case-by-Case Basis Is Sufficiently Clear.

Riverkeeper argues that the Phase III Rule as applied to existing facilities is impermissibly vague. The vagueness doctrine arises out of constitutional due process guarantees, and reflects the notion that legal enactments must be clear enough (1) so that the ordinary person can conform his conduct, and (2) to discourage arbitrary or discriminatory enforcement. Kolender v. Lawson, 461 U.S. 352, 357 (1983). Because Riverkeeper asserts a facial challenge, it has a high burden. See Vill. of Hoffman Estates v. Flipside, 455 U.S. 489, 494-95 (1982). To succeed in bringing a vagueness challenge to a regulation that does not reach constitutionally protected conduct, Riverkeeper must show that it is

87

"impermissibly vague *in all of its applications*." Id. (emphasis added).

Riverkeeper cannot meet its burden.

The Rule provides that existing facilities must comply with Section 316(b) requirements determined by the permit writer on a case-by-case basis under 40 C.F.R. § 125.90(b). 71 Fed. Reg. at 35,009/1. This means each permit writer must determine what is the "best technology available for minimizing adverse environmental impact" at each facility. See id. at 35,017/3; see also 40 C.F.R. § 125.90(b) (cross-referencing CWA Section 316(b)). The BTA standard is "not so vague or ambiguous as to be useless, lacking in meaning, or unenforceable. Best Technology Available, under the statute, is something which exists, and can be ascertained as fact." Hudson Riverkeeper Fund, 835 F. Supp. at 165.

Because the Phase III Rule requires BTA to be applied in case-by-case permitting decisions and BTA is something ascertainable by permit writers and permit applicants, it survives Riverkeeper's vagueness challenge. Moreover, the specific requirements a facility must meet will be set forth in draft NPDES permits, which before becoming final and enforceable, are subject to public notice and comment. 40 C.F.R. §§ 124.10(a)(1), 123.25(a)(28). In addition, the final NPDES permits are subject to administrative and judicial review. See 33 U.S.C. § 1369(b)(1)(F) (authorizing review of EPA issued permits); 40 C.F.R. §§ 123.30

88

(requiring state court review of state-issued permits), 124.19 (authorizing

administrative review of EPA-issued permits).  Thus, permitees and members of

the public have ample opportunity to review and object to the Section

316(b)-related requirements that may be imposed in the permit.

Riverkeeper also faults EPA for failing to identify the technical information

in the record EPA expects permit writers to consider in developing case-by-case

limits for existing facilities.  However, EPA did specify in the preamble the

information EPA believes would be useful, referring explicitly to the proposed

numeric performance standards, information regarding control technologies EPA

evaluated, and EPA's evaluation of environmental impacts.  71 Fed. Reg. at

35,018/3.  Thus, Riverkeeper's argument that the Rule is impermissibly vague

should be rejected.

### F.    EPA Published the Rule and Was Not Required to Incorporate by Reference the Record Information Permit Writers May Consider.

In the Rule's preamble, EPA advised permit writers and interested persons

of useful factual and technical information in the rulemaking record that it expects

permit writers will consider when developing case-by-case Section 316(b)

requirements for existing facilities.  Id.  Riverkeeper contends that EPA should

have published this information in the Federal Register or followed incorporation

by reference procedures.  As discussed below, EPA published the Rule's

89

substantive requirements in the Federal Register, but was not required to publish

or incorporate by reference information permit writers may consider when

implementing the Rule.

The APA requires publication in the Federal Register of certain types of

agency pronouncements, including "substantive rules of general applicability

adopted as authorized by law, and statements of general policy or interpretations

of general applicability formulated and adopted by the agency." 5 U.S.C.

§ 552(a)(1)(D). An agency may satisfy this requirement by incorporating by

reference the requirements the agency intends as legally binding norms, provided

the agency follows special procedures. See id. § 552(a)(1); 1 C.F.R. § 51.9.

The Phase III Rule requires that permit writers apply case-by-case Section

316(b) requirements to existing Phase III facilities, pursuant to 40 C.F.R.

§ 125.90(b). This substantive rule was published in the Federal Register, 71

Fed. Reg. at 35,009/1, thereby satisfying the APA publication requirement.

Riverkeeper's contention that EPA also was required to publish or

incorporate by reference factual and technical information in the rulemaking

record, Riverkeeper Br. 81, fails because EPA did not intend to require

compliance with the information or incorporate by reference the information as

part of the Rule's legally binding requirements. EPA intended the record

information to be available as guidance; the information does not constitute a substantive rule of general applicability, a policy statement, or an interpretation of general applicability.  Therefore, the information does not fall within the types of agency statements that are required to be published or incorporated by reference under 5 U.S.C. § 552(a)(1)(D).

Thus, Appalachian Power, 566 F.2d at 455, is distinguishable.  That case involved EPA's 1976 Section 316(b) regulation, which "impose[d] mandatory obligations upon members of the public and permit issuing authorities [to] consider the information in the Development Document in designing and approving [] intake structures."  Id.; see also former 40 C.F.R. § 402.12 as published in 41 Fed. Reg. at 17,390/1 (the information in the Development Document "*shall* be considered" in determining BTA) (emphasis added).  Further, EPA stipulated that it intended the information in the Development Document to be incorporated by reference as part of the regulation's legally binding requirements.  Appalachian Power, 566 F.2d at 454-55.  Accordingly, because "the substance of [the 1976] regulation impos[ed] specific obligations on outside interests in mandatory terms," the court held the information had to be published in the Federal Register or incorporated by reference.  Id. at 455.

91

In contrast, EPA intends the information in the Phase III record as discretionary guidance; permit writers are free to disregard it if they so choose. Further, unlike <u>Appalachian Power</u>, EPA did not intend to incorporate by reference the information as part of the Rule's legally binding requirements. Because the information in the record does not impose mandatory, legally binding requirements, EPA was not required to publish it in the Federal Register or to follow the incorporation by reference procedures.

## II.    CONOCOPHILLIPS' PETITION SHOULD BE DENIED.

In the Phase III Rule, EPA chose to regulate all new offshore rigs under one uniform regulation.  ConocoPhillips challenges this decision, alleging that EPA failed to conduct a cost-benefit analysis before regulating uniformly, did not properly consider location, and impermissibly treated deepwater and shallow water rigs alike.

ConocoPhillips' arguments fail.  EPA reasonably concluded that a cost-benefit analysis is not required, appropriate, or feasible for new facilities such as new offshore rigs.  Further, EPA more than adequately considered the deepwater and shallow water locations of new offshore rigs in all aspects of this rulemaking. Moreover, EPA determined that a uniform regulation was appropriate because: (1) the technology behind the Rule's uniform standards is technically available and economically feasible for all new offshore rigs to adopt, regardless of location, and (2) the potential for adverse environmental impact exists in all locations.  In short, EPA's decision to regulate all new offshore rigs under one uniform regulation is supported by the record, the statute, and the relevant case law, and should be upheld in its entirety.

A.     **EPA Reasonably Chose Economic Achievability, Not Cost-Benefit, to Determine BTA for New Offshore Rigs Because a Cost-Benefit Analysis Is Not Required, Appropriate, or Feasible for New Facilities.**

The Phase III Rule establishes uniform standards for all new offshore rigs that employ cooling water intake structures and that meet certain threshold conditions.[39]  40 C.F.R. § 125.131(a).  While the Rule is "uniform," in the sense that it applies to all new offshore rigs regardless of location, the Rule's standards are tailored to suit the various types of offshore rigs in the industry (e.g., fixed vs. mobile) and the intake structures they employ (e.g., sea chest vs. no sea chest).  40 C.F.R. § 125.134; 71 Fed. Reg. at 35,014.  The Rule's primary requirement is that all new offshore rigs must design their intake structures to meet a through-screen velocity of 0.5 feet per second or less.  40 C.F.R. § 125.134(b)(2).  But the Rule also provides sufficient flexibility: new offshore rigs may choose to comply with the Track I technology-based option, or, if they are fixed facilities, they may choose to demonstrate through the Track II option that other technologies will achieve comparable results, or they may seek less stringent standards by showing that the costs EPA considered are wholly out of proportion to the costs they actually face.  Id. §§ 125.134(b)-(c), 125.135.

_____

[39] In particular, the Rule's standards apply to new offshore rigs that use at least 25% of the water withdrawn for cooling purposes only and that have an intake structure designed to withdraw at least 2 MGD.  40 C.F.R. § 125.131(a).

94

Despite this flexibility, ConocoPhillips argues that the Rule's uniform regulation is arbitrary and capricious because EPA failed to conduct a cost-benefit analysis that accounted for the possible variations in potential adverse environmental impact from intake structures in deepwaters versus shallow waters. See CP Br. at 18-20, 28-32. This argument is without merit. While Section 316(b) authorizes EPA to conduct a cost-benefit analysis, it does not *require* it. Also, the CWA's regulatory approach for *new* facilities focuses on economic achievability, not relative costs and benefits. See Chem. Mfrs., 870 F.2d at 262. Consistent with that framework, EPA established BTA for new offshore rigs by determining whether the chosen control technologies are technically available and economically feasible for the industry to adopt as a whole and whether there is a potential for adverse environmental impact absent regulation. This approach is similar to the economic achievability analyses EPA conducts for new source performance standards under Section 306 of the CWA, was used to establish BTA for other new facilities in the Phase I rulemaking, and is consistent with the Second Circuit's decision in Riverkeeper I, 358 F.3d at 186-87, regarding EPA's Section 316(b) regulatory approach for new facilities.

1.    **EPA's Decision to Rely on Economic Achievability Is Reasonable and Deserves Deference Because Section 316(b) Is Silent on the Issue and Because It Comports with the CWA's New Facility Regulatory Framework.**

ConocoPhillips contends that EPA interpreted Section 316(b) as *requiring* a cost-benefit analysis.  See CP Br. at 18-20, 26-28.  To the contrary, EPA has long interpreted Section 316(b) as *not requiring* such analysis.  65 Fed. Reg. 49,060, 49,094/2 (Aug. 10, 2000) (citing the 1976 Final Rule Preamble, 41 Fed. Reg. 17,387 (Apr. 26, 1976)).  While EPA interprets Section 316(b) as authorizing it to consider a cost-benefit analysis for *existing* facilities, see 71 Fed. Reg. at 35,010/2-3, EPA found that it was neither appropriate nor feasible to weigh costs against benefits in developing Section 316(b) requirements for *new* facilities.  See 65 Fed. Reg. at 49,094-95 (explaining why cost-benefit is appropriate for existing facilities but not new facilities in the Phase I Rule); 66 Fed. Reg. at 65,309/1, 65,312; 71 Fed. Reg. at 35,034.

Because Section 316(b) is silent as to the "precise question" of whether EPA *must* consider costs in relation to benefits, the Court must defer to EPA if its interpretation is reasonable.  Chevron, 467 U.S. at 842-43.  As demonstrated below, EPA's interpretation is reasonable and consistent with the statute, and therefore deserves deference.

96

Section 316(b) provides that "[a]ny standard established pursuant to . . . [Section 306] . . . shall require that . . . cooling water intake structures reflect the best technology available for minimizing adverse environmental impact." 33 U.S.C. § 1326(b).  Section 306 of the CWA governs performance standards for effluent discharges from new sources.  33 U.S.C. § 1316(b).  Thus, consistent with the Phase I rulemaking for new facilities, as well as the Second Circuit's holding in <u>Riverkeeper I</u>,[40] EPA turned to Section 306 for guidance in establishing Section 316(b) standards for new offshore rigs.  <u>See</u> 71 Fed. Reg. at 35,009/3-10/1.

Section 306 provides that, in establishing the "best available demonstrated control technology" for new sources, EPA shall take into consideration "the cost of achieving such effluent reduction, and any non-water quality, environmental impact and energy requirements."  33 U.S.C. § 1316(b)(1)(B).  This Court has held that Section 306 requires EPA to "inquire into the initial and annual costs of applying the technology and make an affirmative determination that those costs can be reasonably borne by the industry."  <u>Chem. Mfrs.</u>, 870 F.2d at 262.  Accordingly, when promulgating Section 306 performance standards for new sources, EPA focuses on the economic achievability of the control technology and

_____

[40] The court in <u>Riverkeeper I</u> held that Section 316(b)'s cross-reference to Section 306 "is an invitation to look to section 306 for guidance in discerning what factors Congress intended the EPA to consider . . ." when establishing BTA for new facilities.  358 F.3d at 185-86.

97

determines whether the costs of the chosen technology will be a "barrier to entry" for some facilities (i.e., whether the compliance costs will prevent facilities from entering the market) and whether the costs can be reasonably borne by the industry as a whole. See 65 Fed. Reg. at 49,095 (explaining economic achievability test); 66 Fed. Reg. at 65,309/1.

Although this Court has not addressed the specific issue of whether Section 306 requires a cost-benefit analysis, other courts have held that it is not required. See Nat'l Wildlife Fed'n, 286 F.3d at 570 (Section 306 requires that EPA "must take costs into consideration, but does not require that [it] conduct a cost-benefit analysis."); CPC Int'l, Inc. v. Train, 540 F.2d 1329, 1341 (8th Cir. 1976) ("There is no language in [Section] 306 requiring a cost-benefit analysis. Rather, the EPA is required only to take costs under 'consideration.'"); BP Exploration, 66 F.3d at 799-800 (EPA acted within its discretion by not conducting a cost-benefit analysis in setting Section 304 BAT and Section 306 BADT standards); see also Tex. Oil, 161 F.3d at 936 ("EPA may prescribe [BAT effluent limitations] whose costs are significantly disproportionate to their benefits, just as long as [they remain] economically feasible for the industry as a whole.").

These decisions are consistent with the policy behind new facility regulation under the CWA. As explained in American Iron & Steel Institute v. EPA, 526

98

F.2d 1027, 1058-59 (3d Cir. 1975), Congress intended EPA to give decreasing

weight to expenses when regulating new facilities because they can plan ahead

and install and employ pollution controls more easily and with less cost than

existing facilities, which must incur substantial retrofitting costs. Congress

specifically recognized two important factors in regulating new facilities:

> "(1) the need to preclude the construction of new sources . . . which
> use less than the best available control technology . . . and (2) the
> recognition of the significantly lower expense of attaining a given
> level of effluent control in a new facility as compared to the future
> cost of retrofitting [an existing] facility . . . ."

Id. (quoting CWA Leg. Hist. at 797).

Indeed, EPA has determined that economic achievability, and specifically,

barriers to entry, are appropriate cost measures for new facilities because they

analyze whether a regulation will place new facilities at a competitive

disadvantage as compared to existing facilities. Here, EPA believes that new

offshore rigs would have an advantage over existing facilities because new rigs

will not incur installation downtime costs to comply with the Rule. See EBA at

E1-2, JA XX; see also 65 Fed. Reg. at 49,094/3-95/1 (explaining that cost-benefit

is not appropriate for new facilities because they will not incur retrofitting costs).

EPA thus determined that technological availability and economic

achievability, not cost-benefit, were the proper measures for determining BTA for

new offshore rigs under Section 316(b).  See 71 Fed. Reg. at 35,024-29; see also

Response to Comment ("RC") 316bMFR.032.039, JA XX.  EPA used this same

approach to establish Section 316(b) standards for other new facilities in the Phase

I Rule.  65 Fed. Reg. at 49,095; 66 Fed. Reg. at 65,281-82, 65,309/1, 65,324.

Accordingly, because "EPA . . . has considerable discretion in evaluating the

relevant factors and determining the weight to be accorded to each," Tex. Oil, 161

F.3d at 928, and because EPA's decision is reasonable in light of the statute's

silence and the CWA's new facility regulatory approach, this Court should defer to

EPA's determination that a cost-benefit analysis is neither required nor appropriate

for regulating new facilities under Section 316(b).

> **2.    EPA's Conclusion that It Lacked Sufficient Data to Conduct a Meaningful Cost-Benefit Analysis for New Offshore Rigs Is Rational and Deserves Deference.**

Consistent with its interpretation of Section 316(b), EPA did not compare

costs and benefits when determining BTA for new offshore rigs.  71 Fed. Reg. at

35,034.  EPA's decision is reasonable because estimating economic benefits for

new facilities necessarily relies on speculation regarding where and when the

facilities will locate and operate.  Id.  EPA had information only on the general

location of new offshore rigs and had no data measuring impingement or

entrainment from offshore rig intake structures.  Id. at 35,013/1; RC

100

316(b)MFR.024.015, JA XX.  EPA thus concluded that it lacked sufficient data to

generate a reliable economic benefits estimate for new offshore rigs.  71 Fed. Reg.

at 35,032, 35,034.  This Court should accord EPA substantial deference regarding

this decision, given its technical and scientific nature.  See Chem. Mfrs., 870 F.2d

at 231 ("[w]hen reviewing an agency's scientific determinations in an area within

the agency's technical expertise, a reviewing court must be *at its most*

*deferential*.") (emphasis added).

ConocoPhillips concedes that EPA did not have information as to the exact

location of new offshore rigs but claims EPA had enough data to perform a

meaningful cost-benefit analysis because it knew the types of rigs that would be

constructed and the seas and depths in which they would operate (e.g., the Gulf of

Mexico and off the California and Alaska coasts).  CP Br. at 29-31.

ConocoPhillips points to the fact that EPA had enough data to develop cost

models for new offshore rigs, as well as the fact that EPA conducted a cost-benefit

analysis for existing facilities.  Id. at 31-35.

While EPA had sufficient information to estimate new offshore rig costs for

its economic analysis, it lacked the data necessary to generate reliable economic

benefits estimates for a cost-benefit analysis.  To estimate such benefits, it is

important to identify and, where possible, quantify the beneficial outcomes of a

101

regulation.  Economic Analysis of the Final Regulations Addressing Cooling

Water Intake Structures for New Facilities, (Nov. 2001) ("Phase I EEA") at 11-16,

JA XX.[41]  Location informs EPA of the specific types of ecosystems and

organisms that a facility will affect, which, in turn, informs EPA of the specific

types and quantities of benefits that a regulation will produce.  See id. at 11-1–11-

2, 11-16, JA XX-XX, XX; 66 Fed. Reg. at 65,325/1-2.  For example, the type and

number of fish species in a given waterbody benefitted by intake structure control

technologies will vary depending on the exact location and depth of that

waterbody.  Id.  Hence, a new offshore rig in the Gulf of Mexico may locate in

waters filled with numerous commercial and recreational fish, or it may locate in

waters filled with scant numbers of those fish.  Either way, without knowing more

than the general location of at least some of the facilities subject to regulation,

EPA lacks the requisite data to generate a reliable cost-benefit analysis.

New facilities pose a particular challenge in this regard because they do not

yet exist, and therefore it is difficult to compile data that depends on location.  See

65 Fed. Reg. at 49,094/3-95/1; 66 Fed. Reg. at 65,325/1-2.  Here, EPA knew the

─────────────────────

[41] For example, some of the basic data EPA deems necessary to generate an
economic benefits analysis for intake structure regulation include data on any
resulting increased fishing, shell fishing, and aquaculture activity, as well as data
on any resulting improvement in the value of recreational and subsistence fishing.
See Phase I EEA at 11-21, JA XX.

general seas in which new offshore rigs likely will operate, but it did not have detailed information as to when or exactly where these rigs will eventually operate. 71 Fed. Reg. at 35,013/1, 35,034. This was especially true for new mobile offshore rigs, which comprise the majority of the rigs subject to the Rule and which do not stay in one place for any set period of time. See id. at 35,034/2. Moreover, EPA lacked site-specific impingement and entrainment data from existing rigs. See EBA at A2-1, JA XX; 71 Fed. Reg. at 35,013/1. As a result, the environmental characteristics of the specific locations in which new offshore rigs will locate were unknown, and EPA could only speculate as to the quantitative magnitude of the economic benefits the Rule would produce regarding these facilities. See 71 Fed. Reg. at 35,034.

In contrast, with the exception of existing offshore rigs, EPA was able to conduct a cost-benefit analysis for Phase III *existing* facilities, in part, because those facilities exist and their exact locations are known. To estimate benefits for existing facilities, EPA evaluated actual impingement and entrainment data acquired from 76 existing power generating facilities in the Phase II rulemaking and 20 existing facilities potentially subject to the Phase III Rule. Id. at 35,032/1-33. EPA then developed model facilities based on this information, which EPA

103

used to extrapolate impingement and entrainment rates to generate benefits

estimates across all potentially regulated existing facilities.  Id. at 35,033.

For new offshore rigs, however, there is no existing offshore rig data

measuring impingement and entrainment from intake structures, and thus EPA had

no information from which it could create models or extrapolate benefits.  See id.

at 35,013; RC 316(b)MFR.302.007, JA XX.  In fact, the Minerals Management

Service ("MMS"), the federal agency responsible for managing oil and gas leasing

on the United States' Outer Continental Shelf, concluded that studies of offshore

rig intake structure impingement and entrainment are unavailable through the open

literature.  TDD at 7-13, JA XX.  Additionally, subsequent to the Phase III

proposal but prior to the Phase III final rule, MMS promulgated requirements for

offshore rig operators that, for the first time, require the systematic collection of

information on offshore rig intake structures.  TDD at 7-11, JA XX.

Regardless, that EPA chose to adopt a cost-benefit analysis for existing

facilities is of no consequence here because, as explained in the previous section,

EPA rationally chose to regulate new offshore rigs in the same manner in which it

regulates all other new facilities under the CWA.[42]  And as this Court has held,

_____

[42] Hence, ConocoPhillips' discussion of and reliance on the Phase III existing
facility cost-benefit analysis and of EPA's explanation as to why location factored
into its Phase III existing facility decision is irrelevant.  CP Br. at 33-34, 45.

courts must be "extremely deferential" where EPA's decision "rests on an evaluation of complex scientific data within the agency's technical expertise." Tex. Oil, 161 F.3d at 934 (citations omitted). Because EPA's conclusion that it lacked the requisite data to conduct a cost-benefit analysis for new offshore rigs is consistent with its authority under Section 316(b) and supported by the record, it deserves deference.

Consequently, ConocoPhillips' assertion that EPA should have conducted a cost-benefit analysis for new offshore rigs is unavailing. Because Section 316(b) does not require a cost-benefit analysis, because EPA reasonably followed the CWA's new facility regulatory framework in determining that a cost-benefit analysis was not appropriate for new facilities, and because EPA rationally concluded that it lacked the requisite data to generate economic benefits, EPA's decision not to conduct a cost-benefit analysis for new offshore rigs is neither arbitrary nor capricious and must be upheld.[43]

---

[43] For the same reasons, ConocoPhillips' argument that EPA's qualitative analysis of the potential for adverse environmental impact is "an arbitrary and capricious substitute for the kind of benefits analysis necessary to perform the required cost/benefit comparison" fails. CP Br. at 33. Furthermore, EPA's analysis of the potential for adverse environmental impact from these facilities was meant to determine just that—the *potential* for adverse environmental *impact*, not to substitute for an economic benefits analysis. 71 Fed. Reg. at 35,016/1, 35,019/1.

**B.    EPA Reasonably Chose to Regulate Uniformly Because the Technology Behind the Rule's Standards Is Technically Available and Economically Feasible for All New Offshore Rigs to Adopt and Because a Real Potential for Adverse Environmental Impact Exists in All Locations.**

ConocoPhillips contends that EPA failed to "properly" consider location by choosing to regulate all new offshore rigs under one uniform regulation.  CP Br. at 28-40.  Specifically, ConocoPhillips argues that the "extremely wide variation in aquatic life densities" in deepwaters versus shallow waters warrants case-by-case permitting or an exemption for deepwater rigs altogether.  Id. at 41-44.

As demonstrated below, EPA adequately considered location in promulgating the Rule's uniform standards for new offshore rigs.  Furthermore, contrary to ConocoPhillips' contention, EPA may regulate facilities uniformly, despite variations in environmental impact, so long as it determines that the technology behind the uniform regulation is technically available and economically feasible for all facilities to employ.  EPA so determined here, and ConocoPhillips does not challenge that determination.  Moreover, EPA found that, despite variations between deepwaters and shallow waters, a real potential for adverse environmental impact exists in all locations.  EPA thus reasonably concluded that a uniform regulation was warranted.  This decision is supported by the record, statute, and relevant case law, and as such, is not arbitrary or

106

capricious.  See Tex. Oil, 161 F.3d at 934 ("the Court must determine whether the agency action 'bears a rational relationship to the statutory purposes' and whether 'there is substantial evidence in the record to support it.'" (citation omitted).

> **1.    EPA Adequately Considered the Locations of New Offshore Rigs in All Aspects of this Rulemaking.**

ConocoPhillips alleges that Section 316(b) requires, and that EPA interpreted it to require, consideration of facility location.  CP Br. at 18-20, 22, 25-28, 32.  ConocoPhillips asserts that EPA ignored this requirement by disregarding locational variations in the SEAMAP ichthyoplankton density studies in the Gulf of Mexico, pointing to the fact that EPA chose to regulate all new offshore rigs under one uniform regulation.  CP Br. at 40.  ConocoPhillips' argument fails for several reasons.

Section 316(b) does not require EPA to consider the physical location of the facility employing the intake structure.  Rather, Section 316(b) states that EPA "shall require that the *location*, design, construction, and capacity *of cooling water intake structures* reflect the best technology available for minimizing adverse environmental impact." 33 U.S.C. § 1326(b) (emphasis added).  In other words, it is the physical location of the intake structure that must be considered in the regulation, and it is that location which must "reflect the best technology available for minimizing adverse environmental impact."

Moreover, choosing not to regulate based on location does not mean that EPA failed to consider location. In fact, EPA previously deferred regulating new offshore rigs precisely because it needed more time to gather and assess information on the particular engineering and economic issues associated with these rigs' unique offshore locations and the effects of the candidate control technologies. See 66 Fed. Reg. at 65,310/3-11/1. Also, EPA designed its technical analysis for new offshore rigs by taking into account the key factors that offshore rig operators consider when selecting the type of rig to use for their offshore exploration and drilling, such as water depth. See TDD at 7-2, 7-13, JA XX, XX.

As demonstrated below, EPA assessed both the deepwater and shallow water locations of offshore rigs in determining what control technologies are available and economically feasible for new offshore rigs to adopt, and in determining the potential for adverse environmental impact. EPA therefore reasonably considered location in establishing the Rule's uniform standards for new offshore rigs.

2.    **EPA Rationally Determined that the Technology Behind
the Rule's Standards Is Technically Available and
Economically Feasible for All New Offshore Rigs to Adopt,
Regardless of Location.**

Section 316(b) does not compel EPA to regulate in a certain manner, i.e., by

a single, overarching regulation, by categories or classes of facilities, or on a case-

by-case basis.  See Riverkeeper I, 358 F.3d at 203; see also supra at Part I.B.

Rather, Congress gave EPA the discretion to determine how best to regulate intake

structures.  Here, EPA chose to regulate new offshore rigs under one uniform

regulation because the technology behind the regulation is technically available

and economically feasible for all new offshore rigs to adopt.  71 Fed. Reg. at

35,016/1, 35,019/1, 35,024-29; TDD at 7-24, 7-30, JA XX, XX.

Indeed, this Court has upheld EPA's decision to regulate uniformly based

on similar findings.  In Chemical Manufacturers, the petitioners challenged EPA's

decision to regulate the organics, chemicals, pesticides, and synthetic fibers

industries through one uniform standard.  870 F.2d at 210-11.  The  petitioners

argued that cold temperatures affect the biological treatment required by the

uniform guidelines, and therefore the plants located in the northern and middle

latitudes should be regulated in a subcategory subject to less stringent limitations.

Id.  This Court upheld EPA's decision to regulate uniformly based on EPA's

determination that the uniform limitations could be achieved across the industry

during all seasons, regardless of climate or plant location. Id. at 211-13. This Court also upheld EPA's decision not to subcategorize certain facilities based on "EPA's determination that such plants would not experience any uniquely burdensome costs that would make [the standard] unachievable with respect to them." Id. at 257.[44]

Likewise, this Court should uphold EPA's decision to adopt a uniform standard for new offshore rigs, regardless of location, because EPA determined that the Rule's limitations can be achieved across the industry. See 71 Fed. Reg. at 35,019/1, 35,027-29. In making this determination, EPA relied on a variety of sources to generate technical and economic data related to offshore rigs and their intake structures, such as EPA's 2003 industry-wide survey, comments on the Proposed Rule, and information from trade associations. Id. at 35,012/2-3; TDD at 7-10–7-19, JA XX-XX. From these sources, EPA identified the various intake structures employed by existing mobile and fixed offshore rigs in deepwaters (waters greater than 1,000 feet deep) and shallow waters (waters less than 1,000

---

[44] Compare with Nat'l Wildlife Fed'n, 286 F.3d at 566-67 (upholding EPA's decision not to establish categorical standard where such regulation was not technologically and economically achievable), and Tex. Oil, 161 F.3d at 940 (upholding EPA's decision to apply a more lenient standard to one particular facility because the compliance costs would be substantially higher for it than the rest of the subcategory's facilities).

feet deep),[45] identified the available impingement and entrainment control

technologies for these structures, and found six technologies that were superior to

others in terms of impingement and entrainment reliability, performance, and ease

of operation.[46]  71 Fed. Reg. at 35,025/1-2; TDD at 7-2–7-31, JA XX-XX.[47]

Additionally, EPA projected the general location and number of new

offshore rigs for the mobile and fixed rig categories.  EPA determined that there

will be growth in deepwater exploration and drilling in the Gulf of Mexico, both

in the mobile and fixed offshore rig categories.  EBA at B2-11, B2-21, JA XX,

XX.  For mobile rigs, EPA found that bottom-supported units (e.g., submersibles

and jackups) primarily operate in the shallow waters of the Gulf of Mexico,

whereas floating units (e.g., semi-submersibles and drill ships) primarily operate

_____

[45] The offshore rig industry classifies its wells as located in deepwaters or shallow waters, which are defined as waters greater than or less than 1,000 feet (or roughly 300 meters) deep, respectively.  TDD at 7-2, JA XX.  Accordingly, EPA used the same water-depth classifications for its technical analyses.

[46] For example, in its industry-wide survey, EPA categorized offshore rig information by location: Gulf of Mexico platforms (deepwater versus shallow water), California platforms, Alaska platforms, and mobile rigs.  TDD at 7-13, JA XX.

[47] The six chosen technologies are various types of wedge wire screens and velocity caps.  71 Fed. Reg. at 35,025/2.  Wedge wire screens are static grill or mesh screens that act as a physical barrier to fish entrainment, whereas velocity caps convert vertical flow into horizontal flow at the entrance of the intake.  TDD at 7-20, JA XX.

in deepwaters far from shore.  EBA at B2-2, JA XX.[48]  EPA also determined that

103 new mobile rigs, constructed over the next 20 years, will be subject to the

Rule.  71 Fed. Reg. at 35,025/3; EBA at B2-23, Table B2-9, JA XX.  For fixed

offshore rigs, EPA determined that the majority will operate in the deepwater

regions of the Gulf of Mexico.  EBA at B2-13, B2-21–B2-22, JA XX, XX-XX.

EPA further concluded that, while most new shallow water fixed rigs will not meet

the Rule's thresholds and thus will not be subject to the Rule, see EBA at B2-13,

JA XX, 21 new deepwater fixed rigs (20 in the Gulf of Mexico and one in

Alaska's Cook Inlet) will be subject to the Rule.  71 Fed. Reg. at 35,027/3; EBA

B2-23, Table B2-9, JA XX.

        In deciding whether its chosen control technologies represent the "best"

technologies "available" to new offshore rigs, EPA conducted an economic impact

analysis to determine whether the technologies will pose a barrier to entry and

whether they can be reasonably borne by the industry.  Specifically, EPA

conducted three economic analyses for both new mobile and fixed offshore rigs.[49]

---

[48] EPA received no comments regarding its reliance on existing offshore rig data to base its economic projections for new offshore rigs.  EBA at B2-19, JA XX.

[49]  EPA's mobile offshore rig economic impacts analyses included: (1) a rig-level closures analysis, which assessed estimated changes in the rig's cash flow and net income; (2) a rig-level barrier-to-entry analysis, which computed the present value of estimated start-up permitting costs; and (3) a firm-level cost-to-revenue analysis, which compared the annualized compliance costs for representative new

71 Fed. Reg. at 35,025-29. EPA determined that the Rule will not prevent any new mobile or fixed offshore rig from being constructed and put into operation or force any of them to close once operations begin. Id. at 35,027-29; EBA at B3-1–B3-17, JA XX-XX.

For example, EPA estimated that new deepwater fixed offshore rigs in the Gulf of Mexico will incur $306,323 in incremental compliance costs (initial permitting costs plus capital/installation costs), compared to construction costs ranging from $114 million to $2.3 billion, resulting in a ratio of incremental compliance costs to construction costs of 0.01% to 0.3%. 71 Fed. Reg. at 35,029/1. EPA also estimated that it will cost the new offshore rig industry annually, *as a whole*, $1.4 million in initial after-tax investment costs to comply with the Rule, compared to the industry's total annual revenue of $1.3 trillion. EBA at B3-15, Table B3-6, JA XX. Thus, the total annual cost-to-revenue ratio for the fixed offshore rig industry will be less than 0.001%—i.e., the Rule's annual compliance costs will equate to *less than one thousandth of 1%* of the industry's

---

mobile offshore rigs to the revenue of firms likely to construct such facilities over the next 20 years. 71 Fed. Reg. at 35,025-27. For fixed offshore rigs, EPA's economic impacts analysis included: (1) a production/shut-in analysis, which assessed the potential reduction in economic value and earlier production close-downs due to the costs of complying with the Rule; (2) a rig-level barrier-to-entry analysis; and (3) a firm-level cost-to-revenue analysis. Id. at 35,027-29.

113

total annual revenue.[50/]  Id.  EPA also found that, on average, the annual pre-tax and after-tax compliance costs per firm will be approximately $200,000 and $100,000, respectively, resulting in a cost-to-revenue ratio of 0.032% or less for all firms.[51/]  71 Fed. Reg. at 35,029/2-3.

In short, EPA's economic analyses demonstrate that the costs of complying with the Rule will not pose a barrier to entry for any new offshore rig and that the costs can be reasonably borne by the industry as a whole.  In fact, EPA found that some existing facilities already employ the technologies on which the Rule's standards are based.  71 Fed. Reg. at 35,016/1.  Neither ConocoPhillips nor any other commenter produced significant data showing that these existing

---

[50/] The annual cost-to-revenue for Anadarko's new fixed offshore rig operations will be 0.003% (pre-tax) and 0.002% (after-tax), while ConocoPhillips' will be less than 0.001% (both pre-tax and after-tax).  EBA at B3-15, Table B3-6, JA XX.

[51/] The economic impact analyses for new mobile offshore rigs also demonstrate that the Rule will not pose a barrier to entry and can be reasonably borne by the industry.  71 Fed. Reg. at 35,025-27.  EPA estimated that the incremental compliance costs will be $130,000 for semi-submersibles, $269,000 for jackups, and $261,000 for drill ships.  Id. at 35,027/1.  These costs represent a very small portion of the overall construction costs for these rigs, which average $285 million per semi-submersible, $130 million per jackup, and $385 million per drill ship.  Id. For example, EPA estimated that the incremental compliance costs for these rigs will range from 0.03% to 0.21% of their construction costs.  Id.  EPA also estimated that, for the 103 new mobile offshore rigs projected to be built over the next 20 years, it will cost the industry an annual total of $2.2 million in after-tax dollars to comply with the Rule, compared to the industry's total annual revenue of $12.2 billion.  EBA at B3-9, Table B3-3, JA XX.

114

technologies are too costly to adopt.  Indeed, ConocoPhillips did not challenge

EPA's economic findings in its opening brief.  Accordingly, EPA reasonably

concluded that a uniform regulation is appropriate for all new offshore rigs to

comply with because the technology behind the standard is technically available

and economically feasible for all rigs to adopt, and this Court should defer to

EPA's decision.  Chem. Mfrs., 870 F.2d at 211-13.

### 3. EPA Reasonably Determined that a Real Potential for Adverse Environmental Impact Exists in Both Deepwaters and Shallow Waters.

In the Phase III rulemaking, EPA was particularly concerned with the

potential for adverse environmental impact from offshore rig intake structures on

planktonic (free-floating) species.  71 Fed. Reg. at 35,013.  Fish species with

planktonic early life stages have high rates of entrainment because they are unable

to swim and thus cannot avoid being drawn into the intake flow.  Phase I EEA Ch.

11 at 11-16, JA XX.  In fact, planktonic fish species in estuaries and oceans

experience the highest rates of impingement and entrainment.  Id.  Also, there are

many marine species that rely on drifting planktonic life stages of their offspring

to increase their ability to disperse over a wide area, which helps to increase

survival rates for some species.  Id. at 11-14, JA XX.  EPA thus focused its

adverse environmental impact analysis on these planktonic species, and because

115

the majority of new offshore rig construction will take place in the Gulf of Mexico, EPA centered its analysis on that region. See 71 Fed. Reg. at 35,013.

Although EPA found no studies that directly examine or document offshore rig impingement and entrainment, EPA was able to use ichthyoplankton (planktonic egg and larval life stages of fish) density data from the ongoing SEAMAP study to examine the potential for impingement and entrainment. Id. This long-term sampling program collects information on fish egg and larvae density throughout the Gulf of Mexico. Id. The SEAMAP data shows that ichthyoplankton occur throughout the Gulf of Mexico, with spatial, temporal, and depth variations in average density. Id. The data also indicates that over 600 different fish taxa, including commercial and recreational utility species, live in the Gulf of Mexico. Id. EPA also relied on ichthyoplankton densities and other organism data from the areas surrounding offshore rigs off the coasts of California and Alaska; this data shows a number of fish and shellfish species that live and spawn in these regions. Id. Finally, EPA found that aquatic organisms are attracted to and concentrate in offshore rig underwater systems where intake structures are located. Id. Based on this data, EPA concluded that a real potential for adverse environmental impact exists from intake structures employed by new offshore rigs. Id. at 35,014/1.

116

For example, from the SEAMAP data, EPA determined that average ichthyoplankton densities are highest in the shallower waters and lowest in the deeper waters of the Gulf of Mexico. 71 Fed. Reg. at 35,013/2. In the shallower waters of the Gulf of Mexico, i.e., waters less than 150 meters deep where the majority of new mobile offshore rigs will locate,[52] average larval ichthyoplankton densities range from 100 organisms per 100 cubic meters ("org/100m³") to greater than 450 org/100m³. 71 Fed. Reg. at 35,013 n.3. In the deeper waters of the Gulf of Mexico, i.e., waters greater than 150 meters deep where new offshore fixed rigs will locate, average larval ichthyoplankton densities are relatively uniform at 25 to 100 org/100m³. Id.

EPA compared these Gulf of Mexico densities with those observed in coastal and inland waterbodies in the Phase I Rule, and determined that the Gulf of Mexico densities fall within the same range. Id. at 35,013/2-3, 35,019/1. Specifically, EPA compared the Gulf of Mexico densities, which range from as low as 25 org/100m³ to greater than 450 org/100m³, with densities from over 17 other studies,[53] which range from as low as 0 org/100m³ to as high as 2,460

---

[52] See supra at 110-11 and n.45.

[53] ConocoPhillips attempts to characterize EPA's comparison as based solely on three studies. See CP Br. at 39. However, those three studies are merely examples of the 17 studies EPA actually relied upon. See 71 Fed. Reg. at 35,013 n.4 (citing "Summary of Information on Ichthyoplankton Densities in Various

org/100m³.[54]  See RC 316(b)MFR302.008, JA XX.  Although ConocoPhillips may

view these ranges as too dissimilar for comparison, see CP Br. at 39, EPA's

biology experts concluded that, for purposes of determining the potential for

adverse environmental impact, they are comparable.  EPA's conclusion is

supported by the record, and this Court must give great deference to EPA's

scientific determinations.  Chem. Mfrs., 870 F.2d at 231 (rejecting contention that

EPA's analyses were unreliable because they allegedly contradicted industry

petitioners' analyses).

Regardless, EPA was concerned about *all* waterbodies that could be

potentially impacted by intake structures, not just those waterbodies with the

highest density ranges.  See RC 316(b)MFR.024.015, JA XX.  And contrary to

ConocoPhillips' assertion that EPA relied solely on the SEAMAP data, see CP Br.

---

Aquatic Ecosystems in the United States," DCN 8-5240).

[54] For example, the average larval density in Sooner Lake, Oklahoma, ranges
between 0 and 800 org/m³, and the minimum average larval density in the
Caloosahatchee Estuary in Florida is 10 org/100m³—a minimum average lower
than the minimum 25 org/100m³ for new offshore rigs.  See Eugene R. Gilliland,
Density and Distribution of Larval Fish in an Oklahoma Power Plant Cooling
Water Reservoir, in Proceedings of the Oklahoma Academy of Science 63:33-36
(1983), DCN 8-5242, JA XX-XX; R.H. Chamberlain, et al., Technical
Documentation to Support Development of Minimum Flows and Levels for the
Caloosahatchee River and Estuary, in Impacts of Freshwater Inflows on the
Distribution of Zooplankton and Ichthyoplankton in the Caloosahatchee Estuary,
Florida, Appendix C (2003), DCN 8-5248, JA XX-XX.

at 40-41, the record shows that EPA considered a compelling amount of additional corroborating information indicating a potential for adverse environmental impact. EPA found that the offshore areas in which these rigs will locate contain large numbers of fish, shellfish eggs, and larvae that drift with ambient currents and have minimal swimming ability. TDD at 7-30–7-31, JA XX-XX. Offshore rigs also provide important fish habitat—so much so that 70% of all fishing trips in the Gulf of Mexico head for offshore platforms, and 30% of the 15 million fish caught by recreational fishermen every year off the coasts of Texas and Louisiana come from the waters surrounding platforms. TDD at 7-31, JA XX. Additionally, offshore rigs have been shown to attract and concentrate adult and young organisms in the immediate vicinity of their underwater structures, often resulting in fish densities higher than those found in adjacent open waters. 71 Fed. Reg. at 35,013/3. In fact, five to 100 times more fish may concentrate near offshore rig platforms than in other habitats in the Gulf of Mexico. TDD at 7-30–7-31, JA XX-XX. And if a facility remains in one place for a sufficient length of time, some aquatic organism species may take up residence directly upon the underwater structure and form reef-like communities. 71 Fed. Reg. at 35,014/1. This increase in the number of organisms living near the underwater portion of

119

offshore rigs where intake structures are located increases the potential for impingement mortality and entrainment. Id.

Based on all of the aforementioned data, EPA concluded that a real potential for adverse environmental impact exists from intake structures employed by new offshore rigs, whether these rigs locate in shallow waters or deepwaters. See 71 Fed. Reg. at 35,014/1. Importantly, even though ConocoPhillips submitted comments concerning the lack of impingement and entrainment data for offshore rigs, neither ConocoPhillips nor any other commenter offered EPA additional data. As the First Circuit explained, when faced with an "admitted information shortage[,] EPA must make use of the information it has . . . [and need not] wait[] for the day when it might possess perfect information." BASF Wyandotte Corp. v. Costle ("BASF"), 598 F.2d 637, 652 (1st Cir. 1979). Here, EPA acquired and analyzed all of the information it could given the time restraints imposed by the consent decree. Had ConocoPhillips or any other source come forward with more information, EPA would have considered it. See id. at 653 (refusing to hear industry petitioners' complaint that EPA relied upon insufficient data and holding that EPA's conclusions based on limited data were reasonable). Furthermore, "it is within EPA's discretion to decide that in the wake of uncertainty, it would be better to give the values a conservative bent rather than err on the other side."

120

Am. Iron, 115 F.3d at 993; see also BASF, 598 F.2d at 652 ("[judicial] review of agency rulemaking is very limited, especially where [EPA] must overcome . . . scientific uncertainty in making its delegated discretionary decisions.").

Accordingly, EPA thoroughly analyzed all of the available data, which accounted for variations in aquatic life and densities between deepwaters and shallow waters. EPA reasonably concluded that the data shows a real potential for adverse environmental impact, regardless of where new offshore rigs may locate. EPA also determined that the technology behind the Rule's uniform standards is available and feasible for all rigs to adopt, whether they locate in deepwaters or shallow waters. Because EPA considered all of the relevant factors, took a hard look at the technical, economic, and scientific data, and drew a rational conclusion, EPA's decision to regulate all new offshore rigs under a uniform regulation is reasonable and must be upheld. See Tex. Oil, 161 F.3d at 933-34.

### C.    ConocoPhillips' Remand Request Lacks Merit.

ConocoPhillips petitions the Court to remand the Rule and instruct EPA to regulate new offshore rigs on a case-by-case basis, to exempt deepwater rigs, or to set an intake threshold of no less than 20 MGD for deepwater rigs. CP Br. at 41-47. This request is based not on the statute, record, or any relevant case law; rather, it is based solely on ConocoPhillips' preference as to when and how to

121

apply Section 316(b) to new offshore rigs.  In short, ConocoPhillips' argument

reflects its belief that uniform national standards are unwarranted unless the

environmental benefits from such regulation are similar for all facilities subject to

it and unless the benefits outweigh the costs of such regulation.  This position

merely reflects ConocoPhillips' disagreement with EPA on a policy level and is

therefore unavailing.

For example, ConocoPhillips contends that the ichthyoplankton density

levels in the deepwaters of the Gulf of Mexico show no "appreciable" risk of

adverse environmental impact, and thus there will be no "appreciable" benefit to

regulation in deepwaters.  CP Br. at 44.  While ConocoPhillips may believe that

the record shows no "appreciable" environmental impact or benefit, it has not

produced any evidence showing that there is *no* adverse environmental impact or

that the Rule will achieve *no* environmental benefit.  See BP Exploration, 66 F.3d

at 799-800 (rejecting offshore oil and gas industry argument that the

environmental benefits of EPA's zero discharge effluent limitation were negligible

where petitioners failed to show that the limitation "does not achieve any

additional environmental benefit").

Nor has ConocoPhillips presented *any* evidence to support its position that

new offshore rigs that locate in waters more than 100 meters deep will incur

"substantially" greater costs than those located in shallower waters due to the Rule's inspection and monitoring requirements. CP Br. at 44 n.30. EPA accounted for these costs in its economic analysis, which constitute a minor part of the total incremental compliance costs. See EBA B3-11, Table B3-4, B3-12, Table B3-5, JA XX, XX. Furthermore, whether new rigs locate in waters less than or greater than 100 meters deep, they likely will place their intake structures at the same water-depth (e.g., 20 to 100 feet deep). 71 Fed. Reg. at 35,016/1.

Finally, ConocoPhillips' rationale for setting the intake threshold at 20 MGD for deepwater rigs is itself arbitrary and capricious. Neither ConocoPhillips nor any other commenter suggested this approach during the rulemaking.[55] Also, EPA is unaware of any study comparing the environmental impacts of a 20+ MGD intake threshold versus a 2 MGD intake threshold for offshore rigs. See RC 316bMFR.032.036, JA XX. Furthermore, EPA found nothing in the record to justify a ten-fold increase in the proposed 2 MGD threshold. See RC 316bMFR.008.003, JA XX.[56]

---

[55] American Petroleum Institute ("API"), of which ConocoPhillips and Anadarko are members, suggested that the de minimis threshold for new offshore rigs should be set "at *no less than 25* MGD in *shallow water* and should exempt every facility in deep water." RC 316bMFR.032.036, JA XX.

[56] In fact, ConocoPhillips may be requesting the 20 MGD threshold for deepwater rigs simply because a significantly smaller number of those rigs would be subject to the Rule. For example, at a 20 MGD threshold, only two new fixed offshore

Regardless, the Court need not consider ConocoPhillips' alternative regulatory approaches. That EPA could have chosen other approaches says nothing about the reasonableness of the approach EPA selected. Tex. Oil, 161 F.3d at 934 ("If the agency's reasons and policy choices conform to minimal standards of rationality, then its actions are reasonable and must be upheld."). EPA rationally determined that the technologies required to meet the Rule's standards are available, in use at some existing offshore rigs, and economically feasible for all new offshore rigs to adopt. In short, EPA reasonably exercised its discretion in regulating new offshore rigs and, supported by the record, chose to issue one uniform, yet flexible, regulation that accommodates all of the various types of offshore rigs and their intake structures, regardless of location. This approach, consistent with the goals and policies of the CWA, is within EPA's discretion, and this Court should not substitute ConocoPhillips' judgment, any more than its own, for that of EPA. See id. at 933-34. Accordingly, this Court should uphold EPA's Phase III Rule for new offshore rigs in its entirety.

---

rigs would be subject to the Rule. See EBA at B2-23, Table B2-9, JA XX.

# **CONCLUSION**

For the foregoing reasons, all pending petitions should be denied and the

Phase III Rule should be upheld in its entirety.

Respectfully submitted,

RONALD J. TENPAS
Acting Assistant Attorney General

JOHN C. CRUDEN
Deputy Assistant Attorney General

_____
JESSICA O'DONNELL

_____
ROCHELLE L. RUSSELL

Of Counsel:                           Environmental Defense Section

ROBERT STACHOWIAK               Environment & Natural Resources Div.
Office of General Counsel        United States Department of Justice
United States Environmental      P.O. Box 23986
Protection Agency                Washington, DC  20026-3986
1200 Pennsylvania Ave., N.W.     (202) 305-0851
Washington, D.C. 20460           *Counsel for Respondents*
_____
Dated: July 13, 2007

125

## CERTIFICATE OF COMPLIANCE

Pursuant to 5th Cir. R. 32.3, I hereby certify the following certificate of compliance as to the type-volume limitations, typeface requirements, and type style requirements of Fed. R. App. P. 32(a) and 5th Cir. R. 32:

1.     This consolidated brief contains 27,954 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).  I have submitted herewith a motion to file this over-length brief.

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Word Perfect 12 in 14-point Times New Roman font.

Dated:        July 13, 2007              _____

                                          Rochelle L. Russell
                                          Counsel for Respondents

# CERTIFICATE OF SERVICE

I hereby certify that on July 13, 2007, I caused two true and correct copies of the foregoing BRIEF FOR RESPONDENTS and separate ADDENDUM TO BRIEF FOR RESPONDENTS to be served by electronic and U.S. Mail on the following counsel:

Reed W. Super
Environmental Law Clinic
Morning Heights Legal Services, Inc.
Columbia University School of Law
435 West 116th Street
New York, NY  10027
Email: rsuper@law.columbia.edu
*Counsel for Petitioners Riverkeeper,*
*Inc., et al.*

Charles C. Caldart
National Environmental Law Center
3240 Eastlake Ave East, Suite 100
Seattle, WA 98102
Email: cccnelc@aol.com
*Counsel for Petitioner Environment*
*Massachusetts, Inc.*

Jackson Battle
Brown McCarroll, L.L.P.
111 Congress Avenue
Suite 1400
Austin, TX 78701
Email: JBattle@mailbmc.com
*Counsel for Petitioners*
*ConocoPhillips, et al.*

Fredric P. Andes
David T. Ballard
Barnes & Thornburgh LLP
Suite 4400
One North Wacker Drive
Chicago IL 60606-2833
Email: David.Ballard@BTLaw.com
*Counsel for American Petroleum*
*Institute, Respondent-Intervenor*

Russell S. Frye
FryeLaw PLLC
1101 30th Street, N.W.  Suite 220
Washington, DC  20007-3769
Email: rfrye@fryelaw.com
*Counsel for Cooling Water Intake*
*Structure Coalition, Respondent-*
*Intervenor*

 

 

_____
Jessica O'Donnell
Counsel for Respondents

THE ENVIRONMENTAL LAW CLINIC
MORNINGSIDE HEIGHTS LEGAL SERVICES, INC.
COLUMBIA UNIVERSITY SCHOOL OF LAW
435 WEST 116TH STREET • NEW YORK, NY 10027

TEL: 212-854-4376                                           Fax: 212-854-3554
RLLOYD@LAW.COLUMBIA.EDU

October 2, 2007

**VIA FEDERAL EXPRESS**

The Honorable P. Kevin Castel
United States District Judge
United States Courthouse
500 Pearl Street, Room 2260
New York, New York 10007-1312

Re: *Riverkeeper, Inc., et al. v. EPA*, 06 Civ. 12987 (PKC)

Dear Judge Castel:

I am the lead counsel for the plaintiffs in the above-entitled matter, and am writing regarding two matters referenced in Your Honor's Memorandum and Order denying defendants' motion to dismiss and the September 28, 2007 amendment thereto, certifying the jurisdictional question for appeal.

First, we wish to update you with respect to the status of the petitions filed in the Court of Appeals seeking review of the same agency action that is challenged herein. The petitions remain pending in the Fifth Circuit but that court has not yet addressed the question of jurisdiction.[1] Briefing on both jurisdiction and the merits is underway; the matter has not yet been assigned to a merits panel, and presumably will not be so assigned until after all briefing has concluded. There are three more briefs yet to be filed, to be followed by a joint deferred appendix and then final form briefs. In light of this Court's recent ruling that it has jurisdiction, we now intend to file a motion with the Fifth Circuit to stay those proceedings pending a determination by the Second Circuit of the jurisdictional issue on appeal. A motion to stay that case was not previously filed because, as I explained in my March 8, 2007 declaration in opposition to EPA's motion to dismiss, plaintiffs intended to file a motion with the Second Circuit to stay proceedings *if* the petitions were transferred; otherwise, plaintiffs intended to present the same jurisdictional arguments to the Fifth Circuit that they raised in this Court. See Declaration of Reed W. Super in Opposition to Defendants' Motion to Dismiss the Amended Complaint, filed March 8, 2007, at ¶¶ 2, 3. Consistent with those stated intentions, because the motion to transfer was denied plaintiffs/petitioners made their jurisdictional arguments in their Fifth Circuit briefs. However, to avoid simultaneous review of the merits by two different

---

[1] By order dated March 22, 2007, the Fifth Circuit denied the motion to transfer to the Second Circuit. Six days later, on March 28, 2007, the intervenor in this case informed this Court that the motion to transfer was denied. See Intervenor's Reply Memorandum in Support of Defendants' Motion to Dismiss at 3, n.3.

The Honorable P. Kevin Castel
October 2, 2007
Page 2

courts, we believe that a stay of the Environmental Petitioners' petitions in the Fifth Circuit is now appropriate until the Second Circuit has ruled on jurisdiction.

Second, with respect to the relationship of this case to the Cronin v. Browner case (currently captioned as Riverkeeper v. Johnson) 93 Civ. 0314 (LTS), plaintiffs contend that the parties who are plaintiffs in both that case and this case have not surrendered the right to seek regulations implementing section 316(b) for existing Phase III facilities, and that this case is not subsumed within that case. Plaintiffs would be happy to submit briefing on both of those points, if and to the extent that defendants may disagree. However, plaintiffs believe that judicial economy would be best served if the parties could first discuss these matters before burdening the Court with any further briefing.

Sincerely,

R. SUPER /sck

Reed Super
Counsel for Plaintiffs
email: rsuper@law.columbia.edu
phone: 646-345-9658

cc (by Federal Express):
    Wendy H. Waszmer, Assistant US Attorney, Counsel for Defendants
    Russell S. Frye, Counsel for Intervenors